```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF INDIANA
 2    INDIANAPOLIS DIVISION
      CASE NO. 1:15-cv-01712-TWP-DML
 3
 4
      BILLIE THOMPSON, as Personal   )
 5    Representative of the ESTATE OF )
      DUSTY HEISHMAN,                )
 6                                   )
            Plaintiff,   )
 7                       )
          vs.            )
 8                       )
      CITY OF INDIANAPOLIS,          )
 9    INDIANAPOLIS METROPOLITAN POLICE)
      DEPARTMENT, OFFICER BRIAN      )
10    BURNETT, in his individual and )
      official capacities, OFFICER   )
11    DONALD SPIEGL, in his individual)
      and official capacities, OFFICER)
12    WILLIAM BUECKERS, in his       )
      individual and official        )
13    capacities, PARK RANGER PHILLIP )
      GREENE, in his individual and  )
14    official capacities, MARION    )
      COUNTY SHERIFF'S DEPARTMENT,   )
15    DEPUTY BILLY JOHNSON, in his   )
      individual and official        )
16    capacities, HEALTH AND HOSPITAL )
      CORPORATION OF MARION COUNTY,  )
17    MEDIC LANCE COPE, in his       )
      individual and official        )
18    capacities, MARK BRITTON, and  )
      WILLIAM PATTERSON,             )
19                                   )
            Defendants.  )
20
21
22          DEPOSITION OF LANCE COPE
23
24
25
```

Page 5

```
 1              LANCE COPE,
 2   having been first duly sworn to tell the truth, the
 3   whole truth and nothing but the truth relating to
 4   said matter, was examined and testified as follows:
 5
 6   DIRECT EXAMINATION,
 7       QUESTIONS BY MR. SCOTT L. BARNHART:
 8   Q   Good morning, sir.
 9   A   Good morning.
10   Q   My name is Scott Barnhart. I represent the
11       plaintiff in this matter. Please state your
12       name and spell your last name for the record.
13   A   Lance Cope. Last name is spelled C-O-P-E.
14   Q   Have you ever been deposed before?
15   A   No.
16   Q   You understand what a deposition is?
17   A   Yes.
18   Q   I'm going to go over some ground rules. I'm
19       sure they've been covered before. Everything is
20       being written down, so I ask that you answer out
21       loud; okay?
22   A   Okay.
23   Q   She can't record head nods or shakes or anything
24       like that, so we need to verbally answer the
25       questions. I'll presume if I ask a question
```

Page 6

```
 1       that you both understood it and you heard it.
 2       If you didn't understand it, I can rephrase it
 3       or I can clarify. I just ask that you ask me to
 4       do so; is that fair?
 5   A   Yes.
 6   Q   I'll presume that if you answer a question, that
 7       you've heard it and understood it; is that fair?
 8   A   Yes.
 9   Q   If you need a break for any reason, that's
10       absolutely fine, we've had a lot of coffee this
11       morning, so we'll probably take one, but if you
12       need one, just let us know, but I would ask that
13       you answer the pending question; okay?
14   A   Okay.
15   Q   Are you currently under the effects of any
16       alcohol, drugs or prescribed medication?
17   A   No.
18   Q   Is there anything that would affect your memory
19       here today?
20   A   Time.
21   Q   That's a good answer. In anticipation of this
22       deposition, what did you do to prepare?
23   A   I met with Mary. I reviewed the run report.
24   Q   Anything else?
25   A   And reviewed the statement I gave to the IMPD
```

Page 7

```
 1       officer.
 2   Q   Other than counsel, have you spoken to anybody
 3       about this matter we're here today to discuss?
 4   A   No.
 5   Q   How old are you, sir?
 6   A   38.
 7   Q   And what's your educational background?
 8   A   I have an undergraduate degree from Indiana
 9       State University in communications. I have a
10       master's in business from Indiana Wesleyan
11       University. I have a EMT certificate from St.
12       Vincent Hospital. I have my paramedic education
13       from St. Francis Hospital in Indianapolis, and
14       associate's of nursing from Ivy Tech.
15   Q   Where did you go to high school?
16   A   Franklin Community High School.
17   Q   Is that Franklin, Indiana?
18   A   It's 20 miles south of Indianapolis.
19   Q   Okay. Do you have any law enforcement training?
20   A   No.
21   Q   Do you have any military experience?
22   A   No.
23   Q   Who's your current employer?
24   A   St. Francis Hospital.
25   Q   How long have you been working for them?
```

1 A Roughly, about a year and a half.
2 Q Who did you work for before St. Francis?
3 A Indianapolis EMS.
4 Q How long had you worked for them?
5 A Between four and five years.
6 Q What caused you to move from Indianapolis EMS to
7   St. Francis?
8 A I was pursuing a degree in nursing. Once I
9   completed that, I changed fields.
10 Q You weren't terminated by Indianapolis EMS?
11 A No.
12 Q Prior to working for Indianapolis EMS, who did
13   you work for?
14 A I worked for Rural Metro Ambulance.
15 Q And what did you do for them?
16 A I worked as an EMT.
17 Q How long did you work for them?
18 A For two years.
19 Q And before that?
20 A Before that, I worked at Navigant Consulting.
21 Q What kind of work did you do for them?
22 A We did work for the State, consulting work for
23   the State; specifically, IDEM, Indiana
24   Department of Environmental Management.
25 Q In your capacity at Indianapolis EMS, what were

1   your responsibilities?
2 A So at EMS, I was a paramedic, and primary
3   responsibilities as a paramedic, respond to
4   emergency calls, make patient contact, treat
5   patients, take them to the hospital, provide
6   care as needed.
7 Q Okay. So were you assigned to a vehicle?
8 A Yes.
9 Q Okay. How many people are assigned to a vehicle
10   typically?
11 A Typically, there's two people assigned to a
12   vehicle.
13 Q And driver and then the person in the back, or
14   how does it work?
15 A Typically, it's an EMT and paramedic.
16 Q Okay. Is the driver an EMT paramedic as well?
17 A No, not necessarily. I could be the driver
18   sometimes.
19 Q Okay.
20 A An EMT is basic life support provider.
21   Paramedic is advanced life support provider.
22   Depending on the nature of the call determines
23   who would drive and who would be in the back
24   with the patient.
25 Q Paramedics have more training than an EMT?

1 A Yes.
2 Q And your role was primarily as a paramedic?
3 A Yes.
4 Q Did you ever drive?
5 A For this call or ever?
6 Q Ever?
7 A Sure.
8 Q And did you ever drive for Indianapolis EMS?
9 A Did I ever drive for --
10 Q When you were assigned a particular shift, how
11   often -- what's the time period that you would
12   work?
13 A I would work from 7:00 to -- let's see, I'm
14   trying to think. I'm getting my schedule
15   confused with one now, 7 to 7, 7 PM to 7 AM.
16 Q And when you were assigned to a shift, do you
17   know who determines whether you're going to be
18   driving or not?
19 A It's determined on your relationship with your
20   partner as far as driving to the call. Driving
21   from the call is totally different. It depends
22   on what -- the acuity of the patient, what the
23   acuity of the patient is.
24 Q And how many partners did you have in your time
25   period with Indianapolis EMS?

1 A Permanent partners or --
2 Q Start with permanent partners.
3 A Okay. Permanent, two.
4 Q Who were they?
5 A Josue Ceballos and Doris Gilbert.
6 Q How often did you work with Mr. Ceballos?
7 A I believe we worked together for about three
8   years, and that's a rough estimate.
9 Q So in October -- do you recall the run --
10 A Yes.
11 Q -- that we're here for today? Was he your
12   partner around that time?
13 A Yes.
14 Q Okay. And how long had he been your partner at
15   that time, so how long had you been working with
16   him prior to --
17 A Probably over two years.
18 Q Okay. So you're familiar with him?
19 A Yes.
20 Q What's his training and background; do you know?
21 A I know his training is -- I believe he had an
22   associate's degree from Ivy Tech in fire science
23   and also he received EMT training, and I'm not
24   sure where he received that training from.
25 Q Okay. Was he an EMT and a paramedic or just an

1  EMT.
2  A  He's just an EMT.
3  Q  Okay.
4  A  EMT basic is the correct term, I guess.
5  Q  Do you recall any other runs that you made that
6     day?
7  A  No.
8  Q  Okay. Do you recall whether you made any other
9     runs that day?
10 A  None that stand out. I'm sure in a 12-hour
11    period, we definitely did.
12 Q  What do you recall about this run?
13 A  We were at our station, Station 29. We were
14    dispatched out for an animal bite to Iowa and
15    East Street. When we arrived -- it's a very
16    short distance from the fire station, but when
17    we arrived, the -- there was a gentleman there
18    that was brought up by a police officer and
19    complaining of being bit and also complaining of
20    having a broken nose.
21 Q  Do you recall his name?
22 A  No, I don't.
23 Q  What happened after that?
24 A  He was -- he kept asking us to straighten his
25    nose. We told him no, we don't straighten your

1     nose. We'll take you to a hospital and have a
2     doctor evaluate you. We didn't really talk to
3     him too long because -- I didn't talk to him
4     very long because another police officer came up
5     to us and said hey, can you come over and check
6     on somebody for us?
7  Q  Do you recall who that officer was?
8  A  I don't recall who that officer was.
9  Q  Do you recall what color his uniform was?
10 A  I would assume the standard issue, which is the
11    dark blue, but honestly, I would be totally
12    guessing.
13 Q  Okay. Let me back up a little bit. You were at
14    Station 29 --
15 A  Uh-huh.
16 Q  -- Firehouse; is that correct?
17 A  Yes.
18 Q  Okay. Is that where you would normally start
19    your shifts out?
20 A  Yes.
21 Q  And would you always -- so when you started your
22    shift out, you go to the station house and you
23    go on runs?
24 A  Yes.
25 Q  Okay. And you said you didn't go far from the

1     station house. How long of a drive was it?
2  A  I don't know the actual -- mileage, I would
3     estimate half a mile.
4  Q  Okay.
5  A  Not much further than that.
6  Q  Did you have lights and sirens on?
7  A  Yes.
8  Q  Who drove?
9  A  Josue Ceballos.
10 Q  And did he stay in the vehicle, or did he get
11    out as well, or do you know?
12 A  He got out.
13 Q  When you got out of the vehicle -- I assume
14    you're riding in the cab; is that right?
15 A  Sitting in the front.
16 Q  So when you go out, you're riding up front?
17 A  Correct.
18 Q  And when you get out, who did you see? What's
19    the first thing you did once you got out?
20 A  We were met by an IMPD officer and the patient
21    with a broken nose.
22 Q  Okay.
23 A  So that's the first thing we did, was have that
24    conversation with him.
25 Q  Okay. And then what did you do next?

1  A  Well, after I was requested by law enforcement
2     to come over and check on another patient they
3     had, I went over there. My partner stayed with
4     the gentleman with the broken nose.
5  Q  You refer to the term "patient," why do you
6     refer to them as a patient?
7  A  Refer to --
8  Q  The next individual that you?
9  A  Because I typically only deal with patients.
10 Q  And do you recall who that individual was?
11 A  Well, I later learned his name to be Dusty.
12 Q  Okay. And so from where you were, when you were
13    interacting with the law enforcement officer and
14    the individual with the nose issue, how far away
15    was the other individual; do you know where they
16    were located?
17 A  They were in the street. I don't have an exact
18    number, 20 feet maybe.
19 Q  How many people were around?
20 A  There was quite a few people. I think I've said
21    before at least about five officers. I
22    definitely didn't count.
23 Q  Were there any civilians around?
24 A  Yeah, there was a lot of whatever you want to
25    call them, bystanders, civilians. There's a bar

```
 1    nearby.
 2 Q  Did those bystanders or civilians appear to come
 3    from the bar?
 4 A  I can't speak to that.
 5 Q  Approximately, how many bystanders were there;
 6    do you have any idea?
 7 A  I don't know how many there were.
 8 Q  Other than the bar, were there any other
 9    establishments around?
10 A  I can't recall.
11 Q  Do you know the name of the bar?
12 A  No.
13 Q  And what time of day was this?
14 A  I believe it was somewhere between 7 and 8.
15    Probably closer to 8.
16 Q  So did your partner go with you to Mr. Heishman
17    or is it just you?
18 A  Initially, it was just me.
19 Q  Okay.
20 A  He stayed back with the man with the broken
21    nose.
22 Q  Okay. So once you go over there, what happens
23    after that?
24 A  So I see him, Dusty on the ground. He is prone,
25    so face down. He is -- law enforcement was
```

```
 1    trying to restrain him and he's fighting against
 2    them.
 3 Q  Was he handcuffed?
 4 A  He was handcuffed.
 5 Q  Were his legs shackled?
 6 A  Yes.
 7 Q  How was he fighting against them?
 8 A  Just trying -- it appeared that he was trying to
 9    get up, even though they were trying to subdue
10    him.
11 Q  And how many officers were around him?
12 A  I would guess five.
13 Q  What were those officers doing?
14 A  Trying to hold him down to get control of him.
15 Q  Were they saying anything to him?
16 A  I don't recall them saying anything
17    specifically.
18 Q  Was he saying anything to the officers?
19 A  I don't recall him actually saying any words,
20    but it was more of just like moans and groans of
21    the struggle that was going on, and the grunts.
22 Q  What did you do next?
23 A  So I assessed him. He a pulse. He was
24    breathing. It appeared that he was under the
25    influence of something in the -- it was just a
```

```
 1    brief rundown of the history that I got about
 2    what had taken place before that caused the
 3    police to be there with him.
 4 Q  Did you have any idea what he was under the
 5    influence of?
 6 A  No. I mean, without a lab, no, but with his
 7    presentation, I was guessing some type of
 8    amphetamines.
 9 Q  Anything else that you thought he was on?
10 A  No. At that point it was really -- I really
11    wasn't sure what else he was on.
12 Q  Was he prone when you were doing your
13    assessment?
14 A  He was prone.
15 Q  Did you try to speak with him?
16 A  I did ask him if he was okay? He did not say
17    anything to me. He just kept fighting against
18    the officers.
19 Q  When you say "fighting against the officers,"
20    can you describe what you mean by that?
21 A  Sure. I'll do my best. I guess what I mean is
22    struggling against the officers as far as not
23    allowing himself to be handcuffed. It was
24    clear -- if we would have rolled him over, I,
25    personally, believe he would have been trying to
```

```
 1    kick us, do anything he could to get up and run
 2    even with shackles on -- I don't know that for
 3    sure, but he was not compliant with anyone.
 4 Q  What clothing was he wearing?
 5 A  I don't recall exactly any clothing being on
 6    him. I believe he was totally naked.
 7 Q  Did you see any -- you said you assessed him; is
 8    that right?
 9 A  Yeah.
10 Q  When you're assessing somebody, what do you do?
11 A  Well, the first things you focus on are the
12    ABC's, airway, breathing, circulation. Airway
13    was intact. He was breathing. Circulation
14    wise, yes, he did have a pulse. Tried to
15    determine his level of consciousness. He was
16    awake, enough to fight them.
17       Without being -- without having any kind
18    of -- without speaking to us or answering --
19    complying, it appeared that he was somewhat
20    confused, and from there, it's hard to do any
21    other assessment, like, take a blood pressure
22    when somebody's fighting against you.
23 Q  Did you look at his head to see if he had any
24    head trauma?
25 A  I looked at the back of his head, but it was
```

Page 20

1 hard to totally see his face because he was face
2 down and it didn't appear that there was any
3 head trauma.
4 Q What was the lighting like when you were
5 assessing him?
6 A It was right there like around dusk, so the sun
7 is going down. It's not the best lighting.
8 Q So he never actually said anything to you, he
9 was just making noises?
10 A Correct.
11 Q Okay. What were the officers doing when you
12 were making your assessment?
13 A They were still just trying to hold him down and
14 gain control of him.
15 Q And what did you do after you made your
16 assessment?
17 A Well, it appeared to be that he needed to be
18 chemically restrained for his safety, for our
19 safety, because we wouldn't be able to transport
20 him to the hospital in that condition. So I
21 gave him 10 milligrams of Versed IM,
22 intramuscular.
23 Q Okay. Were you in communication with the
24 hospital?
25 A At that direct point in time?

Page 21

1 Q Uh-huh.
2 A No.
3 Q Had you spoken to a doctor prior to giving him
4 Versed?
5 A No, I had not spoken with a doctor.
6 Q Had you spoken with anybody about him prior to
7 giving Versed other than the people on the
8 scene?
9 A So I had spoken to somebody that was not --
10 Q The hospital, the medical staff, anything?
11 A No. I follow the Marion County protocols.
12 Q What are those protocols?
13 A For chemical restraint, when somebody appears to
14 be under the -- they can be under the influence
15 of any kind of drugs or it could be a
16 psychiatric condition, anything that -- where
17 this person needs medical care but you can't
18 provide that care without injury to yourself or
19 injury to them, we have a protocol of giving
20 them 10 milligrams of Versed.
21 Q Were you injured by Mr. Heishman?
22 A No, I was not.
23 Q Was there anybody that you're aware of that was
24 injured by him?
25 A I believe the initial gentleman that approached

Page 22

1 us, the law enforcement officer, when we arrived
2 on scene, I believe that's how he sustained a
3 broken nose, however, he didn't stick around for
4 EMS to fully evaluate him.
5 I know when I left to go see Dusty, my
6 partner told me that he -- this gentleman got
7 upset because we wouldn't straighten his nose
8 and left.
9 Q You said you believed that he -- Mr. Heishman
10 caused his injury; is that right, the nose
11 issue?
12 A From what -- that's what the gentleman that --
13 when we initially got there?
14 Q Yeah.
15 A I don't know his name, the man with the broken
16 nose, I believe that's that's how -- I believe
17 that's how he said he got the broken nose, was
18 from Dusty.
19 Q All right. Anybody else that you're aware of
20 that had any injuries from Dusty?
21 A Not that I'm aware of.
22 Q So you don't make any calls to the hospital,
23 you're following Marion County protocols for the
24 administration of Versed; right?
25 A Correct.

Page 23

1 Q And you make that determination?
2 A Correct.
3 Q Where did you apply it?
4 A Left deltoid.
5 Q And he was still on the ground?
6 A Correct.
7 Q He had not changed positions?
8 A No, not yet. It wasn't safe to.
9 Q How far away was he from your vehicle?
10 A Around 20 feet. That's a rough estimate on my
11 part.
12 Q Okay. Had you taken his blood pressure prior to
13 that point?
14 A No. He wasn't able to -- the blood pressure was
15 not able to be obtained on him due to his
16 condition.
17 Q Did you try?
18 A No.
19 Q Do you know -- and you don't know what was in
20 his system; is that right, any drugs?
21 A I don't know.
22 Q You presume that he was on something?
23 A Correct.
24 Q Okay. That he was intoxicated?
25 A I don't know about intoxicated.

Page 24

1 Q Okay. Did you smell alcohol?
2 A I did not smell alcohol.
3 Q Were you looking for alcohol?
4 A I try to look for any signs or symptoms of
5   alcohol or drug ingestion.
6 Q So he was noncooperative?
7 A Correct.
8 Q But you -- you didn't think that he was
9   intoxicated?
10 A I didn't know for sure if he was intoxicated.
11 Q Okay.
12 A It appeared to be more -- being intoxicated due
13   to his presentation, being hyperaggressive,
14   being tachycardic, being totally naked.
15 Q Tachycardic, what --
16 A A very high heart rate.
17 Q Did you get his pulse?
18 A Yes.
19 Q And do you recall what it was?
20 A I believe in the area of 120. I'd have to look
21   at my run report.
22 Q And is there a pulse where you start getting
23   concerned?
24 A Well, sure. I mean, for this particular patient
25   or any patient?

Page 25

1 Q I would say, in general?
2 A 60 to 100 is normal. Anything below or above,
3   you would definitely want to look into that.
4 Q Okay. What did he do after you administered the
5   Versed to his left deltoid?
6 A I'd say around a minute, two minutes or so, he
7   was pretty still and subdued, or still
8   breathing. We rolled him over onto his back and
9   picked him up. We had the stretcher there,
10   picked him up and placed him supine on his back
11   on the stretcher.
12 Q So you were at the same location?
13 A Uh-huh.
14 Q And you said he was still breathing, how did you
15   know that?
16 A I could -- I mean, I could see his chest rise
17   and fall.
18 Q Other than watching his chest, did you have any
19   indication of monitoring for respiratory issues?
20 A Did I have --
21 Q Did you have any machines with you?
22 A No, not right there at the -- not right there
23   beside him.
24 Q Did you have your bag with you?
25 A Yes.

Page 26

1 Q What's in your bag.
2 A Bag, we have oxygen, intubation kit, IV
3   supplies, blood pressure cuff, stethoscope.
4 Q Is there a reason why you picked the left
5   deltoid instead of the right?
6 A I believe that was the easiest one to get to,
7   the one that was most accessible.
8 Q Is there other protocols for where the Versed
9   should be administered?
10 A On specific parts of the body, no, it doesn't
11   specify that. It says you can give it IV, which
12   there was no way we could get an IV on him, IM,
13   intramuscular, or intranasal. Those are the
14   three options we have.
15 Q Do you know whether any of those three options,
16   whether there's a preferred option?
17 A Really, it's tailored to the patient. IM, I
18   felt, was the best route at that time. It would
19   be dangerous and reckless for me to try and
20   attempt an IV on him. Intranasal, in my
21   experience, you do have to have some cooperation
22   with them, and trying to put something in
23   somebody's nose, who's fighting against you,
24   wouldn't have been the best route.
25 Q So at the time it was administered, he was

Page 27

1   shackled and he was handcuffed; correct?
2 A Correct.
3 Q Okay. And you wait a minute to 2 minutes after
4   you administer it? You step back and watch?
5   What do you do?
6 A Well, I am waiting for him to calm down, to be
7   subdued so we can actually start getting him
8   loaded into the ambulance -- put him on the
9   stretcher and getting him into the ambulance,
10   and then, obviously, we're trying to monitor his
11   breathing.
12 Q Okay. And are you looking for anything else?
13 A As in?
14 Q Your assessment after you've administered the
15   Versed, what are you looking for?
16 A Do you mean the reason why we give Versed?
17 Q No, no. I'm talking about after you administer
18   the drug, what factors or indications are you
19   looking at within the patient about his reaction
20   to that particular drug?
21 A The biggest thing is breathing.
22 Q Okay.
23 A We want to monitor his pulse also, and then his
24   level of consciousness.
25 Q Okay. And why did you choose to administer

1  Versed to Dusty Heishman at that time?
2  A  Because he was a danger to himself and to others
3     and we -- there's absolutely 100 percent no way
4     we could have taken him to the hospital without
5     having him restrained. And chemical restraint
6     is better than the physical restraint. There
7     are problems inherent with prolonged physical
8     restraint, and that's another reason why we have
9     a chemical restraint protocol.
10 Q  How long after you saw him did you decide to
11    administer the Versed?
12 A  I'd have to look at the run report for the
13    actual times.
14 Q  Okay. Did you ever consider waiting to see if
15    he would tire out?
16 A  No. In cases like that, with -- that appear to
17    be excited delirium, they will eventually tire
18    out, and that tire out means cardiac arrest. So
19    getting them subdued, giving them a sedative
20    would be the first line treatment.
21 Q  Okay. Did you have any concerns that the
22    sedatives or Versed would interact with what was
23    in his system?
24 A  Sure. I mean, you never totally know what's in
25    somebody's system. That's why you'd have to

1     continue to monitor them. Being on
2     potentially -- in my mind, I thought he was on
3     some type of amphetamine just based on his
4     presentation.
5        I just know that that's -- just from
6     training from protocols, just education,
7     benzodiazepine is something you would give to a
8     patient who appears in an excited delirium.
9  Q  What does the term "excited delirium" mean to
10    you?
11 A  To me, it means basically a episode where you
12    are in this stage where you're confused,
13    somewhat delirious, hyperthermic, so your
14    temperature greatly increases. You're
15    tachycardic. You have hyper aggression.
16       Dusty being naked on the ground and just
17    the brief history I got on what kind of led up
18    to that, along with his vital signs, tended to
19    point more toward an excited delirium.
20 Q  Did you observe any injuries that he had to his
21    body?
22 A  Once we got him onto the stretcher and into the
23    ambulance, I know he the probes from the taser,
24    I believe chest and abdomen.
25 Q  Was that one probe in his chest and one probe in

1     his abdomen, or are there --
2  A  Correct.
3  Q  Were those left in?
4  A  Once we got him in the ambulance, no, we pulled
5     those out.
6  Q  So they were left -- they were in his chest and
7     his abdomen when he was prone down on the
8     ground?
9  A  Yes.
10 Q  Do you know whether -- did you pull them out?
11 A  I'm not sure. It was either myself or my
12    partner. I don't recall. Somebody in the
13    ambulance did. I can't remember specifically
14    who pulled the actual probes out.
15 Q  Did you see whether they were embedded into the
16    skin?
17 A  Did I see where?
18 Q  Did you see whether they were or not?
19 A  Yes, they were.
20 Q  Okay. Do you know whether they were
21    superficial, they were in deep, do you have any
22    idea?
23 A  I don't have any idea.
24 Q  When you were -- so I'm going to back up a
25    little bit. When he's on the ground after you

1     administer the drug, did you tell the officers
2     that were around that you were going to do that?
3  A  Yes.
4  Q  What was your communications with them?
5  A  I just told them that he needed to be chemically
6     restrained so we could take him to the hospital.
7  Q  Do you recall any response?
8  A  I don't recall any specific response.
9  Q  Did you use the term "chemically restrained?"
10 A  Yes.
11 Q  And at that point they were still touching him?
12 A  Yes.
13 Q  Okay. And you said it was about five officers?
14 A  A rough estimate, yes.
15 Q  Okay. And you don't recall them saying anything
16    to you?
17 A  About?
18 Q  So after you administer it, you're waiting on
19    the drug to take effect, presumably?
20 A  Uh-huh.
21 Q  Is that a yes?
22 A  Yes.
23 Q  I'm going to catch you from time to time. It
24    happens.
25 A  Okay.

Page 32

1  Q  And, so, at that point, what are the officers
2     doing?
3  A  They're still holding him, waiting for him to
4     stop fighting them. Once he stops fighting,
5     then that's when I direct everybody to roll him
6     on his back and then put him on the stretcher.
7  Q  And was the stretcher nearby?
8  A  It was right next to him.
9  Q  Did you bring the stretcher out when you went
10    over to him?
11 A  I believe somebody brought the stretcher out for
12    us. Typically, we had somebody else. Our
13    district lieutenant, I believe, was there at
14    some point, Doug Lackey. I'm not sure if he's
15    the one that brought it out or not. I do know
16    somebody brought the stretcher up for us.
17 Q  Why was Doug Lackey there?
18 A  He got called there once -- so we had two
19    patients. We called for backup, for another
20    ambulance for the guy with a broken nose. And
21    then I -- I'm not sure when Doug arrived
22    exactly, but eventually, when this changed to
23    cardiac arrest, we asked for more manpower, and
24    that's when the fire department came, and I'm
25    not sure what time he arrived, Doug arrived on

Page 33

1     scene.
2  Q  Okay. When did it change to cardiac arrest?
3  A  Once we got him on the way to the ambulance
4     which was roughly 20 feet -- you know, we're
5     wheeling him and trying to watch for the chest
6     rise and fall. It appeared that -- it looked
7     like it had stopped, and as soon as we put him
8     into the ambulance and checked for a pulse,
9     that's when we knew he was in cardiac arrest.
10 Q  You said "it looked like it had stopped," what
11    do you mean?
12 A  It looked like his chest was not rising and
13    falling.
14 Q  Okay. When did you observe that?
15 A  As we're pushing him on the stretcher to the
16    ambulance.
17 Q  And what did you do in response to that?
18 A  We pulled the barbs out so we could start CPR.
19 Q  And CPR was initiated before you got to the
20    ambulance?
21 A  No, it was started when we loaded him into the
22    ambulance. It was literally -- probably by the
23    time I saw the chest rise and fall, stop, we
24    were 5 feet from the ambulance where it would
25    have made more sense to put him in there because

Page 34

1     all the equipment, better lighting and
2     everything is inside there. And when I say all
3     the equipment, I mean we had our bag with us,
4     yes, but things are more easily accessible in
5     the ambulance.
6  Q  You said "better lighting," can you describe the
7     lighting inside the ambulance?
8  A  Typically, on the top of the ambulance, you have
9     at least three big lights right above where the
10    patient is. So you flip those on, and it lights
11    the whole back end of the ambulance up.
12 Q  Why is lighting important?
13 A  Lighting is important so you can see your
14    patient better. You can attempt an IV on them
15    and see the veins. Just the standard of care
16    would be to put him in the best lighting.
17 Q  Did you give him an IV?
18 A  Eventually, we did, yes.
19 Q  Is that inside the ambulance?
20 A  Yes.
21 Q  And you said you started administering CPR?
22 A  Uh-huh.
23 Q  When was that?
24 A  The timeline, I'd have to look at the paperwork
25    there, the run report to note the exact time.

Page 35

1     But I mean, as soon as we checked the pulse and
2     saw that he didn't have one, CPR was started
3     right then.
4  Q  When did you check the pulse; was that inside
5     the ambulance?
6  A  Yes.
7  Q  Did you check the pulse on your way -- from when
8     you put him on the stretcher to the ambulance?
9  A  No. No. I was watching his breathing. It was
10    hard to have -- it would be hard to have a hand
11    up on him and pushing the stretcher and carrying
12    our bags all within 5 feet of the ambulance.
13 Q  So you were carrying your bag and pushing the
14    stretcher at the same time?
15 A  Yes.
16 Q  Okay. Was there anybody helping you push the
17    stretcher?
18 A  My partner would have been there, Josue.
19 Q  Do you recall him specifically helping you?
20 A  Yes, yes.
21 Q  So it was two of you pushing the stretcher, were
22    any law enforcement officers pushing the
23    stretcher?
24 A  I don't remember if there was a law enforcement
25    officer or not pushing the stretcher.

Page 36

1 Q The bag, does it have handles, or was it over
2 the shoulder, or both?
3 A It has both.
4 Q How do you handle it?
5 A I typically put it on my shoulder.
6 Q So you're pushing him. Was he physically
7 resisting on the stretcher?
8 A No. Once we -- he was on the stretcher, he was
9 not resisting.
10 Q And you grab your bag?
11 A Uh-huh.
12 Q Okay. Are you both pushing it, or is one at one
13 end and one at the other?
14 A Usually, one person's at one end and one person
15 is at the other.
16 Q Do you recall in this case where he was?
17 A I was down by the head, so it would have been
18 more the back of the stretcher, so he would have
19 been pulling it from the foot end.
20 Q Okay. And so you get him in there, and once
21 he's in the ambulance, how long did you wait to
22 take his pulse?
23 A Almost immediately.
24 Q What did you discover?
25 A There was no pulse.

Page 37

1 Q And you had checked his pulse when he was on the
2 ground; correct?
3 A Correct.
4 Q Did you check his pulse at any point after he
5 got onto the stretcher?
6 A No, because we wanted to get him to the
7 ambulance as fast as possible.
8 Q I guess what I'm trying to understand is what
9 was the time frame between the last time you
10 checked his pulse, when he was on the ground,
11 and when you checked his pulse when he was in
12 the ambulance?
13 A Am I allowed to look at the --
14 Q Yes. We'll get to the report in a little bit.
15 A Okay.
16 Q But your recollection without looking at the
17 report is what I'm --
18 A Okay. My best guess would be a couple of
19 minutes.
20 Q And a lot of times in these circumstances, a
21 report is what you refresh your recollection
22 with.
23 A Okay.
24 Q I'm trying to get your recollection without it.
25 A Okay.

Page 38

1 Q And who started administering CPR, was it you?
2 A I don't remember if it was myself, my partner,
3 or one of the police officers.
4 Q And who was in the ambulance with you?
5 A My partner, Josue, and I believe one of the
6 police officers was over there with us.
7 Q Do you happen to recall which one, what his name
8 was?
9 A I think his name is Bill, and it's either
10 Bueckers or Bueckers.
11 Q Okay. What was he doing?
12 A He works part -- well, I don't know if he still
13 does, but at one point he was working part time
14 as an EMT for us. So he picked up a computer
15 and started helping, time stamped everything and
16 started reviewing information.
17 Q What information did he enter; do you know?
18 A I don't know for sure exactly what he did.
19 Q What information would you typically enter?
20 A Well, we would typically enter -- probably the
21 most important thing at that time period would
22 have been to get times down, so when you're
23 starting stuff. When you're starting CPR, when
24 you're stopping CPR, when you're putting in an
25 IV, when you're giving a medication, those type

Page 39

1 of things are initially what you would put in.
2     Also, like to put in the name and the
3 demographics, but at that point, we didn't even
4 know who he was or didn't have that information
5 right off the bat, or at least I did not have
6 the information.
7 Q And why is the timing of particular
8 administration of CPR important?
9 A Well, it just is a good practice to keep a
10 record of what you're doing. You know, you want
11 to show what actually happened and paint the
12 best picture for times like this so you can give
13 a more accurate report to the hospital because,
14 unfortunately, you know, time does fade your
15 memory.
16 Q Sure.
17 A But yeah, we definitely wanted to get the time
18 stamps on there to show when we started CPR
19 because you can't go without a pulse for long.
20 Q Is time important as to how long his heart had
21 stopped?
22 A Oh, absolutely.
23 Q Okay. Do you know how long his heart had
24 stopped?
25 A I don't know for sure. I don't exactly when it

Page 40

1 stopped so I don't know.
2 Q And so you're in the back, Bill is in the back
3 as well, your partner, so there's three of you,
4 was there anybody else?
5 A Not at that time. I don't recall.
6 Q At any other time was there anybody else in the
7 back?
8 A We actually called for manpower which is
9 basically requesting more assistance from the
10 fire department. I remember Natalie Cox, who's
11 a firefighter paramedic with IFD, and I remember
12 her arriving and helping out, assisting us.
13 Q Did she get in the back; do you know?
14 A She did eventually, yes.
15 Q When you say "we," was it you, particularly, or
16 was it your partner, who was it?
17 A That was in the back?
18 Q That made the call? When you said we called for
19 additional manpower, how did you do that?
20 A Typically one of us would get on the radio and
21 say control from Medic 29, please change this to
22 cardiac arrest and send additional manpower. It
23 would be something to that nature.
24 Q Okay. And who would that be made to?
25 A That would be made to the Marion County dispatch

Page 41

1 system.
2 Q Did you have any communications with the
3 hospital?
4 A Not at that point, no.
5 Q The term IHERN, does that mean anything to you?
6 A IHERN is just the radio system.
7 Q Did you have any contact on the IHERN radio
8 system?
9 A Eventually, we did with Eskenazi, but no, not at
10 that point.
11 Q Okay. So your radio communication initially
12 goes to the dispatch, which is Indianapolis EMS,
13 the fire department and law enforcement; is that
14 correct?
15 A Yes, and I'm sure there's some acronym for it.
16 I can't think of what that actual name is right
17 now.
18 Q They change. So you're initially on that
19 dispatch, and at some point you get on the IHERN
20 with Eskenazi; correct?
21 A Correct. That's after we get pulses back and we
22 start transporting him and then we call. It's
23 our protocol to work a cardiac arrest, an adult
24 that's in cardiac arrest on the scene.
25 Q So that's my question. So you didn't have

Page 42

1 contact with the hospital until after he was
2 resuscitated?
3 A Correct.
4 Q Okay. But you did have contact and
5 communication with EMS dispatch and fire
6 dispatch; is that correct?
7 A Correct.
8 Q Do you know whether IMPD or any other law
9 enforcement have access to that communication?
10 A From what I understand, they're all located in
11 the same building, but we are not -- fire and
12 EMS is dispatched on totally different, I don't
13 know what you want to call it, frequencies or --
14 so no, we don't hear all the police dispatches.
15 Q Channel is a term that I'm familiar with?
16 A Correct.
17 Q So you're on the fire department or EMS channel?
18 A Yes.
19 Q And you called for more manpower, did anybody
20 show up other than Natalie Cox?
21 A I don't recall who her partner was. On squad,
22 there's always two people. IFD would have sent
23 an engine, typically an engine or a ladder truck
24 with additional guys, and I don't recall who
25 showed up that day.

Page 43

1 Q Okay. So you try to administer CPR on scene,
2 was there ever any consideration given to try
3 and transport him to the hospital?
4 A No. It's a protocol to work on scene.
5 Typically, all adult patients are going to be
6 worked for up to 30 minutes on scene. So that's
7 the standard of care.
8 Q For up to 30 minutes, is that part of the
9 protocol as well?
10 A Uh-huh.
11 Q What do you do after the 30 minutes?
12    MS. FELDHAKE: That's a yes?
13    THE WITNESS: Yes. Thank you.
14 A Well, after the 30 minutes, you would want to
15 get in contact with the hospital, but you
16 would -- essentially, you would cease -- if
17 there was no pulse after 30 minutes, they're not
18 going to be viable so our protocol is to cease
19 CPR.
20 Q How long did it take to resuscitate in this
21 case?
22 A I believe it was about 7 minutes.
23 Q So does that mean he was without a pulse for 7
24 minutes?
25 A A pulse of his own, yes.

Page 44

1 Q Okay.
2 A But he received compressions immediately, so he
3   was being perfused and oxygen was being
4   administered.
5 Q You said he was receiving compressions
6   immediately, what do you mean by that?
7 A Once I checked his pulse and found out that he
8   did not have one, he started receiving
9   compressions.
10 Q Okay. So there may have been a time period
11   where he wasn't receiving compressions and he
12   did not have a pulse?
13 A Yes. There could have been because I -- I mean,
14   essentially, yes, there would have been because
15   I wasn't -- I didn't have my hand on him the
16   whole entire time and felt the pulse stop.
17 Q So there's a gap from when he was transported --
18   when he was on the ground, transported to the
19   gurney to when you got him in the ambulance that
20   you weren't -- unsure as to whether he had a
21   pulse or not?
22 A Correct.
23 Q Okay. And you only determined when he had a
24   pulse, when you got him inside the ambulance and
25   you checked him and he didn't have one; is that

Page 45

1   correct?
2 A Correct.
3 Q Okay. So the CPR and the resuscitation, can you
4   describe who participated in that, and what was
5   done?
6 A Myself, Josue Ceballos, my partner, eventually
7   Natalie Cox was there. I know Doug Lackey was
8   there. We pulled out the probes, started
9   compressions. We put a non-rebreather mask that
10   supplies oxygen over his mouth and nose,
11   established an IV, gave him epinephrine, and
12   eventually he was intubated. We got him back
13   pretty quick -- well before we could get him
14   intubated, so the intubation was after he was
15   resuscitated.
16 Q Where did you administer the epinephrine?
17 A In his IV, through his IV.
18 Q Okay. Do you recall what the dosage was?
19 A It would be 1 milligram, 1 to 10,000
20   concentration.
21 Q And the administration of the 10 milligrams of
22   Versed, did you have any -- is there any leeway
23   as to how much you administer or is it always 10
24   milligrams?
25 A We can administer up to 10 milligrams. In

Page 46

1   situations where it would be for somebody that
2   looked -- maybe the patient you get is maybe 100
3   pounds, I wouldn't -- me, personally, I would
4   have definitely dosed that down. He appeared to
5   be -- he looked about 170, roughly -- I didn't
6   have a scale, but to my best guess. It
7   appeared -- due to the aggressiveness, it
8   appeared that that would be an appropriate dose.
9 Q And 10's the most you could use?
10 A Correct, unless I call for orders to get more.
11 Q Okay. So your determination on dosage was based
12   on his size and physical aggressiveness?
13 A Yes.
14 Q Any other factors?
15 A No.
16 Q Approximately -- and we'll get to the report, do
17   you recall how long it took to resuscitate him?
18 A I believe 7 minutes.
19 Q And what was your partner doing at the time when
20   you were doing what you were doing? Do you
21   recall what he was doing?
22 A I don't recall specifically what he was doing.
23 Q Okay. And I presume when you got him into
24   the -- he was not communicative? He never
25   talked to you at any point?

Page 47

1 A No.
2 Q Was there anybody, any bystander that approached
3   that indicated that they knew him or knew
4   anything about him?
5 A Not to me.
6 Q Did anybody else, to your knowledge?
7 A Not to my knowledge.
8 Q Do you recall whether anybody, part of your team
9   or any EMTs or paramedics that went out and
10   tried to get that information to see if they
11   knew who this individual was?
12 A I don't know if -- I don't know if anybody
13   specifically did that day. I know
14   somebody -- somebody did because we had to get
15   his name somehow, and I know I had it before I
16   left the hospital. I don't know who found his
17   ID or information, though.
18 Q Prior to that day, how often had you
19   administered Versed in the field?
20 A I'd say somewhere between ten and 20 times.
21 Q And was it in the same or similar circumstance
22   here where you decided based on protocols to
23   administer it?
24 A It's a mixture, and also, the size of the
25   chemical restraint protocol, there's a protocol

1 for people that are having seizures, that
2 medication would be appropriate, so it could be
3 a mixture of those two.
4 Q And of those ten to 20 times, do you recall how
5 many of those occasions where you used the
6 maximum dosage of 10 milligrams?
7 A I don't recall how many times that would have
8 been.
9 Q Do you recall other circumstances where you used
10 the maximum dosage?
11 A Yes. I know I've definitely used that
12 10 milligrams before.
13 Q Okay.
14 A There's been times where I had to use more than
15 that and called the hospital.
16 Q Okay. And do the times that you've used the
17 10 milligrams -- and these are all -- this is
18 prior to October; okay?
19 A Okay.
20 Q Were there times that you made a determination
21 that they were physically aggressive as well?
22 So I guess my question is: Is physical
23 aggression a factor in the determination of what
24 dosage you use?
25 A It is. If somebody is combative with you and

1 law enforcement and you can't treat them
2 medically, then absolutely.
3 Q In those 10 to 20 times where you administered
4 it, are those instances where individuals were
5 physically combative?
6 A No. That number is also a mixture of people
7 having seizures, too. So somebody convulsing is
8 not being combative with you.
9 Q Okay. So of those 10 to 20 times, how many does
10 that involve individuals being combative?
11 A I don't know a number for sure. Do you want a
12 best guess or --
13 Q I don't want a guess.
14 A Then I don't know for sure how many number of
15 times that was.
16 Q Was it more than five?
17 A I don't know.
18 Q Of those 10 to 20 times that you've administered
19 Versed, how many of those happened at dusk or at
20 night?
21 A I don't recall. I mean, we're talking about a
22 time period of years so I don't know.
23 Q To your knowledge or recollection, do the
24 protocols account for circumstances like
25 lighting or time when you encounter the

1 individual?
2 A Well, I mean -- let me approach lighting first.
3 There's nothing in the protocol that
4 specifically has anything to do with lighting.
5 Most people that work night shift carry
6 flashlights because of that.
7 You know, flashlights aren't -- they're a
8 great resource, but they're not the most ideal
9 circumstances because somebody has to hold it
10 and so it's hard to work on somebody when you're
11 holding a flashlight and trying to take care of
12 them. So that's why we move them to the
13 ambulance so we don't have to worry about that.
14 And then I think you were asking about time?
15 Q Yes.
16 A There's nothing specifically -- in the protocol,
17 the chemical restraint protocol, I believe,
18 doesn't say anything about time. You know, you
19 do want to try to deescalate the situation and
20 use the least amount -- you know, you want to
21 verbally deescalate, which that wasn't an option
22 for Dusty.
23 You would like to physically restrain them
24 if the conditions warrant that. That wasn't
25 successful to be able to treat him medically.

1 So then your next option is chemical restraint.
2 So there is going to be a progression of time
3 that goes through there, but there's no specific
4 time restraint.
5 Q Once you got him in the back and you assessed
6 him, did you notice any injuries to his body?
7 A The taser probes.
8 Q Anything else?
9 A Not that I recall.
10 Q All right.
11 A At that point we were more focused on the
12 resuscitation.
13 Q And it took about 7 minutes to resuscitate him,
14 then what did you do after he was resuscitated?
15 A We went emergent, so lights and sirens to the
16 hospital, to Eskenazi.
17 Q And who drove?
18 A I don't recall exactly who drove. I know
19 Natalie Cox was in the back with me, but I can't
20 remember if it was Josue or one of the other IFD
21 people.
22 Q Okay. How long did it take you to get to the
23 hospital?
24 A Probably four minutes maybe, five minutes.
25 Q And so this was -- what side of town did this

## Page 52

1     happen on?
2 A So we'd be on the south side of town.
3 Q And do you recall what route you took?
4 A Me being in the back, no, I don't.
5 Q What happened once you got to the hospital?
6 A Took the patient on the stretcher inside,
7     straight to the shock room and transferred care
8     to the Eskenazi staff.
9 Q Do you recall interacting with anybody?
10 A Not specifically. I mean, I would have
11     definitely given a report to one of the nurses
12     there.
13 Q And you don't recall which nurse it was?
14 A I don't know the name, what her name was.
15 Q So after you turned him over to the hospital,
16     what did you do?
17 A Well, then we have to write a report, restock
18     the truck, get it ready to get back in service.
19 Q And mark back in?
20 A We did eventually, yes.
21 Q When did you write your report?
22 A I started on it pretty much right after, right
23     after the call. So I still -- I would have been
24     working on it -- even driving back to the
25     station, I would have had to have been working

## Page 53

1     on it. There was just so much that went on, you
2     know, that sometimes you can get away with doing
3     your report on the way to the hospital, but this
4     wasn't the case.
5 Q And do you recall going back to the firehouse?
6 A I know we definitely went back to the firehouse.
7 Q Do you have any specific recollection?
8 A No, nothing specific.
9 Q How long did you stay at the hospital after you
10     turned him over?
11 A I don't know. Usually they want us in-service
12     in about 15 minutes.
13 Q Okay.
14 A So my guess would be somewhere in the nature of
15     15 minutes.
16 Q Okay. Do you recall what he, what Dusty looked
17     like?
18 A No.
19     (Plaintiff's Exhibit(s) C was previously
20     marked for identification.)
21 Q Okay. I'll hand you a picture, Exhibit C, would
22     that refresh your recollection?
23 A Okay.
24 Q Does that appear to be Mr. Heishman?
25 A Yes.

## Page 54

1 Q I'm going to direct your attention to -- there
2     appears to be some injuries or trauma to his
3     face. Do you recall seeing this on scene?
4 A No, I don't recall seeing those on scene.
5 Q Okay. And you indicated he had chest probes but
6     you don't recall seeing any other injuries?
7 A No. You know, and that's -- when somebody loses
8     a pulse, you know, you're just so focused on the
9     resuscitation that you can't stop and stop
10     compressions and, you know, check their whole
11     body.
12 Q So you're not saying he wasn't injured, you just
13     weren't focusing on that --
14 A Correct.
15 Q -- would that be correct?
16 A (Witness nodded.)
17 Q Is that a yes?
18 A Yes.
19     (Plaintiff's Exhibit(s) H was marked for
20     identification.)
21 Q I'm showing you a photograph what I will
22     represent to you to be Dusty's legs, and I think
23     I know the answer to this. Do you recall seeing
24     any injuries to his legs?
25 A I don't recall seeing any injuries on his legs.

## Page 55

1 Q Which is aside from what your focus was, which
2     was to try and resuscitate him?
3 A (Witness nodded.)
4 Q Is that a yes?
5 A Yes.
6     (Plaintiff's Exhibit(s) I was marked for
7     identification.)
8 Q Is this the report that you were referencing?
9 A Yes.
10 Q Okay. I would like for you to look it over and
11     see whether it's a true and accurate copy of
12     your report?
13 A (Witness complies.) Okay, it is.
14 Q The animal bite that you went on scene, did
15     you -- was that unrelated to the incidents, or
16     do you have any idea whether that had any
17     connection with Mr. Heishman at all?
18 A I believe the gentleman with a broken nose also
19     had a bite, too, on his hand, and what my
20     understanding was with his conversation with
21     Josue, the bite was not actually an animal bite
22     but a bite from Dusty.
23 Q Okay. So there was just a miscommunication in
24     terms of dispatch? Do you have any idea
25     what --

Page 56

1  A   Yeah. There's no animal involved as far as I
2      know.
3  Q   Do you know whether there was some unrelated
4      incident where there was an animal bite, do you
5      have any idea?
6  A   No. I don't remember hearing any other
7      dispatches going out for that -- yeah, it says
8      on here. I mean, IMPD requesting, so I don't
9      know if they misinterpreted human bite.
10 Q   Okay.
11 A   I don't even think there is a code for human
12     bite.
13 Q   Okay.
14 A   I think it's just animal bite.
15 Q   And in your report, it says -- sixth line
16     down -- fifth line down, sorry, IMPD states they
17     were called because patient was naked in the
18     streets, had broken a car window, and was
19     combative with officers when approached?
20 A   Yes.
21 Q   How did you know that information?
22 A   One of the officers told me that. I don't
23     recall the officer's name, but that's how I
24     would have found that out.
25 Q   And you say skin p/w/d, what does that mean?

Page 57

1  A   Pink, warm, dry.
2  Q   So he wasn't sweaty?
3  A   Not that I felt.
4  Q   Okay. And you indicate that breathing was
5      non-labored. What do you mean by that?
6  A   It didn't appear that he was gasping for breath.
7  Q   Would that include him being out of breath from
8      physical activity, or physically accelerated or
9      labored breathing?
10 A   Well, if he was breathing anywhere outside the
11     normal rate, between 12 and 20 a minute --
12     roughly, if he was totally exhausted -- I've
13     seen people that have been totally exhausted and
14     they're not breathing, they stop breathing.
15 Q   So he was breathing what you would deem to be a
16     normal rate; would that be accurate?
17 A   Yeah. It didn't appear that he was labored or
18     rapidly breathing.
19 Q   And you say gave patient 10 MGs Versed IM left
20     deltoid as chemical restraint for patient and
21     crew safety?
22 A   Uh-huh.
23 Q   At what point -- so you use the term "patient"
24     now; right?
25 A   Yes.

Page 58

1  Q   Is that a term that you use on anybody that you
2      encounter?
3  A   Anybody I encounter on a run that needs medical
4      care, yeah, I would always call them the
5      patient.
6  Q   Okay. At what point did you determine that he
7      needed medical care?
8  A   As soon as I saw that he was trying to be
9      restrained and being combative against the
10     officers.
11 Q   Okay. What made you come to that determination?
12 A   Well, along with the brief history given by
13     IMPD, the vital signs, his presentation as far
14     as being noncommunicative, besides the
15     grunting -- I mean, there's really nothing of
16     substance that was said, or he couldn't --
17     wasn't in the frame of mind to answer any
18     questions. I mean, at that point, it's a
19     patient that needs medical care.
20 Q   And you have in here patient calmed down within
21     a couple of minutes?
22 A   Uh-huh.
23 Q   Did you do anything monitoring wise after -- in
24     that couple minute period when he calmed down?
25 A   Well, that was when we were -- I'm just visually

Page 59

1      watching for the -- you know, him breathe and
2      just trying to watch for him to struggle. I was
3      surprised that he stopped so quickly because
4      that medication doesn't work that fast when you
5      give it IM. The onset is 10 minutes.
6  Q   When you say "onset", what do you mean?
7  A   The onset of actions, the onset of the desired
8      effects of the medication. When you gave it IM,
9      typically it's 10 minutes.
10 Q   When you say a couple of minutes -- patient
11     calmed down within a couple of minutes, is that
12     2, or was that -- what period of time are you
13     referring to?
14 A   To me it, would be 2 or less.
15 Q   Was he ever -- were his handcuffs or shackles
16     ever removed, to your knowledge?
17 A   Yes.
18 Q   When?
19 A   When we took him -- when we got him into the
20     ambulance to start CPR, we had to get his hands
21     uncuffed from behind his back and cuffed in the
22     front which, honestly, I don't remember if they
23     even recuffed him or not.
24 Q   Okay. Were the shackles ever removed?
25 A   I don't recall the shackles being removed

Page 60

1 because they were kind of -- I know I wouldn't
2 have requested those to be removed because they
3 didn't prevent us from providing care.
4 Q Okay. So you say EMS crew and officers picked
5 patient up and placed him on cot; is that
6 correct, or POC, placed on cot?
7 A Placed on cot.
8 Q When you say EMS crew, who are you referring to
9 specifically?
10 A Myself, Josue.
11 Q Anybody else?
12 A That's all I remember as far as the EMS crew.
13 Q And officers, do you know which officers helped
14 pick him up?
15 A I don't know specifically which officers.
16 Q And pupils were fully dilated and nonreactive to
17 light; correct?
18 A Correct.
19 Q Did you ever evaluate his pupils prior to
20 putting him on the cot?
21 A No. He wasn't -- he wouldn't cooperate in
22 looking at his pupils, when you shine a
23 flashlight in his face.
24 Q Did you have a flashlight?
25 A Yes, I always carry a flashlight.

Page 61

1 Q And did you use it?
2 A I believe one of the officers was using a
3 flashlight for us, shining a flashlight for us.
4 Q And you say on the way to ambulance, it appeared
5 that PT, meaning patient; is that right?
6 A Correct, patient.
7 Q Was no longer breathing but the darkness made it
8 difficult to fully assess; is that correct?
9 A That is correct.
10 Q Okay. What did you mean by that?
11 A So when -- you know, when you're working on a
12 patient and he's on the ground and there's
13 people able to shine flashlights, it's easier to
14 see. When you put him onto the stretcher and
15 take him to the ambulance, kind of everybody's
16 busy pushing the stretcher, and so you don't
17 have somebody constantly following you with a
18 flashlight, you know. That's why we need to get
19 him in the back of the ambulance, to provide
20 medical care and get better lighting.
21 Q Okay. It says patient now in ambulance
22 teritoid?
23 A Carotid.
24 Q Carotid, there we go, pulse absent,
25 and what's the --