IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BILLIE THOMPSON, as Personal Representative of the ESTATE OF DUSTY HEISHMAN, | ) ) ) ) |
| Plaintiff, | ) CAUSE NO. |
| -v- | ) 1:15-cv-1712-TWP-DML ) |
| CITY OF INDIANAPOLIS, INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT, in his individual and official capacities, OFFICER DONALD SPIEGL, in his individual and official capacities, OFFICER WILLIAM BUECKERS, in his individual and official capacities, PARK RANGER PHILIP GREENE, in his individual and official capacities, MARION COUNTY SHERIFF'S DEPARTMENT, DEPUTY BILLY JOHNSON, in his individual and official capacities, HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, MEDIC LANCE COPE, in his individual and official capacities, MARK BRITTON, and WILLIAM PATTERSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

The deposition upon oral examination of
THOMAS J. SOZIO, D. O., a witness produced and sworn
before me, Russell J. Scheiner, RPR, CSR, and Notary
Public in and for the County of Marion, State of
Indiana, taken on behalf of the Plaintiff in the
offices of Keffer Barnhart, LLP, 230 East Ohio
Street, Suite 400, Indianapolis, Marion County,
Indiana, on August 2, 2016, at 7:00 a.m., pursuant to
Notice and Federal Rules of Civil Procedure.

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302

1 Q. Is that a true and accurate copy of your

2     educational background and your professional

3     background?

4 A. It is.  It hasn't been updated on this website

5     since January of 2015 or February of 2015.

6 Q. What updates would you have added to it?

7 A. I've probably been to some conferences, added a

8     little bit more counties that I've worked for.

9     That's probably the big two things there.

10 Q. And what is your current occupation, sir?

11 A. I'm a forensic pathologist.

12 Q. What do forensic pathologists generally do?

13 A. We do autopsies to help with death

14     investigations, to help determine the cause and

15     manner of death, and testify to those findings in

16     a court of law if need be.  And collect evidence.

17 Q. What is the purpose of an autopsy?

18 A. The purpose of an autopsy is to collect evidence,

19     document the body, any injuries, and then

20     formulate an autopsy report to help with the

21     scene investigation, law enforcement

22     investigation, to determine the cause and manner

23     of death, which the coroner then signs the death

24     certificate for the state.

25 Q. How many autopsies have you done in your career?

1    A.  Around 2,500 to 3,000.

2    Q.  And are you Board Certified?

3    A.  Yes.

4    Q.  Have you testified as an expert?

5    A.  Yes, I have.

6    Q.  Approximately how many times?

7    A.  Probably close to 100 now.

8    Q.  Do you recall the autopsy that we're here today

9        to discuss?

10   A.  I vaguely recall the case.

11   Q.  What do you recall about it?

12   A.  I just kind of remember the general -- it was a

13       death in custody case.  I kind of remember that

14       it was a delayed death.  He was in the hospital

15       for a while, and then we received the body and

16       then needed to do a complete autopsy.  It wasn't

17       a death at the scene and brought in the next day.

18       There was some delay in this case I remember.

19   Q.  Why does the delay -- does that matter?

20   A.  It does change some things.  It really makes

21       things a little bit more difficult actually.

22   Q.  How does it make it more difficult?

23   A.  You lose a lot of the toxicology that is present

24       right at the time of death, if they were to die

25       and go right into the hospital and then die right

1    shortly after, or die at the scene.  It changes

2    some aspects of the toxicology testing.

3        There is some complications that do arise in

4    this case.  There was some complications that did

5    arise because of him being on a ventilator in the

6    hospital.

7 Q.  What were those complications?

8 A.  He developed pneumonia.  The drug screen had

9    changed a little bit from what the initial drug

10   screen was showing.  Things might have been

11   healed a little bit.

12 Q.  That was my next question.  So over the course of

13   time the body heals; is that correct?

14 A.  Yes.

15 Q.  What was the delay, how long of a delay was it in

16   this case?

17 A.  The initial police custody action occurred on

18   October 5th, 2014.  I believe he was pronounced

19   on the 13th, and we did the autopsy on the 14th.

20   Is that the time frame?  Yes.  Pronounced at

21   Methodist on the 13th, and did the autopsy the

22   next day on the 14th.

23       (Plaintiff's Deposition Exhibit

24   Letter B was marked for identification

25   by the reporter.)

1  Q.  I'm going to show you what has been marked as

2       Exhibit B.  I think you're referring to a copy of

3       that I believe, but that appears to be your

4       autopsy report; is that correct?

5  A.  Yes.

6  Q.  Is that a true and accurate copy of it?

7  A.  Yes, it is.

8  Q.  What was the cause of death in this case?

9  A.  The cause of death was summarized as

10      complications of excited delirium, with multiple

11      contributing factors that played a role in the

12      death.  Those include acute methamphetamine

13      intoxication, positional body restraint by law

14      enforcement, acute psychotic state with mania,

15      dilated cardiomyopathy discharge by an electrical

16      stun gun -- in this case it was a taser, and a

17      history of grand mal seizures.

18  Q.  Are these contributing factors in any particular

19      order?

20  A.  No.

21  Q.  And are there any of these factors that have more

22      weight or less weight than the others?

23  A.  It's hard to put a percentage on, you know if you

24      take one out would we still have a death.  This

25      case has got a lot of issues, a lot of

1    contributing factors that all play a role in my

2    opinion to some degree.  It's hard to assign a

3    number.

4  Q.  Let's start with complications of excited

5    delirium.  What does that mean exactly?

6  A.  Well, excited delirium is a term used in forensic

7    pathology that when you have somebody that is

8    excited, they're under acute stressful situations

9    such as being under the influence of drugs or

10    being arrested, they have a sudden cardiac

11    arrhythmia, a sudden cardiac death.

12        In police custody there is usually some type

13    of drugs involved or psychiatric issues that come

14    into play.  That's kind of a term that we use,

15    excited delirium, to summarize an acute death

16    within police custody.

17  Q.  And the acute methamphetamine intoxication, what

18    is your understanding of that?

19  A.  Well, his urine drug screen when he was admitted

20    to I believe it was Eskenazi Hospital on the 5th,

21    was positive for methamphetamine/amphetamine.

22    That could have been that he used three days

23    before that, but it's also possible that he was

24    acting under the state of intoxication by

25    methamphetamine.  And I believe that was true,

1    based on the way he was acting, the mannerisms at

2    the scene.  I believe that he was under the

3    influence of some drug like methamphetamine.  And

4    so that -- what was your question?  How did that

5    play and contribute --

6  Q.  What does that mean in terms of -- what is your

7    understanding of what acute methamphetamine

8    intoxication means?

9  A.  So he's under the influence of methamphetamine,

10    which is a stimulant, I believe at the time of

11    the police custody action.  That is a stimulant

12    that causes your heart to beat faster, or

13    tachycardia.  It can predispose to cardiac

14    arrhythmias and can cause death.

15  Q.  Positional body restraint by law enforcement.

16    What is your understanding of that term?

17  A.  Positional body restraint meaning there is some

18    type of restraint used, whether it's something to

19    the neck or to the back or being restrained with

20    handcuffs or wrists, or being hog tied, or

21    someone is on top of their back, not allowing

22    their chest to expand appropriately for

23    breathing.  That can contribute to death.

24  Q.  And is there a period of time where this

25    positional body restraint can occur, or can it

1    occur over any period of time?

2  A.  I'm not really -- I'm trying to understand your

3      question.

4  Q.  Sure.  So the positional body restraint by law

5      enforcement, is it just the position of law

6      enforcement's position on the individual they are

7      trying to restrain, or is there a time component

8      to it?

9  A.  If it's for a short period of time it probably

10     won't cause any problems.  If it's for a long

11     period of time it might.  I don't know the exact

12     time period in this case, I just know that there

13     was some hemorrhage in the back, and that's what

14     was documented in some of the witness statements,

15     that there was some -- I think maybe even a

16     private citizen was involved too, I don't

17     remember, but law enforcement was on top, on the

18     back.

19  Q.  Is it just the hemorrhaging in the back that led

20     you to that conclusion, or was there --

21  A.  And the witness statements, and some of the other

22     statements that I've -- I just want to be clear,

23     first of all, that I've only received the autopsy

24     report and the EMS report.  The file for this

25     case is probably this thick.  I don't know if you

```
 1   A.   It's always a chance, but if they went into the
 2        deltoid muscle there is really no major arteries
 3        or veins near there.  It's very unlikely.
 4   Q.   But it's possible?
 5   A.   Everything is possible.
 6   Q.   Did you have the occasion to speak to anybody at
 7        the scene that had dealt with Mr. Heishman?
 8   A.   There was a delay in this case, and I think Lloyd
 9        Sproule in the Field Deputy Report, which I don't
10        know if you have, he kind of maybe summarized
11        what it was.
12             I might have talked to Mark Prater about what
13        some of the witnesses were saying.  I kind of
14        tried to summarize that into the Circumstances of
15        Death portion in there, and I don't know exactly
16        who said what and when in the way my sources are.
17        Basically I look at the Field Deputy Report and
18        talk to whoever is there at the autopsy, and kind
19        of put that into the Circumstances of Death.
20   Q.   You indicated that you talked to Detective
21        Prater.  Is that an email that you sent to him?
22   A.   This was an email I cc'd to myself and Mark
23        Prater, but it was going to Brian Graban, who I
24        don't know who he is.
25   Q.   And who is he?
```

1  A.  I don't know.  I forget.

2              (Plaintiff's Deposition Exhibit

3        Letter D was marked for identification

4        by the reporter.)

5

6  Q.  Does this appear to be a true and accurate copy

7        of the email that you sent?

8  A.  Yes.  Is he the Internal Affairs guy or

9        something?  I don't know.

10        MR. BARNHART:  Let's take a short break, and

11        we'll be back.

12            (A brief recess was taken at this time.)

13

14        MR. BARNHART:  That's all that I have.

15

16  CROSS-EXAMINATION,

17        QUESTIONS BY MS. MARY FELDHAKE:

18  Q.  Doctor, my name is Mary Feldhake, and I represent

19        the EMS in this matter.  I have a few questions

20        for you.

21            Did you have the EMS report at the time of

22        performing the autopsy?

23  A.  A copy of the EMS report is received and is

24        reviewed prior to the start of the examination.

25        Yes.

1  Q. And is it fair to say that you did not include

2     anything that was done by the EMS as a

3     contributing factor in the death of Mr. Heishman?

4  A. Yes, I don't see anything in the cause of death

5     statements that have anything -- that the EMS did

6     to him or administered to him.

7  Q. Is that your opinion today?

8  A. Yes.

9  Q. There were questions about whether the

10    administration of Versed could have been in the

11    vein.

12       Is intravenous administration of Versed one

13    appropriate route of administration?

14 A. It is.

15 Q. Are there certain drugs that don't show up in tox

16    screens?

17 A. It really depends on what hospital, or is it a

18    forensic lab, what panel you're asking for.  In

19    this case the Versed would not be present in the

20    urine.

21 Q. Are there other street drugs like K Spice or K2

22    or other synthetic drugs that often don't show up

23    in the tox screens do you know?

24 A. That wouldn't show up in the urine drug screen

25    performed at Eskenazi either.  There is eight

```
 1        common drugs:  It's cocaine, methamphetamine,
 2        THC, opiates, methadone, PCP, that are tested for
 3        just in the urine.
 4   Q.   Is excited delirium a medical emergency?
 5   A.   Yes, it is.
 6   Q.   Do you have an opinion as to whether Versed is an
 7        appropriate medication for someone in excited
 8        delirium?
 9   A.   There needs to be some type of chemical restraint
10        usually to calm a person down so they don't hurt
11        themselves or others, so they can be given
12        medical treatment.  It can be Haldol -- I've seen
13        Haldol administered in this case -- not this
14        case, but other cases with the same
15        circumstances, and then Versed is another one
16        that can be used.
17   Q.   So you would agree with the statement that
18        medications are required to sedate excited
19        delirium patients, to expedite their medical
20        evaluation, to decrease their fight or flight
21        response, and to avoid further harm to both the
22        patient and those involved in the patient's care?
23   A.   Yes.  That's a good way to put that, yes, I
24        believe that's true.
25   Q.   Is it a concern when a person that is in excited
```

1    delirium suddenly quits fighting and is

2    acquiescent, do you know?

3  A.  Yes.  That's a warning sign of cardiac arrest,

4    and emergently something needs to be done to

5    provide medical care to reverse that.

6  Q.  So is it fair to say that left untreated one of

7    the conditions that encompasses excited delirium

8    is cardiac arrest?

9  A.  Well, cardiac arrest is kind of the end result of

10    why is the heart stopping, meaning arrest, is

11    stopping.  In this case it's probably due to an

12    arrhythmia, which is due to all these other

13    factors.  So that's kind of how you look at it.

14 Q.  Do you know what the time of onset of the

15    sedative effect is of intramuscular

16    administration of Versed in an adult male?

17 A.  I don't know the exact time.  I know it's

18    relatively quick, like a couple of seconds.  Ten

19    seconds or something like that.

20 Q.  Can one of the causes of cardiac myopathy,

21    dilated cardiomyopathy in a 29 year old white

22    male, be due to drug use?

23 A.  It can be if there is chronic use of some type of

24    stimulants that caused hypertension, or high

25    blood pressure, throughout his entire life.  For

1   an extensive amount of time it can result in
2   that.
3   Q.   In your autopsy you mentioned chronic passive
4        congestion of the liver --
5   A.   Yes.
6   Q.   -- and sinusoidal congestion and portal triadi --
7   A.   Triaditis.   Yes.
8   Q.   What is the significance of those conditions?
9   A.   You're referencing the histology, where I looked
10       under the microscope at the liver, and that's
11       just to me indicating that we have cardiac
12       failure and we have excessive fluid entering into
13       the liver because of the heart failure, and
14       causing those two signs or microscopic findings
15       under the microscope.
16  Q.   You also mentioned white pulp expansion of the
17       spleen.   What is the significance of that?
18  A.   The spleen is an immune organ, part of your
19       immune system, and it's responding to some type
20       of infection in the body.   In this case it's
21       probably the pneumonia.
22            MS. FELDHAKE:   I don't think I have anything
23       further for you, Doctor.   Thank you.
24
25

1  CROSS-EXAMINATION,

2      QUESTIONS BY MS. KATHRYN BOX:

3  Q.  Doctor, my name is Kathryn Box.  I represent the

4      law enforcement defendants in this case.  I just

5      have a few questions for you.  It shouldn't take

6      long.

7          Have you ever had occasion to do an autopsy

8      on an individual who is resisting law

9      enforcement?

10 A.  Yes, I have.

11 Q.  And you noted in your autopsy abrasions and

12     contusions on Mr. Heishman.

13         Would the abrasions and contusions that you

14     saw be consistent with an individual who is

15     resisting law enforcement?

16 A.  There was actually some locations of the

17     abrasions that are characteristic for what we're

18     calling kind of drag marks, where someone is

19     either not responsive or fighting, and they are

20     dragging like on their feet, and we had some

21     areas like that.

22 Q.  All right.  And you mentioned as a contributing

23     factor the positional body restraint by law

24     enforcement.

25         Were you referring to the hemorrhaging on the

 1    traumatic where you're on top of the chest, like

 2    if you're working on your car and the jack fails

 3    and falls on your chest or your back and you

 4    can't expand, or someone is on top of your back

 5    and you can't expand.

 6        Positional asphyxia is kind of very close to

 7    that.  Their neck is in a way -- their hands are

 8    behind their back or they're obese.  Something is

 9    occluding the mechanism of breathing because of

10    either neck compression or some type of chest

11    compression because of the position the body is

12    in.

13 Q.  That makes sense.  Are you aware of any actions

14    that law enforcement can take when they have a

15    suspect who is possibly prone on the ground, that

16    would help decrease the chances of positional

17    asphyxia?

18 A.  I mean, I'm not trained really in law enforcement

19    restraint maneuvers.  Basically I'm looking at

20    this from a medical standpoint of what was done

21    that to me, in my opinion contributed to the

22    overall cardiac arrest, cardiac arrhythmia and

23    arrest.

24        I don't know what is proper protocol or not

25    in carotid sleeper holds, tasering or not, what

     1       locations or not, when you're supposed to hog

     2       tie, or never supposed to do that, or -- I really

     3       don't know those answers.

     4   Q.  Fair enough.  And I'm just asking more from a

     5       medical standpoint, not from a law enforcement

     6       protocol standpoint.  I'm just wondering if there

     7       is anything that would help decrease those

     8       chances.

     9           What about possibly using double handcuffs so

    10       the arms are further apart?

    11   A.  To me, anything that is going to give more leeway

    12       to allowing the chest to expand would be

    13       advantageous.

    14   Q.  And is there any amount of time in your

    15       opinion -- you mentioned that a short amount of

    16       time probably wouldn't cause these injuries.  Can

    17       you put a number on that time at all?

    18   A.  Well, typically an adult male can go a minute or

    19       two, and after two minutes is kind of the cut off

    20       that we kind of read about.  But there is so many

    21       factors that go into that.  But if it's really

    22       not too much longer than over like a minute or

    23       two, basically it's -- you're not going to die

    24       from that.  You need either some prolonged

    25       mechanism, or some type of force for a prolonged

1    amount of time.

2         We deal a lot with that with strangulation,

3    like what is the time that it needs to cause

4    complete asphyxia and strangulation.  And so

5    there is really not an exact time.  But if it's

6    something that is transient, not lasting that

7    long, it shouldn't result in the death.

8  Q.  I completely understand.  And I just want to

9    touch briefly on the electric stun gun.

10        In your opinion is an electric stun gun in an

11   otherwise healthy individual, not in an acute

12   state, a safe restraint mechanism?

13 A.  Yes.

14 Q.  Have you ever in your 2,500 or 3,000 autopsies

15   performed, had an individual where you could say

16   that the sole cause of death was due to a stun

17   gun with no contributing factors?

18 A.  Well, out of those 2,500 or 3,000, probably only

19   five to ten of them -- I don't know the exact

20   number, and I should know the exact number -- of

21   death in custody cases, excited delirium type

22   cases, out of those very limited amounts there

23   was always other factors that came into play.

24 Q.  And did you form an opinion in this case about

25   the law enforcement officers and their actions

1      that they took, whether it was criminal or

2      negligent?

3 A.  I did not.

4      MS. BOX: Okay. No further questions.

5

6 REDIRECT EXAMINATION,

7      QUESTIONS BY MR. SCOTT BARNHART:

8 Q.  Doctor, you indicated that Versed is a chemical

9      restraint; is that right?

10 A.  Yes.

11 Q.  In your understanding of a chemical restraint, is

12      that a chemical substance designed to physically

13      incapacitate an individual?

14 A.  It's to cause sedation, it's to prevent traumatic

15      injury, it's to sedate and calm down an

16      individual that is acutely hysterical, whether

17      it's mania or schizophrenia or bipolar. In

18      somebody that is causing harm to themselves or

19      others, chemical restraint is something that is

20      given acutely in a setting to calm them down so

21      they are not causing more harm to themselves.

22 Q.  Would you equate a chemical restraint to a

23      version of handcuffs?

24 A.  No. That's something that is manual and

25      physical. That's more of a physical restraint.

1   Q.  So would you say that --

2   A.  Chemical meaning a drug is administered.  Yes.

3   Q.  And intended to depress the central nervous

4       system?

5   A.  Yes.

6   Q.  And with the use of chemical restraints is it

7       important to monitor individuals where the

8       chemical restraint has been injected?

9   A.  Yes.

10  Q.  Why is that important?

11  A.  Well, I mean, there was -- with excited delirium

12      it's a medical emergency, and it needs to be

13      monitored definitely, and they need to be

14      admitted to a hospital and put under the

15      telemetry or something that monitors.  The EKG

16      monitors the heart function and all that.  In

17      somebody that is given a drug acutely to calm

18      them down, they definitely need to have their

19      vitals monitored, they need to be administered

20      oxygen, a typical EMS protocol.

21  Q.  So monitoring would include oxygen?

22  A.  That's a therapeutic thing that you should give

23      somebody that is being sedated with some

24      medication.

25  Q.  And you said their vitals.  So they are checking

 1    their heart rate?

 2  A.  Heart rate, the pulse, respiration rate, blood

 3      pressure.

 4  Q.  How would you check respiration rate?

 5  A.  Kind of look at the chest and see how many times

 6      it's expanding, rising and falling within a

 7      minute.  Maybe have them do it for 30 seconds and

 8      kind of estimate it and multiply by two to figure

 9      out the respirations per minute.

10  Q.  Is lighting important in order to determine

11      whether somebody is breathing?

12  A.  Well, I did see in the ambulance report that they

13      were having some problems with assessing the

14      individual because of lighting issues.  Yes, it's

15      always better to work in light.

16  Q.  Sure.  So would that be important in terms of the

17      EMT's response after the administration of

18      Versed?

19  A.  To monitor them?

20  Q.  Yes.

21  A.  Yes, it's important.

22  Q.  What happens if someone would fail to monitor?

23  A.  Well, it could mean nothing, or it could mean

24      that if he took a turn for the worse that it's

25      not caught fast enough.  There is a lot of

```
 1      variables that go into that.

 2   Q. Not caught fast enough.  What you mean by that?

 3   A. I mean, if you give some drug or do something to

 4      somebody and then leave the room, and you're

 5      supposed to be monitoring them and you don't, and

 6      they take a turn for the worse, maybe there is a

 7      medication error or maybe they gave too much.

 8      Maybe it was into a vein or something like that.

 9      You know, anything can happen, and you want to

10      assess for any possible side effects of that.  If

11      you aren't looking for that and you miss it, time

12      is crucial.

13   Q. Including cardiac arrest?

14   A. Could be.

15   Q. What about respiratory arrest?

16   A. Yes.

17   Q. If somebody flat lined, or is without a

18      heartbeat, how long can they last without a

19      heartbeat?

20   A. I think it's around 30 seconds without -- if

21      they're totally asystole -- it really depends on

22      the circumstances, though, of what is causing

23      that.  I think it's 30 seconds to a minute when

24      their heart is totally not functioning asystole,

25      that can cause sufficient lack of blood to the
```