IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
representative OF THE ESTATE OF )
DUSTY HEISHMAN, )
 )
 )
       Plaintiff, ) CAUSE NO.
  -v- ) 1:15-cv-1712-TWP-DML
 )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
 )
       Defendants. )

    The deposition upon oral examination of
**DONALD SPIEGL**, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 2:00 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.

    RUSSELL J. SCHEINER, RPR, CSR, Notary Public
            3437 Beasley Drive
        Indianapolis, Indiana 46222
        Tel. & Fax (317) 299-6302

```
IN THE UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF INDIANA
       INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal    )
representative OF THE ESTATE OF )
DUSTY HEISHMAN,                 )
                                )
          Plaintiff,            )  CAUSE NO.
     -v-                        )  1:15-cv-1712-TWP-DML
                                )
CITY OF INDIANAPOLIS, INDIANAPOLIS)
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his   )
individual and official         )
capacities, OFFICER DONALD SPIEGL,)
in his individual and official  )
capacities, OFFICER WILLIAM     )
BUECKERS, in his individual and )
official capacities, PARK RANGER)
PHILIP GREENE, in his individual)
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT,    )
DEPUTY BILLY JOHNSON, in his    )
individual and official         )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY,   )
MEDIC LANCE COPE, in his        )
individual and official         )
capacities, MARK BRITTON, and   )
WILLIAM PATTERSON,              )
                                )
          Defendants.           )
```

The deposition upon oral examination of DONALD SPIEGL, a witness produced and sworn before me, Russell J. Scheiner, RPR, CSR, and Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiff in the offices of Keffer Barnhart, LLP, 230 East Ohio Street, Suite 400, Indianapolis, Marion County, Indiana, on July 27, 2016, at 2:00 p.m., pursuant to Notice and Federal Rules of Civil Procedure.

```
       RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                   3437 Beasley Drive
                Indianapolis, Indiana 46222
                  Tel. & Fax (317) 299-6302
```

APPEARANCES

FOR THE PLAINTIFF:
    Scott Barnhart, Esq.
    Brooke Smith, Esq.
    KEFFER BARNHART, LLP
    230 East Ohio Street
    Suite 400
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS CITY OF INDIANAPOLIS, INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER DONALD SPIEGL, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER WILLIAM BUECKERS, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, PARK RANGER PHILIP GREENE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, MARION COUNTY SHERIFF'S DEPARTMENT, AND DEPUTY BILLY JOHNSON:
    Kathryn Box, Esq.
    OFFICE OF CORPORATION COUNSEL
    200 East Washington Street
    Suite 1601
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, MEDIC LANCE COPE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES:
    Mary R. Feldhake, Esq.
    Bose McKinney & Evans, LLP
    111 Monument Circle
    Suite 2700
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS MARK BRITTON AND WILLIAM PATTERSON:
    Not present or represented by counsel.

---

INDEX OF EXAMINATION

|  | Page |
|---|---|
| DIRECT EXAMINATION, Questions By Mr. Barnhart | 4 |

INDEX OF EXHIBITS

|  | Page |
|---|---|
| Plaintiff's Exhibit P | 50 |

---

4

1       DONALD SPIEGL,
2  having been first duly sworn to tell the truth,
3  the whole truth and nothing but the truth in the
4  aforementioned matter, testified as follows:
5
6  DIRECT EXAMINATION,
7    QUESTIONS BY MR. SCOTT BARNHART:
8  Q. Sir, please state your name for the record and
9     spell your last name.
10 A. Donald Spiegl. S-p-i-e-g-l.
11 Q. Have you ever been deposed before, sir?
12 A. Yes.
13 Q. How many times?
14 A. Several.
15 Q. Civil or criminal, or both?
16 A. I believe just maybe criminal. I don't believe
17    civil.
18 Q. Are you currently under the influence of alcohol
19    or drugs?
20 A. No.
21 Q. Any prescribed medication?
22 A. High blood pressure medicine.
23 Q. Nothing that would prevent your --
24 A. No, no.
25 Q. And I'm not trying to get into your medical

Page 5

1 history, I'm just asking whether anything would
2 affect your ability to tell the truth here today.
3 A. No.
4 Q. What did you do to prepare for today's
5 deposition?
6 A. I met with the city legal.
7 Q. Did you review any documents?
8 A. Yes.
9 Q. What were those?
10 A. The Internal Affairs statement I had, and the
11 report here.
12 MS. BOX: The Interrogatories.
13 Q. Did you review any video?
14 A. No.
15 Q. Other than counsel, did you talk with anybody in
16 preparation for today's deposition?
17 A. No.
18 Q. Have you generally, not just in preparation for
19 the deposition, have you spoken with anybody
20 other than counsel about the nature of the
21 allegations involved in this Complaint?
22 A. No.
23 Q. How old are you, sir?
24 A. Fifty-nine.
25 Q. Where did you go to high school?

Page 6

1 A. Chatard High School.
2 Q. Do you have any college?
3 A. Approximately three years at I. U. P. U. I.
4 Q. Did you go to ILEA, or the --
5 A. Indianapolis.
6 Q. What class were you in, do you recall?
7 A. Gosh, no. I don't recall.
8 Q. How long have you been in law enforcement.
9 A. Thirty-three years.
10 Q. What is your current rank?
11 A. Patrolman.
12 Q. Have you always been a patrolman?
13 A. Yes, sir.
14 Q. Have you had any promotions or demotions?
15 A. No.
16 Q. In what district have you been --
17 A. South side.
18 Q. Have you always been on south side?
19 A. Yes, sir.
20 Q. Are you familiar with Bryant's Friendly Inn?
21 A. Yes.
22 Q. Have you had the occasion to make runs there?
23 A. Yes.
24 Q. How often?
25 A. Maybe once in several months.

Page 7

1 Q. What kind of area is that area where Bryant's is
2 located in?
3 A. Low income.
4 Q. Is it a rough area?
5 A. It's just -- it's not the best area of the city,
6 and obviously it's not the worst area of the
7 city. You just have to be careful at times when
8 you're doing stuff with vehicles and property.
9 Q. When you went through the academy did you get
10 training on law enforcement techniques?
11 A. Yes, sir.
12 Q. And you graduated from the academy; is that
13 right?
14 A. Yes.
15 Q. And by statute you have to have continuing
16 education; is that correct?
17 A. Yes, sir.
18 Q. Have you satisfactorily completed your continuing
19 education during the course of your 33 years?
20 A. Yes, sir.
21 Q. Have you had any additional training?
22 A. Back in 2000 I went to hazards device school in
23 Alabama.
24 Q. Any other trainings that you can recall?
25 A. Not that I recall.

Page 8

1 Q. Are you CIT trained?
2 A. No, sir.
3 Q. Do you know what that means?
4 A. Yes.
5 Q. What does that mean?
6 A. Incident -- Certified Incident Training I believe
7 is what it stands for, that you can try to
8 de-escalate a person who has emotional problems.
9 Q. And there are officers that are CIT trained; is
10 that right?
11 A. Yes.
12 Q. What is that training designed to address?
13 A. The mentally ill, from what I understand.
14 Q. To your knowledge or understanding does that
15 include individuals that might be intoxicated?
16 A. I don't believe so, but I don't know for sure.
17 Q. If I told you the term excited delirium, what
18 does that mean to you?
19 A. Very agitated and irresponsible, not the norm of
20 a normal person as far as the mindset.
21 Q. Are you aware of any General Orders that address
22 individuals that might be in a state of excited
23 delirium?
24 A. In General Orders?
25 Q. Yes.

### Page 9

1 A. No, sir.
2 Q. Are you aware of any General Orders that
3     generally address individuals that are mentally
4     ill or might be mentally ill?
5 A. We have some. Yes, sir.
6 Q. Are you familiar with them?
7 A. Yes, sir.
8 Q. Do you recall interacting with Mr. Heishman in
9     October of 2014?
10 A. Yes.
11 Q. What do you recall about that day?
12 A. Myself and Officer Burnett had received a radio
13     run, a dispatch run, to trouble with a person
14     possibly naked running around East Street and
15     Terrace Avenue.
16 Q. Where were you at the time when you got the call?
17 A. Somewhere around the Shelby and Raymond area.
18 Q. Were you in your vehicle?
19 A. Yes, sir.
20 Q. Were you marked out or marked in?
21 A. I was in-service.
22 Q. In-service. And just for purposes of the record,
23     when you're in-service you're available to take
24     runs or take calls; is that correct?
25 A. Yes, sir.

### Page 10

1 Q. And when you mark out, you're out of service,
2     you're not available to take runs?
3 A. You're not available.
4 Q. So you were in-service, and you were near Shelby
5     and Raymond did you say?
6 A. Yes, sir.
7 Q. And did you mark out of service, or did you
8     respond to the scene?
9 A. When you get a run, they put you out of service
10     on that run.
11 Q. So you got the run and who else?
12 A. Officer Burnett.
13 Q. Did anybody else get the run?
14 A. Not that I recall.
15 Q. How far away were you from the location of the
16     run?
17 A. Shelby is the 1100 east. Six blocks -- eight,
18     nine blocks maybe.
19 Q. How many minutes driving time?
20 A. With traffic and everything, a couple of minutes
21     or so. Three minutes.
22 Q. When you responded, did you respond with lights
23     and sirens?
24 A. I did not, no.
25 Q. And do you recall telling dispatch that you were

### Page 11

1     responding, or you just know that you did?
2 A. Yes. You knowledge on the radio that you
3     respond -- you acknowledge on the radio, and that
4     means that you've accepted the run and you're
5     going on it.
6 Q. And you went directly to the run?
7 A. Yes, sir.
8 Q. What happened when you arrived?
9 A. On the way to the run, I didn't get quite there
10     to the intersection, and Officer Burnett got on
11     the radio and said he had the person, or thought
12     he had the person farther south than where I was
13     at. So I had to make a U-turn and go back south
14     on Shelby Street to approximately I think it was
15     Lincoln. I'm not sure exactly where it was at.
16 Q. Did you hear him say step it up?
17 A. Yes.
18 Q. What does that mean to you?
19 A. Get there quickly. When I got there, he and two
20     civilians were wrestling with a naked man in the
21     street.
22 Q. When you heard him say step it up did you try to
23     get there more quickly?
24 A. Yes.
25 Q. By driving faster, or what did you do?

### Page 12

1 A. I just turned my lights on.
2 Q. Where did you park?
3 A. Right in the middle of the street.
4 Q. How far away from where they were did you park?
5     Do you understand my question?
6 A. Yes. Maybe ten feet at the most.
7 Q. And then what happens after you got out of your
8     car, what do you do next?
9 A. I got my car right up to where they were
10     wrestling with this person, and they're yelling
11     back and forth. He's yelling at me to help get
12     him down, keep him down, keep him down --
13 Q. When you say "he," who are you referring to?
14 A. He's referring to the naked man there that he's
15     wrestling with.
16 Q. So you're talking to Officer Burnett?
17 A. Burnett is telling me we need to keep him down,
18     we need to keep him down.
19 Q. Is he saying anything else?
20 A. And then he's yelling to the two civilians get
21     him down, get him down.
22 Q. And were they helping get him down?
23 A. They got him down once, and he came back up. And
24     he said we need to keep him down.
25 Q. Were they striking him?

## Page 13

1 A. Not that I could see, no.
2 Q. What was Officer Burnett doing?
3 A. Trying to get on his back and push him down.
4 Q. Was he striking him?
5 A. Not that I saw, no.
6 Q. And then what did you do next?
7 A. He said there is an asp. See if you can use that
8 to get him down by his legs.
9 Q. What is an asp?
10 A. It's a metal expandable baton.
11 Q. Did you find that?
12 A. Yes.
13 Q. What did you do?
14 A. I picked it up and tried to strike him. I struck
15 him approximately three times between his knees
16 and his ankles, his legs, to get him down.
17 Q. Were those strikes successful?
18 A. No.
19 Q. What happened next?
20 A. We finally got him down on his belly, one hand
21 behind him, and we had to keep wrestling I
22 believe it was with the right hand. We had
23 trouble getting the right hand behind him to get
24 him cuffed.
25 Q. Were you able to get him cuffed?

## Page 14

1 A. Finally. We used two sets of cuffs to get him
2 cuffed.
3 Q. So you used two sets?
4 A. Two sets together.
5 Q. Right. So four total; right?
6 A. No.
7 Q. I'm sorry. Let me clarify. One set has one
8 grasp for one hand, and one grasp for the other?
9 A. This is a set.
10 Q. Yes. So you use another set and you link them
11 together?
12 A. Together, to make it longer.
13 Q. Yes. So that he has a little --
14 A. To make it easier to get him cuffed, and quicker.
15 Q. So his hands don't have to be as close together
16 in order to use two sets?
17 A. Like I say, it's quicker, a lot quicker to get
18 him cuffed.
19 Q. Whose sets did you use?
20 A. One was mine, and I believe the other -- I'm
21 assuming the other set was Officer Burnett's.
22 Q. And so how long after when you responded were you
23 able to get him handcuffed? Do you have any idea
24 as far as time?
25 A. Several minutes. Like I said, I think it was the

## Page 15

1 right hand that we had trouble getting it from
2 the front of him to behind his back to get him
3 cuffed. The person kept fighting, struggling
4 with us.
5 Q. Did you have any interactions with the civilians
6 that were there helping with the detention?
7 A. As far as talking to them?
8 Q. Yes, sir.
9 A. No, sir.
10 Q. Did you ask them any questions?
11 A. No.
12 Q. Did they say anything to you?
13 A. I don't recall.
14 Q. Were you giving them any directions?
15 A. I wasn't. I might have later on, after we got
16 him cuffed said are you guys okay, but that was
17 all.
18 Q. Did you give them any directions as to the
19 physical tactics and how to apprehend, or what to
20 do physically for Mr. Heishman?
21 A. No.
22 Q. And after you were able to get him handcuffed,
23 what did you do after that?
24 A. Almost immediately after, I would say a minute or
25 so, the wagon, paddy wagon showed up. And we

## Page 16

1 tried to get him, get the subject in the wagon.
2 The wagon driver was on one side of him, and
3 Officer Burnett was on the other side, and tried
4 to escort him to the wagon, get him up into the
5 wagon. He stiffened up again and started to
6 resist some more.
7 Q. So he was handcuffed before the wagon arrived?
8 A. Yes, sir.
9 Q. What did you observe of Mr. Heishman, was he --
10 A. He was still yelling, and then he stopped for a
11 while, and then he tried to resist again and
12 stiffen up, like I said.
13 Q. Well, let me back you up. When you first arrived
14 on scene was he wearing any clothes?
15 A. No.
16 Q. Was there anything in his hands?
17 A. I didn't see his hands.
18 Q. Did you touch him?
19 A. Yes.
20 Q. Was he sweaty?
21 A. Yes.
22 Q. Profusely, or just -- what level? Any idea?
23 A. I don't know. I can't recall.
24 Q. Do you recall what his body temperature was?
25 A. No.

### Page 17

1  Q. Do you recall whether he had any difficulty
2     breathing?
3  A. No. The way he acted, he didn't have any trouble
4     breathing.
5  Q. So, no, he didn't have any trouble breathing?
6  A. Not that I saw.
7  Q. Were you looking for that?
8  A. No.
9  Q. Did you ever take his pulse?
10 A. No.
11 Q. Did you ever look him over for any injuries to
12    his body?
13 A. No.
14 Q. Did you see any blood?
15 A. There might have been some marks around where I
16    had struck him on his legs.
17 Q. Did you see any blood on his hands?
18 A. I don't recall any.
19 Q. Do you recall seeing any blood on his body?
20 A. I don't recall any.
21 Q. Do you recall --
22 A. Other than his leg area.
23 Q. Well, when you hit him with the asp did you break
24    skin?
25 A. I didn't notice any until later on at the

### Page 18

1     hospital. But there wasn't any actual cuts or
2     bruises when I first did it. I didn't notice
3     any.
4  Q. Do you recall either Mr. Burnett or the two
5     civilians strike him in the head?
6  A. No.
7  Q. You don't recall that?
8  A. I did not see any.
9  Q. So you were able to use two sets to get him
10    handcuffed. Did you leave them in the same
11    position?
12 A. Like I say, after we got him cuffed it wasn't a
13    short time later that the wagon was there. We
14    kind of picked him up and escorted him to the
15    wagon.
16 Q. So before that is he -- after you were able to
17    get the handcuffs on him what position is he in?
18 A. He's on his belly.
19 Q. So he's in the prone position?
20 A. Yes.
21 Q. Was his head arched back, or where was his head?
22    Do you have any idea?
23 A. No.
24 Q. So he's handcuffed behind his back; correct?
25 A. Correct.

### Page 19

1  Q. Are there people located on his person, on his --
2  A. Officer Burnett was, and then I believe one of
3     the civilians was trying to keep him down.
4  Q. Where was Officer Burnett? Where was he located?
5  A. Towards his back.
6  Q. Left side or right side?
7  A. I don't recall.
8  Q. And one of the other civilians was trying to keep
9     him down?
10 A. The other civilian was there too. I don't know
11    exactly what he was doing, but I remember one
12    pushing on his shoulder area to keep him down.
13 Q. Was he using one hand or two?
14 A. I believe it was two.
15 Q. You said it was on his shoulder area?
16 A. Shoulder, neck area.
17 Q. Was he on his feet, or was he on his knees, do
18    you have any idea?
19 A. I believe he was on his knees.
20 Q. Pushing his shoulder into the ground?
21 A. Yes.
22 Q. And you were towards his legs?
23 A. Yes, I was towards the back, behind Burnett.
24 Q. What were you doing at that point?
25 A. Trying to keep his legs and his knees down. He

### Page 20

1     was still trying to fight after he was cuffed.
2  Q. Were you successful in doing that?
3  A. Well, later on Ranger Greene came on to assist,
4     and he held his ankles down by his knees, holding
5     him down.
6  Q. Can you give me an idea about the level of
7     flailing? How aggressively was it, was it
8     violent or was it just sort of haphazard, any
9     idea?
10 A. No, it was pretty violent I thought. I mean, it
11    took four of us, almost five of us to keep this
12    one person, just to keep him down.
13 Q. Did you think that he was under the influence of
14    anything?
15 A. He was on something, yes, sir, I thought for
16    sure.
17 Q. What did you think he was on?
18 A. Some kind of narcotic.
19 Q. Any idea about which one?
20 A. No.
21 Q. Did you ever talk to him?
22 A. No.
23 Q. Did he ever communicate with you?
24 A. He was yelling something. I don't remember
25    exactly what it was.

**Page 21**

1 Q. Any idea?
2 A. Something about he wants to get hurt, or he was
3   going to get hurt, if he doesn't do something
4   he's going to get hurt.
5 Q. So when the wagon arrived, what happened
6   afterwards?
7 A. We kind of picked him up and escorted him to
8   wagon. The wagon driver opened his doors,
9   obviously, and we tried to get him up. And there
10   is a step, and we tried to get him up the step,
11   and he just starts to stiffen up like a board so
12   we couldn't get him to bend down to get in the
13   wagon.
14 Q. Was he ever shackled by his legs?
15 A. Later on he was, yes.
16 Q. At the point that he was trying to be put in the
17   van, was he leg shackled at that point?
18 A. I believe so. I don't recall, but I believe so.
19 Q. Did you ever move him to another location from
20   where he was when he was handcuffed to where the
21   van was located, or was it just that one
22   location?
23 A. Just the one location.
24 Q. Do you recall him being leg shackled at that
25   location?

**Page 22**

1 A. I believe once we got him to the wagon they put
2   the shackles on, and then tried to get him up
3   into the wagon.
4 Q. So after you had started to move him, but before
5   you tried to put him in the wagon? Is that a
6   yes?
7 A. Yes.
8 Q. Do you know which officer put the leg shackles
9   on?
10 A. I believe it was the wagon driver.
11 Q. Who was that?
12 A. Deputy Johnson I believe.
13 Q. Did you ever work with him before?
14 A. Yes.
15 Q. Is he the wagon driver for that district or that
16   zone?
17 A. They changed shifts, but he has done that area
18   before, yes. I think he was on middle shift,
19   wagon driver.
20 Q. And so were you one of the officers that had
21   tried to assist him into the van?
22 A. I was behind the deputy, trying to help hold the
23   door so it wouldn't close back on us, and help
24   push him up into the wagon.
25 Q. And what did he do?

**Page 23**

1 A. Just kept stiffening up, and the wagon driver
2   says this isn't going to work, we have to find
3   another way.
4 Q. And who was he saying -- and that was the wagon
5   driver, or Johnson that said that?
6 A. Yes.
7 Q. Who was he saying that to?
8 A. I believe to Officer Burnett and anybody that was
9   around there.
10 Q. So it was you, Officer Johnson, or Deputy
11   Johnson, Officer Burnett. Any other officers you
12   can recall?
13 A. Later on, like I say, Park Ranger Greene was
14   there. And then later on Officer Bueckers showed
15   you.
16 Q. So after he stiffened up and Johnson made the
17   determination that he wasn't going to go in the
18   van; is that correct?
19 A. Yes.
20 Q. Then what happened next?
21 A. Called for an ambulance.
22 Q. Where did you put him.
23 A. We just kind of held him there until the
24   ambulance showed up.
25 Q. Was he on his feet, or --

**Page 24**

1 A. Yes.
2 Q. -- was he on the ground?
3 A. The way I remember he was on his feet.
4 Q. Was he resisting at that point?
5 A. He was still moving around, kind of flailing a
6   little bit.
7 Q. But he was leg shackled, and shackled with his
8   handcuffs; correct?
9 A. Yes.
10 Q. Did you ever put him on the ground before the
11   EMTs arrived?
12 A. I don't believe so.
13 Q. So he was standing there. How long did it take
14   the EMTs to get there?
15 A. They were there quickly. A minute maybe.
16 Q. What happened after they arrived?
17 A. They put him on a gurney face up, strapped him
18   down to the gurney, and got him into the
19   ambulance.
20 Q. Did you ever see any of the EMTs give him any
21   medication, or medicine?
22 A. They gave him something to calm him down, but I
23   don't know if it was -- whether it was on the
24   gurney or when they got him into the ambulance.
25 Q. Did you see them give him something?

**Page 25**

1 A. I don't recall actually seeing them give him
2     something, no.
3 Q. You just know that they did?
4 A. That's what they said, that they were going to
5     give him something to calm him down.
6 Q. Who said that?
7 A. I believe the medics, or -- I don't recall. It
8     was a medic that suggested that, or Officer
9     Burnett or Deputy Johnson, said we need to give
10    him something to calm him down.
11 Q. And was there a conversation being had amongst
12    the officers and the EMT?
13 A. Yes.
14 Q. Do you recall the specifics of that conversation?
15 A. No.
16 Q. Do you recall how long that discussion lasted?
17 A. Not very long at all, because he was still upset
18    and flailing before they put him on the gurney.
19 Q. Did he ever try to head butt anybody?
20 A. I don't recall anything like that.
21 Q. Did he ever try to kick anybody?
22 A. No.
23 Q. And he was just physically bouncing around and
24    moving, wouldn't stand still?
25 A. Wouldn't stand still, and tried to get away from

**Page 26**

1     us as best he could.
2 Q. And it's hard to kind of get on the record, but
3     you're jostling; right?
4 A. Yes.
5 Q. But he wasn't necessarily going after one
6     particular officer, would that be correct?
7 A. He was just trying to get away from all of us,
8     no, that I saw.
9 Q. Did he ever try to run?
10 A. Not that I recall.
11 Q. Was there ever a time when an officer didn't have
12    physical contact with him after you were able to
13    get him handcuffed?
14 A. Say that again.
15 Q. Was there ever a time when an officer didn't have
16    physical contact with him? Do you know what I
17    mean by that? So whenever you have --
18 A. Hands on him?
19 Q. Yes.
20 A. I believe somebody had hands on him.
21 Q. So there was a discussion once the EMT arrived.
22    Who was the EMT, do you remember who it was?
23 A. No, I don't.
24 Q. If I told you it was Medic Cole, do you have any
25    reason to dispute that?

**Page 27**

1 A. I don't know.
2 Q. Have you ever worked with him?
3 A. I don't recall his name or anything.
4 Q. And then so there was a gurney there; correct?
5 A. Yes.
6 Q. Did he bring the gurney with him, or did somebody
7     have to go back and get the gurney and bring it
8     back?
9 A. I think they brought it out with them when they
10    got there.
11 Q. And did you help put him on the gurney?
12 A. No.
13 Q. What were you doing at that point?
14 A. Checking with Officer Burnett to see what he
15    needed done as far as witnesses or anything like
16    that, or names, or start an arrest slip; if he
17    wants somebody to go to the hospital with the
18    subject. Did he want me to go with him, or
19    somebody else, or what do you want, what do you
20    need help with.
21 Q. And what did he tell you?
22 A. I needed to follow the ambulance to the hospital.
23 Q. That you did, or he was going to?
24 A. I did.
25 Q. So you told --

**Page 28**

1 A. I might have volunteered. I'm not sure.
2 Q. So there was a discussion, whether you
3     volunteered or whether he told you to --
4 A. Correct.
5 Q. But he was the arresting officer --
6 A. Yes.
7 Q. So it was his scene?
8 A. Yes.
9 Q. So it would have been his call unless a
10    supervisor got involved?
11 A. Correct.
12 Q. So was there ever a supervisor that arrived on
13    scene that you recall?
14 A. Not that I recall.
15 Q. How many officers do you recall being on scene?
16 A. Myself, Officer Burnett, Deputy Greene, Officer
17    Bueckers showed up. Later on I believe Officer
18    Shafer, she showed up. Five that I recall.
19 Q. Greene, what was his role that you saw?
20 A. He helped me hold the legs down of the subject.
21 Q. Was he with you when you were trying to put him
22    in the van?
23 A. He was there. I don't know exactly where he was.
24 Q. And you said that you knew that there was some
25    medicine or drug that was administered, you just

**Page 29**

1  don't know where you were when that occurred?
2 A. Correct.
3 Q. Do you recall him being transported from the back
4    of the van to the ambulance? Do you know what I
5    mean by that?
6 A. After they put him on the gurney?
7 Q. Well, let me -- Did you help put him on the
8    gurney?
9 A. I don't recall.
10 Q. And after he was on the gurney, then what
11    happened?
12 A. They strapped him down and loaded him into the
13    wagon. Or into the ambulance. Sorry.
14 Q. What was the lighting like that day? What time
15    of day was it?
16 A. I think it was around 7:00 at night. 7:00, 7:30
17    or so.
18 Q. This was in October; right?
19 A. Yes.
20 Q. Was it dark out?
21 A. It was still light out.
22 Q. Was it easy to see, hard to see? Did you have a
23    flashlight on you?
24 A. No, I did not have a flashlight with me.
25 Q. Did anybody have a flashlight around?

**Page 30**

1 A. Not that I recall.
2 Q. And when he was on the gurney did you see him on
3    the gurney?
4 A. Yes.
5 Q. What was he doing when he was on the gurney?
6 A. I don't recall.
7 Q. At any points when you were interacting with
8    Mr. Heishman did you ever see him have any
9    difficulty breathing?
10 A. No.
11 Q. Were you watching for that?
12 A. Not really.
13 Q. When he was --
14 A. He was still yelling sometimes, so I assume he
15    was not having any problem breathing.
16 Q. So when he was transported from the gurney to the
17    ambulance, did you see that?
18 A. No.
19 Q. What were you doing at that point?
20 A. Talking to Officer Burnett, seeing what he wanted
21    done, what information he needed.
22 Q. So he wasn't with the gurney either?
23 A. I don't believe so.
24 Q. Do you know whether there were any officers that
25    were?

**Page 31**

1 A. Later on somebody got on the radio. I think it
2    was Officer Bueckers got on the radio and said we
3    need some help back here. I went to the back of
4    the ambulance, and they were doing the -- Officer
5    Bueckers was doing compressions on him.
6 Q. Okay. So do you know why Officer Bueckers asked
7    for help?
8 A. I think the subject was having trouble. It
9    appeared to me that way anyway.
10 Q. So he was doing chest compressions?
11 A. Correct.
12 Q. Who else was in the back of the ambulance?
13 A. I believe there was another person. It might
14    have been Officer Shafer. I'm not sure.
15 Q. What were they doing, do you have any idea?
16 A. Looked like they were giving him compressions,
17    and trying to get him to come back.
18 Q. So what did you do after that?
19 A. I think I looked towards Burnett and said is he
20    having trouble breathing, are they having trouble
21    with him.
22 Q. And what did he do?
23 A. He said we need to get him to the hospital.
24 Q. And did that happen?
25 A. The subject came back.

**Page 32**

1 Q. Do you know how long he was out?
2 A. No, I don't.
3 Q. So Bueckers calls you back, you're standing and
4    seeing what is happening, you're standing with
5    another officer. Who else was around watching?
6 A. I believe Officer Shafer was there.
7 Q. Any others?
8 A. I don't know who was behind me.
9 Q. So the three of you were standing there watching
10    in the back of the ambulance?
11 A. No. Officer Bueckers was in the ambulance and
12    was helping with compressions, and I believe
13    Officer Shafer was up in the ambulance also, and
14    I was at the end of the ambulance, at the back of
15    the ambulance, standing outside of it.
16 Q. Okay. Did they ask you to do anything?
17 A. No.
18 Q. Or you were just kind of watching?
19 A. No, I was just watching.
20 Q. And what happened, what did you do after that?
21 A. I told Officer Burnett, I said that he's having
22    trouble breathing, and Burnett said we need to
23    get him to the hospital quickly. And then -- but
24    a few seconds later he came back.
25 Q. What did you do after that?

**Page 33**

1 A. They moved some personnel around. Bueckers got
2 out of the ambulance, and I believe Officer
3 Shafer got out of the ambulance, and they closed
4 the doors and we took off to the hospital.
5 Q. And you followed?
6 A. Yes, sir.
7 Q. How long did it take you to get to the hospital?
8 A. It wasn't long at all. Five, six minutes.
9 Q. And you went to Eskenazi?
10 A. Yes, sir.
11 Q. Lights and sirens I assume?
12 A. Yes, sir.
13 Q. Were you watching the back?
14 A. Yes, sir.
15 Q. What happened after you got the hospital?
16 A. They got him out of the ambulance and into the
17 hospital, and they started talking medical stuff,
18 and I waited outside the emergency area.
19 Q. Do you know what room they were in?
20 A. No.
21 Q. Do you know what area of the ER they went to?
22 A. No.
23 Q. What was your responsibility there? Were you
24 just guarding him, or what were you doing?
25 A. Checking to see how he was. We had to get the

**Page 34**

1 handcuffs back off of him and the shackles back
2 off of him. And then later on I believe
3 Lieutenant Feeney, I think he had me on the radio
4 to call him, and said I need to get a condition
5 of him before we go to the hospital.
6 Q. Do you know why he needed a condition of him?
7 A. Probably needs to do a special report on the
8 resisting.
9 Q. At what point did you get your handcuffs back?
10 A. After they had -- quickly after they got there,
11 because they needed to get his hands back to take
12 vitals and stuff like that. They couldn't do it
13 if his hands were behind him.
14 Q. So was he unconscious do you know?
15 A. I don't recall.
16 Q. Backing up a little bit to when you were
17 interacting with him when you arrived on scene,
18 was he conscious at that point?
19 A. When I first got there?
20 Q. Yes.
21 A. Oh, yes. He was acting like a wild man.
22 Q. Was there ever a point where he was unconscious
23 at the time you interacted with him before he got
24 on the ambulance?
25 A. Not that I recall.

**Page 35**

1 Q. So going back to at Eskenazi, when you were in
2 there how long did you stay?
3 A. A half an hour or so. 45 minutes.
4 Q. Did you talk to anybody while you were there?
5 A. Just a couple of the people that were assisting.
6 I said I need the condition, if you have time,
7 let me know how he is.
8 Q. Do you remember which people you spoke with?
9 A. I think it was the nurses there.
10 Q. Do you recall any of the names?
11 A. No, sir. And then later on I asked the nurse
12 again, I said do you have a condition yet,
13 because they got me on the radio. I said they
14 want to know the condition, and they told me to
15 talk to one of the doctors. I don't know the
16 doctor's name. And they said they'll let me know
17 in a second.
18 Q. And what condition did they tell you that he was
19 in?
20 A. I believe they told me he was critical but
21 stable.
22 Q. And is that what Feeney was looking for? When a
23 supervisor asks you about their condition, what
24 is your understanding of what they are asking
25 for?

**Page 36**

1 A. How bad or how good is the patient. What medical
2 condition.
3 Q. So you learned from the physician or from the
4 medical staff that it was critical stable?
5 A. That's what I believe. Yes, sir.
6 Q. Do you recall when you passed that information
7 along to the lieutenant?
8 A. What --
9 Q. When you received that information what did you
10 do?
11 A. I went back to the car and got on the laptop. I
12 believe I told him on the radio, and also sent a
13 message to him that he was in critical but
14 stable.
15 Q. And what did you do after that?
16 A. Went back with Deputy Johnson to give him his
17 shackles back, and I believe Officer Burnett at
18 roll call gave him his handcuffs back.
19 Q. Did you talk with those officers about what had
20 happened?
21 A. A little bit.
22 Q. What did you say?
23 A. Just that he was pretty wild, and I wanted to
24 know what he was on.
25 Q. What did they say to you?

### Page 37

```
 1  A.  It must have been something. I don't know
 2      exactly what they said, but something to that
 3      effect.
 4  Q.  Did you ever pull your taser in an effort to try
 5      to tase Mr. Heishman?
 6  A.  I don't have a taser.
 7  Q.  You don't have a taser. Did you hear one when
 8      you were on scene after you responded?
 9  A.  No.
10  Q.  Did you ever hear Officer Burnett indicate that
11      he was going to use a taser?
12  A.  Not when I was there, no.
13  Q.  The two civilians, did you recognize them at all?
14  A.  No.
15  Q.  You had not interacted with them before?
16  A.  I don't believe so. I did find out later on that
17      I think one got his nose broke in the fight.
18  Q.  Do you know whether they knew, either civilian,
19      whether they knew Mr. Heishman?
20  A.  I don't know.
21  Q.  Did you do a supplemental report?
22  A.  No.
23  Q.  Did anybody ever ask you to do a supplement?
24  A.  Not that I recall.
25  Q.  And you've not seen any video?
```

### Page 38

```
 1  A.  No, sir.
 2  Q.  Does the name Casual Woods mean anything to you?
 3  A.  Casual Woods?
 4  Q.  Yes.
 5  A.  No, sir.
 6  Q.  Have you ever put anybody up for an award, any
 7      civilians up for a commendation through the
 8      department?
 9  A.  No, sir.
10  Q.  Did you consider doing that here?
11  A.  I believe Officer Burnett had talked about it.
12  Q.  Do you know when he talked about it?
13  A.  No, I don't.
14  Q.  Did you talk with him about it?
15  A.  Just that it would be a good idea.
16  Q.  Why did you think it was a good idea?
17  A.  Because until I had gotten there to try to help
18      Officer Burnett, they were the only ones there
19      helping.
20  Q.  How many people were around?
21  A.  Oh, there were several.
22  Q.  So you didn't have a taser. Did you have OC
23      spray?
24  A.  Yes.
25  Q.  On you?
```

### Page 39

```
 1  A.  Yes.
 2  Q.  What about a pepper ball, did you have a pepper
 3      ball on you?
 4  A.  No.
 5  Q.  I may have asked you this before, but you didn't
 6      know Mr. Heishman?
 7  A.  No, sir. I don't recall knowing him anyway.
 8  Q.  Have you ever had the occasion to ask for the
 9      assistance of civilians to assist in an arrest?
10  A.  Yes.
11  Q.  How often has that happened?
12  A.  Just every once in a while.
13  Q.  In your career how often? Every once in a while.
14      Was it ten times, less, more?
15  A.  I would say less.
16  Q.  Do you recall any specific instances?
17  A.  I was chasing a guy years ago that went around
18      the corner. I went around the corner and he was
19      gone. I said where did he go, and they pointed
20      that way. By the time I got there they had
21      pointed to him. I got there to where he was at
22      trying to hide, and they came to watch me. And I
23      said grab his arm, and took him back.
24  Q.  Any other instances?
25  A.  Not that I recall.
```

### Page 40

```
 1  Q.  Are you aware of any General Orders, policies or
 2      procedures of the police department that gives
 3      you directives or protocols as to how you ask
 4      civilians to assist?
 5  A.  No.
 6  Q.  Do you know whether or not either of those two
 7      gentlemen were drinking that night?
 8  A.  That were helping Officer Burnett?
 9  Q.  Yes.
10  A.  I have no idea.
11  Q.  Do you know whether either of those two
12      individuals had been using drugs that night?
13  A.  No, sir.
14  Q.  You don't know?
15  A.  I don't know.
16  Q.  Do you know whether those two individuals had any
17      criminal history?
18  A.  No, sir.
19  Q.  You don't know?
20  A.  I don't know.
21  Q.  Do you know whether they had any law enforcement
22      or military training?
23  A.  I have no idea if they had any or not.
24  Q.  Do you know whether any of them had any battery
25      convictions?
```

The Deposition Upon Oral Examination of: DONALD SPIEGL, taken on 7/27/16.

**Page 41**

1  A. No, sir. I have no idea.
2  Q. And you didn't know who they were before.
3     Have you had any interactions with them
4     since?
5  A. Not that I know of.
6  Q. When you were at the hospital did you observe any
7     physical injuries on Mr. Heishman?
8  A. I saw marks around the bottom of his legs.
9  Q. What about his face?
10 A. I don't recall any.
11 Q. Both legs, one leg? Can you describe the marks?
12 A. There were bruises around his knees, and I
13    believe was one to the left ankle area.
14 Q. At the point that you were observing was he still
15    naked, or did he have clothes on? Did they put
16    any on him?
17 A. I don't recall.
18 Q. Do you recall whether you had the ability to see
19    any other parts of his body?
20 A. I saw around his chest and face area, but I don't
21    recall any marks.
22 Q. What about the arms, did you see his arms?
23 A. I saw his arms, but I don't recall any marks.
24 Q. Do you know whether he had any tattoos?
25 A. I don't recall.

**Page 42**

1  Q. Was there ever a determination made that the
2     civilians were no longer needed?
3  A. I think once the wagon driver showed up they kind
4     of stood back.
5  Q. Were they directed to stand back?
6  A. I don't recall. I don't recall that.
7  Q. Do you recall Mr. Burnett giving those two any
8     direction at all?
9  A. No, sir. You mean after he was handcuffed;
10    correct? Or before?
11 Q. Either. At any point.
12 A. While I was there he said we need to keep him
13    down, talking to myself and the two civilians.
14 Q. Did he give any other instructions?
15 A. Just to keep him down, don't let him get up.
16 Q. Do you recall anything else?
17 A. No.
18 Q. Do you ever recall him saying anything to the
19    effect of don't kill him to the two civilians?
20 A. Officer Burnett?
21 Q. Yes.
22 A. No, sir.
23 Q. I'll show you some video. You've not seen any
24    video; correct?
25 A. No, sir.

**Page 43**

1     (At this time a video file, Exhibit C, was
2     begun.)
3
4  Q. Do you recognize that voice?
5  A. No, sir.
6  Q. I'm stopping it at 1:19, and I'll back it up just
7     a few seconds. And I believe somebody makes a
8     reference to your name. If you recognize that
9     voice, let me know. If you don't, it's not an
10    issue. Do you recognize that?
11 A. No. No.
12 Q. Sometimes people know you in the area?
13 A. Yes. That happens.
14 Q. So at 1:21 does that appear to be you?
15 A. Yes.
16 Q. So you're walking in here; is that right?
17 A. Um-hm.
18 Q. Why aren't you running?
19 A. Looks like they've got him somewhat under
20    control.
21 Q. Does this appear to be a true and accurate
22    representation of what happened?
23 A. Yes, sir.
24 Q. And at 1:36 I'm stopping it. And that's you kind
25    of bending over?

**Page 44**

1  A. Yes.
2  Q. Do you recall what you were doing at this point?
3  A. Asking him what he wants me to do I believe.
4     That's what Officer Burnett wants me to do.
5  Q. And Officer Burnett is on the left; right?
6  A. Yes, sir.
7  Q. And the two civilians --
8  A. The two civilians are at the head.
9  Q. On the right sort of?
10 A. Yes.
11 Q. Whose police vehicle is that, do you know?
12 A. I'm assuming it's Burnett's.
13 Q. So at 1:50, is he resisting at this point?
14 A. I can't tell.
15 Q. I'm going to stop it at 2:12. Do you recall that
16    part of it?
17 A. Yes.
18 Q. What do you recall about it?
19 A. He was trying to get up again.
20 Q. So who responded?
21 A. I don't understand.
22 Q. Sure. What did you do in response to when he
23    tried to get up?
24 A. Tried to get him back down.
25 Q. So you were using physical force?
Russell J. Scheiner, RPR, CSR  3437 Beasley Dr., Indpls., IN. 46222 Tel: (317) 299-6302

Page 45

```
 1  A.  Yes.
 2  Q.  Were the other three individuals that were there,
 3      were they using physical force as well?
 4  A.  Yes, sir.
 5  Q.  I'm stopping it at 2:21. When you arrived on
 6      scene did you always have the asp?
 7  A.  No, sir.
 8  Q.  When did get the asp?
 9  A.  It was laying on the ground.
10  Q.  But it was nearby?
11  A.  Yes.
12  Q.  Do you hear that?
13  A.  Yes.
14  Q.  What is that sound?
15  A.  I believe that's the asp.
16  Q.  You think that's the asp?
17  A.  Yes.
18  Q.  And that's at 2:43, according to the video?
19  A.  Yes.
20  Q.  The asp, does it make a -- it's not electrical,
21      is it?
22  A.  No, sir.
23  Q.  It just makes a sound when it impacts?
24  A.  It can.
25  Q.  You're shaking your head. Is there --
```

Page 46

```
 1  A.  I'm listening to that guy. His comments.
 2  Q.  I'm going to stop it. Do you see that guy with
 3      the hat?
 4  A.  The white hat here?
 5  Q.  The one that --
 6  A.  Yes.
 7  Q.  Do you know who that is?
 8  A.  No.
 9  Q.  And so at 5:21 the van shows up; is that right?
10  A.  Um-hm.
11  Q.  So around the time that he shows up, at that
12      point you had had him handcuffed?
13  A.  Yes, sir.
14  Q.  Before that?
15  A.  Yes, sir.
16  Q.  After seeing that video is there anything that
17      you recall doing to or interacting with
18      Mr. Heishman that refreshes your recollection?
19  A.  I believe maybe somebody did tase him.
20  Q.  Do you recall where?
21  A.  No, sir.
22  Q.  And who would that have been?
23  A.  It had to be Officer Burnett.
24  Q.  You didn't see tasers on the two civilians, did
25      you?
```

Page 47

```
 1  A.  No, I didn't. I guess they could have had one,
 2      but I assume it had to be Burnett.
 3  Q.  Do you have any idea about where he tased him?
 4  A.  No, sir.
 5  Q.  Do you have any idea about whether it was
 6      effective or not?
 7  A.  I don't believe it was, no.
 8  Q.  Do you have any idea about whether he made
 9      contact with Mr. Heishman?
10  A.  No, sir.
11  Q.  When the taser is activated, whether it makes
12      contact or not it makes a noise; is that right?
13  A.  Yes, sir.
14  Q.  If it doesn't make contact it doesn't make noise?
15      Do you understand what I mean by that?
16  A.  Yes. I think when you pull the trigger it makes
17      a clicking sound, if that's what you mean.
18  Q.  Do you have any idea as to how many times he
19      attempted to tase?
20  A.  No, sir.
21  Q.  And when you were using the asp did Officer
22      Burnett use the asp as well, or was it just you?
23  A.  It was laying on the ground when I got there, so
24      I was the only one that used it.
25  Q.  And how many strikes do you recall making?
```

Page 48

```
 1  A.  Three to four.
 2  Q.  Do you recall making any closed hand strikes
 3      other than the asp?
 4  A.  No, sir.
 5  Q.  It was just the asp?
 6  A.  Yes, sir.
 7  Q.  Did you ever lean on him or put your weight on
 8      him in any way?
 9  A.  Yes. On his knee area. And maybe his hip.
10  Q.  And approximately how long were you leaning on
11      him or using your weight to hold him down, do you
12      have any idea?
13  A.  Just as long as he would stay still, then I would
14      let up a little. A couple of minutes.
15  Q.  So you're applying force, and if he stayed still
16      then you would reduce the force?
17  A.  Yes.
18  Q.  But if he tensed up, then you would continue the
19      force?
20  A.  Then later I think I put a foot towards his
21      ankle. As long he stayed still I would let up on
22      that.
23  Q.  Is he talking at all at this point?
24  A.  He was yelling something off and on.
25  Q.  Could you understand it?
```

**Page 49**

1  A. Something to the effect of I'm going to get hurt,
2     or you need to hurt me, or I'm going to hurt
3     myself or something. Something with hurt in
4     there.
5  Q. Did he say anything else?
6  A. Not that I recall.
7  Q. Were the civilians saying anything to him?
8  A. I don't recall.
9  Q. Do you recall Officer Burnett saying anything to
10    him?
11 A. Stay down, get down, stay down, quit resisting,
12    stop resisting. Something to that effect.
13 Q. Anything else?
14 A. No, sir.
15 Q. Have you had any disciplinary issues in your law
16    enforcement career? Have you ever been
17    disciplined?
18 A. No, sir.
19 Q. Have you had any awards?
20 A. Some commendations.
21 Q. Do you recall what those are?
22 A. One was for -- our EOD unit got an award, and
23    then some commendations way back for helping a
24    civilian on a bridge thinking about jumping.
25 Q. Any others?

**Page 50**

1  A. Not that I recall.
2     MR. BARNHART: We'll take a quick break.
3     (A brief recess was taken at this time.)
4
5  Q. A few more questions. Is retirement in sight?
6  A. Maybe the end of this year or the beginning of
7     next year I'll sign up for the draw, if they give
8     me three years more.
9  Q. What is your height and weight?
10 A. Me?
11 Q. Yes.
12 A. 5' 7", 185.
13 Q. Was that your height and weight around October of
14    2014?
15 A. Yes.
16 Q. Officer Burnett, do you have any idea how tall he
17    is?
18 A. Around 6' 2", 6' 3". I don't know, 200 maybe.
19    He has the nickname sometimes of Slim.
20 Q. And I do not.
21    (Plaintiff's Deposition Exhibit
22    Letter P was marked for identification
23    by the reporter.)
24
25 Q. Let me show you what I represent to you to be

**Page 51**

1     your Internal Affairs statement. Please review
2     that and let me know if it's a true and accurate
3     copy of the statement that you made to Internal
4     Affairs.
5     (A brief discussion was held off the record
6     at this time.)
7
8  A. Yes.
9  Q. I'm going to direct your attention to page 3,
10    Bates stamp 1147. It says Officer Burnett -- the
11    middle paragraph of your first answer says, "I
12    got out of my car went up to try to help at that
13    time the man jumped up away from the three people
14    and started to run back south at that time
15    Officer Burnett tackled him and the two civilians
16    tried to get on top of Officer Burnett and around
17    Officer Burnett to hold the man down." Is that
18    correct?
19 A. Yes.
20 Q. "He tried to get up again. I tried to go tackle
21    his legs at that time I found an asp on the
22    street and took the asp tried to start tapping
23    his ankles so that he would not try to stand up
24    and run away anymore." Is that correct?
25 A. Yes.

**Page 52**

1  Q. Are those one of the three or four strikes, or
2     did you do strikes in addition to that, or are
3     those the only times?
4  A. Those are the strikes.
5  Q. The second to last answer. "He was I think more
6     trying to jump up to get away and then Burnett
7     tackled him again and then we tried to get him
8     face down he kept thrashing back and forth." Did
9     you make that statement?
10 A. Yes.
11 Q. At the time that you arrive on scene was he
12    primarily face down in the prone position?
13 A. When I first got there I really couldn't tell,
14    but I believe he was half face up and face down.
15    They were trying to get his hands behind him.
16 Q. I'll direct your attention to the next page, page
17    4. They were trying to hold onto -- one held him
18    around his neck, and then they were just trying
19    to get the other arm to get him back.
20    Did you ever see either of the civilians
21    choke him or grab him around the neck?
22 A. No. They might have grabbed around, pushed
23    around his neck area to keep him down, but I
24    don't know -- when you say choked, to me it's two
25    hands around his neck trying to squeeze.

**Page 53**

1 Q. Is there any other way to choke somebody?
2 A. Not that I know of. Well, I guess you could try
3    it with one hand.
4 Q. Have you ever heard of somebody using their arm?
5 A. I never thought of it. Yes, you could.
6 Q. Have you ever seen somebody try to use their arm
7    to choke somebody?
8 A. Yes.
9 Q. So it's more than just the hands?
10 A. Correct. Could be.
11 Q. You said one held him around has neck. How did
12    he hold him exactly?
13 A. The one hand pushing down and squeezing him down
14    to the ground.
15 Q. And you had your left hand around your left --
16 A. I don't know which --
17 Q. Okay.
18 A. I don't know which, if it was the civilian's
19    right hand pushing down on the side of the neck,
20    or the left hand pushing on the side of the neck.
21    Or both hands pushing down on one side of the
22    neck.
23 Q. And I'll direct your attention to page 1149, page
24    5.
25 A. Okay.

**Page 54**

1 Q. You were asked, "Did he ever show signs that he
2    was in physical distress?" And you indicated,
3    "No?"
4 A. Correct.
5 Q. Were you looking for that, signs of physical
6    distress when you were interacting with him?
7 A. I wanted to make sure that he was conscious,
8    obviously.
9 Q. And he was conscious?
10 A. Yes, sir.
11 Q. Do you recall specifically looking for breathing,
12    or checking his heart rate or anything like that?
13 A. No, sir.
14    MR. BARNHART: Those are all the questions
15    that I have.
16    MS. FELDHAKE: I have no questions.
17    MS. BOX: No questions for me. We'll reserve
18 signature.

_____
DONALD SPIEGL

**Page 55**

STATE OF INDIANA   )
                   )
COUNTY OF MARION   )

I, Russell J. Scheiner, RPR, CSR, and a Notary public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff; that said deposition was taken at the time and place heretofore mentioned between the hours of 8:00 a.m. and 6:00 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent, and thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the

**Page 56**

parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this_____day of_____, 2016.


_____
RUSSELL J. SCHEINER, RPR, CSR, Notary Public

My commission expires:
October 29, 2016

Job No. 0727BAR

The Deposition Upon Oral Examination of: DONALD SPIEGL, taken on 7/27/16.

57

Scott Barnhart, Esq.
Brooke Smith, Esq.
KEFFER BARNHART, LLP
230 East Ohio Street
Suite 400
Indianapolis, Indiana 46204

NOTICE OF DEPOSITION FILING

Billie Thompson, as Personal Representative of the
Estate of Dusty Heishman, vs. City of Indianapolis,
Indianapolis Metropolitan Police Department, et al.

U. S. District Court, Southern District of Indiana
Indianapolis Division, Cause No. 1:15-cv-1712-TWP-DML

In compliance with Indiana Rules of Trial
Procedure, Rules of the Industrial Board or
Federal Rules of Civil Procedure, pursuant to
Indiana Supreme Court order dated 10-1-86, you
are notified of the filing with counsel for the
Plaintiff, the deposition of DONALD SPIEGL.

Returned with ___ without ___ corrections.

_____
(Date of filing or mailing by
certified mail.)

cc:

Kathryn Box, Esq.
OFFICE OF CORPORATION COUNSEL
200 East Washington Street
Suite 1601
Indianapolis, Indiana 46204

Mary R. Feldhake, Esq.
Bose McKinney & Evans, LLP
111 Monument Circle
Suite 2700
Indianapolis, Indiana 46204

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302