UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON as Personal Representative of     )
the ESTATE OF DUSTY HEISHMAN                       )
         Plaintiff,     )
            )
  vs.         )  CASE NUMBER:
            )  1:15-cv-01712-TWP-DML
CITY OF INDIANAPOLIS, INDIANAPOLIS          )
DEPARTMENT OF PUBLIC SAFETY, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, OFFICER   )
BRIAN BURNETT, in his individual and official capacities )
OFFICER DONALD SPIEGL, in his individual and official)
capacities, OFFICER WILLIAM BUECKERS, in his     )
individual and official capacities, PARK RANGER     )
PHILLIP GREENE, in his individual and official capacities)
MARION COUNTY SHERIFF'S DEPARTMENT,       )
DEPUTY BILLY JOHNSON, in his individual and official )
capacities, HEALTH AND HOSPTIAL CORPORATION  )
OF MARION COUNTY, MEDIC LANCE COPE, in his    )
individual and official capacities, MARK BRITTON, and )
WILLIAM PATTERSON,                                 )
         Defendants.     )

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RESPONSE IN
OPPOSITION TO HHC AND COPE'S MOTION FOR SUMMARY JUDGMENT**

---

Scott L. Barnhart, #25474-82
Brooke Smith, #32427-03
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana  46204
(T) 317-857-0160
(F) 855-641-5311
Barnhart@KBindy.com
Smith@KBindy.com

COUNSEL FOR PLAINTIFF

## **<u>TABLE OF CONTENTS</u>**

Table of Authorities …………………………………………………………………………ii

I.      Introduction …………………………………………………………………1

II.     Statement of Material Facts in Dispute ……………………………………...2

III.    Summary Judgment Standard …………………………………………………6

IV.     Argument ……………………………………………………………………7

        A.  Excessive Force …………………………………………………..7

        B.  Deliberate Indifference ……………………………………………11

        C.  Failure to Intervene and Protect …………………………………15

        D.  Official Capacity Claim …………………………………………19

V.      Conclusion …………………………………………………………………19

Certificate of Service ……………………………………………………………20

i

## **TABLE OF AUTHORITIES**

*Cases*

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ………………………1, 9, 10, 16, 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ………………………………………...6

*Brosseau v. Haugen*, 543 U.S. 194 (2004) …………………………………………………...11

*Cole v. City of Chicago*. 2008 WL 4925007 (N.D. Ill. Nov. 14, 2008) …………………………17

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989) ………………18

*Estate of Stevens*, 105 F.3d 1169 (7th Cir. 1997) ………………………………………………18

*Graham v. Connor*, 490 U.S. 386 (1989) ……………………………………………………8, 9, 11

*Humphries v. Milwaukee Cnty.*, 702 F.3d 1003 (7th Cir. 2012) …………………………………9

*Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005) ………………………………………………19

*Makowski v. SmithAmundsen LLC*, 662 F.3d 818 (7th Cir. 2011) ………………………………6

*Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998) ………………………………………………18

*Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) …………………………………………12

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ………………………………………………7, 8

*Pulliam v. City of Chicago*, 2010 WL 3238837 (N.D. Ill. Aug. 12, 2010) …………………10, 18

*Purvis v. Oest*, 614 F.3d 713 (7th Cir. 2010) …………………………………………………7

*Ramirez v. City of Chicago*, 82 F.Supp.2d 836 (N.D. Ill. 1999) ………………………………15

*Reddick v. Bloomingdale Police Officers*, 2001 WL 789432 (N.D. Ill. July 12, 2001) ………...19

*Ross v. United States,* 910 F.2d 1422 (7th Cir. 1990) …………………………………………10, 11

*Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991) ………………………………15, 18, 19

*Tennessee v. Garner*, 471 U.S. 1 (1985) …………………………………………….....9, 11

*Thompson v. City of Indianapolis*, 2016 WL 5253198 (S.D. Ind. Sept. 22, 2016) ………………8

*Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693 (7th Cir. 2002) …………………………………….7

*Washington v. Haupert*, 481 F.3d 543 (7th Cir. 2007) …………………………………………...7

*Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007) ……………………………………12, 14

*Witkowski v. Milwaukee County*, 480 F.3d 511 (7th Cir. 2007) …………………………...18

*Other Authority*

Fed. R. Civ. P. 56(a) …………………………………………………………………………...6

iii

## I.      Introduction

The facts and reasonable inferences supported by those facts demonstrate that Lance Cope was assisting law enforcement as requested in restraining Dusty Heishman in the course of their arrest and not providing medical care when he chemically restrained Dusty. Cope spoke with law enforcement officers who had and were maintaining control over Dusty while he remained in the prone position as he had been for a significant period of time. It was determined that Dusty would be taken to holding room at the hospital rather than the APC. After a discussion with officers, Cope shot Dusty with a "chemical restraint" as he remained in the prone position and waited a couple of minutes without assessing or monitoring him while he lay on the ground in the dark. Several minutes later as Dusty was being taken to the ambulance, Cope acknowledged that "it appeared that [Dusty] was no longer breathing but the darkness made it difficult to fully assess." Dusty went into cardiac arrest and subsequently died several days later.

It is clear that medical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases. *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005). Plaintiff's expert, Dr. Bellotto, noted that Cope gave an overdose of the chemical restraint. He concluded, "[g]iven the timeframe involved, it is essentially impossible to exclude the midazolam injection from inducing Mr. Heishman's sudden collapse[.]"

The cumulative weight of the medical evidence, expert opinions, and the testimony that Dusty was held handcuffed and shackled in a prone position before and after he was chemically restrained supports an inference of unreasonable conduct by Cope. That is, a jury could conclude that Cope used excessive force against Dusty, was deliberately indifferent to a serious medical need, and failed to intervene and protect Dusty as he was required to do. As such, Cope is not entitled to qualified immunity and his motion is without merit and should be denied.

## II.     Statement of Material Facts In Dispute

Prior to handcuffing, Dusty had been physically restrained, tased, choked, and hit by officers and/or civilians (Burnett Depo. Ex D; Ex E p. 2-3, 5, 7; Ex F).   Once Dusty was handcuffed by officers, Dusty started to calm down after about another minute or two (Burnett Depo. p. 30:25, 31:1-4; 32:21).   Officer Burnett could not see if Dusty was bleeding and could not "check him out" (Burnett Depo. p. 35:15-19).   It was dark outside at the time and most of the events occurred behind Officer Burnett's police car (Burnett Depo. p. 35:20-25).

Deputy Johnson arrived on scene with a wagon to transport Dusty and noted that the officers had control over Dusty, who was handcuffed face down on his stomach, and that the scene was secure (Johnson Depo. p. 15:23-25; 16:1; 17:12-25).   Other officers requested leg shackles from Deputy Johnson, which he provided (Johnson Depo. p. 18:4-5; Burnett Depo. Ex D).   Once the leg shackles were placed on Dusty, he was under Deputy Johnson's control (Johnson Depo. p. 82:8-9).   Deputy Johnson knew there was something that was not "quite right" with Dusty and that he was likely on drugs (Johnson Depo. p. 28:18-25, 29:1-2; 57:14-19; Ex A, p. 3).   Deputy Johnson spoke with IMPD Sergeant Ed Miller about getting Dusty into the wagon for transport to the Arrestee Processing Center (Johnson Depo. p. 18:7-10; 19:12-21).   Their conversation lasted approximately one to two minutes (Johnson Depo. p. 20:1-3).

After that conversation, Deputy Johnson assisted the officers in getting Dusty to the wagon (Johnson Depo. p. 20:5-6).   Dusty was not walking on his own, but was not physically resisting the officers, "it was more like what we call dead weight.   You know, like trying to lift a dead body.   He wasn't walking on his own.   We had to assist him over there" (Johnson Depo. p. 20:8-11).   Approximately four officers, including Deputy Johnson, helped move Dusty the approximately twenty-five to thirty feet to the wagon (Johnson Depo. p. 21:18; 22:9-10).

2

However, Deputy Johnson asserts that Dusty "pushed back" against the officers once they were at the van doors, they regained control over him, and put him back down on the ground in a prone position (Johnson Depo. p. 24:11-19; 31:16-25).

At that point, Deputy Johnson knew that "this guy is not going to go in my van[.]" (Johnson Depo. p. 53:16-20).  Deputy Johnson recalled telling the sergeant that he was not going to be able to take Dusty for "safety reasons" and they required a medic (Johnson Depo. p. 24:17-19; 32:4-6).  Deputy Johnson testified, even if he was put into the wagon, Dusty was probably going to be transported to holding room at Eskenazi Hospital because, "[h]e was too intoxicated or too out of control probably for the APC." (Johnson Depo. p. 50:14-18; 81:11-12).  However, during his statement to IMPD Internal Affairs, Deputy Johnson indicated that, "[i]t was just too unsafe in his condition to put him in a cage in the back of a wagon and transport him and then try to get him out at the APC so for my safety and his safety a medic was summoned" (Johnson Depo. Ex A, p. 3).  Officer Burnett testified that after they could not get Dusty into the wagon the officers "just knew that he wasn't getting in the wagon, so we said the only other option is to get him on a cot" (Burnett Depo. p. 37:13-15).

Once on the ground, the officers held Dusty in a prone position until an ambulance arrived (Johnson Depo. p. 63:23-25; 81:1-4).  Deputy Johnson, who weighed approximately 320-330 pounds with gear, applied his knee to Dusty's leg to hold him down and maintained that contact until the medic arrived (Johnson Depo. p. 11:21-25; 12:1-3; 18-21; 30:5-7; 32:22-24).  Deputy Johnson was using most of his weight on the back of Dusty's legs (Johnson Depo. Ex A, p. 3).  According to Deputy Johnson it took medics approximately three to five minutes to arrive (Johnson Depo. p. 34:18-20).

Medic Lance Cope was called to the scene for a bite (Cope Depo. Ex I). When he arrived,

3

at approximately 8:02 p.m., he was redirected over to Dusty and the officers (Cope Depo. Ex I). At the time he arrived, Dusty was prone, face down, handcuffed, and leg shackled (Cope Witness Statement, p.6; Cope Depo. Ex I). Cope saw officers had a hold of Dusty's shoulders and were holding him down (Cope Witness Statement, p. 6-7). Cope received a "brief rundown of the history" and his main concern was about drugs (Cope Witness Statement, p. 8-9; Cope Depo. p. 17:24-25, 18:1-3). Officer Burnett believes he may have told Cope about tasing Dusty, but cannot recall (Burnett Depo. p. 54:3-9). Deputy Johnson recalled telling Cope "the facts of what happened, the incident, and why I refused to transport him, and that he was heading to our holding room. I told him that because we maintain custody over prisoners at the Eskenazi Hospital." (Johnson Depo. p. 50:14-18).

According to Deputy Johnson, "[t]he first thing medics did was they injected him with some kind of drug to knock him out[.]" (Johnson Depo. Ex A p. 3). Cope did not take Dusty's blood pressure at that time (Cope Depo. p. 19:20-22). However, Cope chemically restrained Dusty for "his best interest for the safety of him and everyone" and told the officers that Dusty "needed to be chemically restrained so we could take him to the hospital" (Cope Witness Statement, p. 9; Cope Depo. p. 30:24-25; 31:1-6). Cope shot Dusty with 10mg of Versed (Midazolam) "as a chemical restraint for patient and crew safety" at approximately 8:05 p.m. (Cope Depo. Ex I). Cope alleges that he gave the chemical restraint intramuscularly to Dusty's left deltoid (Cope Depo. Ex I). At his deposition, Cope alleged that the chemical restraint "appeared to be that he needed to be chemically restrained for his safety, for our safety, because we wouldn't be able to transport him to the hospital in that condition." (Cope Depo. p. 20:17-20).

At the time of the chemical restraint was used, it was dark outside (Johnson Depo. p. 35:9-11; 87:16-20; Cope Depo. 20:6-7; 34:15-16; Ex I). Deputy Johnson recalls the injection

being given while Dusty was prone on the ground and that Dusty was not resisting officers or Cope at that time (Johnson Depo. p. 35:6-7; 17-25; 82:14-17). After the injection, no one watched Dusty's vital signs or his breathing, they just let Dusty lay there (Johnson Depo. p. 86:13-25). Deputy Johnson noted that the injection "appeared to put him to sleep" and that it took approximately two minutes for Dusty to become less tense (Johnson Depo. p. 39:13-17; 85:25). Cope stated that Dusty was "motionless" (Cope Witness Statement, p. 9). Deputy Johnson noticed that Dusty was sweaty, but he did not watch Dusty for signs of medical distress once the medics were on scene (Johnson Depo. p. 39:22-23; 40:4-5). Cope was "surprised that he stopped so quickly because that medication doesn't work that fast when you give it IM. The onset is 10 minutes." (Cope Depo. p. 59:7-9).

Dusty was rolled onto his back and then placed on a cot (Cope Depo. p. 25:6-11; Ex I). At that point, "custody was turned over to the medics" (Johnson Depo. p. 43:9-12). Cope and Josue Ceballos began to move Dusty to the ambulance, which was approximately twenty feet away (Cope Depo. p. 23:9-11; Ex I). At some point during the move, Cope, "just by looking at it, you know, I could, and it was getting kind of dark, but it looked like he wasn't really breathing" (Cope Witness Statement, p. 10). According to Cope's IEMS Report, "it appeared that pt was no longer breathing but the darkness made it difficult to fully assess." (Cope Depo. Ex I).

When they eventually arrived at the ambulance, it was determined that Dusty had no pulse (Cope Depo. p. 36:24-25). Cope did not know how long Dusty had been without a pulse (Cope Depo. p. 39:23-25; 40:1). Dusty's handcuffs were removed in the ambulance (Cope Depo. Ex I). Dusty was without a pulse for approximately seven minutes in the back the ambulance (Cope Depo. p. 43:23-25). Dusty was taken to Eskenazi and was later transferred to

Methodist Hospital for further treatment (Sozio Depo. Ex B, p. 3).  However, on October 13, 2014, Dusty was pronounced "nonviable" and died on that day (Death Certificate; Sozio Depo. Ex B, p. 3).

Dr. Robert Belloto Jr. has reviewed this case and Cope's administration of 10mg of midazolam (Belloto Report).  He noted initially that Midazolam has a boxed warning regarding its association with respiratory depression, respiratory arrest and a separate warning for cardiac arrest (Belloto Report).  He stated, "[g]iven the time frame involved, it is essentially impossible to exclude the midazolam injection from inducing Mr. Heishman's sudden collapse!"  (Belloto Report).  He further noted that the drug was used on an already handcuffed and shackled individual and "any threat to law enforcement was minimal (if any at all) when the midazolam was injected." (Belloto Report).  He concluded that Cope gave Dusty an overdose of the drug (Belloto Report).  He further concluded that the "rapidity of the response should have been cause for immediate concern and once he was injected, he should have been continuously monitored and a pulse oximeter should have been immediately placed." (Belloto Report).  To a reasonable degree of pharmacological, toxicological and statistical certainty, Dusty's death was caused by an overdose of midazolam.

### III.    Summary Judgment Standard

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in his favor.  *Makowski v. SmithAmundsen LLC,* 662 F.3d 818, 822 (7th Cir. 2011). "The

nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002).

A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Washington*, 481 F.3d at 550.

## IV.    Argument

### A.  Excessive Force

The facts and reasonable inferences demonstrates that Cope was acting as an agent of law enforcement with the purpose of facilitating Dusty's arrest through use of a chemical restraint. That is, Cope was facilitating the arrest and not providing medical care when he injected Dusty with a chemical restraint that caused his death. There is a two-part test to determine whether the qualified immunity doctrine attaches: "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010).

HHC asserts that Cope provided Dusty with a sedative for his safety as well as those around him (D.E. 96 p. 10). However, Defendants conveniently overlook the fact that Dusty was both handcuffed and shackled at the time that the "chemical restraint" was administered (Cope Depo. Ex I). Further, at the time that the chemical restraint was administered, Dusty was not

fighting the officers or Cope (Johnson Depo. p. 35:6-7; 35:17-25; 82:14-17).  Cope chemically restrained an individual who was not resisting him or the officers.

Rather and as this Court has previously found, "Cope was assisting law enforcement as requested in restraining Heishman in the course of their arrest." (D.E. 54 p. 7).  It was determined that Dusty could not be taken to the Arrestee Processing Center known as the APC. As a result, Dusty would be going to the Sheriff's holding room at the hospital (Johnson Depo. p. 50:14-18).  Once Cope arrived on scene, Deputy Johnson plainly told him the facts of what happened, why he refused to transport him, and "that he was heading to our holding room.  I told him that because we maintain custody over prisoners at the Eskenazi Hospital." (Johnson Depo. p. 50:14-18).  Contrary to Cope's suggestion in his motion (D.E. 96 p. 13), Dusty was not being transported to the hospital for appropriate medical treatment, he was being taken there to be held as an arrestee under the care and custody of the Sheriff's Department.  Like the civilians Burnett utilized, Cope was an agent of law enforcement assisting with Dusty's arrest and transportation to a controlled facility.

The "right to make an arrest...necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  However, this right is not without limits; a "police officer's use of force is unconstitutional if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne*, 337 F.3d at 778.

Fourth Amendment unreasonable seizure claims, like excessive force claims, are analyzed in light of the totality of the circumstances to determine the objective reasonableness of the seizure.  *Thompson v. City of Indianapolis*, No. 115CV00074TWPTAB, 2016 WL 5253198,

at *3–4 (S.D. Ind. Sept. 22, 2016).   To determine the reasonableness and therefore the constitutionality of a seizure, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). In considering this balance, whether under an excessive force or unreasonable seizure claim, the court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Id.* (citing *Graham*, 490 U.S. at 396). When considering this balance, the court views the circumstances "from the perspective of a reasonable officer on the scene." *Id.*

"To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012). "While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Cope does not and cannot contend that deadly force was justified once officers had secured Dusty by handcuffing him and placing him in shackles.   It is clearly established that deadly force is justified only when an official has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others.  *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).  This case is similar to the facts and circumstances outlined in *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005).   In that case, the plaintiff brought an excessive force claim against an officer who during the course of the arrest kneeled on the arrestee's back/shoulder area after he was already lying prone on the ground.  *Id.* at 768.  The arrestee died roughly two minutes later of severe injuries consistent with pressure or crushing trauma to the

9

chest and neck area. *Id*. at 769. The Seventh Circuit reversed the district court finding that the record supports an inference that the officer knelt on the arrestee with enough force to inflict lethal injuries. *Id*.

Here, during the course of the arrest, Cope injected Dusty with a chemical restraint after discussing the matter with law enforcement (Cope Witness Statement p. 8-9; Cope Depo. p. 17:24-25; 18:1-3). Cope did not take Dusty's blood pressure at that time (Cope Depo. p. 19:20-22). According to Deputy Johnson, "[t]he first thing medics did was they injected him with some kind of drug to knock him out[.]" (Johnson Depo. Ex A p. 3). When Dusty was chemically restrained, he was prone on the ground and not fighting the officers or Cope (Johnson Depo. p. 35:6-7; 17-25; 82:14-17). After the injection, no one watched for his vital signs or his breathing; rather, they just let Dusty lay there (Johnson Deposition p. 86:13-25). While there is a material dispute of fact concerning the cause of Dusty's death, Dr. Belloto asserted in his report that "[g]iven the time frame involved, it is essentially impossible to exclude the midazolam injection from inducing Mr. Heishman's sudden collapse!" (Belloto Report). Dr. Belloto concluded that Dusty's death was caused by an overdose of midazolam. As such, like the circumstance in *Abdullahi*, the record supports an inference that Cope used force that inflicted lethal injuries.

Further still, it is clearly established in this Circuit that there is a constitutional right that prevents police officers from cutting off private avenues of aid without providing an alternative. *See Ross v. United States,* 910 F.2d 1422 (7th Cir. 1990) (noting that a police officer cannot cut off private avenues of aid without providing an alternative); *see also Pulliam v. City of Chicago*, No. 08 C 7318, 2010 WL 3238837, at *9 (N.D. Ill. Aug. 12, 2010). Here, Cope assisted law enforcement with their arrest and did not provide Dusty with aid. Again, Dusty was prone on the ground and was not fighting officers or Cope at that time the chemical restraint was used

10

(Johnson Depo. p. 35:6-7; 17-25; 82:14-17).  After the injection, no one watched Dusty's vital signs or his breathing, they just let Dusty lay there until the chemical restraint had its desired effect (Johnson Depo. p. 86:13-25).  Deputy Johnson noted that the injection "appeared to put him to sleep" and that it took approximately two minutes for Dusty to become less tense (Johnson Depo. p. 39:13-17; 85:25).  Importantly, although Cope knew the inherent dangers associated with being prone for a prolonged period of time, he nonetheless did nothing to change that position and allowed Dusty to remain in the prone position before and after he chemically restrained him (Cope Depo. 28:2-9; Johnson Depo. 35:6-7; 35:17-25, 82:14-17; 86:13-25).

Lastly, "in an obvious case" the general objective standards of reasonableness outlined in *Tennessee v. Garner* and *Graham v. Connor* can "clearly establish" violation of the Fourth Amendment, even without a body of relevant case law.  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). There is no dispute that it is unreasonable for police officers to use excessive force to detain an individual or to seize an "unarmed, nondangerous suspect by shooting him dead." *Tennessee,* 471 U.S. at 11.  Similarly, there can be no reasonable dispute that it is unreasonable for a medic to aid law enforcement in an arrest by chemically restraining a handcuffed and shackled individual without monitoring the individual or being in a location where he could fully assess the individual's reaction to the chemical.  This case presents an obvious case where the standards of reasonableness clearly establish a violation of the Fourth Amendment even assuming for purposes of argument that a body of relevant case law does not exist, which it does. As such, a jury is required to weigh all of the evidence and decide material disputes of fact.

### B.  Deliberate Indifference

A reasonable jury could conclude that Cope was deliberately indifferent to a serious medical need.  "Four factors inform our determination of whether an officer's response to [an

arrestee's] medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).  The Fourth Amendment standard for deliberate indifference as the "severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

As his report explains, Cope knew at the time that he administered the chemical restraint that Dusty was handcuffed behind his back and leg shackled (Cope Depo. Ex I).  Cope suspected that Dusty was intoxicated, possibly from methamphetamines (Cope Depo. 18:8).  Cope also knew that Dusty had been "struggling/fighting" with officers and had been tased in the chest prior his arriving on scene (Cope Depo. Ex I).  As such, it can be reasonably inferred that Cope knew that Dusty had medical needs and that those medical needs were serious.  Cope concedes as much in his motion (D.E. 96 p. 11).

While Dusty did not request any medical treatment, Cope conferred with officers and chemically restrained him (Cope Depo. 18:15-18; Ex I).  It is unclear who suggested the chemical restraint.  Officer Spiegel testified that, "they were going to give him something to calm him down." (Spiegel Depo. 25:4-5).  When asked who said that, Spiegel stated, "I believe the medics, or I don't recall.  It was a medic that suggested that, or Officer Burnett or Deputy Johnson, said we need to give him something to calm him down." (Spiegel Depo. 25:7-10).  According to Deputy Johnson, "[t]he first thing medics did was they injected him with some kind

12

of drug to knock him out[.]" (Johnson Depo. Ex A p. 3).  And Cope acknowledges that he gave the chemical restraint without being in communication with a doctor or the hospital (Cope Depo. 21:1-5).  Again, Dusty remained in the same prone position and was not given any aid while Cope and the officers waited around for the chemical to have its desired effect (Johnson Depo. p. 86:13-25).  Cope joined the team of officers in their efforts to facilitate Dusty's arrest and his transportation to a secure facility.

While Cope was effectively serving as a police officer when he chemically restrained Dusty, the dose that he used was an overdose (Belloto Report).  Cope gave an overdose despite the fact that the drug he used has a boxed warning regarding its association with respiratory depression, respiratory arrest and a separate warning for cardiac arrest (Belloto Report).  As such, Plaintiff's expert, Dr. Belloto concluded that "[g]iven the time frame involved, it is essentially impossible to exclude the midazolam injection from inducing Mr. Heishman's sudden collapse." (Belloto Report).  Dr. Belloto further noted, "[i]n this instance, the drug was  used as a chemical restraint on already handcuffed and shackled individual and I state that any threat to law enforcement was minimal (if any at all) when the midazolam was injected." (Belloto Report).

By his own admission, Cope chemically restrained Dusty in a location where he could not fully assess him.  Cope noted in his report that they waited "a couple of minutes" after the injection and then officers and EMS crew placed Dusty on a cot (Cope Depo. Ex I).  Dusty's pupils were fully dialated and non-reactive to light (Cope Depo. Ex I).  He was then covered with a blanket and moved to an ambulance (Cope Depo. Ex I).  Cope then noted, "[o]n way to ambulance, it appeared that [Dusty] was no longer breathing but the darkness made it difficult to fully assess." (Cope Depo. Ex I).  In his deposition, Cope explained, "as soon as we put him into

13

the ambulance and checked for a pulse, that's when he was in cardiac arrest." (Cope Depo. 33:2-9).  Importantly, Cope did not know how long Dusty had been without a pulse.  (Cope Depo. p. 39:23-25; 40:1).  Nonetheless, it took approximately seven minutes to resuscitate him (Cope Depo. 46:18).  It can be reasonably inferred that Cope chemically restrained Dusty without being able to appropriately monitor him and any adverse reaction to a drug that warns of respiratory and cardiac arrest.

Nurse Cunningham, who is a nurse for HHC and treated Dusty at the hospital, provided testimony demonstrating that Cope's actions were objectively unreasonable.  She noted that she has not used Versed very often (Cunningham Depo. 21:1-4).  She used that drug less than ten times, but always with an order for medicine (Cunningham Depo. 21:12).  Generally, it is used for conscious sedation and "we have a very specific flow sheet and a very specific protocol for those situations." (Cunningham Depo. 21:16-21).  Nurse Cunningham testified that she would never administer Versed in a completely dark room (Cunningham Depo. 24:6).  If Versed is given, you have to monitor vitals and "observe the patient to make sure that they're—their status does not deteriorate to a point where we need to intervene in some way." (Cunningham Depo. 22:1-3).  Here, Cope chemically restrained Dusty after he had been tased and physically assaulted by civilians and officers and waited without giving any aid in a location where he could not fully monitor him and his reaction to the chemical.  A reasonable jury could conclude that Cope was deliberately indifferent to a serious medical need.

This case is similar to the circumstances outlined in and *Williams*, 509 F.3d at 403.  *See also Oritz*, 656 F.3d at 530.  In *Williams*, an individual had been arrested had severe breathing problems.  While he was being processed at the jail, his brother and wife went to the station and met briefly with the arresting officer.  *Williams*, 509 F.3d at 392.  His wife asked the officer if

14

her husband had his asthma inhaler, to which the officer responded that he did have it.  Then, just to be sure, his wife gave the officer an extra albuterol inhaler and asked that it be given to the arrestee.  The officer responded that he would do so.  *Id*.   This however, did not occur. The officer did not give the arrestee his inhaler and also ignored the arrestee when he asked the officer if his wife had brought his medicine.  *Id*.  Here, Cope ignored the obvious distress that Dusty was under and his serious medical need and shot him with a chemical restraint to facilitate his arrest and transportation.  Moreover, even assuming for the sake of argument that there is not a body of relevant case law, which there is, this case presents an obvious case where the standards of reasonableness clearly establish a violation of the Fourth Amendment.  As such, Cope is not entitled to qualified immunity and his motion is without merit.

### C.  Failure to Intervene and Protect

Cope failed to intervene and failed to protect Dusty despite knowing that excessive force was being used and that he had a realistic opportunity to prevent the harm from occurring.   In his pursuit of the dismissal of this claim, Cope points to a district court decision in *Ramirez v. City of Chicago*, 82 F.Supp. 2d 836 (N.D. Ill. 1999) in support of his position (D.E. 96 p. 17).  However, that case demonstrates that Cope is not entitled to qualified immunity.  As that case demonstrates, Cope had a clearly established constitutional duty to treat Dusty.  *See Ramirez*, 82 F. Supp. at 836; *see also Salazar v. City of Chicago,* 940 F.2d 233, 237 (7th Cir. 1991) (noting that if the plaintiff was in custody at the time that the paramedics arrived and the individual was not free to seek other forms of assistance, then the paramedics might be liable for violating his right to due process by failing to treat his injuries).

Cope's argument is fundamentally flawed because imbedded in it is the premise that he provided medical care to Dusty when he administered the chemical restraint.  Simply, he did not.

Cope did not provide medical care, but administered a chemical restraint to aid law enforcement in their arrest.   He approached Dusty, interacted with officers, and then administered a chemical restraint to facilitate that arrest.  He then waited for a couple of minutes while Dusty remained in the prone position (Cope Depo. 23:8; 25:6-7).  Cope made no effort to move Dusty from a prone position or ask or direct the officers to move him to allow less interference with normal breathing.  As Dennis Waller noted in his expert report, Dusty could have been moved into a seated position on the ground with his legs extended to the front (Waller Report p. 8).

Defendants are improperly asking this Court to look past the applicable standard of review and accept Cope's version of events.  However, the facts and reasonable inferences in support of Plaintiff demonstrate that Cope failed to intervene and to protect Dusty when he had a reasonable opportunity to do so.

The Seventh Circuit addressed this issue in *Abdullahi*, 423 F.3d at 763.  In that case, police responded to and interacted with Jamal Mohamed, the son of Somali immigrants, suffered from severe Post Traumatic Stress Disorder (PTSD) due to various traumatic experiences he endured as a child in his homeland.  *Id*. at 764.  Officers gained control over Mohamed and took him to the ground onto his stomach.  *Id*.  Once on the ground, Mohamed began kicking his legs, moving his arms so they could not be handcuffed and arching his back upwards as if he were trying to escape.  *Id*.  One of the officers placed his right knee and shin on the back of Mohamed's shoulder area and applied his weight to keep Mohamed from squirming or flailing. The officer increased the pressure on Mohamed's back until Mohamed stopped arching his back upward.  *Id*.  Mohamed apparently stopped struggling about 15-20 seconds after the officer began to apply his weight to Mohamed's shoulder area, and the officer was able to cuff Mohamed's right wrist and connect the handcuffs to those that had applied on Mohamed's left

16

wrist.  *Id*.  At some point, police officers all soon realized that Mohamed was not breathing.  He died approximately two and a half minutes after the defendant officers had taken him to the ground.  *Id*.

In addressing the failure to intervene claim, the Court noted, whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all of the evidence, a reasonable jury could not possibly conclude otherwise.  *Id*. at 774.  In that case, the Court noted, "as a last-ditch effort to win the day, defendants argue (in just three pages of their appellate brief) that they are entitled to qualified immunity." *Id*.  It concluded that plaintiff has certainly alleged a violation of a valid constitution right.[1]  In addressing the second prong, the Court found that a jury should decide whether the officer's actions would have made it clear to a reasonable officer that intervention was warranted, and if so, whether other officers had a realistic opportunity to intervene.  *Id*.  In this case, a jury should decide whether the officers' actions of tasing, physically attacking, and keeping Dusty in the prone position for an extended period of time would have made it clear to Cope that actual and adequate medical treatment and/or removal from the prone position to facilitate breathing was warranted and that he had a realistic opportunity to intervene.

Specifically as it relates to paramedics, it is clearly established that if an individual is in custody, the on-duty paramedic at the scene acquires a duty to intervene to prevent the use of excessive force against the arrestee.  *Cole v. City Of Chicago*, No. 06 C 4704, 2008 WL 4925007, at 4 (N.D. Ill. Nov. 14, 2008) (noting that state actors have a constitutional duty to intervene and provide adequate medical care to individuals who are in custody and have no other

---

[1] The *Abdullahi* Court also noted, "given the excessive force claim is not amenable to summary judgment, the associated failure to intervene claims must go to trial as well."  *Id*. at 774.

17

option); *see also Salazar,* 940 F.2d at 237 ("If [the plaintiff] was in custody from the time the paramedics arrived-that is, if he was not free to seek other forms of assistance-then the paramedics might be liable for violating [the plaintiff's] right to due process by failing to treat his injuries").  While Dusty necessarily relied on Cope for medical care, Cope did not provide any substantive or adequate medical care, but rather administered an overdose of a chemical restraint after consulting with law enforcement, left Dusty in a prone position as he had been for some period of time, and failed to properly monitor him.  Dusty subsequently went into cardiac arrest and lost his pulse.

Further still, while Cope was effectively acting as a law enforcement officer when he chemically restrained Dusty, it is clearly established that on-duty paramedics at a scene acquire a duty to intervene to present the use of excessive force.   As a general matter, "the Constitution does not require the government to protect citizens from privately created danger." *Witkowski v. Milwaukee County,* 480 F.3d 511, 513 (7th Cir. 2007) (citing *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189 (1989)).  However, there are two exceptions to this general rule.  *Pulliam*, 2010 WL 3238837 at 7.  The first arises in custodial settings in which the state has limited the individual's ability to care for himself. *Id.* (citing *Estate of Stevens,* 105 F.3d 1169, 1174 (7th Cir. 1997)). The second, known as the state-created danger exception and the exception at issue here, arises "when the state affirmatively places the individual in a position of danger the individual would not have otherwise faced." *Id.* (citing *Estate of Stevens,* 105 F.3d at 1169; *Monfils v. Taylor,* 165 F.3d 511, 516 (7th Cir. 1998)).

As the on-duty paramedic, it is clearly established that Cope acquired a duty to intervene to prevent the use of excessive force against Dusty.  The so-called "'custody exception' triggers a constitutional duty to provide adequate medical care to incarcerated prisoners, those

18

involuntarily committed to mental institutions, foster children, pre-trial detainees, and those under 'other similar restraint of personal liberty.'" *Jackson v. Schultz,* 429 F.3d 586, 590 (6th Cir. 2005); *see also Salazar,* 940 F.2d at 237 ("If [the plaintiff] was in custody from the time the paramedics arrived-that is, if he was not free to seek other forms of assistance-then the paramedics might be liable for violating [the plaintiff's] right to due process by failing to treat his injuries"); *see also Reddick v. Bloomingdale Police Officers*, No. 96 C 1109, 2001 WL 789432 at 9-10 (N.D. Ill. July 12, 2001) (denying qualified immunity for paramedics where they observed law enforcement's attack on plaintiff, but failed to take any action to preclude it).

Here, law enforcement physically limited Dusty's ability to care for himself or to seek aid from others.  After joining and consulting with the team of officers, Cope shot Duty with a sedative despite the fact that he was not resisting him or the officers at that time.  By chemically restraining Dusty and waiting without any aid being rendered in a location where he could not be sufficiently monitored, Defendants affirmatively placed Dusty in a position of danger he would not have otherwise faced.  He subsequently went into cardiac arrest and lost his pulse.  Defendants created a danger and placed him in a position that he would not have otherwise faced, which resulted in his death.  A reasonable jury could conclude that Cope failed to intervene and protect Dusty as he was constitutionally required to do.  As such, Cope is not entitled to qualified immunity and his motion is without merit.

### D.  Official Capacity Claim

With respect to Defendant's claim as it relates to Plaintiff's official capacity claim, Plaintiff has not brought a *Monell* claim in this action.

### V.    Conclusion

Plaintiff has presented a genuine issue of material fact with respect to the claims raised in

his operative complaint.  Moreover, Plaintiff's claims are not precluded as a matter of law and

Cope is not entitled to qualified immunity as he claims.  As such, Plaintiff respectfully requests

that this Court deny Defendants' Motion for Summary Judgment, set this matter for trial, and

grant her all just and proper relief.

Respectfully Submitted,

*/s/  Scott L. Barnhart*
Scott L. Barnhart, Attorney No. 25474-82
Brooke Smith, Attorney No. 32427-03
Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of January, 2016, a copy of the foregoing
Memorandum was filed electronically.  Service of this filing will be made on all ECF-registered
counsel by operation of the court's electronic filing system.  Parties may access this filing
through the court's system.

*/s/ Scott L. Barnhart*
Scott L. Barnhart, #25474-82

Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204
Email: Barnhart@KBindy.com
Phone: (317) 857-0160
Fax: (855) 641-5311