IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COPY·

BILLIE THOMPSON, as Personal      )
Representative of the ESTATE OF   )
DUSTY HEISHMAN,                   )
                                  )
            Plaintiff,            )      CAUSE NO.
      -v-                         ) 1:15-cv-1712-TWP-DML
                                  )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT,   )
OFFICER BRIAN BURNETT, in his     )
individual and official          )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official    )
capacities, OFFICER WILLIAM       )
BUECKERS, in his individual and   )
official capacities, PARK RANGER  )
PHILIP GREENE, in his individual  )
and official capacities, MARION   )
COUNTY SHERIFF'S DEPARTMENT,      )
DEPUTY BILLY JOHNSON, in his      )
individual and official          )
capacities, HEALTH AND HOSPITAL   )
CORPORATION OF MARION COUNTY,     )
MEDIC LANCE COPE, in his          )
individual and official          )
capacities, MARK BRITTON, and     )
WILLIAM PATTERSON,                )
                                  )
            Defendants.           )

      The deposition upon oral examination of
**BILLY JOHNSON**, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 9:30 a.m., pursuant to Notice and
Federal Rules of Civil Procedure.


      RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                  3437 Beasley Drive
              Indianapolis, Indiana  46222
                Tel. & Fax (317) 299-6302

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
Representative of the ESTATE OF )
DUSTY HEISHMAN, )
        Plaintiff, ) CAUSE NO.
    -v- ) 1:15-cv-1712-TWP-DML
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
        Defendants. )

        The deposition upon oral examination of
BILLY JOHNSON, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 9:30 a.m., pursuant to Notice and
Federal Rules of Civil Procedure.

        RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                3437 Beasley Drive
            Indianapolis, Indiana 46222
            Tel. & Fax (317) 299-6302

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Scott Barnhart, Esq.
    Brooke Smith, Esq.
    KEFFER BARNHART, LLP
    230 East Ohio Street
    Suite 400
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS CITY OF INDIANAPOLIS, INDIANAPOLIS
METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER
DONALD SPIEGL, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, OFFICER WILLIAM BUECKERS, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, PARK RANGER PHILIP
GREENE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
MARION COUNTY SHERIFF'S DEPARTMENT, AND DEPUTY BILLY
JOHNSON:
    Kathryn Box, Esq.
    OFFICE OF CORPORATION COUNSEL
    200 East Washington Street
    Suite 1601
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS HEALTH AND HOSPITAL CORPORATION OF
MARION COUNTY, MEDIC LANCE COPE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES:
    Mary R. Feldhake, Esq.
    Bose McKinney & Evans, LLP
    111 Monument Circle
    Suite 2700
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS MARK BRITTON AND WILLIAM PATTERSON:
    Not present or represented by counsel.

---

I N D E X   O F   E X A M I N A T I O N

                                              Page
                                              ----
DIRECT EXAMINATION,
    Questions By Mr. Barnhart              4

CROSS-EXAMINATION,
    Questions By Ms. Feldhake              84

REDIRECT EXAMINATION,
    Questions By Mr. Barnhart              85

RECROSS-EXAMINATION,
    Questions By Ms. Feldhake              88

RECROSS-EXAMINATION,
    Questions By Ms. Box                   89

FURTHER QUESTIONS BY Mr. Barnhart         94


I N D E X   O F   E X H I B I T S

                                              Page
                                              ----
Plaintiff's Exhibit A                      66
Plaintiff's Exhibit B                      66
Plaintiff's Exhibit C                      67

---

                                                      4

1              B I L L Y   J O H N S O N,
2        having been first duly sworn to tell the truth,
3        the whole truth and nothing but the truth in the
4        aforementioned matter, testified as follows:
5
6   DIRECT EXAMINATION,
7        QUESTIONS BY MR. SCOTT BARNHART:
8   Q.  Good morning, sir.  I represent the plaintiff in
9        this matter.  Please state your name and spell
10       your last name for the record.
11  A.  It's Billy Johnson.  Last name J-o-h-n-s-o-n.
12  Q.  And is it actually Billy, or is it William?
13  A.  No.  Billy is my legal name, with a Y.
14  Q.  I bet you get asked that a lot?
15  A.  Yes.
16  Q.  Have you ever been deposed before?
17  A.  Yes.
18  Q.  How many times?
19  A.  I haven't counted.  It's been probably over a
20       dozen.
21  Q.  Have those all been criminal, or civil?
22  A.  Criminal.
23  Q.  This is your first civil deposition?
24  A.  Yes, sir.
25  Q.  Are you currently taking any prescribed

**5**

1 medication?
2 A. No.
3 Q. Are you currently under the influence drugs or
4 alcohol?
5 A. No.
6 Q. Is there anything that would prevent you from
7 giving truthful testimony here today?
8 A. No, sir.
9 Q. You understand the importance of giving truthful
10 testimony?
11 A. Yes, sir.
12 Q. And since you've been deposed before you
13 understand how it works, is that fair?
14 A. Yes.
15 Q. Did you do anything to prepare for this
16 deposition?
17 A. I met with my attorney.
18 Q. Did you review any documents?
19 A. Yes. The Interrogatory, and a statement from
20 IMPD Internal Affairs.
21 Q. Did you review any videos?
22 A. No, sir.
23 Q. Other than counsel, have you spoken to anybody in
24 preparation for this deposition?
25 A. No, sir.

**6**

1 Q. It seemed like you hesitated.
2 A. Well, you said the preparation for this
3 deposition. No.
4 Q. Have you spoken to anybody other than counsel at
5 all about this?
6 A. Yes.
7 Q. Who was that?
8 A. When I first got notice of this last year I told
9 my captain on the Sheriff's Office, Tyler Bouma,
10 about it, just to make sure that my chain of
11 command was aware, and that the office was aware
12 that this was going on.
13 Q. How do you spell his last name?
14 A. B-o-u-m-a.
15 Q. You said he's a captain?
16 A. Yes, sir.
17 Q. What department are you assigned to?
18 A. Marion County Sheriff's Office, jail division.
19 Q. And how long have you worked for them?
20 A. A little over ten years.
21 Q. What is your current title?
22 A. Sergeant.
23 Q. And when did you become sergeant?
24 A. November 7th of 2015.
25 Q. Congratulations.

**7**

1 A. Thank you.
2 Q. And prior to becoming sergeant what was your
3 title?
4 A. Deputy.
5 Q. How long were you a deputy?
6 A. About nine and-a-half years. Nine years, seven
7 months, something like that.
8 Q. So you've had two positions, deputy and then
9 sergeant?
10 A. Yes, sir.
11 Q. What is your current age, sir?
12 A. Thirty-seven.
13 Q. And where did you go to high school?
14 A. Perry Meridian High School.
15 Q. Did you go to college?
16 A. Some vocational school.
17 Q. Where was that?
18 A. It's currently called Breenstein Education. It's
19 like IT. Computer stuff.
20 Q. And did you go to ILEA?
21 A. No, sir.
22 Q. Did you go to --
23 A. Sheriff's Department.
24 Q. They have their own academy; right?
25 A. Yes, sir.

**8**

1 Q. What is that called?
2 A. It was called the Marion County Sheriff's
3 Department. When I first went through it was the
4 Special Deputy Academy, and then it was the
5 Deputy Academy.
6 Q. He's typing down everything that is being said,
7 and so I talk a little fast and I talk a little
8 quiet, so try not to do that today.
9 A. Okay.
10 Q. If you don't understand a question or you don't
11 hear me, you can ask me to rephrase it or repeat
12 it. I just ask that you do so.
13 A. Okay.
14 Q. I'll presume that if you didn't ask me to repeat
15 it that you both understood it and that you heard
16 me. Is that fair?
17 A. Yes, sir.
18 Q. Prior to your employment with the Marion County
19 Sheriff's Department where were you employed?
20 A. With Blue Line Security and Indianapolis Armored
21 Car.
22 Q. And who was your supervisor at Blue Line?
23 A. Tim O'Connor, the owner.
24 Q. And how long did you work for Blue Line?
25 A. I have to think about that for just a moment.

**9**

1  From mid 2004 to mid 2006 when I got hired by the
2  Sheriff's office.
3  Q. And Blue Line is a Security company; correct?
4  A. Yes.
5  Q. Did you have any particular assignment, was there
6  a reach out store or anything like that?
7  A. No, it was all over the place, sir.
8  Q. Did you have any training at Blue Line?
9  A. No, sir.
10  Q. So your law enforcement training, is that
11  confined to what you learned at the Marion County
12  academy?
13  A. Yes, sir.  Marion County Sheriff.
14  Q. And as a deputy and as a sergeant what are your
15  responsibilities for the Marion County Sheriff's
16  Department?
17  A. Currently the APC Processing Center, which
18  includes the processing of those who are
19  arrested.  Fingerprints, photographs, paperwork,
20  and the care and custody control of inmates.
21  Q. In October of 2014 what were your
22  responsibilities?
23  A. I was assigned to the transportation division.
24  Q. And did you have a vehicle?
25  A. Yes, sir.

**10**

1  Q. And what would you do on a given shift?
2  A. Our responsibilities would be basically to go to
3  the IMPD district and respond to calls for
4  transportation, to transport arrested people to
5  the appropriate facility.
6  Q. So you would get a call on dispatch and you would
7  go to wherever you were directed?
8  A. Yes, sir.
9  Q. Did you work primarily -- what law enforcement
10  agencies do you primarily work with?
11  A. IMPD, Beech Grove, Speedway, the state police.
12  We pick up for any law enforcement agency in
13  Marion County.  So they're all under that
14  umbrella, but primarily with IMPD.
15  Q. Are you the only one in the van, or is there
16  another officer?
17  A. No, it's just one deputy.
18  Q. Do you take one individual at a time, or do you
19  take multiple individuals?
20  A. However many are going to jail on that particular
21  instance.
22  Q. What is your capacity?
23  A. It depends on the size of the individual.  But
24  they are usually around 12 to 15.
25  Q. Can you explain to me how your vehicle is set up,

**11**

1  are there two benches along the back?
2  A. It's an extended cargo van.  There is two benches
3  on either side, and in the front there is a
4  entrance door on the passenger side behind the
5  passenger side door.  It's another smaller
6  compartment that could fit two to three people.
7  Q. Are there seats, or are they just benches?
8  A. Basically metal benches.
9  Q. Are there what you call stations to connect
10  people with their handcuffs?
11  A. No, sir.
12  Q. If somebody is riding in the back of the van are
13  they handcuffed?
14  A. Yes.
15  Q. Are they shackled --
16  A. No.
17  Q. -- to the legs?
18  A. No.
19  Q. How tall are you, sir?
20  A. 6' 5".
21  Q. And how much do you weigh?
22  A. The last time I weighed myself it was about 300
23  pounds.  It's been a while, though.
24  Q. And obviously you were about the same height in
25  October of 2014?

**12**

1  A. Yes.
2  Q. What about the weight?
3  A. About the same.
4  Q. Do you have a duty belt that you wear when you're
5  on duty?
6  A. Yes, sir.
7  Q. And did you have a duty belt you wore when you
8  were on duty in October of 2014?
9  A. Yes, sir.
10  Q. What would be your uniform with your duty belt,
11  what would you wear?
12  A. The department issued firearm, two magazines,
13  baton, OC spray, taser, radio, handcuffs, glove
14  pouch.
15  Q. So you're a full sworn deputy with all law
16  enforcement powers?
17  A. Yes, sir.
18  Q. How much does your belt and all your equipment
19  weigh?
20  A. 20, 30 pounds.  It feels like it.  It may be
21  less, but it's heavy.
22  Q. Do you remember the incident, do you have a
23  personal recollection of the incident that we're
24  here for today?
25  A. Yes, sir.  I do.

**13**

1  Q.  What do you remember about it?
2  A.  I remember that night that the officers received
3      the call of a naked man going down the street. I
4      remember the officer who took the run. He
5      arrived on scene and called out that he had a
6      resister.
7          I remember that his voice sounded different.
8      When you work with officers after a while you
9      learn what they sound like and what their normal
10     tone is. His tone sounded different.
11  Q.  Did you know this officer?
12  A.  Yes.
13  Q.  Which officer was it.
14  A.  Brian Burnett. Officer Brian Burnett of IMPD.
15  Q.  How often had you worked with him?
16  A.  Every day.
17  Q.  You said his voice was different. What do you
18      mean by that?
19  A.  It sounded a little -- the tone was higher. A
20      little panic, rushed.
21  Q.  What else do you recall?
22  A.  I remember he called that he had a resister.
23  Q.  Do you remember anything else?
24  A.  I remember other officers marking on the scene,
25      and then they wouldn't answer their radio either.

**14**

1  Q.  You said they would not answer over the radio?
2  A.  No, no. They are trying to cooperate, to get
3      someone to answer and see what is going on, make
4      sure everyone is safe, the scene is secure and if
5      they need more help, and nobody had answered when
6      they arrived on scene.
7  Q.  Do you recall where you were when you received --
8  A.  I was close to downtown. I can't remember
9      exactly where I was, but I'm pretty sure I was
10     close to downtown.
11  Q.  Did you immediately respond?
12  A.  I started heading that way.
13  Q.  And where was the location, do you recall?
14  A.  Iowa and East -- Bryant's Friendly Inn is the
15     closest local landmark I guess you would call it.
16  Q.  What is that?
17  A.  It's a bar.
18  Q.  So you started heading that way. Were you
19      actually dispatched?
20  A.  Yes, I was heading that way, and then someone
21     requested the wagon.
22  Q.  So you received the dispatch to formally go to
23     that location, and you had already started and
24     you were en route?
25  A.  Yes.

**15**

1  Q.  How long did it take you to get there?
2  A.  Maybe five minutes.
3  Q.  What did you do once you got there?
4  A.  I got on scene and I exited the van, and one of
5      the officers asked for leg shackles, so I gave
6      him my leg shackles out of the van.
7  Q.  Do you know which officer that was?
8  A.  I can't recall. No, sir.
9  Q.  And did you get the leg shackles?
10  A.  Yes.
11  Q.  What did you do after you got the leg shackles?
12  A.  I put on my gloves, my rubber gloves like we're
13     required to do and you always do because it's
14     just prudent, and I went over to the scene to try
15     to assist the officers.
16  Q.  Did you observe Mr. Heishman?
17  A.  Yes.
18  Q.  What did you observe about him?
19  A.  He was naked. He was nude, and he was on the
20     ground and he was yelling.
21  Q.  Was he moving physically?
22  A.  He was trying to.
23  Q.  Did the officers have control of him?
24  A.  Yes. They were holding him, yes.
25  Q.  Was he handcuffed?

**16**

1  A.  Yes, sir.
2  Q.  Which officers were around him?
3  A.  I can't remember if Burnett was around him or
4      not. Burnett may have been away. But I believe,
5      if I recall correctly, the park ranger.
6  Q.  Anybody else?
7  A.  There were a couple of IMPD officers. Which ones
8      specifically I can't recall.
9  Q.  Were there any civilians?
10  A.  There were civilians, yes.
11  Q.  Physically around him?
12  A.  No. On scene, but not like -- not in the same
13     proximity as the officers. They are away.
14  Q.  Was Mr. Heishman saying anything?
15  A.  He was, but I couldn't make it out at that time.
16     No.
17  Q.  Was it that you couldn't recall, or you couldn't
18     make it out?
19  A.  I couldn't make it out. No, sir.
20  Q.  Were you trying to?
21  A.  Not really, no.
22  Q.  Was it loud?
23  A.  I don't recall if it was really loud, but I was
24     walking towards him and I could hear him a little
25     bit. But what it was I couldn't tell you.

**17**

1  Q.  Did he seem in distress?
2  A.  No.
3  Q.  You indicated earlier that dispatch had indicated
4      they were asking whether the scene was secure.
5          At that point did you think the scene was
6      secure?
7  A.  No.
8  Q.  Why not?
9  A.  Because none of the officers who had arrived on
10     scene had radioed back indicating that it might
11     have been secure.
12 Q.  Based on your observations did you think it was
13     secure?
14 A.  When I arrived?
15 Q.  Yes.
16 A.  Yes.
17 Q.  When you observed Mr. Heishman was he face down
18     on the ground?
19 A.  He was -- yes.  On his stomach.
20 Q.  Prone?
21 A.  Yes, prone down.  Yes.
22 Q.  Were his arms out to the side?
23 A.  No, he was in handcuffs.
24 Q.  So he's handcuffed?
25 A.  Yes.

**18**

1  Q.  And were his legs out to the side?
2  A.  They were -- no, he was down laying on his
3      stomach, and the legs were in a normal position.
4  Q.  Did you immediately get the shackles?
5  A.  When I arrived on scene, yes.
6  Q.  What did you do once you got the shackles?
7  A.  Like I said earlier, I gloved up, and then I
8      talked to the sergeant, one of the sergeants on
9      the scene, and we made a plan to attempt to get
10     Mr. Heishman over to the wagon.
11 Q.  Did you apply the shackles?
12 A.  I did not, no.
13 Q.  Did somebody apply shackles?
14 A.  Yes.
15 Q.  Were they applied immediately, or was there a
16     delay?
17 A.  The best I can recall it was immediately.
18 Q.  Did you actually observe them apply the shackles?
19 A.  No, I did not.
20 Q.  Were you able to hear or listen at this time,
21     where you around the area?
22 A.  No.
23 Q.  Do you know whether they had any difficulty
24     applying the shackles?
25 A.  No, sir.

**19**

1  Q.  No, you were not aware, or, no, they didn't?
2  A.  If they had any trouble with him applying the
3      shackles I'm not aware of it.
4  Q.  And do you remember which officer took the
5      shackles, or --
6  A.  No, sir.  I cannot recall.
7  Q.  So you were talking to the sergeant; is that
8      correct?
9  A.  Yes.
10 Q.  Which sergeant was that?
11 A.  I believe it was Sergeant Ed Miller.
12 Q.  And what were you talking to him about?
13 A.  Whether or not I could take Mr. Heishman into the
14     van.
15 Q.  Whose call is that?
16 A.  Mine.
17 Q.  And did you elect to take him?
18 A.  I said we will try it.  I had reservations, but
19     we would try to get him in the van and get him
20     out of the scene, get him to where he needed to
21     go.
22 Q.  And do you recall what Sergeant Miller said to
23     you?
24 A.  No.  Just that we had to try to get him out of
25     there.

**20**

1  Q.  How long was that conversation with Sergeant
2      Miller?
3  A.  Maybe a minute.  At the most, two.
4  Q.  Then what did you do after that?
5  A.  With the assistance of IMPD officers we tried to
6      walk Mr. Heishman over to the wagon.
7  Q.  Was he walking?
8  A.  He was kind of -- not really.  It was more like
9      what we call dead weight.  You know, like trying
10     to lift a dead body.  He wasn't up walking on his
11     own.  We had to assist him over there.
12 Q.  Was he fighting at that point?
13 A.  He felt tense.  He was -- you know, when you grab
14     somebody's arms or touch them you can tell in
15     their muscles when they tense up.
16 Q.  But was he fighting?
17 A.  No, he wasn't fighting.  No.  As far as I know,
18     no.
19 Q.  So he was tense but he wasn't physically --
20 A.  No, he wasn't -- no.
21 Q.  -- kicking or trying to strike anybody?
22 A.  No.  No, sir.
23 Q.  And his handcuffs were behind his back?
24 A.  Yes, sir.
25 Q.  Did he ever try to head butt anybody?

**21**

1  A. No, sir.
2  Q. So whenever somebody is leg shackled and their
3     hands are behind their back -- because you've
4     arrested probably a fair number of people, is
5     that fair?
6  A. Yes, sir.
7  Q. What are the safety concerns that you have when
8     somebody is leg shackled and when they are
9     handcuffed behind their back?
10 A. Like you mentioned, they can still head butt.
11    They can still break free or grasp. They can
12    spit. And actually I've even been kicked by
13    somebody in leg shackles before.
14 Q. He didn't do any of that?
15 A. No, sir.
16 Q. So how many officers were with him when he was
17    being sort of escorted to the van?
18 A. About four of us.
19 Q. Do you recall which four?
20 A. The only one I can recall off the top of my head
21    is Matthew Coffing.
22 Q. Coffey?
23 A. Coffing. C-o-f-f-i-n-g I believe.
24 Q. And let me back up a little bit. Did you observe
25    any officers strike or hit Mr. Heishman?

**22**

1  A. No.
2  Q. Did you observe any officers at any point strike
3     or hit or physically attack Mr. Heishman?
4  A. No, sir.
5  Q. So four officers are walking him to the van?
6  A. Yes.
7  Q. How far was the van away from where he was
8     arrested?
9  A. Let me think on that for a moment. It's probably
10    25 to 30 feet at the best I can recall.
11 Q. When you arrived on scene was he ever moved at
12    any point?
13 A. Prior to us attempting to move him into the wagon
14    do you mean?
15 Q. Yes.
16 A. No.
17 Q. So he's dead weight, he's tense, but he's not
18    otherwise resisting, is that fair?
19 A. That would be fair to say, yes.
20 Q. What happens next?
21 A. Well, we get him to the back of the wagon, and as
22    we attempt to load him up into the wagon he
23    was -- he actually did try to step up, and he put
24    his foot and leg up against -- there is like
25    three steps on the back of the van, and there is

**23**

1     a bottom one underneath the actual manufacturer's
2     bumper, and he put his foot into that and used
3     his weight and pushed into the officers and he
4     knocked us backwards.
5  Q. And the van, just for purposes of the record --
6  A. Yes.
7  Q. So it's two doors in the back?
8  A. Yes, sir.
9  Q. And there is a stair step. Is there one step or
10    two?
11 A. There is two steps. I'm trying to describe it
12    the best that I can. It's about the width of the
13    back doors, and it's about three feet long I
14    guess you could say. Three feet by five, six
15    feet. And that is supplied by our contractor who
16    puts in the cages and all the equipment. And
17    then there is the actual step that is the bumper,
18    you know, that every car has.
19 Q. And the bumper is not an actual step, but it's
20    used as a step?
21 A. It can be. There is a little divot there, but
22    that's the actual place for them to step in on
23    that.
24 Q. And I know what you're talking about, but I'm
25    trying to get it for the record.

**24**

1     So there is an actual intended step that is
2     supplied by the contractor below --
3  A. Yes.
4  Q. -- that you can step on, and then you have the
5     bumper that is used as a step, and then it goes
6     into the van area?
7  A. Yes, sir.
8  Q. So did he step on the actual step that was
9     supplied by the contractor?
10 A. The contractor step, yes.
11 Q. And then he pushed back?
12 A. Yes.
13 Q. With his weight?
14 A. Yes.
15 Q. So what happened after he pushed back?
16 A. We regained control of him, we put him down on
17    the ground, and I told the sergeant on scene I'm
18    not going to be able to take him for safety
19    reasons.
20 Q. Was he saying anything at that point?
21 A. He told me at some point, and I can't recall
22    exactly where it is, he said either they're going
23    to kill me, or kill me. I couldn't make out
24    which one. The only thing I do recall him saying
25    is kill me.

25

1 Q. So you don't remember whether it was kill me, or
2     they are going to kill me?
3 A. Yes.
4 Q. Correct?
5 A. Correct.
6 Q. And did he say anything else that you recall, any
7     other statement?
8 A. No, sir.
9 Q. Do you know who he was referring to?
10 A. No, sir.
11 Q. Do you know whether there were any civilians that
12     were involved in his arrest?
13 A. I had heard there was, yes.
14 Q. What had you heard?
15 A. That two civilians were there and aided the
16     officers in taking Mr. Heishman into custody.
17 Q. How far was the bar from where he was located
18     when you arrived on the scene?
19 A. It was across the street.
20 Q. How many people were around?
21 A. I couldn't tell you, honestly. Between people
22     outside the bar to people around -- at least 30.
23     Neighborhood people.
24 Q. And what time of day was this?
25 A. It was late evening. Dusk. It was October. The

26

1     sun I think was just about to set completely, if
2     I recall.
3 Q. Was it a chaotic scene, or what was the crowd
4     like?
5 A. A lot of people. They weren't anti-police or
6     interfering, they were just all mingling around,
7     watching and talking.
8 Q. When you were escorting him to the van were any
9     officers talking to him?
10 A. Not that I recall. No, sir.
11 Q. Have you been CIT trained?
12 A. No, sir.
13 Q. Do you know what that is?
14 A. Yes, sir.
15 Q. What is CIT training?
16 A. Crisis Intervention Training.
17 Q. And what is your understanding of what CIT
18     training is used for?
19 A. It's given to officers so they can better handle
20     and deal with situations dealing with people with
21     mental illness. It's prevalent in the world, and
22     it's definitely prevalent in law enforcement, and
23     we're dealing with more and more of it every day.
24     Seventy percent of our jail is full of people who
25     have some kind of psychosis or mental disorder.

27

1     And maybe a CIT officer has more options and
2     training available to them, maybe they can deal
3     with the situations a little better than a normal
4     or standard, you know, procedures that officers
5     use. Usually our only recourse is jail. So
6     that's what CIT training is.
7 Q. Do you know whether any of the officers that were
8     on scene had any CIT training?
9 A. No, sir.
10 Q. What was his breathing like when he was at the
11     van, when you were escorting him to the van, did
12     you notice anything about his --
13 A. Appeared normal to me.
14 Q. Was he sweaty?
15 A. A little bit.
16 Q. Were you looking for those signs? When you put
17     somebody in the van are you looking for any
18     initial signs of medical distress?
19 A. Yes.
20 Q. What do you look for?
21 A. The first thing to look for is intoxication. You
22     know, whether they can -- if they're too
23     intoxicated to even sit up and ride in the van.
24     Any kind of obvious signs of medical distress, or
25     any kind of injury that would prevent the safe

28

1     transport of those prisoners.
2 Q. Did you observe any injuries on him?
3 A. No, sir. I did not.
4 Q. Did he have any cuts?
5 A. If he did, I cannot recall.
6 Q. Did you look specifically for any injuries, cuts,
7     bruising, anything like that?
8 A. Other than just the normal, you know, initial
9     checking of somebody, you know. If they have a
10     huge injury we can't take them, if they're still
11     bleeding or a head injury or something like that.
12     I didn't observe any of that.
13 Q. Did you have any concerns that he had any mental
14     illness?
15 A. At the time, no.
16 Q. And in reflection did you have any concerns?
17 A. No.
18 Q. At any point was there any concern about him
19     being intoxicated?
20 A. Yes, sir.
21 Q. Tell me about that.
22 A. Well, just from my training and experience in the
23     Sheriff's Office we deal with intoxicated people
24     on a nightly basis. And when I arrived on scene,
25     obviously him being naked in public was obviously

**29**

1  your first indication maybe something, you know,
2  isn't quite right.  Intoxicated people, you can
3  take them into custody and they're fine, and you
4  can have problems later on down the road.
5  Q.  Did you smell any alcohol?
6  A.  No, sir.  I did not.
7  Q.  Did you think that he was intoxicated?
8  A.  Under the influence of something.
9  Q.  What did you think he was under the influence of?
10 A.  Through my training and experience, possibly, you
11     know, PCP or wet or spice or a combination of
12     drugs.
13 Q.  So it appeared to you as if he was intoxicated on
14     something?
15 A.  Yes.
16 Q.  And when you say "Wet," what do you mean?
17 A.  Wet is a slang term for marijuana that has been
18     soaked in formaldehyde, and people ingest it for
19     whatever reason.
20 Q.  PCP, what is your understanding of that?
21 A.  A disassociative.  It gets people extremely high,
22     elevated strength.
23 Q.  Did you ever physically touch Mr. Heishman?
24 A.  When we were escorting him back to the van.
25 Q.  Did you ever sit on him?

**30**

1  A.  No, sir.
2  Q.  Did you ever put your knee on him at any points?
3  A.  After he pushed us back down and -- when we tried
4      putting him in the wagon he pushed against the
5      step, and we put him back on the ground, I
6      applied my knee to his leg, yes, to hold him
7      down.
8  Q.  So when he pushed back on the step did he knock
9      anybody over?
10 A.  He came close, but he knocked us off balance
11     would be a good way to put that.
12 Q.  But nobody fell down?
13 A.  I didn't fall down, no.  If anybody else did I'm
14     unaware.
15 Q.  And he didn't fall down?
16 A.  No.  We had him with --
17 Q.  Did he try to run?
18 A.  No.
19 Q.  So he just pushed back?
20 A.  Uh-huh.
21 Q.  And what was your understanding of what he was
22     trying to accomplish?
23 A.  I don't know if he might have been trying to
24     break.  You know, didn't want to go in the van.
25     We have a lot of people that don't want to go to

**31**

1  jail for obvious reasons.  But I'm not sure what
2  his mindset was.
3  Q.  Did he say anything?
4  A.  No, he didn't say anything, no.
5  Q.  So he just pushed back?
6  A.  Yes.
7  Q.  Knocked you off balance?
8  A.  Yes.
9  Q.  And then you put him on the ground?
10 A.  Yes, sir.
11 Q.  How did you put him on the ground, was he on his
12     knees?
13 A.  From what I recall, the officers, we just all
14     guided him to the ground.  We just took control
15     of his body, arms, and put him on the ground.
16 Q.  Was he on his side?
17 A.  He might have initially landed on his side.
18 Q.  Do you remember?
19 A.  No, I can't recall exactly.
20 Q.  And then at that point what did you do?
21 A.  I remember we put him on the ground.  I remember
22     he was pushing against us.  I remember that.
23 Q.  How?
24 A.  Using his body weight and using his strength to
25     try to get up off the ground.

**32**

1  Q.  Was he able to do that?
2  A.  No.
3  Q.  What happened next?
4  A.  I remember I talked to Sergeant Ed Miller, and I
5      said I'm not going to be able to transport him,
6      and they requested a medic.
7  Q.  Did you stay on scene?
8  A.  Yes, sir.
9  Q.  And was he ever moved at that point?
10 A.  No, we left him right there.
11 Q.  Was he saying anything at that point?
12 A.  No.  If he was, I didn't hear it.
13 Q.  So you left him there.  Was anybody on top of
14     him?
15 A.  No, sir.
16 Q.  So but at one point your knee was on his leg; is
17     that correct?
18 A.  Yes.  On the back of his calf.  Yes, sir.
19 Q.  So did you get up?
20 A.  No, we stayed there pretty much until the
21     ambulance came.
22 Q.  So you had physical contact him until the
23     ambulance came; is that correct?
24 A.  Yes.
25 Q.  How many officers had physical contact with him

**33**

1     until the ambulance came?
2  A.  I believe it was about four.
3  Q.  What is happening while you were waiting?
4  A.  Somebody was talking to him. What they were
5     saying I can't recall. We were just basically
6     holding him down so he wouldn't, you know,
7     attempt to get up or attempt to injure himself or
8     one of us.
9  Q.  And you were successful in doing that; right?
10 A.  Yes.
11 Q.  Was he pushing back the entire time, or at some
12    point did he calm down?
13 A.  It would ebb and flow, it would come and go. He
14    would push against us and he would try to raise
15    up.
16 Q.  Did anybody ever strike him at that point?
17 A.  I did give a common -- a knee strike -- academy
18    talk -- knee strike to the common peroneal nerve.
19    I believe it was on his right leg.
20 Q.  And he was still handcuffed?
21 A.  Yes, sir.
22 Q.  Still shackled?
23 A.  Yes, sir.
24 Q.  How many strikes did you use?
25 A.  One.

**34**

1  Q.  Where was that?
2  A.  Common peroneal nerve.
3  Q.  Which is located where?
4  A.  It's a nerve that runs all the way down your
5     body, and the strike was delivered in the right
6     upper thigh. It's basically on the outer seam of
7     your pants, is a good way to describe it.
8  Q.  Were you aware of any other strikes by any of the
9     other officers?
10 A.  No, sir. The only other -- it was not even a
11    strike. The only thing I recall after was
12    Matthew Coffing using a pain compliance or
13    pressure point wrist manipulation, attempting to
14    gain control.
15 Q.  Are you aware of any other use of force at that
16    point?
17 A.  No, sir.
18 Q.  How long did it take for the EMTs to get there?
19 A.  Three minutes. Maybe five. Three to five
20    minutes, yes.
21 Q.  What happened once they arrived?
22 A.  Medics arrived, they then administered some kind
23    of medicine to Mr. Heishman. And after they
24    administered it he calmed down. And once he was
25    basically out they put him on the gurney and put

**35**

1     him in the back of the medic.
2  Q.  Did you watch them administer the medicine?
3  A.  Yes, sir.
4  Q.  And where was he exactly when the medicine was
5     administered?
6  A.  He was on the ground, and they administered it on
7     the shoulders.
8  Q.  What was the lighting like at that time?
9  A.  Like I said, it was about night time. It was
10    dark. There were some street lights.
11    Neighborhood lighting.
12 Q.  Was anybody using a flashlight at that point?
13 A.  If they were, I can't recall.
14 Q.  So he administered the medicine to his shoulder;
15    is that right?
16 A.  Yes.
17 Q.  And at that point did he have any difficulty
18    administering the medicine?
19 A.  No.
20 Q.  Was he resisting at the point that the medicine
21    was administered?
22 A.  Was he actually trying to fight us?
23 Q.  Yes.
24 A.  No, he wasn't trying to fight us, no.
25 Q.  Was he calm?

**36**

1  A.  He was still acting the way he was acting when we
2     attempted to place him in the wagon. He was
3     tense, pushing against us still.
4  Q.  But not flailing or head butting or spitting or
5     anything like that?
6  A.  No, sir.
7  Q.  He was just tense and he was pushing back?
8  A.  Yes.
9  Q.  And everybody was still on top of him; is that
10    correct?
11 A.  We had control of him.
12 Q.  And so were you observing him as the medicine was
13    being administered?
14 A.  Yes, sir.
15 Q.  What were your observations of him at that point?
16 A.  The medicine was administered, and probably a
17    minute or two later I could kind of feel the
18    medicine -- I don't want to say that. That
19    sounds -- but he started getting a little less
20    tense. His muscles started to relax. I guess
21    that's the best way to describe it.
22 Q.  So based on your observations you felt that the
23    medicine was working?
24 A.  Something. Something happened.
25 Q.  Because his behavior was changing?

37

1  A.  His muscles changed, yes.
2  Q.  And you felt that?
3  A.  I mean, you could -- well, you could feel him
4      stop pushing against us, yes.
5  Q.  Were you still waiting at that point?
6  A.  They administered the medicine, they went and got
7      the cot, and at that point we put him on the cot.
8      I can't remember who put him on the cot.
9  Q.  Were there any statements that were being made?
10 A.  I can't recall anything being said at that point.
11 Q.  Do you know which EMT it was?
12 A.  No, sir.  I do not.
13 Q.  Do you recall ever working with that EMT?
14 A.  No, sir.
15 Q.  Do you recall whether the EMT gave any
16     instructions?
17 A.  No, sir.
18 Q.  Do you recall any statements being -- any
19     conversations at all?
20 A.  No, sir.  I do not.
21 Q.  So you were just waiting?
22 A.  Yes.
23 Q.  Did anybody get off him at that point after the
24     medicine was administered?
25 A.  Once administered it appeared it was successful.

38

1  A.  Because I have experienced, and I'm sure the
2      officers have too, but I can't speak to their
3      experience, people who they administer the
4      medicine and it doesn't work.
5  Q.  How often does that happen?
6  A.  Twice.
7  Q.  When did that happen?
8  A.  I can't recall the exact date.  I know there was
9      an incident close to downtown many years ago
10     where actually they had to take the kid to
11     Wishard and give him surgery level anesthetic to
12     actually bring him under control.
13 Q.  How did they transport him from the location
14     to --
15 A.  Are we talking about Mr. Heishman?
16 Q.  No.  The other individual that you were referring
17     to.
18 A.  Leg shackles and handcuffs on a cot, with an
19     officer riding in the back of the ambulance.
20 Q.  Was that option discussed with Mr. Heishman?
21 A.  No, it was not.
22 Q.  And that incident you were making reference to,
23     did it happen before this incident?
24 A.  Yes.
25 Q.  And the other time where the medicine didn't

39

1      work, did that happen before this incident?
2  A.  Yes.
3  Q.  When was that, do you recall that?
4  A.  I cannot recall the exact date.  No, sir.
5  Q.  Do you recall what happened on that incident?
6  A.  It was somebody under the influence of unknown
7      narcotics, and they were in such a -- you know,
8      they were so out of control that for their safety
9      they couldn't go in the back of the van.  Because
10     it's a metal box inside a metal box, and people
11     have been known to injure themselves in those
12     things.
13 Q.  You said he became less tense after the medicine
14     was administered.
15 A.  Yes.
16 Q.  How long did that take?
17 A.  One to two minutes, the best I can recall.
18 Q.  Then what happened?
19 A.  He was turned over to the medics and we waited.
20     I was waiting for the area to clear so I could
21     leave.  My vehicle was blocked anyway.
22 Q.  Were you watching for signs of medical distress?
23 A.  Once the medics were there, no, sir.
24 Q.  At the point that you had him on the ground and
25     you were maintaining him, before the medic

40

1      arrived and while you were waiting, was he having
2      any difficulty breathing?
3  A.  No, sir.  Not that I observed.
4  Q.  Was he still sweaty?
5  A.  A little bit.
6  Q.  Did it appear as if he was out of breath?
7  A.  No, sir.
8  Q.  Did it appear as if he was under distress?
9  A.  No, sir.
10 Q.  And then he applies the medication.
11     When the EMT applied the medication did he
12     give it into his back?
13 A.  Like I said, it was one of the shoulders, the
14     best I can recall.
15 Q.  And I'm trying to figure out what he did to
16     prepare to give the medication I guess is my
17     question.  So did you see him get the medication
18     out?
19 A.  No, sir.
20 Q.  Did he have a bag with him?
21 A.  Not that I recall.
22 Q.  Was there any equipment with him?
23 A.  Not that I recall.
24 Q.  Do you think you would recall seeing equipment if
25     it was there?

**41**

1  A.  Most likely, yes.
2  Q.  And this was in the middle of the street?
3  A.  Yes, sir.
4  Q.  Near your van?
5  A.  Yes, sir.
6  Q.  Are there any lights on the back of your van?
7  A.  Yes, sir.
8  Q.  Were they on?
9  A.  Are you referring to emergency equipment?
10  Q.  Yes.
11  A.  Or any lighting at all?
12  Q.  Well, you tell me what kind of lights are on the
13      back of your van.
14  A.  Okay.  When the doors are shut we have red and
15      blue lights on the doors, and then there is a
16      little red and blue strobe lights up above the
17      roof line.
18  Q.  Are there any spotlights or anything to
19      illuminate the area?
20  A.  When the door is open, on the model of van that I
21      had there was an LED door light, and it's
22      hardwired.  You open the door and it comes on and
23      blinds everybody.
24  Q.  Were the doors open or shut?
25  A.  The best I recall, one was open.

**42**

1  Q.  So do you know whether the light was on?
2  A.  If the door was open, then yes.  Like I said,
3      it's hardwired into that.
4  Q.  And I apologize for jumping around.
5          So he administers the medicine.  Do you know
6      whether he looked -- and how did he administer it
7      specifically?
8  A.  He used a syringe.
9  Q.  Do you have any idea what dose, or anything like
10      that?
11  A.  No, sir.
12  Q.  Was there any discussion of that?
13  A.  Not with me, sir.
14  Q.  Do you know whether he looked to see what amount
15      he was going to give?
16  A.  No, sir.
17  Q.  And do you know what I mean by that?  Have you
18      ever been administered medication through a
19      syringe before?
20  A.  Oh, yes.
21  Q.  So sometimes you can look to see what dosage?
22  A.  Yes.
23  Q.  Did he ever do anything like that?
24  A.  If he did, he didn't do it in front of me, sir.
25  Q.  Were you looking at him?

**43**

1  A.  I was watching him administer the drug.
2  Q.  Right.  Because there are four guys around, and
3      he's the one that is responding to it?
4  A.  Yes.
5  Q.  So you're waiting on that, one to two minutes
6      approximately --
7  A.  Yes.
8  Q.  Then what happened next?
9  A.  Once it was apparent that whatever they had
10      administered was working, like I said, we helped
11      put him on the cot, the officers did, and custody
12      was turned over to the medics.
13  Q.  Was he resistant at that point?
14  A.  No, sir.
15  Q.  Was he conscious?
16  A.  His eyes were closed.
17  Q.  Was he talking?
18  A.  No, sir.
19  Q.  Do you know whether he was breathing?
20  A.  Best I could recall, it appeared he was
21      breathing.
22  Q.  And did you help put him on the cot?
23  A.  I'll be honest, I can't recall.  I may have.  But
24      I honestly can't remember if I did or not.
25  Q.  Was he ever unshackled or un-handcuffed at any

**44**

1      point?
2  A.  No, sir.
3  Q.  Was he additionally restrained to the cot?
4  A.  They have a little seatbelts or lap belts.  Those
5      were put on probably.  Probably put on, yes.
6  Q.  At various points along the way; right?  So when
7      you strap them over to secure them, is that fair?
8  A.  Yes.
9  Q.  Do you recall whether those seatbelts were
10      applied?
11  A.  I can't recall with 100 percent certainty whether
12      they were or not.  They probably were, but that's
13      just based on my experience.  For this specific
14      incident I can't recall, sir.
15  Q.  So was he transported to the ambulance?
16  A.  Yes, sir.
17  Q.  Were you a part of that?
18  A.  No, sir.
19  Q.  What did you do?
20  A.  I went and just was standing around, went back to
21      my van for a little bit.  Just waited for the
22      area to clear, because my vehicle was blocked by
23      fire trucks and other police cars.
24  Q.  So you got up off of him, and you were on his
25      leg?

45

1  A.  Yes, sir.
2  Q.  Correct?
3  A.  Yes, sir.
4  Q.  So you got up off of him and he was put on the
5      cot?
6  A.  Yes, sir.
7  Q.  And then he was moved somewhere else?
8  A.  Yes, sir.
9  Q.  And you didn't go with the cot?
10 A.  No, sir.
11 Q.  So you just stood back around.  Were you securing
12     the scene at all, or were you just hanging out
13     until you could drive away?
14 A.  Just basically waiting to drive away.
15 Q.  Did you do anything else while you were on scene?
16 A.  I remember a civilian came up and asked me to
17     reset his broken nose.
18 Q.  Do you recall what his name was?
19 A.  No, sir.  I do not.
20 Q.  Did you look at his nose?
21 A.  Yes, sir.
22 Q.  Was it broken?
23 A.  Yes, sir.
24 Q.  What did you tell him?
25 A.  I told him I don't reset broken noses.

46

1  Q.  The Sheriff probably wouldn't let you do that,
2      would he?
3  A.  No.  Beyond my skill to practice.
4  Q.  So after he approached and asked you that, what
5      happened next?
6  A.  He reset his own broken nose, and then went back
7      in the bar to go drinking I think.  Just waited
8      for the area to clear.
9  Q.  So after he was secured -- and you said there
10     were several people that were around?
11 A.  Yes.
12 Q.  Did they go make their way back into the bar?
13 A.  Some might have, some may have just stood out
14     and -- I can't recall where everybody went.
15 Q.  After he approached you did he go away, or
16     apparently went back to the bar?
17 A.  I assume, yes.
18 Q.  And then you're still just kind of waiting
19     around?
20 A.  Yes, sir.
21 Q.  Are you doing anything?
22 A.  No, sir.
23 Q.  What are you watching?
24 A.  I'm just watching the scene, just waiting for the
25     area to clear.

47

1  Q.  Did you notice anything about the scene at that
2      point?
3  A.  Other than just a lot of cops there.
4  Q.  How many?
5  A.  Probably I would say about ten.
6  Q.  At the moment you arrived on scene, when you
7      first pulled up, how many officers were on scene?
8  A.  I would say probably at least six to seven.
9  Q.  And then so you're just kind of watching the
10     scene and observing?
11 A.  Yes, sir.
12 Q.  And how long were you watching until you left?
13 A.  Oh, probably -- honestly I cannot recall how
14     long.  I know I was on scene for a while just
15     because of the nature of the incident.  Not
16     abnormally long, but I just can't -- you know,
17     for a transportation run, but I can't recall how
18     long I was actually waiting.
19 Q.  Did you ever observe EMTs or any of the other
20     officers having any additional difficulty with
21     Mr. Heishman?
22 A.  Yes, sir.
23 Q.  What did you observe about that?
24 A.  I recall that one of the officers said come back
25     to the back of the truck, in reference to the

48

1      ambulance.  I went back there along with the
2      other officers to see what was going on, and I
3      observed through the back window an officer and
4      the EMTs and paramedics administering CPR to
5      Mr. Heishman.
6  Q.  Do you recall specifically who was administering
7      CPR?
8  A.  I believe it was Officer Bill Bueckers, or
9      William Bueckers.
10 Q.  And do you recall specifically how he was doing
11     that?
12 A.  Chest compressions.
13 Q.  Do you recall what the intensity of those chest
14     compressions were?
15 A.  Pretty intense.  Yes, sir.
16 Q.  Was he beating on him, or was he just --
17 A.  No, it was chest compressions.  He had his hands
18     interlocked, and he was pushing up and down on
19     the area where we're trained, if you're trained
20     in CPR, to give chest compressions.
21 Q.  So for purposes of the record, you had your hands
22     interlaced?
23 A.  Yes, sir.
24 Q.  Did he have his hands on his chest area?
25 A.  Yes, sir.

**49**

1 Q. And he was doing chest compressions on his chest
2     area?
3 A. Yes, sir.
4 Q. Where specifically are you trained to do those
5     compressions?
6 A. There is a notch right in the middle of your rib
7     cage, and it's right in the middle, and you go
8     one hand width above. So right at mid breast
9     line.
10 Q. And did you observe anybody else giving chest
11     compressions?
12 A. No, sir.
13 Q. What else did you observe about that?
14 A. I observed that, and they were working on him
15     inside the truck, and I walked away at that
16     point.
17 Q. Who was inside the truck at that point, how many
18     people?
19 A. The best I can recall, three to four.
20 Q. So you said you walked away?
21 A. Yes, sir.
22 Q. What did you do at that point?
23 A. I just stayed on scene. Because like I said
24     before, I couldn't leave.
25 Q. You couldn't leave because physically your

**50**

1     vehicle was blocked?
2 A. Yes.
3 Q. And then at some point did the ambulance leave?
4 A. Yes, sir.
5 Q. How long did it take the ambulance to leave?
6 A. I can't recall.
7 Q. Did it leave with lights and sirens on?
8 A. The best I can recall, yes, it did.
9 Q. And then what happened after it left?
10 A. I remember I got back in my van and I called my
11     captain to fill him -- or not my captain, my
12     lieutenant, and advised him of what had happened.
13 Q. What did you tell him?
14 A. I told him the facts of what happened, the
15     incident, and why I refused to transport him, and
16     that he was heading to our holding room. I told
17     him that because we maintain custody over
18     prisoners at the Eskenazi Hospital.
19 Q. Because there are special deputies out there; is
20     that correct?
21 A. It's our department. Yes.
22 Q. And so your understanding of where he was being
23     taken was to where?
24 A. Eskenazi generally, yes, because that's where
25     people under arrest go. Like I said, we have a

**51**

1     specially built holding room out there just for
2     people in custody.
3 Q. And your understanding is that he was going to
4     that holding room?
5 A. Yes, sir.
6 Q. How many times have you had the occasion in your
7     employment to have individuals that were
8     administered the medication?
9       MS. BOX: I'm going to object, just because
10     he doesn't know exactly what medication was
11     administered.
12       MR. BARNHART: Sure.
13 Q. And let me rephrase just for purposes of that
14     objection, but you can answer the question.
15       You've observed people being administered
16     medication during the scope of your employment;
17     is that correct?
18 A. Yes, sir.
19 Q. How many times has that occurred?
20 A. Are you referring to medication to bring people
21     under control, or any type of medication?
22 Q. To bring people under control.
23 A. I would say three that I can recall.
24 Q. Do you know what medication that is?
25 A. No, sir. I do not.

**52**

1 Q. And that is administered typically by whom in
2     those three instances?
3 A. Usually by the paramedics on scene. EMTs.
4 Q. And those three incidents, is that three
5     including this incident, or three excluding?
6 A. Three including.
7 Q. So two others?
8 A. Yes, sir.
9 Q. And the two others that you made reference to
10     earlier --
11 A. Yes, sir.
12 Q. And those two others it didn't have any effect?
13 A. No, sir.
14 Q. So this was the only occasion where you believe
15     that it was -- that the medicine worked?
16 A. Yes, sir.
17 Q. Do you know what excited delirium is?
18 A. Yes, sir.
19 Q. What is that?
20 A. It's where somebody reaches a state that their
21     heart starts beating way too fast, their body
22     basically just -- it goes into overload mode.
23     It's a combination usually of somebody who has a
24     medical history or is using narcotics, and they
25     engage in physical activities. In our case, in

**53**

1  police, it's usually fleeing, resisting,
2  fighting.
3  Q. In your observations do you think Mr. Heishman
4  was in a state of excited delirium?
5  A. Possibly.
6  Q. Did you ever check his heart rate?
7  A. No, sir. I did not.
8  Q. Have you ever encountered individuals that you
9  suspected were in a state of excited delirium?
10 A. I can't recall any specific instance off the top
11 of my head. No, sir.
12 Q. Did that term come to mind at the time when you
13 arrived on scene?
14 A. Right when I pulled up, no, sir.
15 Q. At any point did it ever come to your mind?
16 A. When we tried to load him up in the van he
17 wouldn't go, and he had super elevated strength,
18 it kind of came to my mind this guy is not going
19 to go in my van, and there is too much of a
20 liability and risk.
21 Q. So is liability something you think of in terms
22 of whether you're going to transport somebody or
23 not?
24 A. Absolutely.
25 Q. And what are those factors? Tell me about that.

**54**

1  A. Well, the factors for liability is, you know,
2  we're responsible for everybody we come in
3  contact with, especially on transportation.
4  We're the sole person in charge of them, and
5  sometimes, you know, we have multiple people on
6  board. I don't want to get sued, I don't want to
7  get the department sued, and that's intertwined.
8  You go after one, you go after the other. And we
9  have a constitutional right to -- we have a legal
10 obligation to look out for their welfare. If
11 they're going to jail or not, we still have to
12 have their best interest in mind.
13 Q. Do you know whether there are any Sheriff's
14 Department General Orders or SOPs that address
15 excited delirium?
16 A. If there is, I would have to review it to see
17 specifically how they deal with it.
18 Q. Sitting here today do you recall whether there
19 are any?
20 A. That specifically deal with excited delirium?
21 Q. Yes.
22 A. No, sir.
23 Q. You don't recall whether there are?
24 A. No.
25 Q. So for physical restraints that you've had use of

**55**

1  and access to for the transportation of
2  individuals, that would be handcuffs; correct?
3  A. Yes.
4  Q. Leg shackles?
5  A. Yes, sir.
6  Q. Anything else?
7  A. We also have what is called a belly chain, a blue
8  box. That's when I worked transportation,
9  because I've been off almost a year now. They're
10 used very sparingly.
11 Q. And what is that?
12 A. That's basically a belly chain that goes around
13 the belly, and the handcuffs, instead of being
14 behind the back, are placed at the left hip and
15 right hip. And a blue box is a restraint device
16 that you can put a padlock and a chain around,
17 and put the handcuffs in front. It's generally
18 used by people transported between facilities or
19 transported to court.
20 Q. Did you discuss using that?
21 A. No, sir. Because we would have had to take
22 Mr. Heishman out of the handcuffs he was already
23 in.
24 Q. And you weren't going to do that?
25 A. No, sir.

**56**

1  Q. Inside the van was there points where you can
2  chain people to, like -- what is the term I'm
3  thinking of -- where you can connect chains?
4  A. Like an eyelet or anything?
5  Q. Yes.
6  A. No, sir.
7  Q. Okay. You know what I'm talking about?
8  A. Yes, sir. I believe so.
9  Q. So there is nothing like that, it's just two
10 benches straight in the back, no points
11 restraining at any location?
12 A. The only -- there is really no point of restraint
13 as you described it. The only thing we have for
14 them is a strap for them to hold onto with their
15 handcuffs behind their back.
16 Q. And you understand what I mean in terms of
17 their -- you mentioned courts. Sometimes in
18 courts there are anchors that are placed next to
19 their chairs?
20 A. Yes. sir. No, there is nothing like that inside
21 the back of a van.
22 Q. Because at some points you jostle around, and
23 there is something for them to hold on to --
24 A. Yes.
25 Q. -- while you're being transported; is that

**57**

1    correct?
2  A.  Yes, sir.
3  Q.  On both benches?
4  A.  Yes, sir.
5  Q.  Other than that there is just --
6  A.  No, sir.
7  Q.  Straight benches?  There is nothing in the back?
8  A.  No, sir.  It's just the benches, the wall that
9    divides the partition, and the strap.
10  Q.  You indicated earlier you thought maybe he was
11    intoxicated from something?
12  A.  Yes, sir.
13  Q.  What signs of intoxication did you observe?
14  A.  Well, the nudity.  Like I said, he was a bit
15    sweaty.  Also just the fact that we -- you know,
16    he was making comments to kill me, or somebody is
17    trying to kill me, I believe he may have been,
18    you know, under the influence of something and he
19    was hallucinating.
20  Q.  Anything else?
21  A.  No, sir.
22  Q.  Did you do a report for this incident?
23  A.  No, sir.  I did not.
24  Q.  Had you ever responded to Friendly's bar before?
25  A.  Multiple times in my career.  Yes, sir.

**58**

1  Q.  Tell me about that.
2  A.  Most of the time we're there it's for drunken
3    people who get thrown out of the bar.  If they
4    call, they're usually pretty drunk and out of
5    control.
6  Q.  So had you made runs to there prior to October of
7    2014, prior to this incident?
8  A.  Yes, sir.
9  Q.  And prior to this incident how many runs had you
10    made?
11  A.  I cannot tell you the exact total, sir.
12  Q.  Can you give me any approximate estimation?
13  A.  I would probably say around 30 to 40.  And that
14    may be a low number.
15  Q.  And of those 30 or 40 approximately, maybe low,
16    how many of those -- were those primarily
17    involving drunk people?
18  A.  Yes, sir.
19  Q.  Do you recall any runs that didn't involve
20    intoxication?
21  A.  No, sir.
22  Q.  What kind of area is this, what part of town?
23  A.  It's the southeast quadrant of IMPD.  It's south
24    of downtown.  Southeast.  I would call it a lower
25    to middle income area.

**59**

1  Q.  What is sort of the clientele at the bar, the
2    atmosphere, do you have any idea?
3  A.  I don't go in there.  Usually it's what we would
4    call, you know, a rough crowd.
5  Q.  Do you know whether Officer Burnett had responded
6    to Friendly's?  Do you have any idea whether any
7    of those calls were him?
8  A.  I'm sure he's probably responded to that area.
9    If you work southeast and you work that area,
10    you've probably been to Bryant's Friendly Inn.
11    But I can't speak for Officer Burnett's history.
12  Q.  Sure.  And that leads to my next question.  So
13    that area is within southeast district?
14  A.  Yes, sir.
15  Q.  And southeast district is located at East
16    Virginia and -- what is the cross street there?
17    Is it Fountain Square?
18  A.  Yes, sir.
19  Q.  How far away is that district headquarters,
20    southeast district headquarters, from that
21    location?
22  A.  Probably about mile.
23  Q.  And if you're a van driver you know Indianapolis
24    fairly well, is that fair?
25  A.  Yes, sir.  Especially that district.  Yes, sir.

**60**

1  Q.  Especially that district.  Do you make a lot of
2    runs to that district?
3  A.  I was assigned that district for seven years.
4  Q.  So when you're driving the van you're assigned to
5    a particular district?
6  A.  When I was assigned -- when I worked that's where
7    I was assigned.  I can't speak to today.  I think
8    it's a little different.  Yes, sir.
9  Q.  But October and before you were assigned a
10    particular district, and you knew that district
11    very well?
12  A.  Yes.  That's the one I was assigned to.  Yes,
13    sir.
14  Q.  Did you know Dusty Heishman prior to this
15    incident?
16  A.  No, sir.
17  Q.  Never met him before?
18  A.  No.
19  Q.  What about an individual by the name of Mark
20    Britton, does that ring any bells?
21  A.  No, sir.
22  Q.  What about William Patterson?
23  A.  No, sir.
24  Q.  And you worked with Officer Burnett before;
25    correct?

61

```
1  A.  Yes, sir.
2  Q.  What about Officer Spiegl?
3  A.  Yes, sir.
4  Q.  Was he assigned to the southeast district as
5      well?
6  A.  Yes, sir.
7  Q.  And Officer Bueckers, had you worked with him
8      before?
9  A.  Yes, sir.
10 Q.  Regularly?
11 A.  Yes, sir.
12 Q.  And with Officer Spiegl regularly?
13 A.  Yes, sir.
14 Q.  What about Park Ranger Philip Greene?
15 A.  Sporadically, because park rangers are all over
16     the city.
17 Q.  What are their responsibilities, do you know?
18 A.  The park rangers?
19 Q.  Yes.
20     MS. BOX:  Objection.  I don't think he can
21     testify to a park ranger's responsibilities.
22 Q.  You can answer.  That's okay.
23 A.  The best I understand, they are assigned to all
24     the city parks.
25 Q.  Do you recall making any runs prior to that run?
```

62

```
1  A.  I'm sure I did, but I can't recall where it was
2      to.
3  Q.  Do you recall any other runs that day, either
4      before or after?
5  A.  No, sir.
6  Q.  And you didn't have anybody in the van at the
7      time when --
8  A.  No, sir.  I was empty.
9  Q.  Sometimes you'll have people in the van?
10 A.  Yes, sir.
11 Q.  Did you observe any injuries on Mr. Heishman's
12     body at any point?
13 A.  No, sir.
14 Q.  Did anybody ever pat him down?
15 A.  He was naked.
16 Q.  Yes.  Which leads to my next obvious question.
17     He didn't have any weapons on him?
18 A.  No, sir.
19 Q.  Anything in his hands?
20 A.  No, sir.
21 Q.  Did you ever do a cavity search or anything like
22     that?
23 A.  No, sir.
24 Q.  Have you ever arrested naked people before?
25 A.  I've transported a few.
```

63

```
1  Q.  Is there any protocol associated with
2      transporting naked people?
3  A.  No, there is no policy on how to really -- you
4      know, as far as searching, because generally when
5      we deal with searches it's with clothing.  No,
6      there is not.
7  Q.  Do you have any clothing in your van to give --
8  A.  No, sir.  That's not supplied to us.
9  Q.  So the force you applied to him was the one
10     peroneal strike on the upper thigh; is that
11     correct?
12 A.  Yes, sir.
13 Q.  Were there any other strikes or use of force that
14     you applied?
15 A.  No, sir.
16 Q.  Do you have any idea what positional asphyxia is?
17 A.  Yes, sir.
18 Q.  What is that?
19 A.  That is where someone who is laid out prone with
20     their hands behind their back can go into
21     difficulty breathing and die if they remain in
22     that position too long.
23 Q.  And he was in that position; is that correct?
24 A.  For a few minutes.  He was on his stomach, yes.
25 Q.  And you were touching him; is that correct?
```

64

```
1  A.  Yes, sir.
2  Q.  Did you ever have any indication of whether he
3      was hot or warm?
4  A.  The best I can recall, his body temperature
5      seemed normal to me.
6  Q.  What about shivering?
7  A.  No, sir.  I did not observe that.
8  Q.  Did you ever look at his eyes?
9  A.  No, sir.
10 Q.  Did he throw up at any point?
11 A.  No, sir.
12 Q.  Did he ever indicate to you in any of his
13     statements whether he had taken any drugs?
14 A.  No, sir.
15 Q.  Were you monitoring him closely?
16 A.  Yes, sir.
17 Q.  Do you know whether the other officers were
18     monitoring him?
19 A.  I can't speak to what they were doing, sir.
20 Q.  When you were monitoring what were you looking
21     for?
22 A.  You just monitor their overall well-being, and
23     you make sure that they don't exhibit any sudden
24     signs of distress, and nothing changes and goes
25     abnormal.
```

65

1  Q. Did you go to the hospital?
2  A. No, sir.
3  Q. You just marked back in after you left the scene?
4  A. Yes, sir.
5  Q. And after you walked away from the back of the
6     ambulance did you go back to your van?
7  A. I can't recall if I went straight back to my van.
8  Q. Do you recall talking to anybody else?
9  A. No, sir.
10 Q. You said Sergeant Miller was on the scene.
11    Do you recall talking to any of the other
12    officers other than Sergeant Miller?
13 A. No, sir.
14 Q. Do you know whether Sergeant Miller -- was he
15    just on scene as the sergeant, or do you know
16    whether he had any interactions with
17    Mr. Heishman?
18 A. I can't speak to if he was there as a sergeant or
19    what his duties were there.
20 Q. Why did you approach him?
21 A. When I arrived on scene I -- because he was the
22    one that requested the wagon. When I first spoke
23    to him I remember telling him I don't think I'll
24    be able to transport the subject.
25 Q. And you gave a statement to Internal Affairs; is

66

1     that right?
2  A. Yes, sir.
3        (Plaintiff's Deposition Exhibit
4     Letter A was marked for identification
5     by the reporter.)
6
7  Q. And I purport that to be your statement. Can you
8     look it over?
9  A. Absolutely.
10 Q. And let me know when you're finished.
11    Is that a true and accurate copy of your
12    Internal Affairs statement?
13 A. Yes, sir.
14       (Plaintiff's Deposition Exhibit
15    Letter B was marked for identification
16    by the reporter.)
17
18 Q. I'll show you what has been marked as Exhibit B.
19    It looks like a general conduct letter, Letter of
20    Caution from the Sheriff; is that correct?
21 A. Yes, sir.
22 Q. And in here there is a reference that you are
23    being ordered for remedial training on
24    interpersonal relations with others?
25 A. Yes, sir.

67

1  Q. What was that in reference to, do you know?
2  A. Yes, sir.
3  Q. Can you explain that?
4  A. Yes, sir.
5  Q. Okay.
6  A. Me and my wife had had a verbal argument. I left
7     the house, I took my daughter with me. She went
8     to a fire house or called her dad, I can't
9     remember. Either way, they called the police out
10    and she wanted to make a complaint because I got
11    mad and I threw a Febreze bottle through the
12    window. Or not through the window, but at a
13    blind, and broke it. So they had to do an
14    investigation, an Internal Affairs investigation.
15 Q. So it was a personal issue?
16 A. Yes, sir.
17 Q. It wasn't while you were on duty?
18 A. No, sir.
19    MR. BARNHART: I'm about done. Let's take a
20    break.
21       (A brief recess was taken at this time.)
22       (Plaintiff's Deposition Exhibit
23    Letter C was marked for identification
24    by the reporter.)
25       (At this time a video file, Exhibit C, was

68

1     begun.)
2
3  Q. You laughed. What caused you to laugh?
4  A. Just hearing that.
5  Q. Is it fair to say that that's consistent with
6     Bryant's --
7        MS. BOX: Are we on the record?
8        MR. BARNHART: Yes. On the record. I'm
9     sorry. We're back on the record. My apologies.
10 Q. You laughed when you heard the start of the
11    video; is that correct?
12 A. Yes, sir.
13 Q. Do you associate that with kind of the
14    environment of Bryant's?
15 A. Yes, sir.
16 Q. We're at 5:08 on this as far as the time marker.
17 A. Okay.
18 Q. If you need to move it, feel free to move it if
19    you can't see it. So is that your van?
20 A. Yes, sir.
21 Q. There is somebody talking. Do you know who that
22    is?
23 A. Probably the officers, but I can't make them out.
24 Q. I'm going to stop it right here. Okay. I'm
25    stopping at 5:43 for time marker purposes. It

**69**

1 appears that there is a group of individuals over
2 here; is that right?
3 A. Yes, sir.
4 Q. Does that appear to be where Dusty Heishman is
5 located?
6 A. Yes.
7 Q. You indicated earlier that you thought he was
8 about 25 to 30 feet away from your van?
9 A. Yes, sir.
10 Q. Did he move at any other points? Is this the
11 point at which you arrived on scene?
12 A. Yes, sir.
13 Q. So when you got out of the van to assess the
14 situation, that's the location where he was?
15 A. Yes, sir.
16 Q. Can you identify any of these people?
17 A. No, sir.
18 Q. So I'm going to go back to where it was. This is
19 at 5:44. And like I say, if you need to move it
20 to look, please do.
21      Does it appear as if there are non-uniform
22 individuals around him?
23 A. It appears there may be one.
24 Q. Does that refresh your recollection as to who
25 might have been near Mr. Heishman when you

**70**

1 arrived on scene?
2 A. I couldn't tell you who that is, though.
3 Q. Can you identify any of these specific officers
4 around him?
5 A. No, sir. No, sir.
6 Q. But that is your van?
7 A. That is my van. Yes, sir.
8 Q. Would that be a true and accurate depiction of
9 what you saw when you arrived?
10 A. Yes, sir.
11 Q. Okay. And that street that you're on --
12 A. Yes, sir.
13 Q. What street is that?
14 A. East Street.
15 Q. So is East two ways?
16 A. Yes, sir.
17 Q. So somebody had been blocking it off?
18 A. Yes, sir.
19 Q. So you're on the left side facing north?
20 A. South.
21 Q. You're facing south?
22 A. Yes, sir.
23 Q. If you were driving would you be on the correct
24 side or the wrong side of the street?
25 A. Wrong side of the street, sir.

**71**

1 Q. But there is no traffic because somebody had
2 blocked it off?
3 A. Yes, sir.
4 Q. This vehicle here in the foreground, do you know
5 who that vehicle belongs to?
6 A. No, sir. I do not.
7 Q. All right. I'm done with this video for now.
8      Do you know any of the individuals that you
9 have arrested at Bryant's by name?
10 A. No, sir.
11 Q. And I want to go over the CAD audio.
12 A. Okay.
13 Q. So this will be a little bit easier. And for
14 purposes of identification, this is Track 4, and
15 the video was the Biggerstaff video, for purposes
16 of I. D. of Exhibit C.
17      MS. BOX: So is the audio still part of C?
18      MR. BARNHART: Yes. C includes Track 4,
19 Track 5, and the Biggerstaff video. And I'm
20 playing Track 4.
21      (At this time Track 4 of Exhibit C was
22 played.)
23 Q. Do you recall who that is?
24 A. That's Burnett.
25 Q. So that was around 29 seconds into CAD 4?

**72**

1 A. Yes.
2 Q. And at some point if there is voices on here I
3 might ask you to acknowledge them to see if you
4 know them.
5 A. Okay.
6 Q. At 37, who is that?
7 A. Could you clarify, please?
8 Q. Sure. That asked to "Step it up." Do you
9 recall --
10 A. That's Control Operator LouAnn Pipes.
11 Q. Control Operator LouAnn Pipes?
12 A. Yes, sir.
13 Q. Was she the dispatch operator?
14 A. She's the one that is assigned to southeast.
15 Q. Now, where is she physically located? Is she at
16 southeast district?
17 A. 47 South State Avenue MECA.
18 Q. So she's in MECA?
19 A. Yes, sir.
20 Q. And what does MECA stand for?
21 A. Metropolitan Emergency Communications Agency.
22 Q. And that's her as well?
23 A. Yes, sir.
24 Q. Is that you?
25 A. No.

73

1 Q. Who is that?
2 A. I can't recall. It sounds like Burnett.
3 Q. And that's you?
4 A. That's me.
5 Q. And so you got the call for the run?
6 A. Yes, sir.
7 Q. And you were advising that you were already en
8    route?
9 A. Yes, sir.
10 Q. At 18 seconds she was asking for what, do you
11    recall?
12 A. If the scene was safe or if there is any more
13    cars.
14 Q. Who responded?
15 A. I don't know who that is. I can't recall that.
16    MS. SMITH: Is that 18 or 1:18?
17    MR. BARNHART: 1:18. I'm sorry. Thank you.
18 Q. But somebody did respond?
19 A. Sounded like it. Yes, sir.
20 Q. Do you know who that is?
21 A. No, sir.
22 Q. Do you know who that is?
23 A. No.
24 Q. And that's at 1:29. Do you know who 518 is?
25 A. I believe that's Sergeant Ed Miller.

74

1 Q. Who is that?
2 A. That's Ed Miller.
3 Q. At 1:35?
4 A. Yes, sir.
5 Q. He said 37. Is that you?
6 A. That was my unit number. Yes, sir.
7 Q. So she's advising that you should be there
8    momentarily?
9 A. Yes, sir.
10 Q. So at 1:49 LouAnn Pipes indicates that the
11    subject is under control; is that correct?
12 A. That's what she said.
13 Q. According to CAD?
14 A. That's what she said. Yes, sir.
15 Q. Who is that?
16 A. Sounds like Sergeant Ed Miller.
17 Q. And that's at 1:55, sending a medic for a bite
18    wound?
19 A. Yes, sir.
20 Q. And somebody indicated that the scene was secure?
21 A. Yes, sir.
22 Q. Who is that?
23 A. It sounds like Sergeant Ed Miller.
24 Q. What does ET mean?
25 A. As far as for IMPD it means evidence technician,

75

1    as far as I know.
2 Q. So that was LouAnn Pipes?
3 A. No.
4 Q. Who was that?
5 A. The officer requesting sounds like Officer Amanda
6    Shafer.
7 Q. Was she on scene do you know?
8 A. Yes, sir.
9 Q. Did you see her on scene?
10 A. Yes, sir.
11 Q. She's with IMPD?
12 A. Yes, sir.
13 Q. Do you know what her involvement was?
14 A. No, sir.
15 Q. And you said you saw her on scene. What did you
16    see her do?
17 A. Running around a little bit. I didn't see what
18    she specifically did.
19 Q. Was she one of the several officers that
20    responded?
21 A. Yes.
22 Q. Do you know who she is referring to?
23 A. 244?
24 Q. Yes.
25 A. Yes, sir.

76

1 Q. Who is that?
2 A. Donald Spiegl I believe.
3 Q. Who is that?
4 A. I believe, and this is the best of my
5    recollection, it sounds like Matthew Cook maybe.
6 Q. Did you see Matthew Cook on the scene?
7 A. I can't recall if I did or not.
8 Q. Okay. So at 2:45 they indicate that they thought
9    they knew the suspect's name; is that correct?
10 A. Yes.
11 Q. Whose voice is that?
12 A. Matt Coffing.
13 Q. And that's still Coffing?
14 A. Yes, sir.
15 Q. Did you ever ask the individual to give his name?
16 A. No, sir.
17 Q. Do you know how they learned his name?
18 A. No, sir.
19 Q. She says Odyssey and Justice. Do you know what
20    she's referring to?
21 A. Yes, sir.
22 Q. What is she referring to?
23 A. Justice is our old computer mainframe program.
24    Basically it is what the courts use, police use.
25    It was our case management system is the best way

**77**

```
1       to describe it.
2   Q.  So she was running a background check on him?
3   A.  Yes.
4   Q.  It appears so?
5   A.  Yes.
6           (At this time Track 5 of Exhibit C was
7       played.)
8
9   Q.  This is Track 5, just for purposes of the record.
10      Who is that?
11  A.  Bill Bueckers.
12  Q.  And 518, remind me who that is again.
13  A.  Sergeant Ed Miller.
14  Q.  So he's telling Sergeant Ed Miller to go to the
15      ambulance?
16  A.  Um-hm.
17  Q.  And in addition to your equipment you have
18      radios; correct?
19  A.  Yes, sir.
20  Q.  So you're listening to this as it's happening?
21  A.  Yes, sir.
22  Q.  Does this refresh your recollection as to what
23      occurred?
24  A.  Yes, sir.
25  Q.  Who is that?
```

**78**

```
1   A.  That's Burnett.
2   Q.  So somebody is looking for Miller?
3   A.  Um-hm.
4   Q.  582.  Remind me who that is.
5   A.  Brian Burnett.
6   Q.  It says 501.  Who is that?
7   A.  I believe that's Tom Feeney, Lieutenant.
8   Q.  So at 1:08 -- around 1:07 he says our guys are
9       all over him.  Who was that?
10  A.  I believe that's Ed Miller.
11  Q.  At 1:43, who is that talking?
12  A.  I have no idea, sir.
13  Q.  255.  Who is that?
14  A.  Matthew Coffing.
15  Q.  Do you hear that?  'Got a name.'
16  A.  Yes, sir.
17  Q.  Who is that?
18  A.  Can you play it again?
19  Q.  Yes.  She said she sent him a picture.  How would
20      they send pictures through MECA?
21  A.  Generally it's through email.
22  Q.  And that's the dispatcher, and again she sent a
23      picture of what they believe to be the individual
24      that was being apprehended via email?
25  A.  That's what it sounds like to me.
```

**79**

```
1   Q.  233.  Who is that?
2   A.  I can't recall who that is.
3   Q.  Do you recall who that is?
4   A.  Which one, sir?
5   Q.  The one that requested.
6   A.  582?
7   Q.  Yes.
8   A.  That's Brian Burnett.
9   Q.  Do you hear that?
10  A.  Yes, sir.
11  Q.  Do you know who that is?
12  A.  No, sir.
13  Q.  Do you hear that?
14  A.  Yes, sir.
15  Q.  Who is that?
16  A.  I don't know, sir.
17  Q.  Did you hear that?
18  A.  Yes, sir.
19  Q.  Who is that?
20  A.  Well, Burnett referred to Don, so that would
21      probably be Don Spiegl, but I can't say for 100
22      percent certainty that it is.
23  Q.  So he referred to his phone; right?
24  A.  Yes, sir.
25  Q.  What is your understanding of why an officer
```

**80**

```
1       would call somebody, as opposed to putting it
2       over on radio traffic?
3   A.  Well, for me, you wouldn't want to tie up the
4       radio unnecessarily.  Or clarity, to make sure
5       you got the right information.
6   Q.  Any other reasons?
7   A.  I can't speak to why they wouldn't want to do it.
8       I don't know.
9   Q.  He says he's moving his feet.  Do you know who
10      that was, who made that statement?
11  A.  No, sir.
12  Q.  And that's at 4:27.
13          Do you recognize that voice?
14  A.  No, sir.
15  Q.  'That thing was something else over there.'  Do
16      you know who that is?
17  A.  I have no idea who that is, sir.
18  Q.  Okay.  Did you notice any blood on Mr. Heishman
19      at any points?
20  A.  No, sir.
21  Q.  When you were leaning on him and you had contact
22      with him were you applying your weight?
23  A.  No, sir.
24  Q.  What were you trying to do, what was your
25      objective?
```

81

1 A. At first just walk him to the back of the van.
2    And then after he pushed off against the van it
3    was just to hold him down and restrain him until
4    the medics arrived.
5 Q. When he was going to go to the van, or he was
6    going to go into the van, where was he going to
7    go?
8 A. In the back, prisoner compartment.
9 Q. But where were you going to take him, Eskenazi,
10   to the APC?
11 A. Probably to Eskenazi.  He was too intoxicated or
12   too out of control probably for the APC.
13 Q. Are there certain requirements, physical
14   requirements that you have in order to take him
15   to the APC?  Do you know what I mean by that?
16 A. If you could clarify?
17 Q. Sure.  Is there a point at which APC won't take
18   somebody?
19 A. Generally it's due to high levels of
20   intoxication.
21 Q. And whose call is it to decide whether he goes to
22   Eskenazi or goes to the APC?
23 A. If we take them to the APC and they are
24   determined not to stay there, the determination
25   is made by the on-duty medical staff.

82

1 Q. If it's made on scene, whose call is that?
2 A. Generally it's the officers on scene or the
3    deputy.
4 Q. Would it have been your call to go to one or the
5    other?
6 A. If I took him into custody, yes, sir.
7 Q. At any point did you ever take him into custody?
8 A. I put my leg shackles on him.  Like I said, he
9    never physically got into my van, no.
10 Q. And at the point that he was administered the
11   medicine where was he exactly?
12 A. He was behind my van.  Like I said, we were we
13   were maybe five, seven, ten feet behind my van.
14 Q. Was he prone on the ground?
15 A. Yes, sir.
16 Q. So he was on his stomach?
17 A. Yes, sir.
18 Q. And the drug was administered in his shoulder?
19 A. Yes, sir.
20 Q. Where at in his shoulder specifically?
21 A. The best I can recall is more towards the back,
22   closer to his shoulder blade, the best I can
23   recall.
24 Q. It was not in his deltoid?
25 A. I'm not a medical expert, so I don't know what

83

1    you're referencing.
2 Q. It wasn't his arm?
3 A. No.  It was in the top of his shoulder.
4 Q. When he administered it did you physically
5    observe him do it?
6 A. Yes, sir.
7 Q. How did he do it?
8 A. He used a syringe.
9 Q. Did he swab it?
10 A. I can't recall.
11 Q. Did he jab it, or did it look like he was picking
12   a particular spot?
13 A. It looked like he was picking a particular spot.
14   He didn't come up and just pick one and go and
15   stab him with it, he looked for a certain area to
16   administer it.
17 Q. You gave the leg shackles, but you don't recall
18   putting them on?
19 A. No, I did not put them on.  No, sir.
20 Q. Did you bring documents with you?
21 A. Yes, sir.
22 Q. What documents did you bring with you here today?
23 A. It was just a copy of my Interrogatories and IA
24   statement.
25 Q. The statement that we have a copy of?

84

1 A. Yes.  The exhibit.  Yes, sir.
2 Q. Any other document is your Interrogatory?
3 A. Yes, sir.
4     MR. BARNHART:  I believe those are all the
5    questions that I have.
6
7 CROSS-EXAMINATION,
8    QUESTIONS BY MS. MARY FELDHAKE:
9 Q. My name is Mary Feldhake, and I represent the
10   medical people in this matter, and I just have a
11   few questions for you.
12      Do you remember the other medical personnel
13   on the scene other than the gentleman that gave
14   him the injection?
15 A. The only other medical personnel that I recall
16   were paramedics probably from IFD.  But names or
17   stations, or any truck numbers or anything
18   specific like that, I cannot recall.
19 Q. So you don't recall a partner of the IEMS person
20   that gave Dusty the injection?
21 A. By name, no.  I believe the ambulance that
22   responded was Medic 29.  That's the best I can
23   recall.
24 Q. And do you recall whether anyone instructed the
25   he IEMS people to provide medication?

85

1  A.  No.
2  Q.  You don't recall, or, no, they did not?
3  A.  I do not recall.
4      MS. FELDHAKE:  Okay.  All right.  That's all
5  I have.  Thank you.
6      MR. BARNHART:  I have a couple of omitted
7  questions, if you want to --
8      MS. BOX:  Yes.  Go for it.
9
10 REDIRECT EXAMINATION,
11     QUESTIONS BY MR. SCOTT BARNHART:
12 Q.  I'll direct you to the Internal Affairs
13     statement.
14 A.  Sure.
15 Q.  Page 1096.
16 A.  Yes, sir.
17 Q.  About half of the way down it says, "Okay.  You
18     said it took about a minute for that to work?"
19 A.  Yes.
20 Q.  And then your answer is, "It seemed to be about a
21     minute, maybe two, before he started calming down
22     and then went out?"
23 A.  Yes, sir.
24 Q.  What did you mean by "then went out?"
25 A.  It appeared it put him to sleep.  You know, he

86

1      just --
2  Q.  Did he lose consciousness?
3  A.  No, sir.  If I can recall, no.
4  Q.  Put him to sleep?
5  A.  Yes, sir.
6  Q.  How do you know that, just by your observations?
7  A.  Just by what I observed and what I was feeling
8      with the tenseness of his muscles.  The entire
9      time I had been dealing with him he had been
10     tense.  Very, very tense.  And after the medicine
11     was administered, after a minute or two his body
12     relaxed.
13 Q.  Did anybody take his vitals?
14 A.  No, sir.
15 Q.  Did anybody check to see if he was breathing?
16 A.  No, sir.
17 Q.  And it indicates later on down in your statement,
18     "We just kind of let him lay there;" is that
19     correct?
20 A.  Let me see if I can find that.  Yes.
21 Q.  "And let the medicine take effect?"
22 A.  Yes, sir.
23 Q.  At that point nobody is checking his vitals?
24 A.  No, sir.
25 Q.  Are there any medical devices that are being used

87

1      to monitor him at all?
2  A.  No, sir.
3  Q.  And you say, "Then once the medics were satisfied
4      he was completely out under the effect of
5      medication we assisted him and put him on the
6      gurney;" is that correct?
7  A.  Yes, sir.
8  Q.  And the medic was there watching, standing over;
9      is that correct?
10 A.  Yes, sir.
11 Q.  But nobody was checking on him in terms of
12     checking his vitals or anything like that?
13 A.  No, sir.
14 Q.  At that point it was dusk; right?
15 A.  Yes.
16 Q.  What was the lighting like at that time when you
17     were waiting to have the medicine take effect?
18 A.  The sun had just went down.  Dark.  And there
19     were street lights, but the ambient lighting and
20     the lighting from the police vehicles.
21 Q.  Was it easy to see or hard to see?
22 A.  It was kind of -- it was easy to see just because
23     of the street lights in there.  It's well lit.
24     But it was dark.  I mean, if I was on scene with
25     something and no lighting, you would have to have

88

1      a flashlight or something to help you see better.
2      I know it's not what you're asking, is it
3      easy or hard, it's just at that time it was easy
4      street lighting, the lights from the police
5      vehicles.
6  Q.  So if you were doing something you would have
7      liked to have been assisted by a flashlight?
8  A.  Yes.
9  Q.  Did you see the use of a flashlight?
10 A.  No, sir.
11 Q.  Nobody was using a flashlight?
12 A.  Not that I recall.  No, sir.
13     MR. BARNHART:  That's all I have.
14
15 RECROSS-EXAMINATION,
16     QUESTIONS BY MS. MARY FELDHAKE:
17 Q.  Let me just make one thing clear for the record.
18     You did not instruct anyone to give him
19     medication, to give Dusty Heishman any
20     medication; is that right?
21 A.  That is correct.
22     MS. FELDHAKE:  All right.  I have nothing
23     further.
24
25

89

```
1   RECROSS-EXAMINATION,
2       QUESTIONS BY MS. KATHRYN BOX:
3   Q.  I just have a few questions to follow-up with you
4       on.
5           Going back to the beginning, you talked a
6       little bit about your training as a law
7       enforcement officer.  I think you said you had
8       attended the Special Deputy Academy; is that
9       correct?
10  A.  Yes, ma'am.
11  Q.  Have you had any additional law enforcement.
12      training since then?
13  A.  In 2002 I re-attended for about three to four
14      weeks.  In 2006 I was hired by Marion County, and
15      then my continuing education.
16  Q.  Can you explain your continuing education a
17      little bit?
18  A.  By state statute all officers have to receive a
19      minimum of I think it's 40 hours of in-service
20      training every year over various topics, and
21      certain ones are required every year no matter
22      what.  So that's what I mean by continuing
23      education.
24  Q.  And then jumping forward a little bit, at some
25      point you, maybe with the assistance of Sergeant
```

90

```
1       Miller I believe --
2   A.  Yes.
3   Q.  -- made the call that he could not be transported
4       using your wagon; is that correct?
5   A.  Yes.
6   Q.  Do you recall the reasons specific to
7       Mr. Heishman why you made that call?
8   A.  Just due to his state of possible intoxication.
9       Like I said earlier, it's a metal box inside a
10      metal box.  For his welfare and his well-being it
11      would be a risk to transport him in the condition
12      he was in.  He could injure himself inside there.
13          I believed him to be under the influence of
14      some unknown narcotics.  In my training and
15      experience, people who are under the influence
16      can get into the wagon and can injure themselves
17      even further.  And so for his safety and his
18      well-being we had decided that a medic would be
19      used.
20  Q.  In your history or in your experience as a wagon
21      driver have you made that call before, where
22      someone couldn't be transported?
23  A.  Yes.
24  Q.  All right.  And you mentioned Mr. Heishman's
25      comments, something along the lines of kill me or
```

91

```
1       they're going to kill me?
2   A.  Yes.
3   Q.  Do you recall if those were in reference to any
4       of the officers on scene?
5   A.  No.  Like I stated earlier, I cannot recall who
6       he was making reference to, or if he stated, like
7       I said, kill me, or they are going to kill me.  I
8       have no idea what he was talking about.
9   Q.  We talked a little bit about your history or your
10      experience with individuals who have been given
11      medication to sort of calm them down?
12  A.  Yes.
13  Q.  And you said there was two times that the
14      medication didn't work in your experience?
15  A.  Yes.
16  Q.  Is that over the course of your whole career?
17  A.  Yes, ma'am.
18  Q.  And your observation that the medication didn't
19      work, is that based on any medical training that
20      you've had?
21  A.  No, ma'am.
22  Q.  I know that some departments have EMT training.
23      Have you had any EMT training?
24  A.  No, ma'am.
25  Q.  And you haven't attended medical school; is that
```

92

```
1       correct?
2   A.  No, ma'am.
3   Q.  And then with respect to the excited delirium
4       that we spoke about, your observations related to
5       excited delirium are also not based on any
6       medical training?
7   A.  Correct.
8   Q.  Just based on your experience as a law
9       enforcement officer?
10  A.  And training through our academy.  Yes.
11  Q.  You mentioned that Mr. Heishman had super human
12      strength I believe was your terms?
13  A.  Yes.
14  Q.  Can you explain that a little bit?
15  A.  People are known to get super human or elevated
16      strength that goes above -- generally in my
17      experience is it goes above and beyond what a
18      normal person is capable of doing, and it takes a
19      lot of manpower to restrain them, to take them
20      into custody, or to even just transport them or
21      process them.
22          And generally people who have super elevated
23      strength also are, for lack of a better word, are
24      immune to our training.  Our trained use of
25      force, what we would normally use to gain control
```

93

```
 1      of a subject and take them into custody or to
 2      maintain control of them, doesn't work.
 3   Q.  And your statement that Mr. Heishman had super
 4      human strength is based on your personal
 5      interactions with him during this incident?
 6   A.  Yes.
 7   Q.  And do you know, or at least in your experience,
 8      what causes super human strength?
 9   A.  Usually it is ingesting narcotics, a combination
10      of narcotics.
11   Q.  Okay.  I'm kind of backing up a little bit.  I'm
12      sorry.  You stated there was an experience in
13      your past where an individual was -- where the
14      medication didn't work and he was placed in the
15      back of the van with an officer and leg
16      shackles --
17   A.  No.  Ambulance.
18   Q.  Ambulance.  Okay.  Not in your wagon?
19   A.  No, not in my van.  No.
20   Q.  Did Mr. Heishman make any statements directly
21      toward to you?
22   A.  No.
23   Q.  Did he make any statements directly to you?
24   A.  No.
25          MS. BOX:  That's all the questions that I
```

94

```
 1      have.
 2
 3   FURTHER QUESTIONS BY MR. SCOTT BARNHART:
 4   Q.  Did you observe him at the hospital?
 5   A.  Yes.
 6   Q.  And there is a reference to you in your statement
 7      of you sitting on him?
 8   A.  Yes.
 9   Q.  Which you didn't actually sit on him?
10   A.  Not physically sit on him like an egg or
11      anything, no.
12   Q.  It means you were assigned to his room; is that
13      correct?
14   A.  Yes, yes.
15   Q.  And your responsibility was just to maintain
16      security?
17   A.  Yes.
18   Q.  Do you recall why you were assigned to do that?
19   A.  Probably the policy of the Marion County
20      Sheriff's Office.  You would have to ask the
21      admin why we have to go sit on prisoners and what
22      the requirements are.  I couldn't tell you.
23   Q.  And did you observe any injuries to him while he
24      was there?
25   A.  He appeared to be on several IV's.
```

95

```
 1   Q.  Did you observe any injuries to his face or his
 2      body?
 3   A.  No, he was pretty well covered, and he had IV
 4      tubes and all that.
 5   Q.  Getting treatment?
 6   A.  Yes.  So it pretty much blocked the view of
 7      anything on his body.
 8   Q.  And you didn't pull his gown back or look at his
 9      legs or anything like that?
10   A.  I didn't even touch him.  That's not my --
11   Q.  Who else was in the room when you were there?
12   A.  It was just two ICU nurses that would come check
13      on him periodically and turn him as needed.
14   Q.  Any family in the room that you observed?
15   A.  No, no.  Generally per the policy of the
16      Sheriff's Office people in custody are not
17      allowed to visit at the hospital.
18          MR. BARNHART:  I have nothing further.  Thank
19      you.
20          MS. FELDHAKE:  I have no questions.
21          MS. BOX:  Nothing further.
22          MR. BARNHART:  I appreciate it, sir.
23          THE WITNESS:  No problem, sir.
24          MR. BARNHART:  Do you want to explain
25      signature?
```

96

```
 1          MS. BOX:  Yes.  We are going to reserve
 2      signature.  Thank you.
 3
 4      _____
 5          BILLY JOHNSON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

97

STATE OF INDIANA )
                    )
COUNTY OF MARION )

       I, Russell J. Scheiner, RPR, CSR, and a
Notary public in and for said county and state, do
hereby certify that the deponent herein was by
me first duly sworn to tell the truth, the whole
truth and nothing but the truth in the
aforementioned matter;

       That the foregoing deposition was taken on
behalf of the Plaintiff; that said deposition was
taken at the time and place heretofore mentioned
between the hours of 8:00 a.m. and 6:00 p.m.;

       That said deposition was taken down in
stenograph notes and afterwards reduced to
typewriting under my direction; and that the
typewritten transcript is a true record of the
testimony given by said deponent, and thereafter
presented to said witness for signature; that this
certificate does not purport to acknowledge or verify
the signature hereto of the deponent.

       I do further certify that I am a
disinterested person in this cause of action; that I
am not a relative of the attorneys for any of the

---

98

parties.

       IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this_____day
of_____, 2016.


                RUSSELL J. SCHEINER, RPR, CSR, Notary Public

My commission expires:
October 29, 2016


Job No. 0727BAR

---

99

Scott Barnhart, Esq.
Brooke Smith, Esq.
KEFFER BARNHART, LLP
230 East Ohio Street
Suite 400
Indianapolis, Indiana  46204

         NOTICE OF DEPOSITION FILING

Billie Thompson, as Personal Representative of the
Estate of Dusty Heishman, vs. City of Indianapolis,
Indianapolis Metropolitan Police Department, et al.

U. S. District Court, Southern District of Indiana
Indianapolis Division, Cause No. 1:15-cv-1712-TWP-DML

       In compliance with Indiana Rules of Trial
Procedure, Rules of the Industrial Board or
Federal Rules of Civil Procedure, pursuant to
Indiana Supreme Court order dated 10-1-86, you
are notified of the filing with counsel for the
Plaintiff, the deposition of BILLY JOHNSON.

       Returned with ____ without ____ corrections.

       (Date of filing or mailing by
        certified mail.)

cc:

Kathryn Box, Esq.
OFFICE OF CORPORATION COUNSEL
200 East Washington Street
Suite 1601
Indianapolis, Indiana 46204

Mary R. Feldhake, Esq.
Bose McKinney & Evans, LLP
111 Monument Circle
Suite 2700
Indianapolis, Indiana  46204

       RUSSELL J. SCHEINER, RPR, CSR, Notary Public
             3437 Beasley Drive
           Indianapolis, Indiana  46222
           Tel. & Fax (317) 299-6302

---