*In the Matter Of:*

## BILLIE THOMPSON

### vs

## CITY OF INDIANAPOLIS, ET AL.

## LANCE COPE
July 12, 2016



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

SETTING THE RECORD STRAIGHT

**1**

```
1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION
             CASE NO. 1:15-cv-01712-TWP-DML
3
4
   BILLIE THOMPSON, as Personal      )
5  Representative of the ESTATE OF    )
   DUSTY HEISHMAN,                    )
6                                     )
                    Plaintiff,        )
7                                     )
        vs.                           )
8                                     )
   CITY OF INDIANAPOLIS,              )
9  INDIANAPOLIS METROPOLITAN POLICE)
   DEPARTMENT, OFFICER BRIAN          )
10 BURNETT, in his individual and     )
   official capacities, OFFICER       )
11 DONALD SPIEGL, in his individual)
   and official capacities, OFFICER)
12 WILLIAM BUECKERS, in his           )
   individual and official            )
13 capacities, PARK RANGER PHILLIP    )
   GREENE, in his individual and      )
14 official capacities, MARION        )
   COUNTY SHERIFF'S DEPARTMENT,       )
15 DEPUTY BILLY JOHNSON, in his       )
   individual and official            )
16 capacities, HEALTH AND HOSPITAL    )
   CORPORATION OF MARION COUNTY,      )
17 MEDIC LANCE COPE, in his           )
   individual and official            )
18 capacities, MARK BRITTON, and      )
   WILLIAM PATTERSON,                 )
19                                    )
                    Defendants.  )
20
21
22          DEPOSITION OF LANCE COPE
23
24
25
```

**2**

```
1          The deposition upon oral examination of
   LANCE COPE, a witness produced and sworn before me,
2  Rhonda J. Hobbs, RPR, a Notary Public in and for
   the County of Marion, State of Indiana, taken on
3  behalf of the Plaintiff at the offices of Keffer
   Barnhart, LLP, 230 East Ohio Street, Suite 400,
4  Indianapolis, Marion County, Indiana, on the 12th
   day of July, 2016, commencing at the hour of 10:09
5  a.m., pursuant to the Federal Rules of Civil
   Procedure with written notice as to the time and
6  place thereof.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1                    APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFF(s):
4       Scott L. Barnhart
        KEFFER BARNHART, LLP
5       230 East Ohio Street
        Suite 400
6       Indianapolis, IN  46204
        Barnhart@KBindy.com
7
8
   ON BEHALF OF CITY OF INDIANAPOLIS, INDIANAPOLIS
9  METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN
   BURNETT, OFFICER DONALD SPIEGL, OFFICER WILLIAM
10 BUECKERS, PARK RANGER PHILLIP GREENE, MARION COUNTY
   SHERIFF'S DEPARTMENT and DEPUTY BILLY JOHNSON::
11
        Kathryn M. Box
12      Assistant Corporation Counsel
        OFFICE OF CORPORATION COUNSEL
13      200 East Washington Street
        Room 1601
14      Indianapolis, IN  46204
        kathryn.box@indy.gov
15
16
   ON BEHALF OF HEALTH AND HOSPITAL CORPORATION OF
17 MARION COUNTY and MEDIC LANCE COPE:
18      Mary Ruth Feldhake
        BOSE McKINNEY & EVANS, LLP
19      111 Monument Circle
        Suite 2700
20      Indianapolis, IN  46204
        mfeldhake@boselaw.com
21
22
23
24
25
```

**4**

```
1               INDEX OF EXAMINATION
                                          PAGE
2
   DIRECT EXAMINATION...........................   5
3  Questions by Mr. Scott L. Barnhart
4
5
6
7
8               INDEX OF EXHIBITS
                                          PAGE
9  Plaintiff Exhibit(s):
10 Exhibit H - Photograph......................  54
11 Exhibit I - Medical Record..................  55
12
   Previously Marked Exhibit(s)
13
   Exhibit C - Photograph......................  53
14
15
16
17
18
19
20
21
22
23
24
25
```



5

1                    LANCE COPE,
2  having been first duly sworn to tell the truth, the
3  whole truth and nothing but the truth relating to
4  said matter, was examined and testified as follows:
5
6  DIRECT EXAMINATION,
7      QUESTIONS BY MR. SCOTT L. BARNHART:
8  Q  Good morning, sir.
9  A  Good morning.
10 Q  My name is Scott Barnhart. I represent the
11     plaintiff in this matter. Please state your
12     name and spell your last name for the record.
13 A  Lance Cope. Last name is spelled C-O-P-E.
14 Q  Have you ever been deposed before?
15 A  No.
16 Q  You understand what a deposition is?
17 A  Yes.
18 Q  I'm going to go over some ground rules. I'm
19     sure they've been covered before. Everything is
20     being written down, so I ask that you answer out
21     loud; okay?
22 A  Okay.
23 Q  She can't record head nods or shakes or anything
24     like that, so we need to verbally answer the
25     questions. I'll presume if I ask a question

6

1      that you both understood it and you heard it.
2      If you didn't understand it, I can rephrase it
3      or I can clarify. I just ask that you ask me to
4      do so; is that fair?
5  A  Yes.
6  Q  I'll presume that if you answer a question, that
7      you've heard it and understood it; is that fair?
8  A  Yes.
9  Q  If you need a break for any reason, that's
10     absolutely fine, we've had a lot of coffee this
11     morning, so we'll probably take one, but if you
12     need one, just let us know, but I would ask that
13     you answer the pending question; okay?
14 A  Okay.
15 Q  Are you currently under the effects of any
16     alcohol, drugs or prescribed medication?
17 A  No.
18 Q  Is there anything that would affect your memory
19     here today?
20 A  Time.
21 Q  That's a good answer. In anticipation of this
22     deposition, what did you do to prepare?
23 A  I met with Mary. I reviewed the run report.
24 Q  Anything else?
25 A  And reviewed the statement I gave to the IMPD

7

1      officer.
2  Q  Other than counsel, have you spoken to anybody
3      about this matter we're here today to discuss?
4  A  No.
5  Q  How old are you, sir?
6  A  38.
7  Q  And what's your educational background?
8  A  I have an undergraduate degree from Indiana
9      State University in communications. I have a
10     master's in business from Indiana Wesleyan
11     University. I have a EMT certificate from St.
12     Vincent Hospital. I have my paramedic education
13     from St. Francis Hospital in Indianapolis, and
14     associate's of nursing from Ivy Tech.
15 Q  Where did you go to high school?
16 A  Franklin Community High School.
17 Q  Is that Franklin, Indiana?
18 A  It's 20 miles south of Indianapolis.
19 Q  Okay. Do you have any law enforcement training?
20 A  No.
21 Q  Do you have any military experience?
22 A  No.
23 Q  Who's your current employer?
24 A  St. Francis Hospital.
25 Q  How long have you been working for them?

8

1  A  Roughly, about a year and a half.
2  Q  Who did you work for before St. Francis?
3  A  Indianapolis EMS.
4  Q  How long had you worked for them?
5  A  Between four and five years.
6  Q  What caused you to move from Indianapolis EMS to
7      St. Francis?
8  A  I was pursuing a degree in nursing. Once I
9      completed that, I changed fields.
10 Q  You weren't terminated by Indianapolis EMS?
11 A  No.
12 Q  Prior to working for Indianapolis EMS, who did
13     you work for?
14 A  I worked for Rural Metro Ambulance.
15 Q  And what did you do for them?
16 A  I worked as an EMT.
17 Q  How long did you work for them?
18 A  For two years.
19 Q  And before that?
20 A  Before that, I worked at Navigant Consulting.
21 Q  What kind of work did you do for them?
22 A  We did work for the State, consulting work for
23     the State; specifically, IDEM, Indiana
24     Department of Environmental Management.
25 Q  In your capacity at Indianapolis EMS, what were



9

1   your responsibilities?
2   A   So at EMS, I was a paramedic, and primary
3       responsibilities as a paramedic, respond to
4       emergency calls, make patient contact, treat
5       patients, take them to the hospital, provide
6       care as needed.
7   Q   Okay. So were you assigned to a vehicle?
8   A   Yes.
9   Q   Okay. How many people are assigned to a vehicle
10      typically?
11  A   Typically, there's two people assigned to a
12      vehicle.
13  Q   And driver and then the person in the back, or
14      how does it work?
15  A   Typically, it's an EMT and paramedic.
16  Q   Okay. Is the driver an EMT paramedic as well?
17  A   No, not necessarily. I could be the driver
18      sometimes.
19  Q   Okay.
20  A   An EMT is basic life support provider.
21      Paramedic is advanced life support provider.
22      Depending on the nature of the call determines
23      who would drive and who would be in the back
24      with the patient.
25  Q   Paramedics have more training than an EMT?

10

1   A   Yes.
2   Q   And your role was primarily as a paramedic?
3   A   Yes.
4   Q   Did you ever drive?
5   A   For this call or ever?
6   Q   Ever?
7   A   Sure.
8   Q   And did you ever drive for Indianapolis EMS?
9   A   Did I ever drive for --
10  Q   When you were assigned a particular shift, how
11      often -- what's the time period that you would
12      work?
13  A   I would work from 7:00 to -- let's see, I'm
14      trying to think. I'm getting my schedule
15      confused with one now, 7 to 7, 7 PM to 7 AM.
16  Q   And when you were assigned a shift, do you
17      know who determines whether you're going to be
18      driving or not?
19  A   It's determined on your relationship with your
20      partner as far as driving to the call. Driving
21      from the call is totally different. It depends
22      on what -- the acuity of the patient, what the
23      acuity of the patient is.
24  Q   And how many partners did you have in your time
25      period with Indianapolis EMS?

11

1   A   Permanent partners or --
2   Q   Start with permanent partners.
3   A   Okay. Permanent, two.
4   Q   Who were they?
5   A   Josue Ceballos and Doris Gilbert.
6   Q   How often did you work with Mr. Ceballos?
7   A   I believe we worked together for about three
8       years, and that's a rough estimate.
9   Q   So in October -- do you recall the run --
10  A   Yes.
11  Q   -- that we're here for today? Was he your
12      partner around that time?
13  A   Yes.
14  Q   Okay. And how long had he been your partner at
15      that time, so how long had you been working with
16      him prior to --
17  A   Probably over two years.
18  Q   Okay. So you're familiar with him?
19  A   Yes.
20  Q   What's his training and background; do you know?
21  A   I know his training is -- I believe he had an
22      associate's degree from Ivy Tech in fire science
23      and also he received EMT training, and I'm not
24      sure where he received that training from.
25  Q   Okay. Was he an EMT and a paramedic or just an

12

1       EMT.
2   A   He's just an EMT.
3   Q   Okay.
4   A   EMT basic is the correct term, I guess.
5   Q   Do you recall any other runs that you made that
6       day?
7   A   No.
8   Q   Okay. Do you recall whether you made any other
9       runs that day?
10  A   None that stand out. I'm sure in a 12-hour
11      period, we definitely did.
12  Q   What do you recall about this run?
13  A   We were at our station, Station 29. We were
14      dispatched out for an animal bite to Iowa and
15      East Street. When we arrived -- it's a very
16      short distance from the fire station, but when
17      we arrived, the -- there was a gentleman there
18      that was brought up by a police officer and
19      complaining of being bit and also complaining of
20      having a broken nose.
21  Q   Do you recall his name?
22  A   No, I don't.
23  Q   What happened after that?
24  A   He was -- he kept asking us to straighten his
25      nose. We told him no, we don't straighten your



13

1     nose. We'll take you to a hospital and have a
2     doctor evaluate you. We didn't really talk to
3     him too long because -- I didn't talk to him
4     very long because another police officer came up
5     to us and said hey, can you come over and check
6     on somebody for us?
7  **Q**  Do you recall who that officer was?
8  **A**  I don't recall who that officer was.
9  **Q**  Do you recall what color his uniform was?
10  **A**  I would assume the standard issue, which is the
11     dark blue, but honestly, I would be totally
12     guessing.
13  **Q**  Okay. Let me back up a little bit. You were at
14     Station 29 --
15  **A**  Uh-huh.
16  **Q**  -- Firehouse; is that correct?
17  **A**  Yes.
18  **Q**  Okay. Is that where you would normally start
19     your shifts out?
20  **A**  Yes.
21  **Q**  And would you always -- so when you started your
22     shift out, you go to the station house and you
23     go on runs?
24  **A**  Yes.
25  **Q**  Okay. And you said you didn't go far from the

14

1     station house. How long of a drive was it?
2  **A**  I don't know the actual -- mileage, I would
3     estimate half a mile.
4  **Q**  Okay.
5  **A**  Not much further than that.
6  **Q**  Did you have lights and sirens on?
7  **A**  Yes.
8  **Q**  Who drove?
9  **A**  Josue Ceballos.
10  **Q**  And did he stay in the vehicle, or did he get
11     out as well, or do you know?
12  **A**  He got out.
13  **Q**  When you got out of the vehicle -- I assume
14     you're riding in the cab; is that right?
15  **A**  Sitting in the front.
16  **Q**  So when you go out, you're riding up front?
17  **A**  Correct.
18  **Q**  And when you get out, who did you see? What's
19     the first thing you did once you got out?
20  **A**  We were met by an IMPD officer and the patient
21     with a broken nose.
22  **Q**  Okay.
23  **A**  So that's the first thing we did, was have that
24     conversation with him.
25  **Q**  Okay. And then what did you do next?

15

1  **A**  Well, after I was requested by law enforcement
2     to come over and check on another patient they
3     had, I went over there. My partner stayed with
4     the gentleman with the broken nose.
5  **Q**  You refer to the term "patient," why do you
6     refer to them as a patient?
7  **A**  Refer to --
8  **Q**  The next individual that you?
9  **A**  Because I typically only deal with patients.
10  **Q**  And do you recall who that individual was?
11  **A**  Well, I later learned his name to be Dusty.
12  **Q**  Okay. And so from where you were, when you were
13     interacting with the law enforcement officer and
14     the individual with the nose issue, how far away
15     was the other individual; do you know where they
16     were located?
17  **A**  They were in the street. I don't have an exact
18     number, 20 feet maybe.
19  **Q**  How many people were around?
20  **A**  There was quite a few people. I think I've said
21     before at least about five officers. I
22     definitely didn't count.
23  **Q**  Were there any civilians around?
24  **A**  Yeah, there was a lot of whatever you want to
25     call them, bystanders, civilians. There's a bar

16

1     nearby.
2  **Q**  Did those bystanders or civilians appear to come
3     from the bar?
4  **A**  I can't speak to that.
5  **Q**  Approximately, how many bystanders were there;
6     do you have any idea?
7  **A**  I don't know how many there were.
8  **Q**  Other than the bar, were there any other
9     establishments around?
10  **A**  I can't recall.
11  **Q**  Do you know the name of the bar?
12  **A**  No.
13  **Q**  And what time of day was this?
14  **A**  I believe it was somewhere between 7 and 8.
15     Probably closer to 8.
16  **Q**  So did your partner go with you to Mr. Heishman
17     or is it just you?
18  **A**  Initially, it was just me.
19  **Q**  Okay.
20  **A**  He stayed back with the man with the broken
21     nose.
22  **Q**  Okay. So once you go over there, what happens
23     after that?
24  **A**  So I see him, Dusty on the ground. He is prone,
25     so face down. He is -- law enforcement was

17

1   trying to restrain him and he's fighting against
2   them.
3   Q   Was he handcuffed?
4   A   He was handcuffed.
5   Q   Were his legs shackled?
6   A   Yes.
7   Q   How was he fighting against them?
8   A   Just trying -- it appeared that he was trying to
9       get up, even though they were trying to subdue
10      him.
11  Q   And how many officers were around him?
12  A   I would guess five.
13  Q   What were those officers doing?
14  A   Trying to hold him down to get control of him.
15  Q   Were they saying anything to him?
16  A   I don't recall them saying anything
17      specifically.
18  Q   Was he saying anything to the officers?
19  A   I don't recall him actually saying any words,
20      but it was more of just like moans and groans of
21      the struggle that was going on, and the grunts.
22  Q   What did you do next?
23  A   So I assessed him. He a pulse. He was
24      breathing. It appeared that he was under the
25      influence of something in the -- it was just a

18

1   brief rundown of the history that I got about
2   what had taken place before that caused the
3   police to be there with him.
4   Q   Did you have any idea what he was under the
5       influence of?
6   A   No. I mean, without a lab, no, but with his
7       presentation, I was guessing some type of
8       amphetamines.
9   Q   Anything else that you thought he was on?
10  A   No. At that point it was really -- I really
11      wasn't sure what else he was on.
12  Q   Was he prone when you were doing your
13      assessment?
14  A   He was prone.
15  Q   Did you try to speak with him?
16  A   I did ask him if he was okay? He did not say
17      anything to me. He just kept fighting against
18      the officers.
19  Q   When you say "fighting against the officers,"
20      can you describe what you mean by that?
21  A   Sure. I'll do my best. I guess what I mean is
22      struggling against the officers as far as not
23      allowing himself to be handcuffed. It was
24      clear -- if we would have rolled him over, I,
25      personally, believe he would have been trying to

19

1   kick us, do anything he could to get up and run
2   even with shackles on -- I don't know that for
3   sure, but he was not compliant with anyone.
4   Q   What clothing was he wearing?
5   A   I don't recall exactly any clothing being on
6       him. I believe he was totally naked.
7   Q   Did you see any -- you said you assessed him; is
8       that right?
9   A   Yeah.
10  Q   When you're assessing somebody, what do you do?
11  A   Well, the first things you focus on are the
12      ABC's, airway, breathing, circulation. Airway
13      was intact. He was breathing. Circulation
14      wise, yes, he did have a pulse. Tried to
15      determine his level of consciousness. He was
16      awake, enough to fight them.
17          Without being -- without having any kind
18      of -- without speaking to us or answering --
19      complying, it appeared that he was somewhat
20      confused, and from there, it's hard to do any
21      other assessment, like, take a blood pressure
22      when somebody's fighting against you.
23  Q   Did you look at his head to see if he had any
24      head trauma?
25  A   I looked at the back of his head, but it was

20

1   hard to totally see his face because he was face
2   down and it didn't appear that there was any
3   head trauma.
4   Q   What was the lighting like when you were
5       assessing him?
6   A   It was right there like around dusk, so the sun
7       is going down. It's not the best lighting.
8   Q   So he never actually said anything to you, he
9       was just making noises?
10  A   Correct.
11  Q   Okay. What were the officers doing when you
12      were making your assessment?
13  A   They were still just trying to hold him down and
14      gain control of him.
15  Q   And what did you do after you made your
16      assessment?
17  A   Well, it appeared to be that he needed to be
18      chemically restrained for his safety, for our
19      safety, because we wouldn't be able to transport
20      him to the hospital in that condition. So I
21      gave him 10 milligrams of Versed IM,
22      intramuscular.
23  Q   Okay. Were you in communication with the
24      hospital?
25  A   At that direct point in time?



21

1   Q   Uh-huh.
2   A   No.
3   Q   Had you spoken to a doctor prior to giving him
4       Versed?
5   A   No, I had not spoken with a doctor.
6   Q   Had you spoken with anybody about him prior to
7       giving Versed other than the people on the
8       scene?
9   A   So I had spoken to somebody that was not --
10  Q   The hospital, the medical staff, anything?
11  A   No. I follow the Marion County protocols.
12  Q   What are those protocols?
13  A   For chemical restraint, when somebody appears to
14      be under the -- they can be under the influence
15      of any kind of drugs or it could be a
16      psychiatric condition, anything that -- where
17      this person needs medical care but you can't
18      provide that care without injury to yourself or
19      injury to them, we have a protocol of giving
20      them 10 milligrams of Versed.
21  Q   Were you injured by Mr. Heishman?
22  A   No, I was not.
23  Q   Was there anybody that you're aware of that was
24      injured by him?
25  A   I believe the initial gentleman that approached

22

1       us, the law enforcement officer, when we arrived
2       on scene, I believe that's how he sustained a
3       broken nose, however, he didn't stick around for
4       EMS to fully evaluate him.
5           I know when I left to go see Dusty, my
6       partner told me that he -- this gentleman got
7       upset because we wouldn't straighten his nose
8       and left.
9   Q   You said you believed that he — Mr. Heishman
10      caused his injury; is that right, the nose
11      issue?
12  A   From what -- that's what the gentleman that --
13      when we initially got there?
14  Q   Yeah.
15  A   I don't know his name, the man with the broken
16      nose, I believe that's that's how -- I believe
17      that's how he said he got the broken nose, was
18      from Dusty.
19  Q   All right. Anybody else that you're aware of
20      that had any injuries from Dusty?
21  A   Not that I'm aware of.
22  Q   So you don't make any calls to the hospital,
23      you're following Marion County protocols for the
24      administration of Versed; right?
25  A   Correct.

23

1   Q   And you make that determination?
2   A   Correct.
3   Q   Where did you apply it?
4   A   Left deltoid.
5   Q   And he was still on the ground?
6   A   Correct.
7   Q   He had not changed positions?
8   A   No, not yet. It wasn't safe to.
9   Q   How far away was he from your vehicle?
10  A   Around 20 feet. That's a rough estimate on my
11      part.
12  Q   Okay. Had you taken his blood pressure prior to
13      that point?
14  A   No. He wasn't able to -- the blood pressure was
15      not able to be obtained on him due to his
16      condition.
17  Q   Did you try?
18  A   No.
19  Q   Do you know -- and you don't know what was in
20      his system; is that right, any drugs?
21  A   I don't know.
22  Q   You presume that he was on something?
23  A   Correct.
24  Q   Okay. That he was intoxicated?
25  A   I don't know about intoxicated.

24

1   Q   Okay. Did you smell alcohol?
2   A   I did not smell alcohol.
3   Q   Were you looking for alcohol?
4   A   I try to look for any signs or symptoms of
5       alcohol or drug ingestion.
6   Q   So he was noncooperative?
7   A   Correct.
8   Q   But you — you didn't think that he was
9       intoxicated?
10  A   I didn't know for sure if he was intoxicated.
11  Q   Okay.
12  A   It appeared to be more -- being intoxicated due
13      to his presentation, being hyperaggressive,
14      being tachycardic, being totally naked.
15  Q   Tachycardic, what --
16  A   A very high heart rate.
17  Q   Did you get his pulse?
18  A   Yes.
19  Q   And do you recall what it was?
20  A   I believe in the area of 120. I'd have to look
21      at my run report.
22  Q   And is there a pulse where you start getting
23      concerned?
24  A   Well, sure. I mean, for this particular patient
25      or any patient?



25

1  Q  I would say, in general?
2  A  60 to 100 is normal. Anything below or above,
3     you would definitely want to look into that.
4  Q  Okay. What did he do after you administered the
5     Versed to his left deltoid?
6  A  I'd say around a minute, two minutes or so, he
7     was pretty still and subdued, or still
8     breathing. We rolled him over onto his back and
9     picked him up. We had the stretcher there,
10    picked him up and placed him supine on his back
11    on the stretcher.
12  Q  So you were at the same location?
13  A  Uh-huh.
14  Q  And you said he was still breathing, how did you
15    know that?
16  A  I could -- I mean, I could see his chest rise
17    and fall.
18  Q  Other than watching his chest, did you have any
19    indication of monitoring for respiratory issues?
20  A  Did I have --
21  Q  Did you have any machines with you?
22  A  No, not right there at the -- not right there
23    beside him.
24  Q  Did you have your bag with you?
25  A  Yes.

26

1  Q  What's in your bag.
2  A  Bag, we have oxygen, intubation kit, IV
3     supplies, blood pressure cuff, stethoscope.
4  Q  Is there a reason why you picked the left
5     deltoid instead of the right?
6  A  I believe that was the easiest one to get to,
7     the one that was most accessible.
8  Q  Is there other protocols for where the Versed
9     should be administered?
10  A  On specific parts of the body, no, it doesn't
11    specify that. It says you can give it IV, which
12    there was no way we could get an IV on him, IM,
13    intramuscular, or intranasal. Those are the
14    three options we have.
15  Q  Do you know whether any of those three options,
16    whether there's a preferred option?
17  A  Really, it's tailored to the patient. IM, I
18    felt, was the best route at that time. It would
19    be dangerous and reckless for me to try and
20    attempt an IV on him. Intranasal, in my
21    experience, you do have to have some cooperation
22    with them, and trying to put something in
23    somebody's nose, who's fighting against you,
24    wouldn't have been the best route.
25  Q  So at the time it was administered, he was

27

1     shackled and he was handcuffed; correct?
2  A  Correct.
3  Q  Okay. And you wait a minute to 2 minutes after
4     you administer it? You step back and watch?
5     What do you do?
6  A  Well, I am waiting for him to calm down, to be
7     subdued so we can actually start getting him
8     loaded into the ambulance -- put him on the
9     stretcher and getting him into the ambulance,
10    and then, obviously, we're trying to monitor his
11    breathing.
12  Q  Okay. And are you looking for anything else?
13  A  As in?
14  Q  Your assessment after you've administered the
15    Versed, what are you looking for?
16  A  Do you mean the reason why we give Versed?
17  Q  No, no. I'm talking about after you administer
18    the drug, what factors or indications are you
19    looking at within the patient about his reaction
20    to that particular drug?
21  A  The biggest thing is breathing.
22  Q  Okay.
23  A  We want to monitor his pulse also, and then his
24    level of consciousness.
25  Q  Okay. And why did you choose to administer

28

1     Versed to Dusty Heishman at that time?
2  A  Because he was a danger to himself and to others
3     and we -- there's absolutely 100 percent no way
4     we could have taken him to the hospital without
5     having him restrained. And chemical restraint
6     is better than the physical restraint. There
7     are problems inherent with prolonged physical
8     restraint, and that's another reason why we have
9     a chemical restraint protocol.
10  Q  How long after you saw him did you decide to
11    administer the Versed?
12  A  I'd have to look at the run report for the
13    actual times.
14  Q  Okay. Did you ever consider waiting to see if
15    he would tire out?
16  A  No. In cases like that, with -- that appear to
17    be excited delirium, they will eventually tire
18    out, and that tire out means cardiac arrest. So
19    getting them subdued, giving them a sedative
20    would be the first line treatment.
21  Q  Okay. Did you have any concerns that the
22    sedatives or Versed would interact with what was
23    in his system?
24  A  Sure. I mean, you never totally know what's in
25    somebody's system. That's why you'd have to



**29**

1  continue to monitor them. Being on
2  potentially -- in my mind, I thought he was on
3  some type of amphetamine just based on his
4  presentation.
5      I just know that that's -- just from
6  training from protocols, just education,
7  benzodiazepine is something you would give to a
8  patient who appears in an excited delirium.
9  Q  What does the term "excited delirium" mean to
10    you?
11 A  To me, it means basically a episode where you
12    are in this stage where you're confused,
13    somewhat delirious, hyperthermic, so your
14    temperature greatly increases. You're
15    tachycardic. You have hyper aggression.
16        Dusty being naked on the ground and just
17    the brief history I got on what kind of led up
18    to that, along with his vital signs, tended to
19    point more toward an excited delirium.
20 Q  Did you observe any injuries that he had to his
21    body?
22 A  Once we got him onto the stretcher and into the
23    ambulance, I know he the probes from the taser,
24    I believe chest and abdomen.
25 Q  Was that one probe in his chest and one probe in

**30**

1  his abdomen, or are there --
2  A  Correct.
3  Q  Were those left in?
4  A  Once we got him in the ambulance, no, we pulled
5    those out.
6  Q  So they were left -- they were in his chest and
7    his abdomen when he was prone down on the
8    ground?
9  A  Yes.
10 Q  Do you know whether -- did you pull them out?
11 A  I'm not sure. It was either myself or my
12    partner. I don't recall. Somebody in the
13    ambulance did. I can't remember specifically
14    who pulled the actual probes out.
15 Q  Did you see whether they were embedded into the
16    skin?
17 A  Did I see where?
18 Q  Did you see whether they were or not?
19 A  Yes, they were.
20 Q  Okay. Do you know whether they were
21    superficial, they were in deep, do you have any
22    idea?
23 A  I don't have any idea.
24 Q  When you were -- so I'm going to back up a
25    little bit. When he's on the ground after you

**31**

1  administer the drug, did you tell the officers
2  that were around that you were going to do that?
3  A  Yes.
4  Q  What was your communications with them?
5  A  I just told them that he needed to be chemically
6    restrained so we could take him to the hospital.
7  Q  Do you recall any response?
8  A  I don't recall any specific response.
9  Q  Did you use the term "chemically restrained?"
10 A  Yes.
11 Q  And at that point they were still touching him?
12 A  Yes.
13 Q  Okay. And you said it was about five officers?
14 A  A rough estimate, yes.
15 Q  Okay. And you don't recall them saying anything
16    to you?
17 A  About?
18 Q  So after you administer it, you're waiting on
19    the drug to take effect, presumably?
20 A  Uh-huh.
21 Q  Is that a yes?
22 A  Yes.
23 Q  I'm going to catch you from time to time. It
24    happens.
25 A  Okay.

**32**

1  Q  And, so, at that point, what are the officers
2    doing?
3  A  They're still holding him, waiting for him to
4    stop fighting them. Once he stops fighting,
5    then that's when I direct everybody to roll him
6    on his back and then put him on the stretcher.
7  Q  And was the stretcher nearby?
8  A  It was right next to him.
9  Q  Did you bring the stretcher out when you went
10    over to him?
11 A  I believe somebody brought the stretcher out for
12    us. Typically, we had somebody else. Our
13    district lieutenant, I believe, was there at
14    some point, Doug Lackey. I'm not sure if he's
15    the one that brought it out or not. I do know
16    somebody brought the stretcher up for us.
17 Q  Why was Doug Lackey there?
18 A  He got called there once -- so we had two
19    patients. We called for backup, for another
20    ambulance for the guy with a broken nose. And
21    then I -- I'm not sure when Doug arrived
22    exactly, but eventually, when this changed to
23    cardiac arrest, we asked for more manpower, and
24    that's when the fire department came, and I'm
25    not sure what time he arrived, Doug arrived on

33

1   scene.
2   Q  Okay. When did it change to cardiac arrest?
3   A  Once we got him on the way to the ambulance
4      which was roughly 20 feet -- you know, we're
5      wheeling him and trying to watch for the chest
6      rise and fall. It appeared that -- it looked
7      like it had stopped, and as soon as we put him
8      into the ambulance and checked for a pulse,
9      that's when we knew he was in cardiac arrest.
10  Q  You said "it looked like it had stopped," what
11     do you mean?
12  A  It looked like his chest was not rising and
13     falling.
14  Q  Okay. When did you observe that?
15  A  As we're pushing him on the stretcher to the
16     ambulance.
17  Q  And what did you do in response to that?
18  A  We pulled the barbs out so we could start CPR.
19  Q  And CPR was initiated before you got to the
20     ambulance?
21  A  No, it was started when we loaded him into the
22     ambulance. It was literally -- probably by the
23     time I saw the chest rise and fall, stop, we
24     were 5 feet from the ambulance where it would
25     have made more sense to put him in there because

34

1   all the equipment, better lighting and
2   everything is inside there. And when I say all
3   the equipment, I mean we had our bag with us,
4   yes, but things are more easily accessible in
5   the ambulance.
6   Q  You said "better lighting," can you describe the
7      lighting inside the ambulance?
8   A  Typically, on the top of the ambulance, you have
9      at least three big lights right above where the
10     patient is. So you flip those on, and it lights
11     the whole back end of the ambulance up.
12  Q  Why is lighting important?
13  A  Lighting is important so you can see your
14     patient better. You can attempt an IV on them
15     and see the veins. Just the standard of care
16     would be to put him in the best lighting.
17  Q  Did you give him an IV?
18  A  Eventually, we did, yes.
19  Q  Is that inside the ambulance?
20  A  Yes.
21  Q  And you said you started administering CPR?
22  A  Uh-huh.
23  Q  When was that?
24  A  The timeline, I'd have to look at the paperwork
25     there, the run report to note the exact time.

35

1   But I mean, as soon as we checked the pulse and
2   saw that he didn't have one, CPR was started
3   right then.
4   Q  When did you check the pulse; was that inside
5      the ambulance?
6   A  Yes.
7   Q  Did you check the pulse on your way — from when
8      you put him on the stretcher to the ambulance?
9   A  No. No. I was watching his breathing. It was
10     hard to have -- it would be hard to have a hand
11     up on him and pushing the stretcher and carrying
12     our bags all within 5 feet of the ambulance.
13  Q  So you were carrying your bag and pushing the
14     stretcher at the same time?
15  A  Yes.
16  Q  Okay. Was there anybody helping you push the
17     stretcher?
18  A  My partner would have been there, Josue.
19  Q  Do you recall him specifically helping you?
20  A  Yes, yes.
21  Q  So it was two of you pushing the stretcher, were
22     any law enforcement officers pushing the
23     stretcher?
24  A  I don't remember if there was a law enforcement
25     officer or not pushing the stretcher.

36

1   Q  The bag, does it have handles, or was it over
2      the shoulder, or both?
3   A  It has both.
4   Q  How do you handle it?
5   A  I typically put it on my shoulder.
6   Q  So you're pushing him. Was he physically
7      resisting on the stretcher?
8   A  No. Once we -- he was on the stretcher, he was
9      not resisting.
10  Q  And you grab your bag?
11  A  Uh-huh.
12  Q  Okay. Are you both pushing it, or is one at one
13     end and one at the other?
14  A  Usually, one person's at one end and one person
15     is at the other.
16  Q  Do you recall in this case where he was?
17  A  I was down by the head, so it would have been
18     more the back of the stretcher, so he would have
19     been pulling it from the foot end.
20  Q  Okay. And so you get him in there, and once
21     he's in the ambulance, how long did you wait to
22     take his pulse?
23  A  Almost immediately.
24  Q  What did you discover?
25  A  There was no pulse.

37

1  Q  And you had checked his pulse when he was on the
2     ground; correct?
3  A  Correct.
4  Q  Did you check his pulse at any point after he
5     got onto the stretcher?
6  A  No, because we wanted to get him to the
7     ambulance as fast as possible.
8  Q  I guess what I'm trying to understand is what
9     was the time frame between the last time you
10    checked his pulse, when he was on the ground,
11    and when you checked his pulse when he was in
12    the ambulance?
13 A  Am I allowed to look at the --
14 Q  Yes. We'll get to the report in a little bit.
15 A  Okay.
16 Q  But your recollection without looking at the
17    report is what I'm —
18 A  Okay. My best guess would be a couple of
19    minutes.
20 Q  And a lot of times in these circumstances, a
21    report is what you refresh your recollection
22    with.
23 A  Okay.
24 Q  I'm trying to get your recollection without it.
25 A  Okay.

38

1  Q  And who started administering CPR, was it you?
2  A  I don't remember if it was myself, my partner,
3     or one of the police officers.
4  Q  And who was in the ambulance with you?
5  A  My partner, Josue, and I believe one of the
6     police officers was over there with us.
7  Q  Do you happen to recall which one, what his name
8     was?
9  A  I think his name is Bill, and it's either
10    Bueckers or Bueckers.
11 Q  Okay. What was he doing?
12 A  He works part -- well, I don't know if he still
13    does, but at one point he was working part time
14    as an EMT for us. So he picked up a computer
15    and started helping, time stamped everything and
16    started reviewing information.
17 Q  What information did he enter; do you know?
18 A  I don't know for sure exactly what he did.
19 Q  What information would you typically enter?
20 A  Well, we would typically enter -- probably the
21    most important thing at that time period would
22    have been to get times down, so when you're
23    starting stuff. When you're starting CPR, when
24    you're stopping CPR, when you're putting in an
25    IV, when you're giving a medication, those type

39

1     of things are initially what you would put in.
2        Also, like to put in the name and the
3     demographics, but at that point, we didn't even
4     know who he was or didn't have that information
5     right off the bat, or at least I did not have
6     the information.
7  Q  And why is the timing of particular
8     administration of CPR important?
9  A  Well, it just is a good practice to keep a
10    record of what you're doing. You know, you want
11    to show what actually happened and paint the
12    best picture for times like this so you can give
13    a more accurate report to the hospital because,
14    unfortunately, you know, time does fade your
15    memory.
16 Q  Sure.
17 A  But yeah, we definitely wanted to get the time
18    stamps on there to show when we started CPR
19    because you can't go without a pulse for long.
20 Q  Is time important as to how long his heart had
21    stopped?
22 A  Oh, absolutely.
23 Q  Okay. Do you know how long his heart had
24    stopped?
25 A  I don't know for sure. I don't exactly when it

40

1     stopped so I don't know.
2  Q  And so you're in the back, Bill is in the back
3     as well, your partner, so there's three of you,
4     was there anybody else?
5  A  Not at that time. I don't recall.
6  Q  At any other time was there anybody else in the
7     back?
8  A  We actually called for manpower which is
9     basically requesting more assistance from the
10    fire department. I remember Natalie Cox, who's
11    a firefighter paramedic with IFD, and I remember
12    her arriving and helping out, assisting us.
13 Q  Did she get in the back; do you know?
14 A  She did eventually, yes.
15 Q  When you say "we," was it you, particularly, or
16    was it your partner, who was it?
17 A  That was in the back?
18 Q  That made the call? When you said we called for
19    additional manpower, how did you do that?
20 A  Typically one of us would get on the radio and
21    say control from Medic 29, please change this to
22    cardiac arrest and send additional manpower. It
23    would be something to that nature.
24 Q  Okay. And who would that be made to?
25 A  That would be made to the Marion County dispatch



41

1   system.
2   Q   Did you have any communications with the
3       hospital?
4   A   Not at that point, no.
5   Q   The term IHERN, does that mean anything to you?
6   A   IHERN is just the radio system.
7   Q   Did you have any contact on the IHERN radio
8       system?
9   A   Eventually, we did with Eskenazi, but no, not at
10      that point.
11  Q   Okay. So your radio communication initially
12      goes to the dispatch, which is Indianapolis EMS,
13      the fire department and law enforcement; is that
14      correct?
15  A   Yes, and I'm sure there's some acronym for it.
16      I can't think of what that actual name is right
17      now.
18  Q   They change. So you're initially on that
19      dispatch, and at some point you get on the IHERN
20      with Eskenazi; correct?
21  A   Correct. That's after we get pulses back and we
22      start transporting him and then we call. It's
23      our protocol to work a cardiac arrest, an adult
24      that's in cardiac arrest on the scene.
25  Q   So that's my question. So you didn't have

42

1       contact with the hospital until after he was
2       resuscitated?
3   A   Correct.
4   Q   Okay. But you did have contact and
5       communication with EMS dispatch and fire
6       dispatch; is that correct?
7   A   Correct.
8   Q   Do you know whether IMPD or any other law
9       enforcement have access to that communication?
10  A   From what I understand, they're all located in
11      the same building, but we are not -- fire and
12      EMS is dispatched on totally different, I don't
13      know what you want to call it, frequencies or --
14      so no, we don't hear all the police dispatches.
15  Q   Channel is a term that I'm familiar with?
16  A   Correct.
17  Q   So you're on the fire department or EMS channel?
18  A   Yes.
19  Q   And you called for more manpower, did anybody
20      show up other than Natalie Cox?
21  A   I don't recall who her partner was. On squad,
22      there's always two people. IFD would have sent
23      an engine, typically an engine or a ladder truck
24      with additional guys, and I don't recall who
25      showed up that day.

43

1   Q   Okay. So you try to administer CPR on scene,
2       was there ever any consideration given to try
3       and transport him to the hospital?
4   A   No. It's a protocol to work on scene.
5       Typically, all adult patients are going to be
6       worked for up to 30 minutes on scene. So that's
7       the standard of care.
8   Q   For up to 30 minutes, is that part of the
9       protocol as well?
10  A   Uh-huh.
11  Q   What do you do after the 30 minutes?
12          MS. FELDHAKE:  That's a yes?
13          THE WITNESS:  Yes. Thank you.
14  A   Well, after the 30 minutes, you would want to
15      get in contact with the hospital, but you
16      would -- essentially, you would cease -- if
17      there was no pulse after 30 minutes, they're not
18      going to be viable so our protocol is to cease
19      CPR.
20  Q   How long did it take to resuscitate in this
21      case?
22  A   I believe it was about 7 minutes.
23  Q   So does that mean he was without a pulse for 7
24      minutes?
25  A   A pulse of his own, yes.

44

1   Q   Okay.
2   A   But he received compressions immediately, so he
3       was being perfused and oxygen was being
4       administered.
5   Q   You said he was receiving compressions
6       immediately, what do you mean by that?
7   A   Once I checked his pulse and found out that he
8       did not have one, he started receiving
9       compressions.
10  Q   Okay. So there may have been a time period
11      where he wasn't receiving compressions and he
12      did not have a pulse?
13  A   Yes. There could have been because I -- I mean,
14      essentially, yes, there would have been because
15      I wasn't -- I didn't have my hand on him the
16      whole entire time and felt the pulse stop.
17  Q   So there's a gap from when he was transported --
18      when he was on the ground, transported to the
19      gurney to when you got him in the ambulance that
20      you weren't -- unsure as to whether he had a
21      pulse or not?
22  A   Correct.
23  Q   Okay. And you only determined when he had a
24      pulse, when you got him inside the ambulance and
25      you checked him and he didn't have one; is that



45

1    correct?
2  A  Correct.
3  Q  Okay. So the CPR and the resuscitation, can you
4     describe who participated in that, and what was
5     done?
6  A  Myself, Josue Ceballos, my partner, eventually
7     Natalie Cox was there. I know Doug Lackey was
8     there. We pulled out the probes, started
9     compressions. We put a non-rebreather mask that
10    supplies oxygen over his mouth and nose,
11    established an IV, gave him epinephrine, and
12    eventually he was intubated. We got him back
13    pretty quick -- well before we could get him
14    intubated, so the intubation was after he was
15    resuscitated.
16 Q  Where did you administer the epinephrine?
17 A  In his IV, through his IV.
18 Q  Okay. Do you recall what the dosage was?
19 A  It would be 1 milligram, 1 to 10,000
20    concentration.
21 Q  And the administration of the 10 milligrams of
22    Versed, did you have any -- is there any leeway
23    as to how much you administer or is it always 10
24    milligrams?
25 A  We can administer up to 10 milligrams. In

46

1     situations where it would be for somebody that
2     looked -- maybe the patient you get is maybe 100
3     pounds, I wouldn't -- me, personally, I would
4     have definitely dosed that down. He appeared to
5     be -- he looked about 170, roughly -- I didn't
6     have a scale, but to my best guess. It
7     appeared -- due to the aggressiveness, it
8     appeared that that would be an appropriate dose.
9  Q  And 10's the most you could use?
10 A  Correct, unless I call for orders to get more.
11 Q  Okay. So your determination on dosage was based
12    on his size and physical aggressiveness?
13 A  Yes.
14 Q  Any other factors?
15 A  No.
16 Q  Approximately -- and we'll get to the report, do
17    you recall how long it took to resuscitate him?
18 A  I believe 7 minutes.
19 Q  And what was your partner doing at the time when
20    you were doing what you were doing? Do you
21    recall what he was doing?
22 A  I don't recall specifically what he was doing.
23 Q  Okay. And I presume when you got him into
24    the -- he was not communicative? He never
25    talked to you at any point?

47

1  A  No.
2  Q  Was there anybody, any bystander that approached
3     that indicated that they knew him or knew
4     anything about him?
5  A  Not to me.
6  Q  Did anybody else, to your knowledge?
7  A  Not to my knowledge.
8  Q  Do you recall whether anybody, part of your team
9     or any EMTs or paramedics that went out and
10    tried to get that information to see if they
11    knew who this individual was?
12 A  I don't know if -- I don't know if anybody
13    specifically did that day. I know
14    somebody -- somebody did because we had to get
15    his name somehow, and I know I had it before I
16    left the hospital. I don't know who found his
17    ID or information, though.
18 Q  Prior to that day, how often had you
19    administered Versed in the field?
20 A  I'd say somewhere between ten and 20 times.
21 Q  And was it in the same or similar circumstance
22    here where you decided based on protocols to
23    administer it?
24 A  It's a mixture, and also, the size of the
25    chemical restraint protocol, there's a protocol

48

1     for people that are having seizures, that
2     medication would be appropriate, so it could be
3     a mixture of those two.
4  Q  And of those ten to 20 times, do you recall how
5     many of those occasions where you used the
6     maximum dosage of 10 milligrams?
7  A  I don't recall how many times that would have
8     been.
9  Q  Do you recall other circumstances where you used
10    the maximum dosage?
11 A  Yes. I know I've definitely used that
12    10 milligrams before.
13 Q  Okay.
14 A  There's been times where I had to use more than
15    that and called the hospital.
16 Q  Okay. And do the times that you've used the
17    10 milligrams -- and these are all -- this is
18    prior to October; okay?
19 A  Okay.
20 Q  Were there times that you made a determination
21    that they were physically aggressive as well?
22    So I guess my question is: Is physical
23    aggression a factor in the determination of what
24    dosage you use?
25 A  It is. If somebody is combative with you and

1    law enforcement and you can't treat them
2    medically, then absolutely.
3 Q  In those 10 to 20 times where you administered
4    it, are those instances where individuals were
5    physically combative?
6 A  No. That number is also a mixture of people
7    having seizures, too. So somebody convulsing is
8    not being combative with you.
9 Q  Okay. So of those 10 to 20 times, how many does
10    that involve individuals being combative?
11 A  I don't know a number for sure. Do you want a
12    best guess or --
13 Q  I don't want a guess.
14 A  Then I don't know for sure how many number of
15    times that was.
16 Q  Was it more than five?
17 A  I don't know.
18 Q  Of those 10 to 20 times that you've administered
19    Versed, how many of those happened at dusk or at
20    night?
21 A  I don't recall. I mean, we're talking about a
22    time period of years so I don't know.
23 Q  To your knowledge or recollection, do the
24    protocols account for circumstances like
25    lighting or time when you encounter the

50

1    individual?
2 A  Well, I mean -- let me approach lighting first.
3    There's nothing in the protocol that
4    specifically has anything to do with lighting.
5    Most people that work night shift carry
6    flashlights because of that.
7       You know, flashlights aren't -- they're a
8    great resource, but they're not the most ideal
9    circumstances because somebody has to hold it
10    and so it's hard to work on somebody when you're
11    holding a flashlight and trying to take care of
12    them. So that's why we move them to the
13    ambulance so we don't have to worry about that.
14    And then I think you were asking about time?
15 Q  Yes.
16 A  There's nothing specifically -- in the protocol,
17    the chemical restraint protocol, I believe,
18    doesn't say anything about time. You know, you
19    do want to try to deescalate the situation and
20    use the least amount -- you know, you want to
21    verbally deescalate, which that wasn't an option
22    for Dusty.
23       You would like to physically restrain them
24    if the conditions warrant that. That wasn't
25    successful to be able to treat him medically.

1    So then your next option is chemical restraint.
2    So there is going to be a progression of time
3    that goes through there, but there's no specific
4    time restraint.
5 Q  Once you got him in the back and you assessed
6    him, did you notice any injuries to his body?
7 A  The taser probes.
8 Q  Anything else?
9 A  Not that I recall.
10 Q  All right.
11 A  At that point we were more focused on the
12    resuscitation.
13 Q  And it took about 7 minutes to resuscitate him,
14    then what did you do after he was resuscitated?
15 A  We went emergent, so lights and sirens to the
16    hospital, to Eskenazi.
17 Q  And who drove?
18 A  I don't recall exactly who drove. I know
19    Natalie Cox was in the back with me, but I can't
20    remember if it was Josue or one of the other IFD
21    people.
22 Q  Okay. How long did it take you to get to the
23    hospital?
24 A  Probably four minutes maybe, five minutes.
25 Q  And so this was -- what side of town did this

52

1    happen on?
2 A  So we'd be on the south side of town.
3 Q  And do you recall what route you took?
4 A  Me being in the back, no, I don't.
5 Q  What happened once you got to the hospital?
6 A  Took the patient on the stretcher inside,
7    straight to the shock room and transferred care
8    to the Eskenazi staff.
9 Q  Do you recall interacting with anybody?
10 A  Not specifically. I mean, I would have
11    definitely given a report to one of the nurses
12    there.
13 Q  And you don't recall which nurse it was?
14 A  I don't know the name, what her name was.
15 Q  So after you turned him over to the hospital,
16    what did you do?
17 A  Well, then we have to write a report, restock
18    the truck, get it ready to get back in service.
19 Q  And mark back in?
20 A  We did eventually, yes.
21 Q  When did you write your report?
22 A  I started on it pretty much right after, right
23    after the call. So I still -- I would have been
24    working on it -- even driving back to the
25    station, I would have had to have been working



53

1    on it.  There was just so much that went on, you
2    know, that sometimes you can get away with doing
3    your report on the way to the hospital, but this
4    wasn't the case.
5  Q  And do you recall going back to the firehouse?
6  A  I know we definitely went back to the firehouse.
7  Q  Do you have any specific recollection?
8  A  No, nothing specific.
9  Q  How long did you stay at the hospital after you
10   turned him over?
11 A  I don't know.  Usually they want us in-service
12   in about 15 minutes.
13 Q  Okay.
14 A  So my guess would be somewhere in the nature of
15   15 minutes.
16 Q  Okay.  Do you recall what he, what Dusty looked
17   like?
18 A  No.
19     (Plaintiff's Exhibit(s) C was previously
20   marked for identification.)
21 Q  Okay.  I'll hand you a picture, Exhibit C, would
22   that refresh your recollection?
23 A  Okay.
24 Q  Does that appear to be Mr. Heishman?
25 A  Yes.

54

1  Q  I'm going to direct your attention to — there
2    appears to be some injuries or trauma to his
3    face.  Do you recall seeing this on scene?
4  A  No, I don't recall seeing those on scene.
5  Q  Okay.  And you indicated he had chest probes but
6    you don't recall seeing any other injuries?
7  A  No.  You know, and that's — when somebody loses
8    a pulse, you know, you're just so focused on the
9    resuscitation that you can't stop and stop
10   compressions and, you know, check their whole
11   body.
12 Q  So you're not saying he wasn't injured, you just
13   weren't focusing on that —
14 A  Correct.
15 Q  — would that be correct?
16 A  (Witness nodded.)
17 Q  Is that a yes?
18 A  Yes.
19     (Plaintiff's Exhibit(s) H was marked for
20   identification.)
21 Q  I'm showing you a photograph what I will
22   represent to you to be Dusty's legs, and I think
23   I know the answer to this.  Do you recall seeing
24   any injuries to his legs?
25 A  I don't recall seeing any injuries on his legs.

55

1  Q  Which is aside from what your focus was, which
2    was to try and resuscitate him?
3  A  (Witness nodded.)
4  Q  Is that a yes?
5  A  Yes.
6      (Plaintiff's Exhibit(s) I was marked for
7    identification.)
8  Q  Is this the report that you were referencing?
9  A  Yes.
10 Q  Okay.  I would like for you to look it over and
11   see whether it's a true and accurate copy of
12   your report?
13 A  (Witness complies.)  Okay, it is.
14 Q  The animal bite that you went on scene, did
15   you — was that unrelated to the incidents, or
16   do you have any idea whether that had any
17   connection with Mr. Heishman at all?
18 A  I believe the gentleman with a broken nose also
19   had a bite, too, on his hand, and what my
20   understanding was with his conversation with
21   Josue, the bite was not actually an animal bite
22   but a bite from Dusty.
23 Q  Okay.  So there was just a miscommunication in
24   terms of dispatch?  Do you have any idea
25   what —

56

1  A  Yeah.  There's no animal involved as far as I
2    know.
3  Q  Do you know whether there was some unrelated
4    incident where there was an animal bite, do you
5    have any idea?
6  A  No.  I don't remember hearing any other
7    dispatches going out for that — yeah, it says
8    on here.  I mean, IMPD requesting, so I don't
9    know if they misinterpreted human bite.
10 Q  Okay.
11 A  I don't even think there is a code for human
12   bite.
13 Q  Okay.
14 A  I think it's just animal bite.
15 Q  And in your report, it says — sixth line
16   down — fifth line down, sorry, IMPD states they
17   were called because patient was naked in the
18   streets, had broken a car window, and was
19   combative with officers when approached?
20 A  Yes.
21 Q  How did you know that information?
22 A  One of the officers told me that.  I don't
23   recall the officer's name, but that's how I
24   would have found that out.
25 Q  And you say skin p/w/d, what does that mean?

57

1  A  Pink, warm, dry.
2  Q  So he wasn't sweaty?
3  A  Not that I felt.
4  Q  Okay.  And you indicate that breathing was
5     non-labored.  What do you mean by that?
6  A  It didn't appear that he was gasping for breath.
7  Q  Would that include him being out of breath from
8     physical activity, or physically accelerated or
9     labored breathing?
10 A  Well, if he was breathing anywhere outside the
11    normal rate, between 12 and 20 a minute --
12    roughly, if he was totally exhausted -- I've
13    seen people that have been totally exhausted and
14    they're not breathing, they stop breathing.
15 Q  So he was breathing what you would deem to be a
16    normal rate; would that be accurate?
17 A  Yeah.  It didn't appear that he was labored or
18    rapidly breathing.
19 Q  And you say gave patient 10 MGs Versed IM left
20    deltoid as chemical restraint for patient and
21    crew safety?
22 A  Uh-huh.
23 Q  At what point -- so you use the term "patient"
24    now; right?
25 A  Yes.

58

1  Q  Is that a term that you use on anybody that you
2     encounter?
3  A  Anybody I encounter on a run that needs medical
4     care, yeah, I would always call them the
5     patient.
6  Q  Okay.  At what point did you determine that he
7     needed medical care?
8  A  As soon as I saw that he was trying to be
9     restrained and being combative against the
10    officers.
11 Q  Okay.  What made you come to that determination?
12 A  Well, along with the brief history given by
13    IMPD, the vital signs, his presentation as far
14    as being noncommunicative, besides the
15    grunting -- I mean, there's really nothing of
16    substance that was said, or he couldn't --
17    wasn't in the frame of mind to answer any
18    questions.  I mean, at that point, it's a
19    patient that needs medical care.
20 Q  And you have in here patient calmed down within
21    a couple of minutes?
22 A  Uh-huh.
23 Q  Did you do anything monitoring wise after -- in
24    that couple minute period when he calmed down?
25 A  Well, that was when we were -- I'm just visually

59

1     watching for the -- you know, him breathe and
2     just trying to watch for him to struggle.  I was
3     surprised that he stopped so quickly because
4     that medication doesn't work that fast when you
5     give it IM.  The onset is 10 minutes.
6  Q  When you say "onset", what do you mean?
7  A  The onset of actions, the onset of the desired
8     effects of the medication.  When you gave it IM,
9     typically it's 10 minutes.
10 Q  When you say a couple of minutes -- patient
11    calmed down within a couple of minutes, is that
12    2, or was that -- what period of time are you
13    referring to?
14 A  To me it, would be 2 or less.
15 Q  Was he ever -- were his handcuffs or shackles
16    ever removed, to your knowledge?
17 A  Yes.
18 Q  When?
19 A  When we took him -- when we got him into the
20    ambulance to start CPR, we had to get his hands
21    uncuffed from behind his back and cuffed in the
22    front which, honestly, I don't remember if they
23    even recuffed him or not.
24 Q  Okay.  Were the shackles ever removed?
25 A  I don't recall the shackles being removed

60

1     because they were kind of -- I know I wouldn't
2     have requested those to be removed because they
3     didn't prevent us from providing care.
4  Q  Okay.  So you say EMS crew and officers picked
5     patient up and placed him on cot; is that
6     correct, or POC, placed on cot?
7  A  Placed on cot.
8  Q  When you say EMS crew, who are you referring to
9     specifically?
10 A  Myself, Josue.
11 Q  Anybody else?
12 A  That's all I remember as far as the EMS crew.
13 Q  And officers, do you know which officers helped
14    pick him up?
15 A  I don't know specifically which officers.
16 Q  And pupils were fully dilated and nonreactive to
17    light; correct?
18 A  Correct.
19 Q  Did you ever evaluate his pupils prior to
20    putting him on the cot?
21 A  No.  He wasn't -- he wouldn't cooperate in
22    looking at his pupils, when you shine a
23    flashlight in his face.
24 Q  Did you have a flashlight?
25 A  Yes, I always carry a flashlight.

61

1  Q  And did you use it?
2  A  I believe one of the officers was using a
3     flashlight for us, shining a flashlight for us.
4  Q  And you say on the way to ambulance, it appeared
5     that PT, meaning patient; is that right?
6  A  Correct, patient.
7  Q  Was no longer breathing but the darkness made it
8     difficult to fully assess; is that correct?
9  A  That is correct.
10 Q  Okay.  What did you mean by that?
11 A  So when -- you know, when you're working on a
12    patient and he's on the ground and there's
13    people able to shine flashlights, it's easier to
14    see.  When you put him onto the stretcher and
15    take him to the ambulance, kind of everybody's
16    busy pushing the stretcher, and so you don't
17    have somebody constantly following you with a
18    flashlight, you know.  That's why we need to get
19    him in the back of the ambulance, to provide
20    medical care and get better lighting.
21 Q  Okay.  It says patient now in ambulance
22    teritoid?
23 A  Carotid.
24 Q  Carotid, there we go, pulse absent,
25    and what's the --

62

1  A  Apneic.
2  Q  Okay.  What's that mean?
3  A  So a carotid pulse absent means I was trying to
4     check the pulse in his neck and there was no
5     pulse.  Apneic meaning that he's not breathing.
6  Q  Okay.  So it was just not cardiac arrest, it was
7     respiratory arrest?
8  A  At that point, yes.
9  Q  Okay.  And IMPD removed cuffs from patient's
10    wrists, but you don't know which officer that
11    was?
12 A  Correct.
13 Q  Okay.  And EMS removed the taser barbs from the
14    patient's chest and abdomen; is that correct?
15 A  Correct.
16 Q  When you say EMS, was that you or was that your
17    partner?
18 A  It could have been either one of us.  I don't
19    remember specifically who pulled those out.
20 Q  Fair enough.  NRB placed at 15, what does that
21    mean?
22 A  I'm sorry.  Where are we?  Okay, I see.  NRB is
23    a non-rebreather placed at 15 liters per minute
24    of O2, oxygen.  So that's the mask I was telling
25    you about that goes over their face for oxygen.

63

1  Q  Placed defib pads on the patient; is that
2     correct?
3  A  Uh-huh.
4  Q  Where did you place those?
5  A  So it'd be right chest and left kind of on of
6     the left side of the chest down here.
7  Q  And you had a machine you use; is that right?
8  A  Cardiac monitor, defibrillator.
9  Q  Was he ever -- the machine ever go off or were
10    you doing --
11 A  Go off?
12 Q  So how were you -- you weren't doing chest --
13    were you doing actual chest compressions or were
14    you using the machine?
15 A  Well, you use both.
16 Q  Okay.
17 A  So you're doing chest compressions while people
18    are placing pads on the patient.
19 Q  Okay.
20 A  And you can -- then you look up at your monitor
21    and see what rhythm they're in.  So he was in
22    asystole, which is the flatline that people
23    typically think of --
24 Q  Okay.  Do you have any idea how long he was
25    flatlined?

64

1  A  No, I don't.  It was sometime between -- I don't
2     know for sure exactly.
3  Q  And it says sinus tach on monitor, what do you
4     mean by that?
5  A  Let me catch up with you here.  How far down are
6     you?
7  Q  I jumped a little bit.  Stopped CPR from
8     reassessment.  Patient has --
9  A  Okay, patient has carotid pulse, sinus tach, so
10    that means his heart rate is above a hundred on
11    the monitor.
12 Q  Okay.
13 A  And his blood pressure is 122 over 60, GCS 3.
14 Q  ALS emergent to Eskenazi, what does that mean?
15 A  Advanced Life Support.  Emergent means with
16    lights and sirens, and ALS means that I'm in the
17    back with the patient, Advanced Life Support
18    with patient.
19 Q  IFD driving and onboard?
20 A  Yes.
21 Q  So somebody from the fire department is driving?
22 A  Yes.
23 Q  BVM ventilation, what does that mean?
24 A  Bag Valve Mask, Ambu bag, and we have 15 liters
25    of oxygen going through that bag.

65

1  Q  It says medical alert Eskenazi?
2  A  So that's when the radio report would have been
3     made, and I would have called in and said
4     something to the effect of Eskenazi, this is
5     Medical 29, we have a medical alert, and I would
6     have given them a rundown of what was going on
7     with the patient.
8  Q  Okay.  These comments are in chronological
9     order; is that correct?
10 A  I always try to keep them in chronological
11    order.
12 Q  Okay.  So would it be fair to say that this
13    medical alert to Eskenazi was the first time you
14    had contact with Eskenazi?
15 A  Correct.
16 Q  It says IFD medic unsuccessful at intubating
17    patient, PT?
18 A  Uh-huh.
19 Q  Was that in reference to you or in reference to
20    another medic?
21 A  IFD would be the fire department, so Natalie Cox
22    who was the paramedic for IFD that was with us.
23    She tried getting a tube placed into his trachea
24    to protect his airway, to better ventilate him,
25    and that also allows us to monitor him better.

66

1     She was unsuccessful at getting that tube
2     placed.
3  Q  And then it says switched with IFD and intubated
4     tube meaning you intubated him?
5  A  Yes.
6  Q  Okay.  Were you successful at doing that?
7  A  Yes.
8  Q  Okay.  It says confirmed with direct
9     visualization.  What did you mean by that?
10 A  It means I saw his vocal cords.  I saw the
11    endotracheal tube pass through the vocal cords
12    into the trachea.  That's what that means.
13 Q  And what's BBS?
14 A  So positive BBS means that bilateral breath
15    sounds were present.  Do you want to know the
16    rest of that, to be clear?
17 Q  Yes.
18 A  Okay.  I just want to make sure.  Negative
19    epigastric sound means when you're listening to
20    the epigastric area or where the stomach would
21    be, you don't hear any sounds.  If the tube was
22    placed in his esophagus, you would hear probably
23    sounds when you ventilated.  And positive EtCO2
24    is entitled carbon dioxide.  So on our cardiac
25    monitors, we have -- we call it end title CO2,

67

1     and that measures the CO2 that the patient
2     expires.  So you ventilate them, and if they're
3     breathing out CO2, then we know that -- it's
4     just another way of knowing we're in the right
5     place.
6  Q  Okay.  And then you have pupils dilated
7     non-reactive; is that right?
8  A  Correct.
9  Q  Okay.  So you're checking his -- so on the way
10    to the hospital, you're checking his --
11    assessing him; is that right?
12 A  Correct.
13 Q  Okay.  And his BP 112?
14 A  112 palp.
15 Q  What does that mean?
16 A  So 112 palp, it means -- sometimes when you're
17    transporting in the ambulance and you have the
18    noise of the vehicle and you have the sirens
19    going, it's hard to hear to actually take a
20    blood pressure where you have the systolic and
21    the diastolic, so the number on the top is
22    systolic and the number of bottom is diastolic.
23    So palp is another way of taking it by
24    feeling for a pulse when you're taking the blood
25    pressure.  And as soon as you pump the cuff up,

68

1     you don't feel the pulse anymore, you release
2     the blood pressure cuff, and as soon as you hear
3     or feel the pulse, then that's your top number.
4     So it only gives you the top number.
5  Q  Okay.  So you didn't have the bottom number?
6  A  No.
7  Q  Okay.  Did you have any concerns of the change
8     in blood pressure from 122 to 112?
9  A  It's not a huge drop.
10 Q  Okay.
11 A  Anything under 90 systolic, then, yeah, I would
12    have definitely been a lot more concerned with
13    that.
14 Q  No resistance to ventilation, what does that
15    mean?
16 A  Meaning that you could freely squeeze the Ambu
17    bag and air would just freely go into his lungs,
18    whereas if it was in the wrong place, and if it
19    was, you know, something obstructing, you
20    wouldn't be able to -- it would be harder to
21    squeeze air into his lungs, but there was no
22    resistance to that at all, which is a good
23    thing.
24 Q  The history, you have symptoms, and you indicate
25    mental health; is that correct?

69

1  A  I'm trying to find where you're at.
2     MS. FELDHAKE:  Symptoms right here.
3  Q  Right below there, yeah.
4  A  Symptoms, yeah, mental health and -- so we have
5     these check boxes, and that's the best fit.
6     That's why I had to put other, combative.
7  Q  Okay.  And you've put scene findings on the
8     second page in the middle paragraph, no
9     pertinent findings.  What typically would you
10    put in the scene findings category?
11 A  Scene findings, if I found drugs on the scene or
12    a weapon on the scene or somebody was in an
13    environment in a house that was, you know,
14    completely cluttered and inhibited to access, I
15    would put those types of things in scene
16    findings.
17 Q  You put alcohol/drug use indicators, not known?
18 A  Correct.  I did not know for sure without a lab,
19    or him telling me, or somebody else that was a
20    witness.  It's hard to say what's in somebody's
21    system.
22 Q  Okay.  Level of consciousness verbal.  What did
23    you mean by that?
24 A  So he wasn't able to converse like you and I are
25    but he was making noises.  He was making sounds.

70

1     So he was verbal as opposed to somebody that's
2     completely unconscious and not making any sounds
3     or doing anything.
4  Q  Okay.  And these observations under actual, are
5     these observations that you made of him upon
6     your arrival and prior to the administration of
7     Versed?
8  A  So that would have been 2002, so that would have
9     been my initial assessment prior to the Versed.
10 Q  Okay.  And behavioral, you put as combative; is
11    that correct?
12 A  Correct, yes.
13 Q  And he was conscious?
14 A  Not fully conscious but he was awake.
15 Q  So when it says loss of consciousness, you put
16    no, what did you mean by that?
17 A  Meaning for the initial assessment, from the
18    history I got from IMPD and up to where I saw
19    him, there was no reference or indication that
20    he had ever lost consciousness.
21 Q  On the bottom of that page, there's a reference
22    to Semi Fowlers?
23 A  On the bottom of this?
24 Q  Yes.
25 A  Oh, Semi Fowlers.

71

1  Q  What is that?
2  A  It just means the position they're sitting at in
3     the cot.  So he's on his back and the head of
4     the cot is elevated a little bit.
5  Q  Is that supine?
6  A  Yeah.
7  Q  So he's a little bit elevated?
8  A  Yeah.  Supine would be totally flat.  Semi
9     Fowlers, you have them so they're kind of
10    sitting up a little bit.
11 Q  And do you have degrees?
12 A  No, it could be vary.
13 Q  And below the Assess/TX, what is that general
14    category for?
15 A  Assessment/treatment.
16 Q  And there are time categories in the left-hand
17    column; is that correct?
18 A  Correct.
19 Q  Do those time categories appear to be correct
20    based on your understanding of the incident?
21 A  Yes.
22 Q  So you initially assess him at 20:02:35; would
23    that be correct?
24 A  Yes.
25 Q  And the medication given at 20:05:45 seconds; is

72

1     that correct?
2  A  Yes.
3  Q  Okay.  So you waited about 2.45 minutes?
4     MS. FELDHAKE:  I think that would be 3.
5     MR. BARNHART:  My math's not correct?
6  A  Where are you, on --
7     MS. FELDHAKE:  Try 5:45.
8  A  Yeah, that would be more like it, 3.
9  Q  Okay.  And so the treatment oxygen,
10    non-rebreather rate 15, complications none,
11    response unchanged.  Where was he in reference
12    to that notation?  Do you understand my
13    question?
14 A  Yes.
15 Q  Okay.
16 A  He would have been -- let's see, he would have
17    been in the ambulance at that point, I believe,
18    just following my -- following the flow sheet
19    from the front page under the comments.  He
20    would have been placed.
21 Q  And under complications, you put none -- let me
22    back up a little bit to 20:05:45, you put
23    complications none, response improved; is that
24    right?
25 A  For the non-rebreather?



73

1  Q  For the drug. Sorry, I'm going back up.
2  A  Correct, there were no complications from the
3     drug. And the response was -- at that time he
4     was improved. It did have the effect that we
5     wanted as far as him not being combative.
6  Q  But at some point, he stopped breathing; is that
7     right?
8  A  Stopped breathing and went pulseless.
9  Q  Would that be a complication?
10 A  In a very high dose of Versed, sure, it can stop
11    your breathing. 10 milligrams intramuscular
12    would not have had that effect in a couple of
13    minutes. It would not have caused you to stop
14    breathing.
15 Q  Okay. But he did stop breathing; right?
16 A  Eventually, he did, yes.
17 Q  Okay. Did he have a heart attack?
18 A  I can't really say if he had a heart attack or
19    not.
20 Q  Okay.
21 A  That would be something that the physician would
22    actually say.
23 Q  So would it be something that a physician would
24    actually say, whether the breathing was
25    connected to the administration of the drug?

74

1  A  I mean, they would be the most knowledgeable
2     about that.
3  Q  Okay.
4  A  I know it's just based on training and any kind
5     of publication you would look at. Onset time,
6     like you said, is 10 minutes IM, so I think that
7     would be highly unlikely, that it would be
8     related to the breathing after a Versed
9     administration.
10 Q  Is it possible?
11 A  I mean, anything's possible, but I can't speak
12    to that for sure.
13 Q  You say this is a flow chart, so this assessment
14    is a flow chart of your actions?
15 A  Yeah, it's a timeline.
16 Q  Okay. Do you know what doctor was on duty at
17    Eskenazi that day?
18 A  I don't know.
19 Q  At any point did he ever -- you said he was
20    trying to get up earlier?
21 A  Oh, when he was on the ground?
22 Q  Yeah.
23 A  When I first got there?
24 Q  Yeah.
25 A  Yeah, that's what it appeared to be, that he was

75

1     trying to do.
2  Q  Okay. Did he ever get to his feet?
3  A  No.
4  Q  And he didn't have any weapons on him, did he?
5  A  Not that I saw. He was totally naked. I didn't
6     check everywhere but --
7  Q  Have you had the occasion, prior to this
8     incident, respond to individuals who have been
9     tased?
10 A  Yes.
11 Q  Do you have any concerns as a paramedic or an
12    EMT for individuals that have been tased; what
13    do you look for?
14 A  So for somebody that's been tased, we would just
15    do -- we do our initial assessment. You know,
16    we'll check their pulse, put them on the cardiac
17    monitor, check their respirations, their level
18    of consciousness. We're the ones that pull the
19    barbs out and we would just want to make sure
20    that all those functions are intact.
21 Q  Okay. When you administered the Versed, was it
22    premeasured? How would you know that you
23    actually administered 10 milligrams?
24 A  It comes in a vial of 10 milligrams.
25 Q  Okay.

76

1  A  So if you draw out all of it, you're going to
2     get 10 milligrams.
3  Q  So if you wanted to administer less, you would
4     have to stop at some point and look?
5  A  Yeah.
6  Q  So you've only got different dosages of -- I've
7     got a 5-milligram section and 10-milligram
8     section?
9  A  No. It's just all -- 10 milligrams vials is all
10    they give us.
11 Q  Okay. What's the most you've given?
12 A  For one patient, it's either 15 or 20 for a
13    chemically-restrained patient.
14 Q  Okay. You mentioned the protocols, that you're
15    trying to follow the protocols?
16 A  Uh-huh.
17 Q  Is that based on your memory or are there
18    physical --
19 A  They print up these little protocol books. I
20    always -- you know, I always keep mine in my
21    pants pocket to have a reference. There's
22    always one on the truck, too.
23 Q  Did you look at that before or did you just know
24    the protocol?
25 A  I knew the protocols, so no, I did not have to

77

1    reference that.
2 Q  And you're a nurse currently; is that right?
3 A  Correct.
4 Q  Okay. Do you use Versed as a nurse?
5 A  Sometimes, yes.
6 Q  When do you have occasion to use Versed as a
7    nurse?
8 A  For anxiety, a lower dose. There are doctors
9    that will use it when they want to sedate
10   somebody for a procedure. It would be in
11   instances like that. I haven't, personally, had
12   to chemically restrain anyone at the -- as a
13   nurse.
14 Q  And when you use the term "chemically restrain,"
15   what do you mean by that? So you say you've had
16   occasion to chemically restrain somebody, what
17   do you mean by that?
18 A  I kind of went through that earlier, but you
19   would give them a medication because you've went
20   through verbal deescalation and that doesn't
21   work. You've tried to physically retrain them
22   and that doesn't work, or you're not able to, so
23   you would go through chemical restraint which
24   would be to give them medication to sedate them.
25 Q  So it's sort of a continuum of sorts; is that

78

1    fair?
2 A  Try to do the least restrictive measure as
3   possible.
4 Q  Is there anything after chemical restraint?
5 A  To restrain someone?
6 Q  Yes.
7 A  Not to my knowledge, or not that I've ever seen.
8 Q  What type of physical restraints do you have
9   available to you as a paramedic?
10 A  As a paramedic, they give us Kerlix, so
11   that's -- basically, it's big rolls of gauze
12   that we'll use to try to physically restrain
13   someone. In my opinion, sometimes they work,
14   sometimes they don't. It just depends on the
15   patient.
16 Q  What about handcuffs?
17 A  We don't have access to handcuffs.
18 Q  Anything else physically that you have access
19   to?
20 A  They give us spit socks, but I don't know if you
21   count that as a restraint. Kerlix would be what
22   they provide for us. I have seen on ambulances
23   before soft restraints, but I'm not sure if the
24   hospital gave those to us or IMS gave those.
25   It's basically just like a soft little pad with

79

1    velcro on it.
2 Q  Did you have soft restraints available for you
3   in this case?
4 A  They would have been in the ambulance, but we
5   never had the need to use them.
6 Q  And what drugs did you have available to you to
7   use?
8 A  For restraining or just --
9 Q  For restraining?
10 A  Versed.
11 Q  Anything else?
12 A  That's the only thing we can use for a chemical
13   restraint.
14 Q  What other medicines did you have?
15 A  Just in general?
16 Q  Yes.
17 A  Okay. We carry Fentanyl, that's for pain. We
18   carry Benadryl, Amiodarone, epinephrine -- I'm
19   trying to think what else -- Toradol, Tylenol,
20   oral glucose, calcium, sodium bicarb,
21   nitroglycerin spray, aspirin, Zofran dissolving
22   tablet, IVs. Those are the ones off the top of
23   my head -- Atropine.
24 Q  Okay.
25      MR. BARNHART: That's all I have.

80

1      MS. BOX: No questions.
2      MS. FELDHAKE: NO questions. We'll read
3 and take signature.
4    (Time noted: 11:59 a.m.)
5      AND FURTHER DEPONENT SAITH NOT.
6
7
8
      _____
9       LANCE COPE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



81

1    STATE OF INDIANA        )
                             )  SS:
2    COUNTY OF MARION        )

3          I, Rhonda J. Hobbs, RPR, a Notary Public in
4    and for the County of Hendricks, State of Indiana
5    at large, do hereby certify that the deponent
6    herein, LANCE COPE, was by me first duly sworn to
7    tell the truth, the whole truth, and nothing but
8    the truth in the aforementioned matter;
9          That the foregoing deposition was taken on
10   behalf of the Plaintiff at the offices of Keffer
11   Barnhart, LLP, 230 East Ohio Street, Suite 400,
12   Indianapolis, Marion County, Indiana, on the 12th
13   day of July, 2016, commencing at the hour of 10:09
14   a.m., pursuant to the Federal Rules of Civil
15   Procedure;
16         That said deposition was taken down in
17   stenograph notes and afterwards reduced to English
18   under my direction, and that the transcript is a
19   true record of the testimony given by said
20   deponent; and that the signature of said deponent
21   to his deposition was requested;
22         That the parties were represented by their
23   counsel as aforementioned.
24         I do further certify that I am a disinterested
25   person in this cause of action; that I am not a

82

1    relative or attorney of either party, or otherwise
2    interested in the event of this action, and am not
3    in the employ of the attorneys for either party.
4          IN WITNESS WHEREOF, I have hereunto set my
5    hand and affixed my notarial seal this _____ day
6    of _____, 2016.
7
8                   _____
9                   N O T A R Y   P U B L I C
10
11   My Commission Expires:
     August 24, 2017
12
13   County of Residence:
     Hendricks
14
15
16
17
18
19
20
21
22
23
24
25

