UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BILLIE THOMPSON as Personal Representative of | ) | |
| the ESTATE OF DUSTY HEISHMAN | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NUMBER: |
| | ) | 1:15-cv-01712-TWP-DML |
| CITY OF INDIANAPOLIS, INDIANAPOLIS | ) | |
| DEPARTMENT OF PUBLIC SAFETY, INDIANAPOLIS | ) | |
| METROPOLITAN POLICE DEPARTMENT, OFFICER | ) | |
| BRIAN BURNETT, in his individual and official capacities | ) | |
| OFFICER DONALD SPIEGL, in his individual and official | ) | |
| capacities, OFFICER WILLIAM BUECKERS, in his | ) | |
| individual and official capacities, PARK RANGER | ) | |
| PHILLIP GREENE, in his individual and official capacities | ) | |
| MARION COUNTY SHERIFF'S DEPARTMENT, | ) | |
| DEPUTY BILLY JOHNSON, in his individual and official | ) | |
| capacities, HEALTH AND HOSPTIAL CORPORATION | ) | |
| OF MARION COUNTY, MEDIC LANCE COPE, in his | ) | |
| individual and official capacities, MARK BRITTON, and | ) | |
| WILLIAM PATTERSON, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RESPONSE IN
OPPOSITION TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Scott L. Barnhart, #25474-82
Brooke Smith, #32427-03
Keffer Barnhart LLP
230 East Ohio Street, Suite 400
Indianapolis, Indiana 46204
(T) 317-857-0160
(F) 855-641-5311
Barnhart@KBindy.com
Smith@KBindy.com

COUNSEL FOR PLAINTIFF

## **TABLE OF CONTENTS**

Table of Authorities ……………………………………………………………………ii

I.      Introduction ……………………………………………………………………1

II.     Statement of Material Facts in Dispute …………………………………………...2

III.    Summary Judgment Standard ……………………………………………………...11

IV.     Argument …………………………………………………………………………12

          A. Contention Interrogatories ……………………………………………………12

          B. Qualified Immunity ………………………………………………………...14

          C. Excessive Force ………………………………………………………………16

                    a. Tasing …………………………………………………………….........18

                    b. Civilian Uses of Force ………………………………………………20

                    c. Excessive Force Prior to and During Handcuffing …………………….23

                    d. Excessive Force after Handcuffing and Attempted Transport …………27

          D. Failure to Protect and Deliberate Indifference …………………………………28

          E. Expert Report……………………………………………………………………32

          F. Wrongful Death and Survival Claims …………………………………………...33

          G. State Tort Claim and Battery Claims ……………………………………………34

V.      Conclusion ………………………………………………………………………35

Certificate of Service ………………………………………………………………35

## TABLE OF AUTHORITIES

*Cases*

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ……………………15, 17, 26, 32, 33

*Acevedo v. Canterbury*, 457 F.3d 721 (7th Cir. 2006) ………………………………………………..17

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994) ……………………………………………………………15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………………………………………...11, 35

*Brosseau v. Haugen*, 543 U.S. 194 (2004) …………………………………………………………...16

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972) …………………………………………………………29, 30

*Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010) …………………………17, 18, 19, 20

*DuFour-Dowell v. Cogger*, 969 F.Supp. 1107 (N.D. Ill. 1997) …………………………………15

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) …………………………19

*Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993) ………………………………………………15

*Estate of Williams v. Ind. State Police Dep't.*, 26 F.Supp.36 824 (S.D. Ind. 2014) ……........33, 34

*Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010) ………………………………………………………15

*Graham v. Connor*, 490 U.S. 386 (1989) …………………………………………………...16, 17

*Greenlaw v. U.S.*, 554 U.S. 237 (2008) …………………………………………………………28, 29

*Groves v. Taylor*, 729 N.E.2d 569 (Ind. 2000) ………………………………………………… …...34

*Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906 (7th Cir. 2011) ……………………..34

*Lacy v. City of Indianapolis*, 2011 WL 5509844 (S.D. Ind. 2011) …………………………..17

*Landeen v. Phonebillit Inc.*, 2007 WL 1703754 (S.D. Ind. 2007) …………………………12

*Lanigan v. Will. Of East Hazel Crest, Ill.*, 110 F.3d 467 (7th Cir. 1997) …………………………15

*Lessley v. City of Madison, Ind.*, 654 F.Supp.2d 877 (S.D. Ind. 2009) …………………………34

*Lynn v. City of Indianapolis,* 2014 WL 3535554 (S.D. Ind. 2014) ……………………………..12

*Makowski v. SmithAmundsen LLC*, 662 F.3d 818 (7th Cir. 2011) ………………………………11

*McAllister v. Price*, 615 F.3d 877 (7th Cir. 2010) ………………………………………………17

*Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ………………………………………………14

*O'Bannon v. City of Anderson*, 733 N.E.2d 1 (Ind. Ct. App. 2000) ……………………………35

*Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) …………………………………………29

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) …………………………………………………12

*Purvis v. Oest*, 614 F.3d 713 (7th Cir. 2010) ……………………………………………………15

*Saucier v. Katz*, 533 U.S. 194 (2001) …………………………………………………………...16

*Sere v. Bd. of Trustees of the Univ. of Ill.*, 852 F.2d 285 (7th Cir. 1988) ………………….....29, 34

*Tennessee v. Garner*, 471 U.S. 1 (1985) ……………………………………………………...15, 16, 26

*Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293 (7th Cir. 1999) …………………………32

*Vukadinovich v. Bd. of Sch. Trs.*, 278 F.3d 693 (7th Cir. 2002) ………………………………...11

*Washington v. Haupert*, 481 F.3d 543 (7th Cir. 2007) ………………………………………...11, 12

*White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) ……………………………………………...29, 30

*Wilson v. Isaacs*, 929 N.E.2d 200 (Ind. 2010) …………………………………………………33, 35

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994) …………………………………………………29

### Statutes

Indiana Code §34-23-1-1 …………………………………………………………………...33

### Other Authority

Fed. R. Civ. P. 56(a) ………………………………………………………………………11

Fed. R. Evid. 702 …………………………………………………………………………..32

Fed. R. Evid. 704(a) ………………………………………………………………………..32

# I.      Introduction

Despite Dusty's apparent intoxication and nudity, Officer Burnett tased Dusty, called upon two intoxicated civilians he directed to use force against Dusty, including strikes meant to take his breath away and a choke hold around his neck.  Officer Burnett would "look up and say hey don't kill him" to the civilians, but did not stop their force.  Officer Spiegl, Ranger Greene, and Officer Bueckers arrived on scene separately and, instead of deescalating the force being used, each used force against Dusty as well.  The Defendants failed to stop each other's continued uses of force and allowed Dusty to be forcibly maintained in the prone position with their knees and weight.  Once handcuffed, Dusty was held in a prone position for several minutes until he was leg shackled and moved to Deputy Johnson's wagon.  Deputy Johnson made a determination that Dusty was to be transported by ambulance to the Sheriff's Department's secure holding room in Eskenazi Hospital and the officers forcibly held Dusty in the prone position until an ambulance arrived and Lance Cope used a chemical restraint.  Once the chemical restraint was used, Dusty was kept in a prone position by the officers for several more minutes without being monitored.  Dusty went into cardiac and/or respiratory arrest and died several days later.  Dr. Sozio, identified positional body restraint by law enforcement and discharge of the taser, among other factors, as contributing Dusty's death.

Despite changing circumstances that would objectively dictate de-escalation, the Defendants escalated the force used against Dusty, were deliberately indifferent to his medical needs, and failed to protect him from excessive force and being held in the prone position, all in violation of the Fourth Amendment.  It is clearly established that lethal force was not appropriate and the Defendants are not entitled to qualified immunity.  Further, the Defendants are liable for Dusty's wrongful death and the batteries that were imposed upon him.

1

## II.     Statement of Material  Facts In Dispute

On October 5, 2014, Dusty Heishman was in a neighborhood bar and was heard yelling, "call the police" or words to that effect (Altee IA Statement, p. 2; Patterson IA Statement, p. 3). When Dusty ran back out into the street, he continued yelling, "call the police, call the police, call the cops" or words to that effect despite the fact that Officer Burnett was already on scene (Altee IA Statement, p. 2; Biggerstaff IA Statement, p. 4).  According to the officer, "[i]t was obviously [sic] he was on narcotics just through the sweating, the looking through you[.] the not responding to commands or requests from me" (Burnett Depo. p. 17:1-4; Ex E, p. 3; Ex D). Officer Burnett knew there was "a lot of narcotics use" in the area (Burnett Depo. p. 24:13-16). He did not ask Dusty if he was on any medications or drugs (Burnett Depo. p. 76:12-17).

According to Officer Burnett, Dusty was walking towards him when Officer Burnett deployed his taser at Dusty, utilizing the cartridge function and striking Dusty "dead center on the chest and probably dead center of his stomach" despite Dusty's apparent condition (Burnett Depo. Ex D; Ex E p. 3, 5; Taser Report).  According to the Officer Burnett's taser's use report, the taser was fired three times: once at approximately 7:51:56 p.m. for a duration of five seconds, once at approximately 7:52:01 p.m. for a duration of four seconds, and once at approximately 7:54:33 p.m. for a duration of four seconds (Taser Report).

Dusty complied with Officer Burnett's orders by laying down on the street in the prone position, face down, with his hands behind his back in front of Officer Burnett (Burnett Depo. p. 64:21-25; Ex E p. 3; Video at 00:30).  Officer Burnett put pressure on Dusty's upper back or neck with his knee, but did not handcuff Dusty (Burnett Depo. p. 65:4-8; Video at 00:30-00:40). After Dusty moved away from Officer Burnett, someone in the growing crowd repeatedly shouted, "get his ass" or words to that effect (Video at 1:11).  As Dusty moved away, Officer

Burnett delivered knee strikes to Dusty and attempted to hold his head down (Burnett Depo. p. 87:9-18; Ex E, p. 8; Video at 00:35-00:40).

Officer Burnett then requested assistance from two civilians, Mark Britton and William Patterson (Sutton Witness Statement, p. 4-5; Patterson IA Statement, p. 4). Officer Burnett did not ask regarding their level of intoxication, their training, or their previous history with Dusty prior to allowing them to touch Dusty (Burnett Depo. p. 23:17-25; 24:1-2; 24:24-25; 25:1-4; 84:22-25; Ex E, p. 3). Britton and Patterson had been drinking and were intoxicated (Britton IA Statement, p. 5; Britton Request for Admissions).

Officer Burnett asserted that the civilians wrestled Dusty to the ground (Burnett Depo. p. 24:18-20). Britton tackled Dusty and took him to the ground and that he had his legs locked around him and had Dusty in a "choke hold like a you know a physical choke hold a cross arm" (Britton IA Statement, p. 2, 7). Officer Burnett stated that he "observed Mr. Britton had his arm around his neck, choking him." (Burnett Depo. p. 26:4-9). During his statement with IMPD Internal Affairs, Officer Burnett stated, "[y]ou know at times I'd look up and say hey don't kill him" (Burnett Depo. Ex E, p. 3). Britton also admitted that he poked Dusty's eye and "got an eye gouge on him[.]" (Britton IA Statement, p. 8). Britton also indicated that Patterson, "ended up punching me in my stomach for some reason...I think he maybe had too many drinks" (Britton IA Statement, p. 5). Britton indicated that he had learned those techniques "[m]ostly just a lot of it is just streets" (Britton IA Statement, p. 8).

According to William Patterson, Britton "grabbed [Dusty] first and was kind of on his back trying to you know hold him" and Patterson ran over, tackled him, and they all fell to the ground (Patterson IA Statement, p. 5; Video at 1:14-1:20). Officer Burnett told Patterson, "hit him, hit him, hit him calm him down hit him and something like that and then he said hit him in

3

his side take his air out of him so we can get this other hand so I did" (Patterson IA Statement, p. 5).  According to another witness, Michelle Altee, "the officer was telling [Britton and Patterson] where to hit him take his breath, take his breath body shock take his breath…the officer told them to take his breath" or words to that effect (Altee IA Statement, p. 4).  When asked whether she saw anyone punch or kick Dusty, she said, "[o]nly when the officer told them to." (Altee IA Statement, p. 4).

Officer Burnett indicated that "[o]nce we got on the ground – like I say, the first time was just a brief down, up.  The second time he was down and all three of them were wrestling around, and that's when I went up to him on the – I was on Mr. Heishman's left side, Mr. Britton was on top of him, and Mr. Patterson was on the right side" and that Dusty was tackled at least two times by the civilians (Burnett Depo. p. 25: 16-23; Ex E, p. 8).  He further testified that he was putting pressure on Dusty's left arm to hold him down and to "deaden" the arm to numb it and had his knees over the top of his shoulder blades" (Burnett Depo. p. 26:10-15; 52:17-19; Ex E, p. 8, 9).  During his statement to IMPD, Officer Burnett indicated that he was holding Dusty down (Burnett Depo. Ex E, p. 4).  At that point, Officer Burnett observed Patterson hitting Dusty and Britton hit Dusty a few times in the head (Burnett Depo. p. 26:20-25; 27:1, Ex D).

Britton almost let go of Dusty and Officer Burnett "actually grabbed Mr. Britton and put him back on the subject[.]" (Britton Depo. Ex E, p. 4, 6).  Officer Burnett noted that Dusty was "pouring sweat" and was breathing heavily (Burnett Depo. p. 27:24-25; Ex E. p. 10).  Additionally, throughout the incident, Dusty continued to say "they're trying to kill me" (Burnett Depo. p. 21:2-6; 29:18-20).  At approximately 2:44 in the video, a taser can be heard (Video at 2:44).  Officer Burnett indicated that he attempted to drive stun Dusty again (Taser Report).

Other officers began to arrive, including Donald Spiegl and Park Ranger Phillip Greene

(Burnett Depo. p. 28:14-17).   Officer Spiegl appears to arrive on scene at approximately 1:21 after the video began (Video at 1:21).   Ranger Greene appears to arrive at approximately 5:08 (Video at 5:08).   After the additional officers arrived, the intoxicated civilians still participated in Dusty's arrest (Video).

When Officer Spiegl arrived, Officer Burnett yelled at him and the civilians "to help get him down, keep him down, keep him down" (Spiegl Depo. p.12:9-21).   Officer Burnett also told Officer Spiegl that "there is an asp. See if you can used that to get him down by his legs." (Spiegl Depo. p. 13:6-8).   Officer Spiegl hit Dusty approximately three times "between his knees and his ankles, his legs, to get him down" (Spiegl Depo. p. 13:13-16).   Officer Spiegl indicated that Dusty was on his stomach and that they had gotten one of Dusty's arms behind his back and were having trouble getting his second hand (Spiegl Depo. p. 13:19-24).   According to Ranger Greene, he "grabbed his ankles just trying to hold his ankles down and at one point he was on his stomach and I had my most of my weight on his ankles…I just kind of laid tried to lay as best I could on his ankles to keep him from moving…" (Greene Depo. Ex Q, p. 3).   Officer Bueckers noted that Dusty was "He was very sweaty.  Extremely sweaty" and that "I tried to extend it [Dusty's arm].  I tried to extend it, but it was bent.  And then he did mention that they are going to kill me." (Bueckers Depo. p. 15:4; 15:10-12)

It is unclear exactly how long it took for Dusty to be handcuffed.[1]   According to Officer Burnett it took "several minutes" (Burnett Depo. Ex E, p. 6).   According to other witnesses it took approximately four (4) to five (5) minutes for Dusty to be handcuffed (Patterson IA Statement, p. 6; O'Harra IA Statement, p. 6; Britton IA Statement, p. 2).   Dusty was held in a prone position during that time (Spiegl Depo. p. 13:19-24).

---

[1] Mr. Biggerstaff's video appears to show Dusty was handcuffed at 5:52.  The wagon driven by Deputy Johnson arrived at around 5:12 in the video (Video at 5:12-5:52).

Once he was cuffed, Dusty started to calm down after about another minute or two (Burnett Depo. p. 30:25, 31:1-4; 32:21).  Yet, one witness observed that an officer "had his foot on [Dusty's] back helping to hold him down while they was…the other officers were holding his legs" after Dusty was handcuffed (Sutton Witness Statement, p. 9).  Officer Burnett could not see if Dusty was bleeding and could not "check him out" (Burnett Depo. p. 35:15-19).  It was dark outside at the time (Burnett Depo. p. 35:20-25).

Deputy Johnson arrived on scene with a wagon to transport Dusty and noted that the officers had control over Dusty, who was handcuffed face down on his stomach, and that the scene was secure (Johnson Depo. p. 15:23-25, 16:1; 17:12-25).  Deputy Johnson stated, "I pulled [sic] up I noticed probably about 4 or 5 officers on top of a naked male and the first thing they asked for was a set of leg shackles…" (Johnson Depo. Ex A, p. 2).  Deputy Johnson immediately provided the requested leg shackles (Johnson Depo. p. 18:4-5; Burnett Depo. Ex D).  Once the leg shackles were on, he was under Deputy Johnson's control (Johnson Depo. p. 82:8-9).  Deputy Johnson knew there was something that was not "quite right" with Dusty  (Johnson Depo. p. 28:18-25, 29:1-2; 57:14-19; Ex A, p. 3).  He spoke with an IMPD Sergeant about getting Dusty into the wagon for transport to the APC (Johnson Depo. p. 18:7-10; 19:12-21).  Their conversation lasted approximately one to two minutes (Johnson Depo. p. 20:1-3).

After that conversation, Deputy Johnson assisted the officers in getting Dusty to the wagon (Johnson Depo. p. 20:5-6).  Dusty was not walking on his own, but was not physically resisting the officers, "it was more like what we call dead weight.  You know, like trying to lift a dead body.  He wasn't walking on his own.  We had to assist him over there." (Johnson Depo. p. 20:8-11).  Approximately four officers, including Deputy Johnson, helped move Dusty to the wagon (Johnson Depo. p. 21:18; 22:9-10).  Dusty stepped onto the first step into the wagon

(Johnson Depo. p. 22:21-25).   However, Deputy Johnson claims that Dusty "pushed back" against the officers, they regained control over him, and put him back down on the ground in a prone position (Johnson Depo. p. 24:11-19; 31:16-25).

At that point, Deputy Johnson knew that "this guy is not going to go in my van[.]" (Johnson Depo. p. 53:16-20).   Deputy Johnson recalled telling the sergeant that he was not going to be able to take Dusty for "safety reasons" and they required a medic (Johnson Depo. p. 24:17-19; 32:4-6).   Deputy Johnson indicated that even if he was put into the wagon, Dusty was probably going to be transported to the holding room at Eskenazi Hospital because, "[h]e was too intoxicated or too out of control probably for the APC" (Johnson Depo. p. 81:11-12; 50:14-18). Officer Burnett stated that officers "just knew that he wasn't getting in the wagon, so we said the only other option is to get him on a cot" (Burnett Depo. p. 37:13-15).

Once on the ground, the officers held Dusty in a prone position until an ambulance arrived (Johnson Depo. p. 63:23-25; 81:1-4).   Deputy Johnson, who weighed approximately 320-330 pounds with gear at the time, applied his knee to Dusty's leg to hold him down and maintained that contact until the medic arrived (Johnson Depo. p. 11:21-25; 12:1-3, 18-21; 30:5-7; 32:22-24).   He was using most of his weight on the back of Dusty's legs (Johnson Depo. Ex A, p. 3).   At some point, Deputy Johnson applied at least one knee strike to Dusty's common peroneal nerve in his right upper thigh while Dusty was still handcuffed and shackled (Johnson Depo. p. 33:17-23; 34:4-7; 44:24-25, 45:1; 63:9-12; Ex A, p. 6).   Other officers were also applying pressure to Dusty including pain compliance or pressure point wrist manipulation (Johnson Depo. p. 34:11-14; Johnson Depo. Ex A, p. 3).   It took medics approximately three to five minutes to arrive (Johnson Depo. p. 34:18-20).

At the time that Medic Lance Cope arrived at 8:02 p.m., Dusty was prone, face down,

handcuffed, and leg shackled (Cope Witness Statement, p.6; Cope Depo. Ex I).  Cope saw officer had a hold of Dusty's shoulders and were holding him down (Cope Witness Statement, p. 6-7). Cope received a "brief rundown of the history" and his main concern was about drugs (Cope Witness Statement, p. 8-9; Cope Depo. p. 17:24-25, 18:1-3).  Deputy Johnson recalled telling Cope "the facts of what happened, the incident, and why I refused to transport him, and that he was heading to our holding room.  I told him that because we maintain custody over prisoners at the Eskenazi Hospital." (Johnson Depo. p. 50:14-18). Cope did not take Dusty's blood pressure at that time (Cope Depo. p. 19:20-22).  However, Cope decided to sedate Dusty, for "his best interest for the safety of him and everyone" and told the officers that Dusty "needed to be chemically restrained so we could take him to the hospital" (Cope Witness Statement, p. 9; Cope Depo. p. 30:24-25; 31:1-6).

At the time of the chemical restraint around 8:05 p.m., it was dark outside (Johnson Depo. p. 35:9-11; 87:16-20; Cope Depo. 20:6-7, 34:15-16, Ex I).  Deputy Johnson recalls the chemical restraint being given while Dusty was prone on the ground and that Dusty was not resisting officers or Cope at that time (Johnson Depo. p. 35:6-7, 17-25; 82:14-17).  After the chemical restraint, no one watched Dusty's vital signs or his breathing, they just let Dusty lie there until the chemical restraint had its desired effect (Johnson Depo. p. 86:13-25).  Deputy Johnson noted that it "appeared to put him to sleep" and that it took approximately two minutes for Dusty to become less tense (Johnson Depo. p. 39:13-17; 85:25).  Deputy Johnson noticed that Dusty was sweaty, but he did not watch Dusty for signs of medical distress once the medics were on scene (Johnson Depo. p. 39:22-23; 40:4-5).

Dusty was eventually rolled onto his back and then placed on a cot (Cope Depo. p. 25:6-11, Ex I). At that point, "custody was turned over to the medics" (Johnson Depo. p. 43:9-12).

8

Cope and Josue Ceballos began to move Dusty to the ambulance (Cope Depo. p. 23:9-11, Ex I). At some point during the move and according to Cope's IEMS Report, "it appeared that pt was no longer breathing but the darkness made it difficult to fully assess (Cope Depo. Ex I). When they finally arrived at the ambulance it was determined that Dusty had no pulse (Cope Depo. p. 36:24-25). Cope did not know how long Dusty had been without a pulse (Cope Depo. p. 39:23-25; 40:1). Dusty received some treatment at Eskenazi and was later transferred to Methodist Hospital (Sozio Depo. Ex B, p. 3). However, on October 13, 2014, Dusty was pronounced "nonviable" and died (Death Certificate; Sozio Depo. Ex B, p. 3).

On October 14, 2014, Thomas Sozio, D.O. performed Dusty's autopsy, which was summarized in a report (Sozio Depo. Ex B). In that report, Dr. Sozio determined that Dusty's cause of death was "Complications of Excited Delirium" with contributing factors of "Acute Methamphetamine Intoxication, Positional Body Restraint by Law Enforcement, Acute Psychotic State (Mania), Dilated Cardiomyopathy, discharge by Electric Stun Device, and history of Grand Mal Seizure disorder" (Sozio Depo Ex B, p. 1). At deposition, Dr. Sozio clarified that the contributing factors were not in any particular order and that it would be hard to weigh the factors (Sozio Depo. 8:18-25). In his report, Dr. Sozio also stated ten Anatomic/Clinical Findings including, "1. Multiple superficial abrasions to face, head, chest, upper extremities and lower extremities, 2. Deep intramuscular hemorrhage to bilateral upper back (s/p positional restraint), 3. Status post taser deployment (x1) on 10/05/2014, 7. Bilateral acute pneumonia, and 8. Severe cerebral edema with cerebellar tonsillar herniation" (Sozio Depo. Ex B, p. 2). Dr. Sozio noted that Dusty's body was "significant for multiple superficial areas of blunt force trauma (mostly abrasions and a few contusions) to the face, head, chest, upper extremities and lower extremities" (Sozio Depo. Ex B, p. 5). Dr. Sozio stated, "[i]n this

9

case the taser being applied to him, especially under the influence of methamphetamine and his heart, and the location of the tasering, all of those in my opinion…it does contribute to the cause of death by an arrhythmia." (Sozio Depo. 14:23-15; 15:1-4).

At his deposition, Dr. Sozio indicated that he had done approximately 2,500 to 3,000 autopsies in his career and that Dusty's autopsy was "one of the top five most complicated, complex cases" he has dealt with (Sozio Depo. p. 6:1; 17:12-13).  Despite the evidence he had from Dusty's body, Dr. Sozio found that the manner of death was undetermined (Sozio Depo. p. 16:9-10).  He stated that, "we have three manners of death, natural, accident, and homicide, all coming into play here."  (Sozio Depo. p. 17).

The Plaintiff retained Dennis Waller to evaluate the officer's actions and Mr. Waller has provided an expert's report on the matter.  According to Mr. Waller, "Officer Burnett knew, or should have known, about the dangers of excited delirium [ED] and positional asphyxia and acted accordingly.  Both are mentioned in IMPD General Orders [GO 1.33 and GO 8.1].  Officer Burnett, his fellow officers and supervisors, were grossly negligent or deliberately indifferent to the dangers posed to Dusty from excited delirium and positional asphyxia by the manner in which they handled him, i.e., forcibly holding him in a prone position for the better part of 13-14 minutes" (Waller Report p. 4-5).  Mr. Waller also indicated that Officer Burnett's failure to secure Dusty when he had an opportunity to do so, was done "negligently, or with deliberate indifference" (Waller Report p. 6).  Additionally, Mr. Waller asserted that Officer Burnett negligently and/or with deliberate indifference to Dusty's well-being solicited the assistance of two civilians to assist him in taking Dusty into custody.  He did so without knowing if they were under the influence of alcohol or narcotics and/or had personal animus toward Dusty (Waller Report p. 7).  Finally, he found that Dusty was kept in a prone position for too long, which was

deliberately indifferent to the likelihood of serious injury or death (Waller Report p. 8).

The Plaintiff retained Dr. Robert Belloto Jr. to produce an expert report regarding the use of Midazolam.  Dr. Belloto concluded in part that, "[g]iven the time frame involved, it is essentially impossible to exclude the midazolam injection from inducing Mr. Heishman's sudden collapse" (Belloto Report p. 1).  Dr. Belloto points out that "the drug was used as a chemical restraint on an already handcuffed and shackled individual and I state that any treat to law enforcement was minimal (if any at all) when the midazolam was injected" (Belloto Report p. 1). Finally, Dr. Belloto indicated that he could not "rule out any contribution due to him being on his stomach with at least one individual on top of him making it difficult to breath (the positional body restraint and the mechanical load of the individual(s)) which is also associated with respiratory arrest." (Belloto Report p. 1).

### III.    Summary Judgment Standard

Summary judgment should only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in his favor.  *Makowski v. SmithAmundsen LLC,* 662 F.3d 818, 822 (7th Cir. 2011). "The nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'"  *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002).  A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact.  *Washington v. Haupert,* 481 F.3d 543,

550 (7th Cir. 2007); *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003).  Thus, a court in ruling

on a summary judgment motion construes all facts in the light most favorable to the nonmoving

party and draws all reasonable inferences in that party's favor.  *Washington*, 481 F.3d at 550.

## IV.    Argument

### A. Contention Interrogatories

As an initial matter, the Defendants' assertions concerning Plaintiff's response to

Defendant Spiegel's Contention Interrogatory 3 are inaccurate.  Rather, the mischaracterization

appears to be an attempt to either improperly reduce the Plaintiff's claims against the Defendants

or to shield their Motion for Summary Judgment from being considered a "partial" motion,

which it is.   In arriving at the twelve contentions identified in the Defendant's brief, the

Defendants had to intentionally disregard the Plaintiff's specifically pleaded complaint, the

Plaintiff's Statement of Claims, and over twenty-one pages of response provided specifically to

Contention Interrogatory 3, all of which state and support at least nineteen separate claims

against the City and County Defendants for violations to Dusty's Fourth Amendment Rights.

The Defendants are correct, "contention interrogatories *can* be used to 'minimize

uncertainty concerning the scope of [a plaintiff's] claims" *Lynn v. City of Indianapolis et al.*,

2014 WL 3535554, at *6 (S.D. Ind. 2014) (emphasis added).   However, the Defendant's

Contention Interrogatory 3 was not drafted in a way that entitles the Defendants to the answers

they claim to expect.  *See Landeen v. Phonebillit Inc.*, 2007 WL 1703754, at *3 (stating that

"[Defendant's] failure to obtain the information he sought in interrogatories nos. 6, 8, 11, and 12

was the result of the poor drafting of the interrogatories").  Specifically, Contention Interrogatory

3 broadly requests every claim being brought for excessive force, which the Plaintiff provided in

a supplemental response that spanned approximately 21 pages (Defendant's Contention

Interrogatories; Plaintiff's Supplemental Answers).   In addition to the twelve sentences the Defendants arbitrarily selected from Plaintiff's response, the Plaintiff also clearly and in significant length stated her contentions in the supplemental responses that were requested by Defendants and provided by the Plaintiff (Plaintiff's Supplemental Answers).

Additionally, Defendant Spiegl's Contention Interrogatory 7 requests the Plaintiff to "[i]dentify each and every use of physical force taken by [the Defendants], whether your claims arise from each of the uses of force, which use of force you contend constitutes excessive force…" (Defendant's Contention Interrogatories).   In response the Plaintiff referred the Defendants back to her response in Contention Interrogatory 3 where much of her answer outlined the specific and pertinent uses of force, among other Fourth Amendment issues, identified by the Defendants in the various statements they have made throughout this matter (Plaintiff's Letter to Counsel; Plaintiff's Supplemental Answers).   Because Dusty died and the Plaintiff was not present at the time of the incident, she has relied upon the Defendants' own statements, made at various times in various reports, and/or deposition testimony, in addition to the video, the witness statements, medical evidence, and expert reports regarding what specific uses of force or other unlawful actions lead to Dusty's injuries and death[2].

While there are numerous material questions of fact regarding what physical actions the Defendants actually took against Dusty, the Plaintiff's response contains over sixteen pages of single spaced excerpts from the Defendants' own statements regarding the actions the Plaintiff believes to be unlawful.   Those statements are supported by Dr. Sozio's autopsy report that Dusty's death was caused by a multitude of factors and injuries and Mr. Waller's reports

---

[2] Despite his death, Dusty's body to some extent was able to articulate the force used against him and the injuries he sustained through Dr. Sozio's discoveries during his autopsy (Sozio Report, p. 2).

regarding the officers' actions.  As a result, the Defendants received sufficient information from the Plaintiff's answers to conclude that her claims are broader than the twelve sentences that appear to be arbitrarily picked by the Defendants.

Additionally, the Defendants overlook this Court's Case Management Order, which orders the parties to provide a statement of claims and their theories (D.E. 25, p.4).  The Plaintiff complied with that Order and identified that she intends to pursue specified claims Fourth Amendment Claims against the City and County Defendants at trial.

The Plaintiff also stated the specific theories under which she intended to pursue her claims, including with respect to Counts I and II (D.E. 83, p. 3).  Importantly, the Plaintiff tendered her first supplemental answers on October 5, 2016, her Statement of Claims on October 13, 2016, and her second supplemental answers on October 18, 2016 (D.E. 83; Plaintiff's Letter to Counsel; Plaintiff's Supplemental Answers).  As a result, if the Plaintiff intended to narrow her claims in her answers to Defendant Spiegl's Contention Interrogatories, which she did not, her Statement of Claims would have reflected that intent.

Despite the apparent conflict the Defendants appear to believe they were confronted with, they did not take steps to remedy the situation.  Specifically, they did not ask for an additional supplement to the Plaintiff's answers, which the Plaintiff had been willing at least two times in the past, and they did not seek the intervention of this Court.  As a result, the Defendants waived their right to raise this issue by failing to bring it to the court's attention through routine discovery process rather than summary judgment.  *See generally Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009).

B.  **Qualified Immunity**

The Defendants seek refuge through the doctrine of qualified immunity (D.E. 81 p. 14).

14

There is a two-part test to determine whether the qualified immunity doctrine attaches:  "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010).

There was clearly established law at the time that gave law enforcement fair notice that certain actions were unconstitutional.  Prior to this incident, it was clearly established that deadly force is justified only when an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.  *Abdullahi v. City of Madison*, 423 F.3d 763 at 769-70 (7th Cir. 2005) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  Moreover, it is well established that "[e]ven 'one violent push and poke' will constitute excessive force when there is no provocation." *DuFour–Dowell v. Cogger,* 969 F.Supp. 1107, 1120 (N.D. Ill. 1997) (quoting *Lanigan v. Vill. of East Hazel Crest, Ill.,* 110 F.3d 467, 475 (7th Cir. 1997)).  *See also Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010).   The record in this case supports the inference that officers used enough force to inflict lethal injuries and used excessive when not provoked by Dusty.

Moreover, when the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, summary judgment is not appropriate.  *See Estate of Starks v. Enyart*, 5 F.3d 230, 234-235 (7th Cir. 1993); *see also Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir. 1994).  As articulated herein, the record, including the eyewitness testimony and their own testimony, contradicts that factual recitation presented by Defendants in support of their motion.  There are numerous disputes of fact concerning what occurred that day and the intent of the officers involved.  The evidence, including medical evidence, demonstrates that a jury could conclude that the officers used or solicited more force than they are necessarily

willing to admit.  *See Saucier v. Katz*, 533 U.S. 194 (2001) ("Consistent with the medical evidence…the jury could have determined that the officers had used force against [plaintiff] far more frequently than they are willing to admit.").

Finally, "in an obvious case" the general objective standards of reasonableness outlined in *Tennessee v. Garner* and *Graham v. Connor* can "clearly establish" violation of the Fourth Amendment, even without a body of relevant case law.  *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). There is no dispute that it is unreasonable for police officers to use excessive force to detain an individual or to seize an "unarmed, nondangerous suspect by shooting him dead." *Tennessee,* 471 U.S. at 11.  Similarly, there can be no reasonable dispute that the Defendants acted unreasonably.  It is unreasonable for Officer Burnett to tase a naked, unarmed man whom he suspected was intoxicated and no doubt needed medical attention.  It was unreasonable Officer Burnett to solicit and authorize untrained and intoxicated civilians to exercise substantial force against Dust.  It was unreasonable for the Defendants to hold Dusty in a prone position for a significant period of time both prior to and after he was handcuffed.  This case presents an obvious case where the standards of reasonableness clearly establish a violation of the Fourth Amendment even assuming for purposes of argument that a body of relevant case law does not exist, which it does.

### C.  Excessive Force

Defendants utilized various methods of physical force against Dusty, including strikes, kicks, pressure point techniques, holds, numerous body weight maneuvers involving officers, one of whom weighed over 300 pounds, and the deployment of the cartridge feature of a taser that constituted excessive force.  Initially, the Defendants have failed to address the uses of physical force perpetrated by Officer Spiegl, Officer Bueckers, Ranger Greene, civilians Mark

Britton and William Patterson[3], and several uses of force perpetrated by Officer Burnett that the Plaintiff identified as excessive in the Plaintiff's Contention Interrogatory 3.  As such, the Defendants have waived those arguments on summary judgment.  *See Lacy v. City of Indianapolis*, 2011 WL 5509844 at 3 (S.D. Ind. 2011) (finding that, "Defendants have not requested summary judgment with regard to the excessive force claim against Officer Ryan and, thus, for purposes of the instant motion only, we assume that Officer Ryan's release of K9 Dennis was indeed excessive and violative of Plaintiff's Fourth Amendment rights").

Claims that officers used excessive force in seizing a person are evaluated under the Fourth Amendment's reasonableness standard. *See Acevedo v. Canterbury,* 457 F.3d 721, 724 (7th Cir. 2006).  The critical question is whether, in light of the facts and circumstances that confronted the officer, the officer behaved in an "objectively reasonable" manner.  *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  There are three factors in this inquiry: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

Injury is not an element of an excessive-force claim, but is evidence of the degree of force imposed and the reasonableness of that force.  *Id*.  Additionally, "[i]f the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).  *See also Abdullahi*, 423 F.3d at 772. The Seventh Circuit has recognized that, "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible to

---

[3] In their excessive force argument, the Defendants' concede that, "[f]or the purposes of this argument, Defendants do not contend that Britton and Patterson were not acting as agents of the government when assisting the officers" (D.E. 91, p. 20, fn 3).

different interpretations…[t]his principle is particularly relevant where, as here, the one against whom force was use has died, because the witness most likely to contradict the officer's testimony – the victim – cannot testify." *Cyrus*, 624 F.3d at 862.

    **a.  Tasing**

Officer Burnett was objectively unreasonable when he utilized his taser against Dusty. Specifically, the Plaintiff maintains that Officer Burnett utilized the cartridge function of his taser, striking Dusty on the chest and stomach and ran two cycles through him.  The Plaintiff's assertions are supported by the Taser Use Report.  According to that report, a five second cycle began at 19:51:56 p.m., a four second cycle started at 19:52:01 p.m., and a four second cycle was started at 19:54:33 p.m. (Taser Report).

Officer Burnett initially stated that he ran one five second cycle through Dusty and made a determination to not use another cycle (Burnett Depo. p. 19:12-13).  At his deposition, Officer Burnett described generally how taser cycles work and stated that, "[i]f you hold [the trigger] down after the five seconds it was continue to cycle" (Burnett Depo. p. 60:21-22).   The Defendants correctly assert that, "[t]he taser report indicates that this initial five-second cycle was followed immediately by a four-second cycle" (D.E. 91, p. 17).  However, the Defendants then incorrectly assert that, "there is no evidence in the record indicating that the probes were still attached to Heishman's body during this second cycle," which is inconsistent with Officer Burnett's own testimony (D.E. 91, p. 17).  Logically, based on the Taser Use Report's readings and Officer Burnett's testimony that 1) a taser will continue to cycle if the trigger is continually held and 2) that Dusty was not able to pull out the taser wires until the taser stopped cycling, it is reasonable to infer that officer held the taser trigger for two cycles and a total of nine seconds while Dusty was still attached to the taser wires.  Regardless of the length of time that he was

tased, Dr. Sozio states that its use contributed to Dusty's death (Sozio Depo. 14:23-15; 15:1-4).

In *Cyrus*, 624 F.3d at 856, Cyrus, who was mentally ill, was located on private property wearing nothing put a bathrobe.  *Id.* at 859.  After law enforcement gave Cyrus a direction to come out into the street to talk, Cyrus stated that his brother lived next door and made his way towards a house on the property.  *Id.*  At that time, the officer fired his taser at Cyrus, who fell onto the ground.  *Id.*  A second officer arrived, but, despite knowing that Cyrus was unarmed, tased Cyrus again.  *Id.*  Cyrus barrel-rolled down the driveway, where officers attempted to handcuff Cyrus.  *Id* at 859-860.  When officers had difficulty getting his hands, the first law enforcement officer drive stunned Cyrus.  *Id* at 860.

The Seventh Circuit determined that summary judgment was not appropriate based on the discrepancy concerning the amount of force used, Cyrus' actions being susceptible to multiple interpretations, disputes in the characterization of Cyrus' actions, the fact that Cyrus had at most committed a misdemeanor offense, that Cyrus was unarmed at the time, and that the officer was aware of Cyrus' mental health status.  *Id.* at 862-863.  The Court also noted that "[f]orce is reasonable only when exercised in proportion to the threat posed[.]" *Id*. at 863.  In that case, the Defendant also relied on the holding in *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) that "a plaintiff cannot ask an officer to infer than an officer used excessive force based solely on the fact that an injury occurred.  *Cyrus*, 624 F.3d at 864.  However, the Court rejected that argument, indicating the Cyrus' estate had "amply identified the specific conduct it contends was excessive and unreasonable under the circumstances" *Id*.

Looking to the totality of the circumstances here, Officer Burnett knew that Dusty was naked, which allowed him to quickly identify that he did not have a weapon.  He knew that Dusty was not in a normal state of mind and that he was likely intoxicated.  Importantly, Dusty

did not try to hit or touch Officer Burnett (Burnett Depo. p. 17:20-25, 18: 1-2).  Despite that information, Officer Burnett tased Dusty for at a total of nine seconds, approximately two cycles of his taser.  Like the circumstance in *Cyrus*, summary judgment is inappropriate here and Officer Burnett's actions were obviously unreasonable.

### b.  Civilian Uses of Force

Officer Burnett acted in an objectively unreasonable fashion when he directed and utilized Britton and Patterson for their uses of force against Dusty.  Plaintiff does not contend that law enforcement cannot utilize the assistance of civilians in police activities.  However, the use of civilians as a tool of law enforcement converts those individuals into agents and does not change the Fourth Amendment's reasonableness standard to which officers are held.

Despite the Defendants' assertions, the record provides a material dispute as to the circumstances at the Officer Burnett requested the assistance of the civilians.  Officer Burnett stated he "saw two citizens, and I said, I'm going to need help" (Burnett Depo. p. 21:25, 22:1-4).  Officer Burnett did not ask regarding their level of intoxication, their training, or their previous history with Dusty (Burnett Depo. p. 23:17-25; 24:1-2; 24:24-25; 25:1-4; 84:22-25; Ex E, p. 3).  Both had been drinking and were intoxicated (Britton IA Statement, p. 5; Britton Admissions).

The video demonstrates that Dusty had been laying on the ground in the prone position and had moved away from Officer Burnett when two civilians chased Dusty down and took him to the ground (Video at 0:34-:49).  Accordingly, the Defendants' assertion that "[a]t the time he asked for assistance, Officer Burnett was by himself, confronted by a naked adult male who was forcibly resisting arrest" is inaccurate (D.E. 91 p. 21).  While he may have been attempting to flee, Dusty was not forcibly resisting when Officer Burnett called upon Britton and Patterson (Video 0:34-:49).  Additionally, approximately thirty-one seconds after the civilians made

contact with Dusty, Officer Spiegl arrived at the scene (Video at 0:49-1:20).   As a result, a

reasonable jury could conclude that Officer Burnett's engagement of the civilians before and

after back up arrived in this instance was not objectively reasonable.

Additionally, after the initial engagement of the civilians, Officer Burnett authorized,

orchestrated, and otherwise directed various uses of excessive force by Britton and Patterson.

Despite the Defendants' assertion that the "record makes clear that Officer Burnett did not allow

Britton and Patterson to use excessive force on Heishman," the record demonstrates otherwise

(D.E. 91, p. 20).   At one point, Officer Burnett candidly acknowledged he would, "[y]ou know at

times I'd look up and say hey don't kill him" (Burnett Depo. Ex E, p. 3).   Patterson recalled

Officer Burnett told him to, "hit him, hit him, hit him calm him down hit him and something like

that and then he said hit him in his side take his air out of him so we can get this other hand so I

did" (Patterson IA Statement, p. 5).   Moreover, Dr. Sozio's autopsy demonstrates that Dusty

suffered extensive physical injuries including multiple superficial abrasions to his face, head,

chest, upper and lower extremities and had deep intramuscular hemorrhage to his back (Sozio

Depo. Ex B p. 2).   Dr. Sozio noted that Dusty's body was "significant for multiple superficial

areas of blunt force trauma (mostly abrasions and a few contusions) to the face, head, chest,

upper extremities and lower extremities" (Sozio Depo. Ex B, p. 5).

In addition to those uses of force outlined above, Mr. Britton asserted that he tackled

Dusty and took him to the ground and that he had his legs locked around him and had Dusty in a

"choke hold like a you know a physical choke hold a cross arm" (Britton IA Statement, p. 2, 7).

Britton also admitted that he poked Dusty's eye and got an eye gouge on him (Britton IA

Statement, p. 8).   Britton also indicated that Patterson was so intoxicated that he "ended up

punching me in my stomach for some reason…I think he maybe had too many drinks" (Britton

IA Statement, p. 5).  According to William Patterson, Britton grabbed Dusty and then he ran

over, tackled him, and they all fell to the ground (Patterson IA Statement, p. 5; Video at 1:14-

1:20).  Ms. Sutton saw one of the civilians hit Dusty in the face approximately two times (Sutton

Witness Statement, p. 7).

Officer Burnett indicated that "[o]nce we got on the ground – like I say, the first time was

just a brief down, up.  The second time he was down and all three of them were wrestling

around, and that's when I went up to him on the – I was on Mr. Heishman's left side, Mr. Britton

was on top of him, and Mr. Patterson was on the right side" and that Dusty was tackled at least

two times by the civilians (Burnett Depo. p. 25: 16-23; Ex E, p. 8).  At one point Officer Burnett

observed Patterson hitting Dusty and Britton hit Dusty a few times in the head (Burnett Depo. p.

26:20-25; 27:1, Ex D).  Britton almost let go of Dusty and Officer Burnett "actually grabbed Mr.

Britton and put him back on the subject[.]" (Britton Depo. Ex E, p. 4, 6).

The uses of force by Britton and Patterson caused Dusty significant injury, up to his

death.  In his autopsy report, Dr. Sozio found that positional body restraint was one of the

contributing factors to Dusty's death (Sozio Depo. Ex B, p. 1).  Dr. Sozio found that Dusty had a

severe cerebral edema with cerebellar tonsillar herniation and deep intramuscular hemorrhage to

bilateral upper back (Sozio Depo. Ex B, p. 2).  Dr. Sozio opined that, "[a]nd so being in

positional asphyxia, someone being on his back, that's probably in my opinion contributing"

(Sozio Depo. p. 26:3-9).

From the various statements made, there is a material dispute regarding the amount of

force used by Britton and Patterson and how much of that force was used at the direction or

approval of Officer Burnett and/or other officers.  A reasonably jury could conclude that it was

not objectively reasonable for Officer Burnett to use Britton and Patterson, because Officer

Burnett was not in direct danger at the time, as Dusty was moving away from him, other trained law enforcement officers were nearby and responding, and Officer Burnett had no information regarding the individuals' training, level of intoxication, or personal animus against Dusty. Additionally, a reasonable jury could determine that Officer Burnett directed Britton and Patterson to use excessive force against Dusty, in violation of his Fourth Amendment rights.  As such, summary judgment is inappropriate here and Officer Burnett's actions were obviously unreasonable.

### c.  Excessive Force Prior to and During Handcuffing

Defendants were objectively unreasonable in using excessive and holding Dusty down in the prone position while he was being handcuffed and after they attempted to transport him.  The Defendants generally assert that, "the officers used no more pressure than was necessary, tailoring the amount of pressure they placed on Heishman to the amount of resistance he offered." (D.E. 91, p. 23).  In support of that assertion, the Defendants rely on Officer Burnett's statement that, "you just sort of hover over him…my knees would overlap his shoulder area, and basically just enough pressure to keep him down" (Burnett Depo. p. 32:3-6).  However, in the context of his deposition, that statement was made regarding the force used after Dusty was in handcuffs (Burnett Depo. p. 31:1-25, 32:21).  The Defendants' assertion does not address the drastic change in circumstances throughout the arrest and is generally disputed by the record.

Officers and the civilians as agents not only held Dusty in the prone position, but applied excessive force in the process.  Officer Burnett, Britton, and Patterson all got Dusty into a prone position at around 1:26 of Mr. Biggerstaff's video (Video at 1:12).  According to Officer Burnett, "[t]he second time he was down and all three of them were wrestling around, and that's when I went up to him on the – I was on Mr. Heishman's left side, Mr. Britton was on top of him, and

Mr. Patterson was on the right side" (Burnett Depo. p. 25: 16-23).   For some portion of the incident, Britton had Dusty in a choke hold (Britton IA Statement, p. 2, 7).   Britton poked and eye-gouged one of Dusty's eyes (Britton IA Statement, p. 8).    Officer Spiegl arrived and joined the other three in holding Dusty down at 1:29 of the video (Video at 1:25-1:30).   Officer Spiegl hit Dusty approximately three times (Spiegl Depo. p. 13:13-16).  He also admitted that he put his weight on Dusty's knee area (Spiegl Depo. p. 48:7-9).   Ranger Greene also, "came on to assist, and he held his ankles down by his knees, holding him down." (Spiegl Depo. p. 20:1-5). According to Ranger Greene, he "grabbed his ankles just trying to hold his ankles down and at one point he was on his stomach and I had my most of my weight on his ankles…I just kind of laid tried to lay as best I could on his ankles to keep him from moving…" (Greene Depo. Ex Q, p. 3).  Officer Bueckers noted that Dusty was "He was very sweaty.  Extremely sweaty" and that "I tried to extend it [Dusty's arm].  I tried to extend it, but it was bent.  And then he did mention that they are going to kill me." (Bueckers Depo. p. 15:4; 15:10-12).

Officer Burnett asked Patterson to "hit him, hit him, hit him calm him down hit him and something like that and then he said hit him in his side take his air out of him so we can get this other hand so I did" (Patterson IA Statement, p. 5).  Officer Burnett "was telling [Britton and Patterson] where to hit him take his breath, take his breath body shock take his breath…the officer told them to take his breath" or words to that effect (Altee IA Statement, p. 4).  During his statement to IMPD Internal Affairs Officer Britton indicated that he was holding Dusty down from the back (Burnett Depo. Ex E, p. 4).   Britton almost let go of Dusty and Officer Burnett "actually grabbed Mr. Britton and put him back on the subject" because at that point Officer Britton's main objective was "just to pin this guy down and-and keep him down until we got some help" (Britton Depo. Ex E, p. 4, 6).  Officer Burnett yelled at Spiegl and the civilians "to

help get him down, keep him down, keep him down" (Spiegl Depo. p.12:9-21).

Officer Burnett asserted at his deposition that Dusty was throwing elbows, kicking, swinging, and biting (Burnett Depo. p. 25:25, 26:1-2). Ranger Greene indicated that Dusty was "kicking and moving around, squirming around" (Greene Depo. p. 11:25). However, according to Officer Spiegl, when he arrived on scene he was not running to assist Officer Burnett and the civilians because it looked, "like they've got him somewhat under control." (Spiegl Depo. p. 43:18-20). That is, there is a material dispute of fact concerning the level of force that Dusty was allegedly using against the officers, the level of force applied by the officers, and the intent and interpretation of that force. Additionally, none of the officers indicate that Dusty became more violent throughout the incident, which could justify the increased use of force demonstrated by the officers.

It is unclear exactly how long it took for Dusty to be handcuffed. According to Officer Burnett it took "several minutes" (Burnett Depo. Ex E, p. 6). According to other witnesses it took approximately four (4) to five (5) minutes for Dusty to be handcuffed (Patterson IA Statement, p. 6; O'Harra IA Statement, p. 6; Britton IA Statement, p. 2). The video appears to demonstrate that it takes approximately five minutes to handcuff Dusty (Video at 5:52). Once he was handcuffed, one witness observed that an officer "had his foot on [Dusty's] back helping to hold him down while they was…the other officers were holding his legs" after Dusty was handcuffed (Sutton Witness Statement, p. 9). Once he was cuffed, Dusty started to calm down after about another minute or two (Burnett Depo. p. 30:25, 31:1-4; 32:21).

The uses of force by the Defendants along with holding Dusty down in the prone position caused Dusty significant injury. In his autopsy report, Dr. Sozio found that positional body restraint was one of the contributing factors to Dusty's death (Sozio Depo. Ex B, p. 1). Dr. Sozio

found that Dusty had a severe cerebral edema with cerebellar tonsillar herniation and deep intramuscular hemorrhage to bilateral upper back (Sozio Depo. Ex B, p. 2). Dr. Sozio opined that, "being in positional asphyxia, someone being on his back, that's probably in my opinion contributing" (Sozio Depo. p. 26:3-9).

In total, it appears as though Dusty was aggressively and forcefully held in the prone position by multiple individuals for approximately five to seven minutes while he was being handcuffed and held for several more minutes after the handcuffs were applied. As a result, a reasonable jury could determine that Officer Burnett directed Britton and Patterson to use excessive force against Dusty, in violation of his Fourth Amendment rights.

It is clearly established that deadly force is justified only when an official has probable cause to believe that the suspect poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). This case is similar to the facts and circumstances outlined in *Abdullahi*, 423 F.3d at 763. In that case, the plaintiff brought an excessive force claim against an officer who during the course of the arrest kneeled on the arrestee's back/shoulder area after he was already lying prone on the ground. *Id*. at 768. The arrestee died roughly two minutes later of severe injuries consistent with pressure or crushing trauma to the chest and neck area. *Id*. at 769. The Seventh Circuit reversed the district court finding that the record supports an inference that the officer knelt on the arrestee with enough force to inflict lethal injuries. *Id*. Here, Dr. Sozio's report provides a reasonable inference that the uses of force from someone being on his back was likely a contributing factor to Dusty's death. Further, there can be no reasonable dispute that it is unreasonable for the Defendants to hold down and strike Dusty, who was naked, unarmed, and in an obvious mental health crisis, with their knees and body weight. As such, a jury is required to weigh all of the evidence and decide material

disputes of fact.

### d. Excessive Force after Handcuffing and Attempted Transport

The Defendants were objectively unreasonable in holding Dusty down in the prone position after they attempted to transport him.  Despite their assertions that Dusty was "kicking and flailing violently" during the first encounter, they do not make an assertion regarding Dusty's behavior while the ambulance arrived that validated three to four officers, one of which weighed over 300 pounds with equipment, holding him in the prone position while they waited for the ambulance to arrive.  To that point, there is a material dispute regarding the totality of the circumstances while the Defendants held Dusty in the prone position for the five to seven minutes while the ambulance arrived and the two minutes after the chemical restraint was used.

Specifically, after Dusty was moved over to Deputy Johnson's wagon, the officers put Dusty back on the ground and held in a prone position until an ambulance arrived because he kept "stiffening up" and Deputy Johnson indicated that they would have to "find another way" to transport him (Johnson Depo. p. 63:23-25; 81:1-4; Spiegl Depo. p. 23:1-3).  Deputy Johnson, who weighed approximately 320-330 pounds with gear at the time, applied his knee to Dusty's leg to hold him down and maintained that contact until the medic arrived (Johnson Depo. p. 11:21-25; 12:1-3, 18-21; 30:5-7; 32:22-24).  Deputy Johnson was using most of his weight on the back of Dusty's legs (Johnson Depo. Ex A, p. 3).  At some point, Deputy Johnson applied at least one knee strike to Dusty's common peroneal nerve in his right upper thigh while Dusty was still handcuffed and shackled (Johnson Depo. p. 33:17-23; 34:4-7; 44:24-25, 45:1; 63:9-12; Ex A, p. 6).  Other officers were also applying pressure to Dusty, by using "a pain compliance or pressure point wrist manipulation" (Johnson Depo. p. 34:11-14).  "One of them had his knee of him back, a couple of them were holding his legs...I know they were attempting to hold him

27

down and keep him on the ground." (Johnson Depo. Ex A, p. 3).

Dusty was not throwing and punches at the time (Bueckers Depo. p. 39:8-11).  According to Deputy Johnson it took medics approximately three to five minutes to arrive (Johnson Depo. p. 34:18-20).  Deputy Johnson noted that the chemical restraint "appeared to put him to sleep" and that it took approximately two minutes for Dusty to become less tense (Johnson Depo. p. 39:13-17; 85:25).  Cope stated that Dusty was "motionless" (Cope Witness Statement, p. 9). Deputy Johnson noticed that Dusty was sweaty, but he did not watch Dusty for signs of medical distress once the medics were on scene (Johnson Depo. p. 39:22-23; 40:4-5).  After Dusty became still, he was rolled onto his back and then placed on a cot (Cope Depo. p. 25:6-11, Ex I). At that point, "custody was turned over to the medics" (Johnson Depo. p. 43:9-12).  As a result, a reasonable jury could infer that there was not cause to continue to apply force and continue hold Dusty in the prone position for approximately five to seven minutes while they waited for him to be transported by the ambulance and a material dispute regarding how much force was used to hold him down.

Further, there can be no reasonable dispute that it is unreasonable for the Defendants to hold down Dusty, who was naked, unarmed, in an obvious mental health crisis, handcuffed, leg shackled, and having been tased approximately three times, with their knees and body weight. As such, a jury is required to weigh all of the evidence and decide material disputes of fact.

### D.  Failure to Protect and Deliberate Indifference

Defendants offer no substantive independent analysis addressing Plaintiff's separate and distinct failure to protect and deliberate indifference claims (D.E. 91 p. 24-27).  Rather, they assert that their discussion on the excessive force claims addresses those claims (D.E. 91 p. 24). This Court relies on the parties to frame the issues for discussion.  *See Greenlaw v. U.S.,* 554

U.S. 237, 243-44 (2008) ("we follow the principle of party presentation.  That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").   By failing to substantively address these claims independently, Defendants have waived their right to summary judgment on those issues.  *Sere v. Bd. of Trustees of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988) (noting a party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for "[i]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel").

Regardless, "[o]missions as well as actions may violate civil rights." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  A state actor's failure to intervene can render him or her culpable under § 1983.  *See White v. Rochford,* 592 F.2d 381, 383-85 (7th Cir. 1979) (police officers liable for exposing children to danger by leaving them unattended in a car parked on the highway after lawfully arresting their guardian); *Byrd v. Brishke,* 466 F.2d 6, 10-11 (7th Cir. 1972).  "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." (emphasis added) *Yang*, 37 F.3d at 285.  Similarly, four factors inform a court's determination about whether an officer's response to medical needs was objectively unreasonable:  (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests.  *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

Defendants again overlook Plaintiff's well-pleaded complaint, Plaintiff's statement of claims, and their own actions. Here, Plaintiff has asserted separate and independent claims for both deliberate indifference and failure to protect (D.E. 83 p. 3-4).

With respect to deliberate indifference, Officer Burnett tased a naked, unarmed man whom he suspected was intoxicated. Rather than attempting to de-escalate the situation or call for an ambulance for medical assistance, he decided to shoot him with a taser and failed to handcuff him after Dusty got on the ground and presented his hands to the officer to be handcuffed. After he was unable to handcuff Dusty, Officer Burnett solicited and exposed Dusty to the danger of untrained and intoxicated civilians physically assaulted Dusty and choked and punched Dusty in an effort to take his breath away. *See White,* 592 F.2d at 383 (7th Cir. 1979); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir. 1986) (remanded for determination on whether defendant police officer had opportunity to intervene to prevent unprovoked beating inflicted by fellow officer). Additionally, Officer Burnett permitted the civilians to participate in the arrest even after other officers arrived on scene to assist in the arrest. As Dennis Waller noted in his expert report, Officer Burnett negligently and/or with deliberate indifference to Dusty's well-being solicited the assistance of two civilians to assist him in taking Dusty into custody (Waller Report p. 7). He did so without knowing if they were under the influence of alcohol or narcotics and/or had personal animus toward Dusty (Waller Report p. 7).

The other officers who assisted in Dusty's arrest suspected that Dusty was intoxicated, but nonetheless assisted in his arrest and physically assaulted Dusty rather than calling for an ambulance or facilitating appropriate medical care. Even after Dusty was handcuffed and had calmed down, officers continued to use force and maintain Dusty in the prone position. The officers waited for a wagon to arrive so Dusty could be taken away.

It was only after Deputy Johnson had decided that he would not be transporting Dusty to the APC in his wagon that the medic was called to the scene. When it was determined that Dusty was unable to be safely transported in a wagon to the APC, a medic was called. Further still, each officer that arrived on scene failed to protect Dusty from the force being applied by the civilians and/or the other officers already there. Although it was readily apparent that Dusty needed appropriate medical care to address his serious medical needs, lethal force was applied. Despite the fact that Dusty was handcuffed and shackled, officers nonetheless permitted the use of a chemical restraint at a time when Dusty was not fighting the officers. Law enforcement physically limited Dusty's ability to care for himself or to seek aid from others. By chemically restraining Dusty and waiting without any aid being rendered while he remained as he had been in the prone position in a location where he could not be sufficiently monitored, Defendants affirmatively placed Dusty in a position of danger he would not have otherwise faced.

With respect to the failure to protect, Officers Burnett, Spiegel, and Bueckers, and Ranger Greene assisted in using physical force before and after he was handcuffed. Each knew or should have known that the force the officers used and the civilians used was excessive. Moreover, once Dusty was handcuffed and shackled, those officers continued to use excessive force against Dusty and were in a position to intervene and protect Dusty from harm. Based on his presentation, it was obvious that he needed medical care rather than transportation to a controlled facility. Nonetheless, officers used force against Dusty while he remained in a prone position in order to facilitate his arrest and transportation to the Sheriff Department's holding room at the hospital. As Mr. Waller also noted in his report, Officer Burnett, his fellow officers and supervisors, were grossly negligent or deliberately indifferent to the dangers posed to Dusty from excited delirium and positional asphyxia by the manner in which they handled him, i.e.,

31

forcibly holding him in a prone position for the better part of 13-14 minutes" (Waller Report p. 4-5). Like the Seventh Circuit found in *Abdullahi*, given that the excessive force claims against the Defendants are not amendable to summary judgment, the associated failure to intervene and deliberate indifference claims should go to trial as well. *Abdullahi*, 423 F.3d at 774.

### E.  Expert Report

Defendants ask this Court not to consider Plaintiff's law enforcement expert because his testimony would not be admissible at trial (D.E. 91 p. 29).  This issue was touched on in *Abdullahi*, 423 F.3d at 763.  The Seventh Circuit noted in that case that while the admissibility of an expert's "conclusory" report may be an open question at a trial, "even brief expert reports will suffice at the summary judgment stage."  *Id*. at 771-72 (citing *Vollmert v. Wisconsin Dept. of Transp.,* 197 F.3d 293, 300-01 (7th Cir. 1999).  This Court can and should consider Waller's expert report on summary judgment and decline the City Defendant's erroneous invitation to disregard it.

Regardless, on the merits, Mr. Waller's report would survive such a challenge and would assist the trier of fact.  In order for expert testimony to be admissible, it must satisfy the Federal Rule of Evidence's threshold requirement that "specialized knowledge ... assist the trier of fact ... to determine a fact in issue." Fed. R. Evid. 702. Once the threshold showing is made, experts may provide broad assistance:  an opinion is not objectionable merely because "it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a).

City Defendants do not dispute that Waller has specialized knowledge, but rather assert that his expert testimony would not assist the trier of fact (D.E. 91 p. 28-29).  In his report, Waller asserts four separate opinions with respect to this incident (Waller Report p. 4-8). Importantly, City Defendants only substantively challenge Waller's first opinion with respect to

excited delirium.  The City Defendants concede that "Waller makes the general argument that the officers should have realized [Dusty] was suffering from excited delirium." (D.E. 91 p. 29). When asked what the term "excited delirium" means, Officer Burnett responded, "I couldn't read it off verbatim."  (Burnett Depo. 44:13-14).  When asked whether that term came to mind when he encountered Mr. Heishman, Officer Burnett indicated that it did not come to his mind (Burnett Depo. 45:9-11).   Waller's knowledge with respect to excited delirium and appropriate recognition and response by a police officer is beyond the ken of the average layperson who no doubt would not frequently encounter a person in a state of excited delirium or know what the appropriate response by a properly trained police officer would be.   Moreover, Mr. Waller proffered his opinion concerning standard police practices.  *See Abdullahi,* 423 F.3d at 772 ("[T]he plaintiff's proffered expert testimony that Brook's tactics violated standard police practices, while not dispositive, may also be deemed relevant to the reasonableness inquiry, as might the plaintiff's evidence that Brooks was aware of Mohamed's mental disabilities.").

### F.  Wrongful Death and Survival Claims

As this Court has recognized, "Indiana's wrongful death statute permits the recovery of damages for an individual's death '[w]hen the death ... is *caused* by the wrongful act or omission of another.'" (emphasis added).  *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 863 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015) (citing I.C. § 34-23-1-1).  Count VI, paragraph 108 of the complaint plainly alleged that "[t]he actions and/or omissions of some or all of the Defendants caused Mr. Heishman's death."  More specifically, Dusty was tased, assaulted, and battered by various individuals.

Furthermore, it is clear that law enforcement immunity does not apply to Plaintiff's battery claims.  *See Wilson v. Isaacs,* 929 N.E.2d 200, 203–04 (Ind. 2010) (explaining that "[i]f

an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery" and that "law enforcement immunity ... does not shield the government from liability for excessive force by police"); *see also Lessley v. City of Madison, Ind.,* 654 F.Supp.2d 877, 913 (S.D. Ind. 2009) ("The statutory law enforcement immunity does not bar plaintiffs' claims for assault and battery against the City of Madison.").

Because the City Defendants did not address Plaintiff's wrongful death claim, they waive that argument and tacitly concede that Plaintiff's claim survives summary judgment.   The Seventh Circuit has stated that if an argument has not been raised by a party, that argument is waived.  *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (noting that "the Supreme Court has described waiver as the 'intentional relinquishment or abandonment of a known right.'"); *see also Sere*, 852 F.2d at 287.

### G.  State Tort and Battery Claims

The emotional distress forming the basis of a negligent infliction of emotion distress claim can be caused by "negligent or otherwise tortuous [sic] conduct," *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000), and battery of course qualifies as other tortious conduct.  *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 865 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015).  Plaintiff noted those batteries in her statement of claims (D.E. 5-8).

Moreover, Plaintiff brought her claims against the officers both in their individual and official capacities (D.E. 1).  And, importantly, Defendants do not (and could not) contend that the record does not support battery claims against each named officer defendant (D.E. 31-32). Plaintiff acknowledges that those battery claims are connected with the § 1983 excessive force claims.  *Estate of Williams*, 26 F. Supp. 3d at 864 (noting that the issue is whether the officers

used unreasonable force: if they did, they are liable; if not, they are not liable). *See also O'Bannon v. City of Anderson,* 733 N.E.2d 1, 3 (Ind. App. 2000)); *Wilson,* 929 N.E.2d at 203–04 (noting that "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery").

Regardless, the officers' personal liability is not protected by the Indiana Tort Claims Act because his actions were criminal, malicious, willful and wanton, or calculated to benefit the employee personally. *See* Ind. Code § 34–13–3–5(c). Officers physically engaged a naked man whom they suspected was intoxicated. The facts in the light most favorable to Plaintiff demonstrates that the officers' actions were criminal, malicious, willful and wanton, or calculated to benefit them personally.

## V.      Conclusion

Plaintiff has presented a genuine issue of material fact with respect to the claims raised in his operative complaint. Moreover, Plaintiff's claims are not precluded as a matter of law. As such, Mr. Sturm respectfully requests that this Court deny Defendants' Motion for Summary Judgment, set this matter for trial, and grant them all just and proper relief.

Respectfully Submitted,

*/s/ Scott L. Barnhart*
Scott L. Barnhart, Attorney No. 25474-82
Brooke Smith, Attorney No. 32427-03
Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of January, 2016, a copy of the foregoing Response was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

*/s/ Scott L. Barnhart*
Scott L. Barnhart, #25474-82
Keffer Barnhart LLP