IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COPY

BILLIE THOMPSON, as Personal          )
representative OF THE ESTATE OF        )
DUSTY HEISHMAN,                        )
                                       )
              Plaintiff,               )      CAUSE NO.
        -v-                            )  1:15-cv-1712-TWP-DML
                                       )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT,        )
OFFICER BRIAN BURNETT, in his          )
individual and official                )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official         )
capacities, OFFICER WILLIAM            )
BUECKERS, in his individual and        )
official capacities, PARK RANGER       )
PHILIP GREENE, in his individual       )
and official capacities, MARION        )
COUNTY SHERIFF'S DEPARTMENT,           )
DEPUTY BILLY JOHNSON, in his           )
individual and official                )
capacities, HEALTH AND HOSPITAL        )
CORPORATION OF MARION COUNTY,          )
MEDIC LANCE COPE, in his               )
individual and official                )
capacities, MARK BRITTON, and          )
WILLIAM PATTERSON,                     )
                                       )
              Defendants.              )

        The deposition upon oral examination of
**BRIAN BURNETT**, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 12:00 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.


        RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                3437 Beasley Drive
            Indianapolis, Indiana  46222
            Tel. & Fax (317) 299-6302

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
representative OF THE ESTATE OF )
DUSTY HEISHMAN, )
                              )
        Plaintiff, )          CAUSE NO.
    -v-                       ) 1:15-cv-1712-TWP-DML
                              )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
                              )
        Defendants. )

        The deposition upon oral examination of
BRIAN BURNETT, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 12:00 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.

        RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                3437 Beasley Drive
            Indianapolis, Indiana  46222
            Tel. & Fax (317) 299-6302

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
        Scott Barnhart, Esq.
        Brooke Smith, Esq.
        KEFFER BARNHART, LLP
        230 East Ohio Street
        Suite 400
        Indianapolis, Indiana  46204

FOR THE DEFENDANTS CITY OF INDIANAPOLIS, INDIANAPOLIS
METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER
DONALD SPIEGL, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, OFFICER WILLIAM BUECKERS, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, PARK RANGER PHILIP
GREENE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
MARION COUNTY SHERIFF'S DEPARTMENT, AND DEPUTY BILLY
JOHNSON:
        Kathryn Box, Esq.
        OFFICE OF CORPORATION COUNSEL
        200 East Washington Street
        Suite 1601
        Indianapolis, Indiana  46204

FOR THE DEFENDANTS HEALTH AND HOSPITAL CORPORATION OF
MARION COUNTY, MEDIC LANCE COPE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES:
        Mary R. Feldhake, Esq.
        Bose McKinney & Evans, LLP
        111 Monument Circle
        Suite 2700
        Indianapolis, Indiana  46204

FOR THE DEFENDANTS MARK BRITTON AND WILLIAM PATTERSON:
        Not present or represented by counsel.

---

I N D E X   O F   E X A M I N A T I O N

                                        Page
                                        ----
DIRECT EXAMINATION,
    Questions By Mr. Barnhart            4

CROSS-EXAMINATION,
    Questions By Ms. Box                87


        I N D E X   O F   E X H I B I T S

                                        Page
                                        ----
Plaintiff's Exhibit D                    57
Plaintiff's Exhibit E                    57
Plaintiff's Exhibit F                    58
Plaintiff's Exhibit G                    72
Plaintiff's Exhibit H                    73
Plaintiff's Exhibit I                    73
Plaintiff's Exhibit J                    74
Plaintiff's Exhibit K                    75
Plaintiff's Exhibit L                    76
Plaintiff's Exhibit M                    77
Plaintiff's Exhibit N                    80
Plaintiff's Exhibit O                    83

---

4

1                B R I A N   B U R N E T T,
2       having been first duly sworn to tell the truth,
3       the whole truth and nothing but the truth in the
4       aforementioned matter, testified as follows:

5   DIRECT EXAMINATION,
6       QUESTIONS BY MR. SCOTT BARNHART:
7   Q. Good morning.  Please state your name and spell
8       your last name for the record.
9   A. Brian Burnett.  The last name is spelled
10      B-u-r-n-e-t-t.
11  Q. Have you ever been deposed before, sir?  Have you
12      ever been deposed before?
13  A. I can't hear you.
14  Q. I'm sorry.  Have you ever been deposed before?
15  A. Yes, sir.
16  Q. How many times?
17  A. Several.
18  Q. Were they in criminal or civil depositions do you
19      recall?
20  A. Both.
21  Q. Are you currently under the influence of any
22      alcohol or drugs?
23  A. No, sir.
24  Q. Any prescribed medication?

---

**Page 5**

1  A.  Zyrtec.
2  Q.  Nothing that would prevent you from telling the
3     truth?
4  A.  No, sir.
5  Q.  And you understand the deposition ground rules,
6     is that fair?
7  A.  Yes, sir.
8  Q.  He's writing down everything.  Sometimes I have a
9     tendency of talking fast and talking a little
10    low, so if you don't hear me I would ask that you
11    ask me to repeat the question, and I'm happy to
12    do so.
13       If you don't understand a question I can
14    rephrase it in a way that might help you.  I
15    would just ask that you ask me to do so, is that
16    fair?
17 A.  Yes, sir.
18 Q.  If you don't ask me to repeat the question or
19    rephrase it, I'll presume that you both
20    understood it and you heard it, is that fair?
21 A.  Yes, sir.
22 Q.  Did you meet with anyone in preparation for
23    today's deposition?
24 A.  Yes, sir.
25 Q.  Who is that?

**Page 6**

1  A.  Counsel.
2  Q.  Did you meet with anybody other than counsel?
3  A.  No, sir.
4  Q.  Did you review any materials in preparation for
5     today's deposition?
6  A.  Yes, sir.
7  Q.  What did you review?
8  A.  The Internal Affairs statement and the incident
9     report and the video.
10 Q.  Have you spoken with anybody else other than
11    counsel about the matter we're here today to
12    discuss?
13 A.  Not the true matter.  I mean, I had to tell my
14    supervisor that I had to come down here and
15    things like that, but not like the court.
16 Q.  Okay.  Have you spoken with any other officers
17    about what happened?
18 A.  Sir?
19 Q.  Sure.  After the incident occurred in October of
20    2014, do you recall that incident involving Dusty
21    Heishman?
22 A.  Yes, sir.
23 Q.  Did you speak with any other officers about what
24    occurred, what they saw, what you saw?
25 A.  Just at what happened at the scene that day.  I

**Page 7**

1     was the reporting officer, and I had to gather
2     all the information.
3  Q.  Was that immediately after the incident?
4  A.  During and after that day, yes, because I had to
5     do the report that night.
6  Q.  So after you had those conversations did you have
7     any discussions with officers after that time?
8  A.  Not pertaining to, like I say, the court.  More
9     or less when we received I guess the claim
10    showing that there was a lawsuit filed, just
11    going to the FOP and asking for assistance and
12    things of that nature.
13 Q.  And other than counsel, who of those individuals
14    did you speak with at the FOP, or after you found
15    out about the Complaint?
16 A.  I did notify the FOP.
17       MS. FELDHAKE:  I'm sorry.  You're going to
18    have to talk up, because I can't hear you down at
19    this end.
20 A.  (Continued) I'm sorry.  I notified the FOP.
21 Q.  Okay.  What is your age, sir?
22 A.  Forty-four.
23 Q.  And where did you go to high school?
24 A.  9th & O, in Louisville, Kentucky.
25 Q.  Do you have any college?

**Page 8**

1  A.  Yes, sir.
2  Q.  Where did you go to college?
3  A.  Eastern Kentucky, and then Graceland University.
4  Q.  Do you have a degree?
5  A.  Yes, sir.
6  Q.  What is it in?
7  A.  Business.
8  Q.  Is that from Graceland?
9  A.  Yes, sir.
10 Q.  Any post college?
11 A.  No, sir.
12 Q.  And you went to ILEA?
13 A.  No, sir.
14 Q.  Where did you go?
15 A.  The Indianapolis Police Department Training
16    Academy.
17 Q.  They have their own academy?
18 A.  Yes, sir.
19 Q.  What class were you in?
20 A.  98th class.
21 Q.  And what year did you graduate?
22 A.  That would be -- the start was July 22nd, 2002.
23    I don't know the exact graduation date.
24 Q.  What is your current rank?
25 A.  Patrolman.

9

1 Q. Have you received any promotions?
2 A. No, sir.
3 Q. So you've been a patrolman since July of 2002?
4 A. Yes, sir.
5 Q. And what districts have you been assigned to?
6 A. South district when it was IMPD, and that turned
7    into southeast. Stayed there, transferred to
8    southwest. Two years -- it will be two years
9    Halloween.
10 Q. So you were transferred shortly after this
11    incident?
12 A. I requested to go to day shift for my son.
13 Q. It wasn't related to this incident?
14 A. No, sir.
15 Q. And you are former IPD?
16 A. Yes, sir.
17 Q. That's the Indianapolis Police Department?
18 A. Yes, sir.
19 Q. And there was a transition in 2006?
20 A. 2006, 2007. Yes, sir.
21 Q. And as a patrolman for IMPD in October of 2014
22    what were your general responsibilities?
23 A. Worked late tech, southeast district, zone 20.
24    Responded to runs in a certain area.
25 Q. What is zone 20?

10

1 A. It's Morris to the north, Meridian to the west,
2    Sherman to the east, and Troy to the south.
3 Q. And you had general training experience at the
4    academy; is that right?
5 A. Yes, sir.
6 Q. Have you had any additional training and
7    experience?
8 A. Yes, sir.
9 Q. What is that?
10 A. It would be -- I have I believe a minimum of 24
11    hours each year, on top of a few I guess elective
12    courses I've taken over the years.
13 Q. What elective courses have you taken?
14 A. I would have to ask for the records to be looked
15    at.
16 Q. Were you CIT trained?
17 A. No, sir.
18 Q. Do you know what that is?
19 A. Yes, sir.
20 Q. What is that?
21 A. Well, it's basically dealing with individuals who
22    maybe have some I guess maybe mental or emotional
23    issues, or maybe different avenues to help with
24    their situation.
25 Q. What does that term -- when I say CIT, what does

11

1    it mean?
2 A. I don't know the correct --
3 Q. Acronym?
4 A. No.
5 Q. Have you worked with Officer Spiegl before?
6 A. Yes, sir.
7 Q. Do you know whether he's CIT trained?
8 A. I do not know.
9 Q. What about Bueckers?
10 A. I do not know.
11 Q. Do you recall your training with respect to
12    dealing with individuals that have mental health
13    issues or suspected mental health issues?
14 A. Can you elaborate?
15 Q. Sure. Are you familiar with any SOPs or General
16    Orders that apply to mental health?
17 A. I cannot recite them.
18 Q. I'm not asking you to recite them, but do you
19    know whether they exist?
20 A. I'm sure they do.
21 Q. How often do you review the SOPs or the General
22    Orders?
23 A. I look at them. I mean, they get changed and
24    updated so often that you look at them. As a
25    matter of fact, I did one today.

12

1 Q. Do you recall the incident in October of 2014
2    involving Dusty Heishman?
3 A. Yes, sir.
4 Q. What do you recall about it? Well, let me back
5    it up. That was a bad question.
6    Do you recall making any other runs prior to
7    responding to the scene?
8 A. I'm sure I did have runs prior to the scene, but
9    I don't know.
10 Q. Any runs that come to mind?
11 A. No. It's been almost two years.
12 Q. And do you recall receiving the dispatch?
13 A. Yes, I do.
14 Q. What do you recall about that?
15 A. I was sitting in the park just south of there,
16    and it came out as the 700 block of Terrace, a
17    person exposing, and I remember the caller
18    informed dispatch, which obviously informed us,
19    that we better get there quick, or she was timing
20    us or something of that nature.
21 Q. You were sitting at the park. Where was that?
22 A. At Garfield Park. It's less than a mile south.
23 Q. And what were you doing, do you recall?
24 A. I was actually -- I believe I was sitting with
25    Park Ranger Greene, just talking to him.

**13**

1  Q.  You weren't running traffic or anything like
2      that?
3  A.  No.
4  Q.  Do you recall what you were talking about?
5  A.  No, sir.
6  Q.  And do you recall whether Park Ranger Greene is
7      responsible for Garfield Park, is that one of his
8      areas?
9  A.  He's a park ranger, so, yes. I think he takes
10     care of all the parks.
11 Q.  Do you recall how long you were talking with him?
12 A.  Not long.
13 Q.  Once you got the call did you end the
14     conversation and respond?
15 A.  Yes. I told him I would be back, and went to my
16     run.
17 Q.  And what did you do once you arrived on scene?
18 A.  Well, the run came out at the 700 block of
19     Terrace. When you come out of the park, you come
20     out of the park and you go straight to East
21     Street, and I was traveling north on East Street.
22     When I reached Iowa and East Street, that's when
23     I observed Mr. Heishman in the middle of the
24     street, surrounded by several other individuals.
25 Q.  Did you know him?

**14**

1  A.  No, sir.
2  Q.  And what is your I. D. number on dispatch, what
3      number you do you use?
4  A.  Charles 582. At the time it was Charles 582.
5  Q.  Has it changed?
6  A.  Yes, sir.
7  Q.  Okay. So you arrive on scene and you see the
8      individual that you later learn is Dusty
9      Heishman?
10 A.  Yes, sir.
11 Q.  What did you do after you --
12 A.  Well, as soon as I noticed him in the middle of
13     the street -- he was nude, obviously, had blood
14     on him and several people surrounding him -- I
15     gave my location because this was several blocks
16     away from the location we were given.
17     Approximately six to seven blocks away.
18 Q.  I'm going to stop you. He had blood on him.
19     Where did he have blood?
20 A.  I know it was on his hands and shirt. You could
21     see some around, you know, just maybe in that
22     general area. Definitely on his hands, because I
23     was watching his hands. And he was sweating
24     really bad.
25 Q.  Was he running, or was he walking, standing,

**15**

1      where was he?
2  A.  When I pulled up he was, you know, in the
3      southbound lanes of East Street, and there were
4      several people surrounding him, and he was sort
5      of just -- I mean, he was bouncing around. You
6      could tell he was just really pumped up and
7      bouncing around, just sort of looking around and
8      moving around and just almost like staring
9      through, if that makes sense.
10 Q.  So what did you do?
11 A.  Like I say, I notified control of my new
12     location, and that way the backup unit would be
13     aware of it. As I went -- like I say, I pull up,
14     he sees my headlights.
15     At that point he starts walking towards me,
16     almost like in a determined walk, an aggressive
17     walk coming towards me. His fist was closed at
18     times, other times just out. But I had to get
19     out of the car quick.
20 Q.  So he approached the vehicle?
21 A.  Yes. He started coming at the car.
22 Q.  Did he ever touch the vehicle?
23 A.  Yes, sir.
24 Q.  What part of the vehicle did he touch?
25 A.  He tried to get in the door, the driver's side

**16**

1      doors.
2  Q.  While you were in it?
3  A.  No.
4  Q.  So before you got out of the vehicle were you
5      watching him, or did you immediately get out of
6      the vehicle upon arrival?
7  A.  No. As I'm pulling up, I mean, there is people
8      in the street. I have to stop. I actually
9      placed my car, trying to, you know, sort of block
10     the road so they wouldn't get struck by vehicles.
11     At the same time he sees the headlights, and now
12     he's starting -- he sees the headlights and I
13     guess it got his attention, and he starts coming
14     at me.
15 Q.  Are you in the car or out of the car?
16 A.  I'm in the car. I'm in the car and trying to get
17     out. I actually tried to get my -- I have a
18     flashlight and a baton that sits right inside of
19     my door. I tried to get one of those, but I had
20     to get out of the car so quick I couldn't even
21     get one of those.
22 Q.  And then what did you do once you got out of the
23     car?
24 A.  I identified myself, I asked him to -- I was
25     trying to get him to sit down, calm down. I

**17**

```
1   mean, it was immediately -- I mean, it was
2   obviously he was on narcotics just through the
3   sweating, the looking through you, the not
4   responding to commands or requests from me.
5 Q. Did you suspect what kind of narcotics that he
6   was on?
7 A. Through past experience I was -- maybe like a
8   bath salt, or maybe like flaka, which is a new
9   drug that just hit the street around that time
10  that they had a lot of issues in Florida with.
11  Or even possibly meth. He was just really -- you
12  know, he just wasn't there.
13 Q. You said flaka?
14 A. Yes, sir.
15 Q. What is that?
16 A. I don't know exactly what it's mixed with, but
17  the same things he was suffering from, the
18  paranoia, stripping down to being nude, just sort
19  of staring through you and not responding.
20 Q. Did he ever try to hit you?
21 A. As he's coming at me?
22 Q. Yes.
23 A. No.
24 Q. Did he ever touch you?
25 A. As he was coming at me, or --
```

**18**

```
1 Q. Yes, as he was coming at you.
2 A. No, sir.
3 Q. And he did try to get in the vehicle?
4 A. Yes, sir.
5 Q. And you are outside of the vehicle at that point?
6 A. Yes, sir. I actually had backed up from him,
7   trying to give him space.
8 Q. And was he communicating with you at all?
9 A. He was not responding at all. Like I say, he had
10  I guess like what they call the thousand yard
11  stare, where he's looking past you.
12 Q. What did you do at that point?
13 A. Actually I tased him when he wasn't responding.
14  Actually I take that back. I tased him first,
15  before he tried to get in my car. The tase was
16  effective, which I was actually surprised it was
17  effective because of just the signs I was seeing
18  as far as past experience with drug use.
19      He went to the ground. When he went to the
20  ground -- you have a lot of things going through
21  your head, you know. I assume he's under
22  narcotics through past experience. The taser was
23  effective, which I was surprised. But now you
24  have -- if he is on narcotics do you want to
25  continue to tase him, or do you try and -- you
```

**19**

```
1   know.
2       So I made the decision to not just do the
3   five second cycle. As soon as I let off the five
4   second cycle he reached up, pulled the probes
5   out, jumped up, and then that's when he tried to
6   get in the car.
7 Q. Was he successful in pulling the --
8 A. He broke -- I don't know, I can't tell you for
9   sure if he actually pulled the probes out, but I
10  know he separated the wires from the probes where
11  the cartridge was inactive.
12 Q. So you ran one five second burst through him?
13 A. Yes, sir.
14 Q. And then after that he pulls the wires off and --
15 A. Pops right up.
16 Q. Where does he go from there?
17 A. Like I say, I was giving him space. He tried to
18  get in my car. I was able to lock it with my key
19  fob.
20 Q. Okay. How far are you away -- well, let me back
21  up a little bit to when you tased him. The
22  probes are barbs; is that right?
23 A. Yes, sir.
24 Q. And they are designed to be shot at a certain
25  range; is that correct?
```

**20**

```
1 A. Yes, sir. Every seven feet they spread a foot.
2   Every seven feet of distance they will spread one
3   foot.
4 Q. And so approximately how far away were you when
5   you shot him?
6 A. I was probably I'm guessing six to seven feet. I
7   actually backed up for the taser to be effective.
8 Q. And where did the probes land?
9 A. The torso and stomach area.
10 Q. And you're pointing towards the middle?
11 A. Yes. I mean, I couldn't tell you, but it was a
12  good spread and it was effective. Which like I
13  say, I was surprised it was.
14 Q. So it was a good spread, and you said -- was it
15  along the left side of his body, right side, in
16  the middle? Do you have any --
17 A. I'm thinking it was pretty well -- pretty good
18  centered I'm thinking. But, I mean, that's been
19  quite some time.
20 Q. Sure. And then after he disconnects does he run
21  off, does he run towards you, or what does he do?
22 A. No, sir. He pops up, tries to get in my vehicle.
23  That's unsuccessful. He turns his attention
24  right back towards me. Again I'm giving him
25  commands. I'm trying to get him to sit down, I'm
```

21

1 trying to get him to his knees. He's just not
2 responding. I mean, other than he made a comment
3 when he first started coming at me. It was
4 either they're trying to kill me, or -- I think
5 it's they're trying to kill me. And I don't know
6 who he was speaking of.
7 So after he tried to get in the car the
8 attention came back onto me. I continued to back
9 up, going around the car continuously, giving him
10 space. I'm trying to get him to respond to some
11 type of command to sit down, just so we can get
12 him help.
13 Q. Did you ask him who was trying to kill him?
14 A. He wouldn't respond to me. He was just -- like I
15 said, just a blank glare through you. I mean, it
16 was not responsive at all.
17 Q. And at that point that you're interacting with
18 him had you interacted with anybody else on the
19 scene, or was it only him at that point?
20 A. It was just him and I.
21 Q. Had you had any conversation or discussions with
22 any civilians that were around at that point?
23 A. Not at that moment.
24 Q. What happened after that?
25 A. I backed all the way around the car. He

22

1 continued to follow. I get on the passenger side
2 of the car backing up. I look to my left. At
3 that point I saw two citizens, and I said, I'm
4 going to need help.
5 Q. At that point do you know whether there were any
6 other officers on scene?
7 A. There was no officer on the scene.
8 Q. Do you know whether anybody had responded?
9 A. Oh, yes. I had gotten on the radio and said step
10 it up, which means for the officers to --
11 obviously exactly what it says, step it up, get
12 there. I knew they were coming, but --
13 Q. So you said there were two civilians that were
14 trying to help?
15 A. They were on the sidewalk when I looked at them
16 and said I'm going to need help with him.
17 Q. Did you know those individuals?
18 A. No, sir.
19 Q. How many people were around?
20 A. Well, there was -- like I say, when I pulled up
21 there was several people around him, but he came
22 out of that circle when he came at me. And those
23 were the closest people to Mr. Heishman and
24 myself.
25 Q. What is in this area? What kind of area is it?

23

1 A. There is a bar that he came out of earlier, that
2 Mr. Heishman had came out of earlier right there
3 on the northeast corner of Iowa and East Street,
4 and the rest is residential homes on both sides.
5 Q. So that's the only business that is around?
6 A. The only one that is open at that hour.
7 Q. That was my next question.
8 So did you presume that the people that were
9 around, did you presume that they were from the
10 bar?
11 A. I have no idea.
12 Q. So did you ask the two closest people to help?
13 A. Yes. They were to my left. At the closest point
14 when -- yes, when I asked for help, yes, those
15 were the two closest people.
16 Q. How do you decide which people that you --
17 A. Well, when you're in a situation like that, when
18 you have an individual that is not responding,
19 that you assume is on narcotics, and you're by
20 yourself, you don't really have a chance to pick
21 and choose.
22 Q. Did you talk to them at all?
23 A. Talk to --
24 Q. To the civilians.
25 A. Before asking them for help?

24

1 Q. Yes.
2 A. No.
3 Q. And after you asked them for help, what did you
4 tell them?
5 A. All I said was I'm going to need help.
6 Q. And what did they do?
7 A. Surprisingly, they helped.
8 Q. How did they help?
9 A. As soon as I asked for help, they both came off
10 the curb trying to get Mr. Heishman on the
11 ground, and they actually -- one of them did get
12 him on the ground just briefly, and then he
13 popped back up.
14 Q. Do you know which one that was?
15 A. I believe it was Mr. Britton. I'm not for sure.
16 It's been a while. And then he popped back up,
17 and then they staggered back over -- or not
18 staggered, but they sort of wrestled back over
19 into the middle of the street, and then they were
20 able to get him on the ground.
21 Q. And what was the other individual's name, do you
22 know?
23 A. Britton and Patterson.
24 Q. Do you know where they had been drinking earlier
25 that day?

**25**

1 A. I have no -- no, I don't know.
2 Q. Any idea whether they had any law enforcement
3     training or anything like that?
4 A. No.
5 Q. So after you asked for help they got him to the
6     ground?
7 A. Yes, sir.
8 Q. Did you help in getting him to the ground?
9 A. Actually when I asked them for help they like ran
10     off the curb at him, which surprised me because
11     it was so quick. As they were trying to do that
12     I opened my car door real quick and got my baton
13     just in case. If they couldn't be effective I
14     grabbed it just in case.
15     Then I ran over there real quick, or walked
16     over there when he was on the ground. Once we
17     got on the ground -- like I say, the first time he
18     was just a brief down, up. The second time he
19     was down and all three of them were wrestling
20     around, and that's when I went up to him on
21     the -- I was on Mr. Heishman's left side,
22     Mr. Britton was on top of him, and Mr. Patterson
23     was on the right side.
24 Q. What did you do at that point?
25 A. Well, Mr. Heishman was throwing elbows, kicking,

**26**

1     swinging, biting. I mean, he was actively
2     fighting. Obviously I keep giving him commands
3     of stop resisting.
4     I observed Mr. Britton had his arm around his
5     neck, choking him. And I know since I had to ask
6     him to help, obviously I still have to make sure
7     they're doing the right thing, so I told them not
8     to choke him, but stay on top of him, hold him
9     down.
10     I was trying to control the left arm. I was
11     trying to basically put pressure on the left arm
12     up high to, one, hold him down, but, two, also to
13     hopefully deaden the arm some for lack of a
14     better term, to numb it, and I had one cuff on
15     him. And once I get the one cuff on -- really it
16     actually makes it worse if you're still fighting,
17     because if he breaks free, now he has metal. So
18     I was trying to control that side.
19     At the same time I'm trying to watch
20     Mr. Britton. I observed Mr. Patterson striking
21     Mr. Heishman in the torso area. I told him to
22     stop hitting him, it's not going to be effective,
23     and to get his right arm. That's when
24     Mr. Patterson started trying to control his right
25     arm. And I did observe Mr. Britton strike

**27**

1     Mr. Heishman a few times in the head area.
2 Q. Was it after you gave your --
3 A. I told him to stop, but he said he's biting me,
4     so I take that as he was trying to get his hand
5     free.
6 Q. Were they still striking him after you had told
7     them not to?
8 A. No.
9 Q. And then what happened?
10 A. Just continued to try to gain control of him. He
11     elbowed Mr. Britton in the face, breaking his
12     nose I'm sure. Continued to kick and move, which
13     was surprising even with both arms, trying to
14     hold both arms with him. He was able to get up
15     to his knees and almost throw Mr. Britton off
16     again.
17     And I had to help I guess steady, or help
18     Mr. Britton, and I said don't let him up, keep on
19     top of him. And then it was just a continuous
20     struggle on the ground trying to get him
21     handcuffed. He never responded to any commands,
22     never made any comments.
23 Q. You said he was sweaty?
24 A. He was sweaty, yes, when I pulled up. He was
25     just pouring sweat.

**28**

1 Q. Was he breathing hard?
2 A. What --
3 Q. Did you observe him have any signs or difficulty
4     breathing?
5 A. No.
6 Q. Did you ever take his pulse?
7 A. No.
8 Q. You had got one handcuff on; is that right?
9 A. Yes, sir.
10 Q. Were you able to get the other one cuffed?
11 A. Finally, after responding officers arrived on
12     scene.
13 Q. Which officers responded?
14 A. I know Spiegl showed up, and I asked him to try
15     and control his legs. I know Philip Greene
16     showed up. I think I asked him to help with the
17     lower part of his body as well. And then after
18     that, I mean, there were several officers getting
19     there. I know that when officers were getting
20     there we moved the -- I know that they were
21     trying to get the civilians away. They got the
22     civilians away, and the officers started helping.
23 Q. Did you secure his other handcuff after the other
24     officers arrived or before?
25 A. He was handcuffed after the other officers

29

```
1    arrived I believe.
2 Q. So he got up once and they moved to another
3    location, and then they got him to the ground,
4    the two civilians; is that right?
5 A. Yes, sir. They all just sort of went to the
6    ground.
7 Q. Did he ever move from that second location?
8 A. Do you mean did he ever get up?
9 Q. Yes. So when you're struggling with him did he
10   ever get up and go to another location?
11 A. No. The second time he was taken to the ground
12   we were able to keep him down and not back up, if
13   that's what you're asking. But he was violently
14   resisting and fighting us. You know, kicking to
15   elbowing to biting.
16 Q. Did he make any statements to you, or was he just
17   physically resisting?
18 A. Just physically resisting. I mean, like I say,
19   he had mentioned they're trying to kill me, but I
20   have no idea what he was speaking of. And that
21   was approaching my vehicle.
22 Q. And so Spiegl arrived on scene?
23 A. Yes, sir.
24 Q. And then Greene arrived as well?
25 A. Yes, sir.
```

30

```
1 Q. Any other officers?
2 A. There were several officers there. I know the
3    wagon driver arrived on scene. I can't tell you
4    who was all there when he was resisting, because
5    it was hard enough just to try to control the arm
6    of the body trying to get him cuffed.
7 Q. Do you know whether he had been handcuffed prior
8    to -- both handcuffs, and it was behind his back;
9    is that right? Was he handcuffed behind his
10   back?
11 A. Did we handcuff him behind his back? Yes, sir.
12 Q. And did that occur prior to the wagon arriving?
13 A. Yes.
14 Q. What happened after you were able to handcuff him
15   behind his back, what did you do?
16 A. He was handcuffed and he still continued to
17   resist. I mean, they had to keep him down. When
18   I say hold him down, we're keeping him from
19   coming up. We're not sitting on him, piling on
20   or nothing like that, we're just trying to keep
21   him from coming up. Because even after
22   handcuffing you don't want someone up, because if
23   they fall they have no way of protecting
24   themselves. But he was still -- we were wanting
25   him to calm down. He finally did calm down.
```

31

```
1    When he finally calmed down I had to ask him
2    multiple times for his name, and he just wasn't
3    making sense even with his name. It was very
4    difficult to understand what he was saying.
5 Q. Did he give you his name?
6 A. Finally he was able to give it. Yes, sir.
7 Q. So when you're holding him down, what are you
8    doing exactly when you're keeping him on the
9    ground?
10 A. Are you speaking of when he finally calms down?
11 Q. Yes.
12 A. We're basically just -- I mean, just very light
13   pressure over top of -- this is after he's done
14   resisting and he's calmed down, is that what
15   you're speaking of?
16 Q. I'm going to get to that. But before, when he is
17   on the ground, you said that you had to hold him
18   so he doesn't get back up.
19 A. So are you speaking of when he's still resisting
20   and not cuffed?
21 Q. Or after he is cuffed.
22 A. Well, he still resisted for some time after that.
23   You know, you have to -- you just can't let
24   someone get up who is cuffed.
25 Q. So I guess my question is when he was still
```

32

```
1    resisting on the ground how did you maintain his
2    position on the ground?
3 A. Like I say, you just sort of hover over him, like
4    either -- on my end, I was on the left side, and
5    my knees would overlap his shoulder area, and
6    basically just enough pressure to keep him down.
7    But, you know, as he eases the pressure eases as
8    well. Does that make sense? If he calms down,
9    then you don't have to put as much force to try
10   to keep him down. But if he doesn't calm down,
11   then it takes more pressure to apply to try to
12   keep him in that position. But we weren't --
13 Q. Were you using your body weight to keep him on
14   the ground?
15 A. I was using my knees, but I still had balance on
16   my feet. Does that make sense?
17 Q. All right. So he calmed down. How long did it
18   take for him to calm down?
19 A. I don't know. It's been a while. I mean, it
20   wasn't -- I would say after being handcuffed,
21   less than maybe a minute or two max.
22 Q. Then what happened after that?
23 A. I was able to get his name. But he would
24   sporadically go from being in a calm state to
25   causing problems again. Like when we went to get
```

**33**

1   him over into the wagon he started resisting
2   again, moving all around. As they were trying to
3   load him into the wagon he actually locked his
4   legs out on the bumper and put all his body
5   weight backwards, and we were supporting, holding
6   him in the air. He just didn't want to get in
7   the wagon.
8   Q. Who helped him get from his location to the
9       wagon?
10  A. I don't know all the officers. I mean, I was
11      there. But I assume that Deputy Sheriff Johnson,
12      the wagon driver, was generally -- they control
13      the prisoner, they take control of the prisoner.
14      But I couldn't tell you who all was around, but I
15      know that we had to, like I say, when he put his
16      feet up there I remember his body weight is
17      leaning back and you have to catch him.
18  Q. What about the two civilians, were they helping?
19  A. No. When the officers -- like I say, when the
20      officers got on scene the civilians were moved
21      out of the way.
22  Q. Did you know the civilians prior to this
23      incident?
24  A. No, sir.
25  Q. You had never met them before?

**34**

1   A. No.
2   Q. Had you ever had any runs to Bryant's Friendly --
3       was it Bryant's Friendly Inn?
4   A. I was to that bar. Yes, sir. I have had
5       several.
6   Q. How many runs have you had out there?
7   A. I don't know. It's a frequent common problem I
8       guess.
9   Q. What kind of place is it?
10  A. Just a neighborhood bar.
11  Q. The runs that you had out there, what were they
12      typically for?
13  A. It could be from -- I mean, anything from
14      intoxicated people to people arguing, to
15      fighting, to prostitution, to narcotics,
16      whatever. I guess all gamuts.
17  Q. It's a problem area in your zone or your
18      district?
19  A. That whole area is a hot spot.
20  Q. When you say "hot spot," what do you mean by
21      that?
22  A. Just a lot of runs. It's a small area.
23  Q. Is it a rough or dangerous area?
24  A. I think so. I mean, narcotics -- a lot of
25      narcotics use, a lot of prostitution, some strong

**35**

1   arm and armed robberies in the area a lot, and
2   shootings.
3   Q. And when he initially told you, hey, they are
4       trying to kill me or something to that effect,
5       did you ask him any questions about who that
6       might be?
7   A. I just talked to him and he just wasn't
8       responding. I mean, like I say, he was
9       physically there, but he just wasn't -- like I
10      say, from what I have experienced in the past, he
11      was on some form of narcotic that was giving him
12      a really bad experience.
13  Q. He had blood on his hands and his torso. Did you
14      notice any active bleeding anywhere?
15  A. I couldn't see it, but at the time it was very
16      difficult to try and -- I mean, I couldn't check
17      him out, you know, during him charging me to
18      trying to get him under control to the events
19      I've told you about.
20  Q. What was the lighting like in that area?
21  A. I mean, it was dark out, but I don't know about
22      street lights, if that's what you're asking. My
23      headlights, you know, probably headlights and
24      taillights, but most of this stuff happened
25      behind the car once he charged the vehicle.

**36**

1   Q. Were you looking for any physical injuries?
2   A. At the time, I mean, I was trying to get him
3       secure so I could help him.
4   Q. So back to trying to get him in the wagon. You
5       said he locked his legs?
6   A. Yes. He actually put his feet up on the back
7       bumper, which I don't know, sits up around maybe
8       a foot, a foot and-a-half off the ground. He
9       actually like almost -- he knew that we had back
10      up, so it was almost like he just threw his feet
11      up and put them on the back bumper and locked his
12      legs out and then leaned all the way back.
13  Q. Did he say anything?
14  A. Maybe 'no." But I don't remember anything other
15      than I just know he didn't want to get in the
16      wagon.
17  Q. Then what happened after that?
18  A. At that point we knew that we had a medic on
19      scene, and they decided to put him on the cot. I
20      believe they shackled -- I believe they put leg
21      shackles on him, and they put him on the cot.
22      Yes, I believe they shackled him and put him on a
23      cot.
24  Q. So when you were walking him over did he have
25      shackles on?

**37**

1 A. I can't remember if it was before he got up or
2 after he kicked off the back bumper. I know it
3 was right around that time.
4 Q. And then he goes immediately from him pushing
5 back off that back bumper to the cot, is that
6 what you're telling me?
7 A. Well, we have to pull the cot. We have to get
8 the cot out. It's not just setting there.
9 Q. Okay. So what was he doing in the meantime? How
10 much time elapsed from when he pushed back? So
11 when he's pushing back and his legs are locked,
12 what do you immediately do after that point?
13 A. We just knew that he wasn't getting in the wagon,
14 so we said the only other choice is to get him on
15 a cot.
16 Q. Did you put him on the ground?
17 A. I don't remember. I really don't remember all
18 that.
19 Q. So you remember from him going from his legs
20 locked to the cot?
21 A. I remember him being -- his legs locked, coming
22 back, and we had to take him -- you know, had to
23 get him back from behind the wagon. I don't know
24 if they just held him standing up, or -- I don't
25 know. I don't know. It's been two years.

**38**

1 Q. Fair enough. And the passage of time.
2 Do you recall whether he was given any
3 medication?
4 A. I was informed he was.
5 Q. Did you see it?
6 A. No.
7 Q. So what were you doing when he was pushing back,
8 or did you have physical control of him?
9 A. At this point I was on the right side of him now,
10 because he's actually facing south. The wagon is
11 facing south and he's facing south, and I was on
12 the right side. So when he started pulling back,
13 obviously, you know, you try to catch him, you
14 don't want him to fall. But I wasn't like -- I
15 guess you would say one -- half of his arms
16 holding on to him behind him. Like I say, I
17 don't know who -- I assumed it was Sheriff
18 Johnson, because it was his wagon.
19 Q. Did you see him being placed on the cot?
20 A. Yes, sir.
21 Q. Was he buckled in or restrained?
22 A. He was still handcuffed, and they always buckle.
23 Q. And they have like seatbelts; right?
24 A. Yes.
25 Q. And do you know how many there were on the cot?

**39**

1 A. No, sir.
2 Q. So you don't know how many buckles there were
3 applied?
4 A. No, sir.
5 Q. What happened after he was in the cot, what
6 happens?
7 A. Medics started taking him to the ambulance at
8 that time. It's my report, so I needed to start
9 gathering information from onlookers, the
10 original caller, the individuals that helped, and
11 any other victims. All this information I have
12 to start gathering. And medic information.
13 Q. And do you have a specific recollection of doing
14 that?
15 A. I remember gathering information, yes.
16 Q. Who did you speak to?
17 A. Obviously Mr. Britton, Mr. Patterson. I had to
18 get their information. I spoke to -- a gentleman
19 came up to me, and I believe his last name is
20 Raez. He informed me of the events that happened
21 prior to me pulling up and finding Mr. Heishman
22 in the middle of the street, where Mr. Heishman
23 had jumped in the back of his truck and picked up
24 a pipe in the back of his truck and started
25 smashing out his back windows. And Mr. Raez was

**40**

1 scared to death, so he took off driving around
2 the neighborhood, trying to throw him out of his
3 truck. And he was either thrown out, jumped out,
4 or fell out. I couldn't get any witnesses to
5 tell me that saw him.
6 But right there at Iowa and East, that's when
7 he was taken out of the truck, popped up, and ran
8 into the bar. He had altercations in there and
9 then came out, and that's when I encountered him.
10 Q. So he had altercations inside the bar?
11 A. Yes, sir.
12 Q. What did Mr. Britton tell you?
13 A. This is all after the fact.
14 Q. Yes.
15 A. He stated that Heishman came in, went in the bar.
16 When he came out Britton was outside smoking.
17 Heishman came up and bit him, and that he had an
18 altercation with him as far as putting him to the
19 ground before my arrival.
20 Q. So Britton told you that he had a physical
21 altercation with him. Did he say why he bit him?
22 A. He doesn't know why. He was outside smoking. He
23 didn't know the guy.
24 Q. So he just says that he randomly came up to him
25 and bit him?

41

1 A. Yes.
2 Q. And that he had a physical altercation with him
3    and put him on the ground?
4 A. He said he put him on the ground.
5 Q. Britton was the same guy that helped you later
6    on?
7 A. Yes.
8 Q. And what did Patterson say?
9 A. Same thing. The guy ran into the bar naked and
10   was causing problems inside the bar.
11 Q. Did they know him?
12 A. No.
13 Q. Did Patterson say anything else?
14 A. He was injured.
15 Q. Who else did you speak with?
16 A. I did ask for an officer to go speak with the
17   original caller because I couldn't leave the
18   scene, I had too much to gather. So he went and
19   gathered her information. And then obviously I
20   spoke with my sergeant and lieutenant at the
21   scene.
22 Q. Who is the sergeant?
23 A. The sergeant was Ed Miller. Sergeant Ed Miller
24   and Lieutenant Tom Feeney.
25 Q. Then what did you do?

42

1 A. While I'm gathering information Officer Bueckers
2    gets on the radio asking myself and the sergeant
3    to come to the back of the wagon. I mean the
4    back of the ambulance. I go to the back of the
5    ambulance, and when we opened the doors we see
6    Officer Bueckers administering chest compressions
7    to Mr. Heishman.
8 Q. Who else was in the back of the ambulance?
9 A. The medical personnel.
10 Q. Anybody else?
11 A. Not that I remember.
12 Q. Had you worked with the medic before, that
13   particular medic?
14 A. Yes.
15 Q. How often had you worked with him before?
16 A. They worked Firehouse 29, which is Area 20. So
17   quite frequently.
18 Q. Had you ever had the occasion prior to this
19   incident to have an incident where somebody was
20   administered medication to your knowledge?
21 A. I'm sorry?
22 Q. Had you ever had the occasion where EMTs
23   administered medication prior to this incident?
24 A. Do you mean someone else?
25 Q. Yes.

43

1 A. Yes, I've seen them.
2 Q. How often have you had the occasion to see that?
3 A. Numerous times.
4 Q. Any idea?
5 A. No.
6 Q. Were those situations like this one, in terms of
7    were there individuals that you deemed to be
8    physically resisting or combative?
9 A. I've seen people that, yes, resist in the past
10   who had to have medication. I've seen people who
11   have OD'd that have had to have medication. But
12   that's --
13 Q. What about medications for somebody that is a
14   combative individual?
15 A. Just to give them medicine because they are
16   fighting us?
17 Q. Yes.
18 A. I don't think that would -- I've never seen that.
19 Q. You said the administration of medicine that
20   you've seen had to do with OD'ing and others.
21   Are there any other circumstances that you've
22   seen it?
23 A. I'm sure there is, but I'm not -- that's not my
24   field. I'm just more there at that point to if I
25   need to gather more information, or to find out

44

1    obviously what hospital they are going to, and
2    then make sure that the medics are safe as well.
3 Q. When you observed him in the back of the
4    ambulance after you had been called back, what
5    else did you observe other than the chest
6    compressions?
7 A. That's really it. I stayed out of the way.
8 Q. Why were you called back, do you know?
9 A. Well, the officer that was -- he knew that I'm
10   the reporting officer. Plus he knew the sergeant
11   was on the scene. So to have us come back there
12   because the situation had changed dramatically.
13 Q. Do you know what the term excited delirium means?
14 A. I couldn't read it off verbatim.
15 Q. What is your understanding of that term?
16 A. I would take it as -- I don't know. I mean, I
17   would be guessing what the definition of it is.
18 Q. Have you ever encountered individuals that you
19   thought were in a state of excited delirium?
20 A. I guess you -- I guess the true definition and my
21   definition would be sort of -- I mean, it's sort
22   of hard for me not to give you the definition and
23   then tell you that I've seen someone that is in
24   excited delirium. Can you reword it in a
25   different form maybe?

**45**

1 Q. Well, have you heard the term?
2 A. Yes, I've heard the term.
3 Q. What is your understanding as we sit here today
4    of that term?
5 A. I would say not with it, totally out of it. I
6    don't know through what, through either medical
7    or something self-induced. I mean, I have no
8    understanding, no knowledge of that.
9 Q. Did that term come to mind when your encountered
10   Mr. Reishman?
11 A. It didn't come to my mind. But, I mean, I could
12   see where people could use it.
13 Q. So when you were addressing him did you think
14   that he was in a state of excited delirium?
15 A. I thought that he was under the influence of
16   narcotics.
17 Q. Do you know whether there are any SOPs or General
18   Orders or policies that address individuals that
19   are in a suspected state of excited delirium?
20 A. I couldn't tell you offhand. I'm sure there may
21   be. Like I say, General Orders are -- there are
22   an awful lot of them.
23 Q. Fair enough. With the benefit of hindsight do
24   you think that he was in a state of excited
25   delirium?

**46**

1 A. I mean, like I say, I don't know the true
2    definition. I think that he was definitely under
3    the influence of narcotics, and I think that it
4    had some major influences on the way he was
5    acting, responding, or not responding.
6 Q. Other than Britton and Patterson were there any
7    other civilians that were involved as far as
8    helping?
9 A. No.
10 Q. Were there any civilians that approached you and
11   indicated that they had taken video of the
12   incident?
13 A. I knew video was taken.
14 Q. How did you know that?
15 A. I could see them.
16 Q. How many did you see?
17 A. I remember the gentleman to the left of me,
18   because at one point I asked him to help at some
19   point, or get away. He just was like right on
20   our face, and actually I was trying to get him
21   away.
22 Q. Do you know his name?
23 A. No. I mean, I know the gentleman. Yes, I
24   remember the gentleman's name. It's -- hold on.
25   We have runs with him all the time. Casual

**47**

1    Woods.
2 Q. What kind of runs have you had with him?
3 A. Narcotics, intoxication, fighting, domestic.
4 Q. Frequent flier? Is that a yes?
5 A. Yes, sir.
6 Q. And so when you saw him you knew who he was?
7 A. Yes.
8 Q. Was there anybody else there on scene that you
9    saw that you knew who they were and you had runs
10   with in the past?
11 A. No. And the only reason he stood out is because
12   he was so close. You have to sort of like look
13   at him for a second, because I didn't know what
14   he was doing at first.
15 Q. And when you determined what he was doing he was
16   video recording?
17 A. I just tried to get him away from us.
18 Q. Did you ever try to get a copy of the video?
19 A. No.
20 Q. Why not?
21 A. I informed -- I don't know what his rank was
22   then, but he's a major now -- Brittle, maybe a
23   day later when he called me --
24 Q. Richard?
25 A. Yes. That there was video.

**48**

1 Q. What did he say?
2 A. Okay.
3 Q. Did he ever tell you to go get it?
4 A. No.
5 Q. And you were the arresting officer?
6 A. Yes.
7 Q. And as the arresting officer is it your
8    responsibility to gather evidence?
9 A. Well, that's something that a detective would do
10   at that point. It gets passed on.
11 Q. Do you know whether a detective was assigned?
12 A. I'm sure there was. I don't know who it is, or
13   who it was.
14 Q. If I told you Detective Prater, does that ring
15   any bells?
16 A. He's in homicide.
17 Q. Did you ever meet with him about this incident?
18   Is that a no?
19 A. No, sir.
20 Q. You met with Internal Affairs; is that correct?
21 A. They came to the district. Yes, sir.
22 Q. And who interviewed you specifically?
23 A. I don't remember his name.
24 Q. So Casual Woods was recording it, and there was
25   you said another individual recording it as well?

**49**

1 A. I know of -- later through YouTube and people
2 saying things on the street, you know, they see
3 it and say, oh, I saw you on TV -- or on YouTube
4 yesterday. You know, citizens. I know that
5 there was maybe one or two more videos.
6 Q. You said "saying things on the street." Because
7 that's your district; right?
8 A. Yes, sir.
9 Q. And did people come up to you afterwards and ask
10 you about what happened, as far as in the
11 district?
12 A. I think -- I mean, like I say, only a few
13 recognized that it was me. All they would say
14 is, you know, I saw the video.
15 Q. Who were those people?
16 A. I don't know their names. They're just people on
17 the street. I had worked that area up until that
18 point for 12 years.
19 Q. So it's fair to say that there is people in there
20 that know the officers that are in that district,
21 and you know some of the people in that district,
22 is that fair?
23 A. Yes.
24 Q. Do you know whether Bryant's has video, whether
25 Bryant's had security video?

**50**

1 A. I don't believe they had video. I think they had
2 cameras, but I don't think they had it. It
3 either wasn't working -- I'm thinking -- or it
4 didn't record or something of that nature. It's
5 been a while. But that would definitely be one
6 place that we went to to try and find video.
7 Q. So take me through the physical force that you
8 applied to Mr. Heishman.
9 What did you physically do to him? Did you
10 apply any strikes?
11 A. I tried to give him a knee strike at one time
12 when he -- this is way back. I mean, this is
13 before he went to the ground or anything.
14 Q. Any other strikes that you can specifically
15 recall?
16 A. No. The knee strike was to basically -- the knee
17 strike wasn't to -- it was basically to create
18 distance, to get him away from me.
19 Q. Were you successful in the knee strike?
20 A. No. It just grazed off of him.
21 Q. Did you physically hit him?
22 A. I did not hit him.
23 Q. And you tased him?
24 A. At the very beginning, yes, sir.
25 Q. Did you tase him at any point after that initial

**51**

1 tasing?
2 A. When he was on the ground that one time I had the
3 taser up in the air, but the cartridge was out,
4 and he kept grabbing me and the taser was going
5 off. But I knew that -- I realized -- with the
6 cartridge off, I guess the best way to explain it
7 is when the prongs don't come out the taser is
8 much more ineffective. The cartridge itself,
9 when you just put pressure on it, with the taser
10 itself you just put pressure on it and tase
11 someone, it's automatically going to make someone
12 pull away to where the prongs will control, if
13 that makes sense. So the taser would -- it was
14 going off here where we're fighting, you know,
15 where he grabbed me at times, but there was no --
16 he was never tased again because the taser was an
17 ineffective tool at that point.
18 Q. And that is what is referred to as a dry stun; is
19 that right?
20 A. Yes, sir.
21 Q. How many additional times did the taser actually
22 go off, how many cycles?
23 A. I mean, it might have went off once or twice.
24 But like I say, it was more of him grabbing
25 and -- you know, I realized that the taser was

**52**

1 not going to be an effective tool.
2 Q. Do you know whether when those one or two times
3 where they went off, whether they made contact
4 with him?
5 A. They didn't make contact. You can hear it. If
6 you're hearing the taser, it's not making
7 contact.
8 Q. But it's making noise; is that right?
9 A. It will arc, yes.
10 Q. How loud is the noise?
11 A. I mean, it arcs.
12 Q. Do you think that Mr. Heishman would have been
13 able to hear it?
14 A. With everything going on him, he should have. It
15 was close to him.
16 Q. Did you ever apply any pressure points to him?
17 A. Like I say, I had my leg on the shoulder area,
18 trying to deaden the arm so that we could gain
19 control of his arm.
20 Q. Do you know what the term positional asphyxia is?
21 A. No, sir. I mean, not the true definition.
22 Q. What is your understanding of that term?
23 A. I would rather it be read to me. You're asking
24 me something --
25 Q. I mean, I'm just --

53

1  A.  I mean, I understand what you're saying, yes.
2  Q.  As we sit here today, and I'm not asking you to
3      recite the dictionary definition, but what is
4      your understanding as we sit here today of that
5      term?
6  A.  I would assume it's in a position to where you're
7      pressing on the diaphragm to where you're not
8      able to get air.
9  Q.  When you were with him with the two civilians,
10     what are you watching for? Are you watching for
11     signs of distress?
12 A.  As far as --
13 Q.  Were you just focused on getting his other hand
14     handcuffed?
15 A.  No. I explained that, you know, I was making
16     sure that they weren't striking him, they weren't
17     choking him. Like I say, the key was just trying
18     to get him secure so we could get him the help he
19     needs, and to make sure that no one else gets
20     hurt.
21 Q.  Did you have any discussions with the EMT about
22     the situation? And it was Cole; right?
23 A.  It was cold?
24 Q.  Cole. Medic Cole?
25 A.  Cole?

54

1  Q.  Yes. Did you have any discussion with the medic?
2  A.  None that I can remember.
3  Q.  Do you remember whether he asked you any
4      questions?
5  A.  I don't remember. I mean, I would assume that --
6      normally when I tase someone I let them know that
7      they've been tased, but I'm sure he was aware of
8      it maybe through me or someone. I can't remember
9      if I told him or not. Like I say, we're talking
10     since almost two years old.
11 Q.  Did you have any injuries?
12 A.  No.
13 Q.  Were you aware of any other officers that had any
14     injuries?
15 A.  Officer Bueckers, the following day, stated he
16     had some injuries from it.
17 Q.  Do you know what they were?
18 A.  No.
19 Q.  You said you looked at a video earlier; is that
20     right?
21 A.  Yes.
22 Q.  Just one video, or --
23 A.  Just one.
24 Q.  And he was conscious when you were -- at the time
25     that you were trying to get him handcuffed he was

55

1      conscious, and was he talking?
2  A.  When we got him handcuffed -- are you talking
3      right after he was handcuffed?
4  Q.  Yes.
5  A.  He was conscious the entire time. Like I say,
6      once he calmed down, then we were able to finally
7      decipher, get his name from him.
8  Q.  So before he got into the ambulance was there
9      ever a time that you observed him where he was
10     not conscious?
11 A.  No.
12     MR. BARNHART: Let's take a quick break. I
13     need to get the video, because we're going to do
14     that shortly.
15     (A brief recess was taken at this time.)
16
17 Q.  Casual Woods. First of all, is it a he?
18 A.  It's a he.
19 Q.  Any idea about age?
20 A.  I would say mid to late 30s.
21 Q.  Race?
22 A.  Black male.
23 Q.  Do you know if he lives in the neighborhood?
24 A.  He used to live on Lincoln Street.
25 Q.  Do you know what address?

56

1  A.  Not off the top of my head.
2  Q.  When you made a decision to tase him, where were
3      you pointing at? Did you pick an area out that
4      you wanted to make contact with on his person?
5  A.  Yes. You try to get in the torso area.
6  Q.  Are there any areas where you're not supposed to
7      tase somebody?
8  A.  You're not supposed to tase them in the genitals,
9      or not in the face, head.
10 Q.  What about the heart, the heart area?
11 A.  Well, the probes don't go that far in. And like
12     I say, off the chart it's the torso area.
13 Q.  When you say you looked at the video, do you know
14     which video it was, do you know the person that
15     took it?
16 A.  No.
17 Q.  Any name associated with that?
18 A.  I'm sure there is. I mean, if I saw it I could
19     tell you.
20 Q.  We're going to go over that in a second. You
21     made a report associated with this case. Did you
22     do a narrative?
23 A.  Yes, sir.
24     (Plaintiff's Deposition Exhibit
25     Letter D was marked for identification

57

1   by the reporter.)
2
3   Q. I'll show you what is marked as Exhibit D, which
4      I represent to you to be your report. Please
5      review that, and then let me know when you're
6      finished.
7         Is that a true and accurate copy of your
8      report?
9   A. Yes, sir.
10  Q. And about the fifth or sixth line from the bottom
11     you say, 'Mr. Britton stated he forced Heishman
12     to the ground just seconds before I arrived on
13     scene.' Do you recall that?
14  A. I recall him telling me that.
15  Q. But if it was in your report would it be fair to
16     say that he told that to you?
17  A. Yes, sir. That's what I said.
18  Q. So you also made an Internal Affairs statement;
19     is that right?
20  A. Yes, sir.
21         (Plaintiff's Deposition Exhibit
22     Letter E was marked for identification
23     by the reporter.)
24
25  Q. Take a look at that, and I'm going to ask you the

58

1      same question I asked you about your report.
2   A. About --
3   Q. About Exhibit E.
4   A. Can I read the whole thing now?
5   Q. Well, whatever makes you --
6   A. I read over it before I came here.
7   Q. But does that appear to be a true and accurate
8      copy of your report?
9   A. Yes, sir.
10  Q. And that was questions that you received from
11     Internal Affairs from IMPD with respect to this
12     incident; correct?
13  A. Yes, sir.
14         (Plaintiff's Deposition Exhibit
15     Letter F was marked for identification
16     by the reporter.)
17
18  Q. And you had a taser report; is that correct?
19     Taser report. Do you understand what that is?
20  A. The computer special (inaudible).
21  Q. Yes. Have you seen this document?
22  A. Yes, sir.
23  Q. When you're assigned a taser, that taser is
24     assigned to a specific officer; is that correct?
25  A. Yes. I assume this is the history of the taser.

59

1   Q. And the taser that you had at the time, it's a
2      taser you had for some time?
3   A. Yes, sir.
4   Q. Does that make sense?
5   A. Yes, sir.
6   Q. And each taser by design is designed to have a
7      report associated with when it's used; is that
8      correct?
9   A. Yes, sir.
10  Q. And --
11  A. Well, can I correct that?
12  Q. Sure.
13  A. When it's used.
14  Q. When it's activated?
15  A. Well, not when it's activated. We have to spark
16     test them constantly. But when it's used as far
17     as on someone, or an animal or something like
18     that. Within that type of scope. But we have to
19     spark test them to make sure they work.
20  Q. Yes. So this indicates use, but that use does
21     not necessarily correlate to when you actually
22     had to use it on duty or on scene; is that
23     correct?
24  A. Well, it would show that as well, but it also
25     shows any time that we spark tested it or

60

1      anything of that nature, to make sure that it's
2      operating correctly.
3   Q. I'm going to direct your attention to page Bates
4      Stamped 1481 on page 26 in the report.
5   A. Did you say 1481?
6   Q. Yes. It appears that on the date of October 5th,
7      2014, that it was activated three times; is that
8      correct?
9   A. Line 990 through line 992?
10  Q. Correct.
11  A. Yes, sir.
12  Q. So I take that to mean that you pulled the
13     trigger three different times, would that be
14     fair?
15  A. Yes, sir. Once you pull the trigger it
16     automatically cycles for five seconds.
17  Q. You have a five second cycle. And so when you
18     pull the trigger it's going to cycle for five
19     seconds, and then it won't cycle unless you pull
20     the trigger again; is that correct?
21  A. Well, no. If you hold it down after the five
22     seconds it will continue to cycle. But if you
23     come off the trigger, then, yes, it won't fire
24     until you -- then every time you touch it it will
25     be five seconds more. Does that make sense?

61

1 Q. It does. When you pulled the trigger did you
2 come off the trigger each time, or did you hold
3 it down?
4 A. I only made contact tased him once. Made contact
5 with him. That's when he was at my driver's side
6 door. That was a five second cycle. The other
7 two times I'm sure is when we were wrestling on
8 the ground and he was grabbing the gun and things
9 of that nature.
10 Q. He reached for your gun?
11 A. No. The taser gun. I'm sorry.
12 Q. Got you. Did you ever pull your firearm?
13 A. No, sir. I'm sorry I said it incorrectly.
14 Q. No, you're fine. Do you have any reason to
15 dispute the time markers on the time entries for
16 990 through 992? I meant to say dispute the
17 accuracy of the time markers, I should say.
18 A. No, sir.
19 Q. Have you had any prior civil lawsuits pending
20 against you, or current?
21 A. Do I have any pending? No, sir. Not that I know
22 of.
23 Q. Do you have any priors where you've been sued
24 civilly?
25 A. Yes, sir.

62

1 Q. How many?
2 A. A few. I don't know the number.
3 Q. Do you know what the results of those were?
4 A. Not all of them. No, sir.
5 Q. Is there any of them that you know the results
6 of?
7 A. I know one was dismissed because he pled guilty
8 to resisting law enforcement. I know one didn't
9 go to trial, so I assume they came to some form
10 of agreement.
11 Q. Okay. I'm going to bring this around. At some
12 point it turns from vertical to horizontal and
13 I'm going to have to change it. But if you have
14 difficulty seeing it at any time, let us know. I
15 presume that you can see it accurately. And I
16 may stop it at several points; okay?
17 A. Yes, sir.
18 (At this time a video file, Exhibit C, was
19 begun.)
20
21 Q. So that vehicle, and this is at four seconds,
22 shortly before that, was that your vehicle?
23 A. The Charger?
24 Q. Yes.
25 A. Yes, sir.

63

1 Q. And do you recognize any of these voices at all?
2 A. No.
3 Q. Okay. And this is at nine seconds. So are you
4 facing north or south?
5 A. The vehicle is facing north.
6 Q. And you can see a naked individual; is that
7 correct?
8 A. Yes, sir.
9 Q. Does that appear to be Dusty Heishman?
10 A. I mean, you can't -- that would be him. Yes,
11 sir.
12 Q. And this is at nine seconds.
13 And let me first clarify. Have you see this
14 video before?
15 A. Yes, sir.
16 Q. So when I asked you whether you had seen the
17 video, this is the one that you've seen before?
18 A. Yes, sir.
19 Q. And you're inside of the vehicle at this point,
20 or are you outside, at nine seconds?
21 A. I'm outside I'm sure. I believe this is me here
22 in the dark shadows. I'm not for sure.
23 Q. There is lots of commotion going around. Could
24 you hear that from where you were?
25 A. Hear what, these guys?

64

1 Q. Yes.
2 A. No, sir.
3 Q. And this is stopping at 25 seconds.
4 A. Yes, sir.
5 Q. And is that you? I know it's a little fuzzy at
6 this point where it stops.
7 A. Yes, sir.
8 Q. And who is that individual?
9 A. Mr. Heishman.
10 Q. And this is at 27 seconds. He gets on the
11 ground?
12 A. Yes, sir.
13 Q. And he puts his hands behind his back?
14 A. He puts them down. I'm thinking he put them
15 here. He might have put them behind his back for
16 a second, but I remember them being here, because
17 I remember him pushing up and getting up.
18 Q. Did you ask him to get on the ground at that
19 point do you recall?
20 A. Yes, sir. This is -- yes, sir.
21 Q. So he had complied with your request to get on
22 the ground?
23 A. Finally, yes.
24 Q. So at that point he was compliant?
25 A. For a brief second, yes. For a brief moment,

65

1    yes.
2  Q.  And I'm stopping at 31. At this point what are
3    you doing?
4  A.  I am on his shoulder blades, putting a little bit
5    of pressure on his shoulder blades, and I'm
6    reaching in my pockets trying to get gloves out
7    because he has blood on him, so I can handcuff
8    him.
9  Q.  Did you have your handcuffs on you?
10  A.  Yes. On the back of my belt.
11  Q.  Did you have your handcuffs available at that
12    point, or you were just grabbing for your gloves?
13  A.  No, I just came around.
14  Q.  And at this point had you tased him or not?
15  A.  He was tased over here, almost from when the
16    video started.
17  Q.  So after the tasing --
18  A.  Yes, sir.
19  Q.  So before the video started is the point at which
20    you had tased him?
21  A.  Right around that time. Yes, sir. See, I'm
22    trying to get the gloves on right now, and he
23    starts to move again.
24  Q.  And I'm stopping at 43. Who is that individual?
25    Do you know who it is?

66

1  A.  I don't know.
2  Q.  Do you know whether it was Britton or Patterson?
3  A.  I don't think it was. I thought they were both
4    on my left side. That might be. I thought they
5    were both on my left.
6  Q.  I'm going to stop it. And this is at 55.
7    There is a corner there. Is that where the
8    bar is, on the corner?
9  A.  It's over here. The northeast corner.
10  Q.  And there is somebody trying to --
11  A.  That's the individual that came. Like I say, I
12    believe Britton and Patterson was over here.
13    When he jumped up, that's when I looked over and
14    told them I needed help.
15  Q.  So at the point that you said you needed help
16    they were standing on the sidewalk beside you?
17  A.  Yes.
18  Q.  And that's shortly after you almost got him --
19    you're getting your gloves on, and he gets up and
20    then you ask for help from bystanders?
21  A.  Yes, sir.
22  Q.  Okay. So at 1:20 it's you and the two other
23    individuals that are physically engaging
24    Mr. Heishman; is that correct?
25  A.  Yes. According to the video, yes.

67

1  Q.  And then one of the onlookers says "Get him,
2    Spiegl." Is that the actual Officer Spiegl?
3  A.  Officer Spiegl.
4  Q.  So that must have been one of the people that
5    knew one of the officers?
6  A.  Yes, sir.
7  Q.  When you say "step it up," does the term step it
8    up mean to respond more quickly than you
9    otherwise would?
10  A.  Yes, sir.
11  Q.  Any idea as to why he was walking, why Spiegl was
12    walking instead of responding more quickly?
13  A.  You have to ask him that.
14  Q.  And at 1:36 on this video it's you, Officer
15    Spiegl, and the two other individuals; is that
16    correct?
17  A.  Yes, sir.
18  Q.  So the two civilians were still participating in
19    his detention at the time that another officer
20    arrived?
21  A.  Well, Spiegl was there. But like I say, when the
22    other one started coming on, that's when they
23    were moved out.
24  Q.  So at 2:02, 2:03, is that the point where he's
25    calm?

68

1  A.  No.
2  Q.  Or is he still resisting?
3  A.  He's still resisting.
4  Q.  Can you tell from the video that he's resisting,
5    or you just know that from your being there?
6  A.  I know that from being there. And you can see
7    him moving around, flailing around still. You
8    can still see him see him moving around, I'm still
9    trying to keep him on the ground.
10  Q.  Okay. At 2:42 there is a very distinctive sound.
11    What is that?
12  A.  That's the taser.
13  Q.  So on this video at 2:42 that's either the first
14    or the second tase of the three that you
15    indicated that you pulled the trigger on, would
16    that be correct?
17  A.  That's a cycle, but it did not hit him.
18  Q.  And how do you know that?
19  A.  Because, one, I know, I was there. And then,
20    two, you can hear it. On the dry stun, if you're
21    making contact you're not going to hear it.
22    That's Mr. Woods.
23  Q.  In the red shirt?
24  A.  Yes, sir.
25  Q.  This guy talking, you don't know who he is?

**69**

1  A.  No, sir.
2  Q.  And at this point it switches. I'll try to
3     Jerryrig it. Is that Casual Woods again with the
4     hat?
5  A.  That's who I think it is, yes.
6  Q.  And is that wagon Deputy Johnson's wagon?
7  A.  I think so.
8  Q.  Okay. So at the point that he calmed down on
9     that video was he in a -- was he calm or was he
10    resisting?
11  A.  On that video?
12  Q.  Yes.
13  A.  I don't think he calmed down at that point at the
14    end of the video.
15  Q.  At what point was he calm I guess? Let me ask it
16    that way.
17  A.  Shortly after that. But, I mean, not -- I think
18    he was still actively resisting. It's hard to
19    see on that video. But right around the time we
20    got him cuffed, like I say, or after he was
21    cuffed, for a minute or two he was still kicking
22    around, moving around, and then he finally was
23    able to calm down to where we could get his name.
24  Q.  So you didn't get his name until he was calm, and
25    that was prior to trying to put him in the truck,

**70**

1     but after this video?
2  A.  After the video, before going to the wagon. Yes,
3    sir.
4  Q.  And after you started physically engaging him did
5    you see any injuries on him?
6  A.  During the altercation, no. Because, you know, I
7    was more concerned about watching his hands,
8    trying to get him under control, get him secure,
9    and then we could go from there to see any more
10    injuries that he might have.
11  Q.  What about after?
12  A.  After, yes. I mean, you could see us starting
13    checking for him, obviously, and that's part of
14    what we do.
15  Q.  What injuries did he have?
16  A.  I don't remember seeing really anything. Like I
17    say, the bleeding of the hands. Some blood was
18    on his body. But I don't know if that came from
19    the hands or if he was bleeding from -- I thought
20    he was bleeding from his head, but I can't
21    remember. But I don't know. I don't know on
22    that. I can't remember. Maybe like some
23    abrasions or something. I'm not for sure.
24  Q.  Do you know whether he had any head injuries?
25  A.  Do I know if he had any?

**71**

1  Q.  Yes.
2  A.  No, I don't know if he had any head injuries. I
3    know I didn't see his head hit the ground when he
4    was taken to the ground while we were trying to
5    fight with him.
6  Q.  Do you know whether Officer Spiegl or the two
7    civilians struck his head?
8  A.  (Inaudible) informed me that Mr. Britton punched
9    him when he was getting bit.
10  Q.  What about the others? Do you know whether
11    Patterson hit him in the head?
12  A.  No, sir. He didn't hit him in the head.
13  Q.  And you had never met Mr. Heishman before?
14  A.  No, sir.
15  Q.  Had you seen him in the area?
16  A.  No.
17  Q.  Do you know whether he was from the area?
18  A.  No, sir.
19  Q.  No, you don't know?
20  A.  I'm thinking his return was out of the county.
21    Like I say, it's been a while. If I look up the
22    CAD maybe maybe it will show. I was thinking he
23    was out of the county.
24  Q.  Do you know whether the two civilians that
25    helped, whether they had any issues with him in

**72**

1     the past --
2  A.  I don't know.
3  Q.  -- or any problems with him?
4  A.  Other than that when he came out of the bar and
5    bit Mr. Heishman -- Mr. Britton. But I didn't
6    know of that until after the fact.
7         {Plaintiff's Deposition Exhibit
8    Letter G was marked for identification
9    by the reporter.}
10
11  Q.  I'll go through some of the General Orders.
12       I represent that to be General Order 1.1,
13    which covers the Law Enforcement Code Of Ethics.
14    Have you read that before?
15  A.  I've read it. Yes, sir.
16  Q.  Is that the General Order 1.1 that applied in
17    October of 2014 during this incident? Any reason
18    to dispute that?
19  A.  I assume that's correct.
20  Q.  And I got it from your office.
21  A.  Yes.
22         {Plaintiff's Deposition Exhibit
23    Letter I was marked for identification
24    by the reporter.}
25

**73**

1 Q. I'll represent this to be General Order 1.12, the
2 Use Of Force General Order.
3 Are you familiar with this? I'm sorry. The
4 Use Of Discretion.
5 (Plaintiff's Deposition Exhibit
6 Letter H was marked for identification
7 by the reporter.)
8
9 A. I'm sorry? What --
10 Q. The order that applies to an officer's use of
11 discretion. Are you familiar with that order?
12 A. I've read it. Yes.
13 Q. Does this appear to be a true and accurate copy
14 of that order?
15 A. Yes, sir.
16 Q. Was this applicable at the time that you
17 interacted with Mr. Heishman?
18 A. I have no other reason not to believe so.
19 Q. And this is the Use Of Force. 1.30. Are you
20 familiar with this General Order?
21 A. I've read it. Yes, sir.
22 Q. Does this appear to be a true and accurate copy
23 of the Use Of Force General Orders?
24 A. Yes.
25 Q. Would this have applied at the time that you

**74**

1 interacted with Mr. Heishman in October of 2014?
2 A. Yes, sir.
3 (Plaintiff's Deposition Exhibit
4 Letter J was marked for identification
5 by the reporter.)
6
7 Q. I represent this to be General Order 1.33, the
8 Electronic Control Devices.
9 A. Yes, sir.
10 Q. Which is the stun gun? Or I'm sorry. The taser?
11 A. Yes, sir.
12 Q. Are there any other electronic devices that you
13 use that would apply to this General Order?
14 A. None that I know of, sir.
15 Q. Does this appear to be a true and accurate copy
16 of the General Order that applied concerning
17 electronic control devices at the time?
18 A. Yes, sir.
19 Q. As a police officer you're allowed to nominate
20 awards in recognition of civilians; is that
21 correct?
22 A. Yes, sir.
23 Q. Did you do that in this case?
24 A. Yes, sir.
25 Q. And who did you --

**75**

1 A. Mr. Britton and Mr. Patterson, for aiding an
2 officer in need.
3 Q. When did you decide to do that?
4 A. Shortly after the incident.
5 (Plaintiff's Deposition Exhibit
6 Letter K was marked for identification
7 by the reporter.)
8
9 Q. Did you make that decision on your own?
10 A. Yes, sir.
11 Q. Did anybody ask you to do it, or encourage you to
12 do it?
13 A. I think I informed my lieutenant I was thinking
14 about doing it just for the fact that they
15 actually helped. Because like I say, in that
16 area normally we don't get the help.
17 Q. You said shortly after. Do you have any idea as
18 to when?
19 A. I don't know the time frame.
20 Q. Would it have been like a week, a month, six
21 months?
22 A. I think it was -- I don't know. I know I put
23 them in for an award.
24 (Plaintiff's Deposition Exhibit
25 Letter L was marked for identification

**76**

1 by the reporter.)
2
3 Q. I represent this to be General Order 4.7, which
4 is concerning Mental Writs/Immediate Detention.
5 Does that appear to be a true and accurate
6 copy of the order that applied at the time that
7 you interacted with Mr. Heishman in October of
8 2014?
9 A. I guess so.
10 Q. Is that a yes?
11 A. Yes, sir.
12 Q. Did you ever ask Mr. Heishman what medications he
13 was on, or what drugs he was on?
14 A. He wouldn't respond. I mean, like I say --
15 Q. Do you remember asking, though?
16 A. No. Because just for the fact that I could
17 barely get his name.
18 Q. Did you think about asking?
19 A. I mean, I would if -- I should put it this way:
20 If I could have got responses from him, yes. But
21 I knew medical was there, so.
22 Q. But medical didn't arrive for some time, though,
23 did it not?
24 A. Right. Like I say, he was unresponsive with the
25 questioning. It wasn't like as soon as we got

77

1  him cuffed and he calmed down he gave us his
2  name. I mean, it took time to get his name from
3  him. Medical was there by the time I got his
4  name.
5       (Plaintiff's Deposition Exhibit
6  Letter M was marked for identification
7  by the reporter.)
8
9  Q.  I represent this to be General Order 8.1,
10  Prisoner Handling, Transportation And Escape.
11  Does this appear to be the General Order?
12  A.  There is an effective change after the date, but
13  before -- there is a before and after date, but,
14  yes, I assume it's fairly the same. I don't know
15  what the change was.
16  Q.  I'm going to direct your attention to page 4 of
17  that, the positional asphyxia portion.
18      It states, "Officers must be aware of warning
19  signs that could result in death by positional
20  asphyxia." Do you see that on the order?
21  A.  Yes, sir.
22  Q.  And it says, "A subject placed on their chest or
23  stomach with legs and arms restrained behind
24  their back may have difficulty breathing, leading
25  to serious injury or illness." Is that a true

78

1  recitation of that order?
2  A.  Yes, sir.
3  Q.  Do you recall at the time when you were
4  interacting with Mr. Heishman being concerned
5  about positional asphyxia?
6  A.  I would say at the moment of struggling with him,
7  no, because he was never laying flat until after
8  the struggle. Does that make sense? Because he
9  was constantly moving.
10  Q.  What about after you were able to get him
11  handcuffed?
12  A.  Once he calmed down, I mean, you worry about
13  those things. But like I say, once he calmed
14  down he was flat, so I would feel that he didn't
15  have any pressure on his diaphragm which would
16  create this here. I don't think -- I just feel
17  that laying on your front would not have -- you
18  know.
19  Q.  And you indicated that medical responded.
20      Do you recall talking to the medic about the
21  situation?
22  A.  About what had just occurred?
23  Q.  Yes.
24  A.  I don't recall. I'm sure we had, like I say,
25  some conversation. But as far as -- you know,

79

1  he's probably under narcotics or something of
2  that nature. But you're talking, like I say, two
3  years back almost.
4  Q.  I'm going to direct your attention to page 7.
5  "If prisoners are transported by ambulance
6  arresting officers --"
7  A.  Where is that at?
8  Q.  I'm sorry. B.
9  A.  B. Yes, sir.
10  Q.  "Must consult with the medical personnel on scene
11  to determine the proper method of restraint
12  within the ambulance to ensure security of the
13  prisoner and protection of the ambulance
14  personnel." Were you the arresting officer?
15  A.  Yes.
16  Q.  Do you recall doing that, having a conversation
17  with the medic about --
18  A.  Like I say, I'm sure we had some type of
19  conversation, because we don't just turn someone
20  over to the medics without them being -- I mean,
21  they have to be aware of what is going on.
22  Q.  Did you ever have any discussions with the medic
23  about the use of a chemical restraint?
24  A.  A chemical restraint?
25  Q.  Yes.

80

1  A.  I didn't -- I don't think I used a chemical
2  restraint.
3  Q.  Do you know whether a chemical restraint was
4  used?
5  A.  I don't remember any CS OC being used.
6       (Plaintiff's Deposition Exhibit
7  Letter N was marked for identification
8  by the reporter.)
9
10  Q.  Okay. I represent this to be General Order 9.13,
11  which is when an officer is assaulted; right?
12  A.  Yes, sir.
13  Q.  And it says in Procedure 1-A-1, towards the
14  bottom of the first page, "A separate form must
15  be completed for each officer assaulted."
16      Do you recall filling out a separate form in
17  this case?
18  A.  I believe that's directed toward the supervisor.
19  Q.  So under this General Order you didn't think you
20  had any obligations to fill out a separate form
21  for assault?
22  A.  No. Like I say, we -- no, that's probably the
23  supervisor. Wait a minute. Let me think about
24  this. Because we switched from -- I don't know
25  the time that the switch was from. Supervisors

81

1  did all the specials to what we did, the blue
2  team special. We just had a switch sometime.
3  And I don't know, it was probably fairly close to
4  that time frame. I think you had to do a taser
5  special. I'm not for sure.
6  Q. Whenever you use a taser you have to fill out a
7  separate form; is that correct?
8  A. Yes. Originally it used to be supervisors did
9  it, but when we went to the blue team form we do
10  it and then they oversee it.
11  Q. And you had one disciplinary finding in 2005; is
12  that correct? And it's where somebody had a
13  knife in their shorts. Do you recall that
14  incident?
15  A. Not in the shorts.
16  Q. In the coat?
17  A. A knife in the coat, but the subject did not have
18  the coat, and the coat was in the property
19  section.
20  Q. And that was in January of 2005; is that correct,
21  roughly?
22  A. I would assume so.
23  Q. Any reason to dispute that?
24  A. No, sir.
25  Q. I'm just generally --

82

1  A. Yes, yes.
2  Q. Any other disciplinary history other than that
3  incident?
4  A. No, sir.
5  Q. And you were sued civilly by Derek Harper. Does
6  that sound familiar?
7  A. Can you elaborate on that?
8  Q. Sure. There is a Cause 110-cv-1150, Derek Harper
9  versus Daniel Bain, Jeff Barbary and Brian
10  Burnett?
11  A. Yes.
12  Q. And you indicated earlier you had a couple of
13  civil lawsuits that you recall?
14  A. Yes, sir.
15  Q. Which one of those -- is that one that you
16  recall?
17  A. Yes, sir.
18  Q. Was that dismissed?
19  A. I don't know if they -- I know they settled
20  somehow. I don't know how they finished it.
21  They never got back with me.
22      (Plaintiff's Deposition Exhibit
23  Letter O was marked for identification
24  by the reporter.)
25

83

1  Q. And so I present to you the Nomination Form,
2  Exhibit O. One for Mark Britton and one for
3  William Patterson; is that correct?
4  A. Yes, sir.
5  Q. You said you put them up for an award; is that
6  right?
7  A. Yes, sir.
8  Q. In the body of that award was that your writing?
9  A. I believe it looks like it, yes.
10  Q. I mean typing.
11  A. Yes, it's mine. I'm just trying to see if it's a
12  copy and paste or not.
13  Q. And that was one of my questions.
14  A. It's reworded, but I guess so. Not the
15  information you would give on like a Probable
16  Cause, but enough to maybe give someone a
17  nomination for an award.
18  Q. So is this your statement, or is this somebody
19  elses? Did you provide this information?
20  A. I originally -- yes. I mean, I typed it. I
21  don't know if it was -- I don't know if it was
22  corrected at all after I submitted it or not.
23  Q. Did you ever have any discussions with then
24  Lieutenant and now Captain Riddle about this
25  nomination?

84

1  A. Not with Riddle. No, sir.
2  Q. But with your lieutenant you did?
3  A. Yes, sir.
4  Q. Anybody else?
5  A. Not that I know of.
6  Q. I'm going to direct your attention to the second
7  page, where it says, "The unselfish acts of both
8  men, no doubt, rendered a valuable role in ending
9  the subject's assault on the neighborhood and the
10  officer that night."
11      Is that your statement, do you recall writing
12  that?
13  A. I don't recall, but I know I put them in for the
14  award.
15  Q. And do you know whether they had any motivations
16  that they didn't tell you about to assist you
17  in --
18  A. I would have no knowledge.
19  Q. So you don't know why they helped you, you just
20  know that they did?
21  A. Yes, sir.
22  Q. And you didn't know whether they had any
23  interactions or motivations to potentially hurt
24  Mr. Heishman, did you?
25  A. No, not at the time, no.

85

1 Q. Have you ever followed up to ask them?
2 A. I can assume.
3 Q. Have you ever seen them since?
4 A. Shortly after this I had an invasion of privacy
5     run on Mr. Britton, and I had to lock him up.
6 Q. Is it fair to say he's familiar with the criminal
7     justice system? Would that be fair?
8 A. I don't know. I didn't check his history, but
9     I'm sure he is.
10 Q. Did he mention this incident when you locked him
11     up?
12 A. I don't remember. All I remember is, you know,
13     telling him why I was there, why he had to be
14     arrested, and then I told him thank you for
15     helping me, but I still have to do my job, and I
16     had to lock him up that day for invasion of
17     privacy.
18 Q. Was there an awards ceremony?
19 A. There is. I don't know if they got awards or
20     not.
21 Q. Did you go --
22 A. No, sir.
23 Q. Have you had any subsequent contact with Casual
24     Woods?
25 A. No, sir.

86

1 Q. So he hasn't made any statements to you about
2     this incident?
3 A. Casual Woods?
4 Q. Yes.
5 A. No.
6 Q. What about William Patterson?
7 A. No, sir.
8 Q. Did you have any follow-up discussion with the
9     EMTs after this incident?
10 A. No, sir.
11 Q. What about other officers? Spiegl?
12 A. No, sir, other than that we were getting a
13     lawsuit against us and we need to go to the FOP
14     attorney.
15 Q. At what point did Park Ranger Greene arrive on
16     the scene? Do you know when he came in --
17 A. When the subject was on the ground for the last
18     time, sometime -- I think he was the second
19     officer on scene after Spiegl. I couldn't tell
20     you exactly what time frame.
21     MR. BARNHART: That's all I have.
22     MS. FELDHAKE: I have no questions.
23
24 CROSS-EXAMINATION,
25     QUESTIONS BY MS. KATHRYN BOX:

87

1 Q. I just have one question. I think you kind of
2     clarified it when we were going through the
3     video.
4     Is there a point after Mr. Heishman walked to
5     the passenger side of your car and then got down
6     on the ground?
7 A. Yes, ma'am.
8 Q. And what happened after that?
9 A. He actually did go on the ground. I forgot.
10    That's where I messed up on telling him. But,
11    yes, he went to the ground. You can see on the
12    video as well that I'm yelling over the top of
13    him, I'm trying to get gloves due to the fact
14    that there is blood all over him. As I'm trying
15    to get a glove on, he puts his arms out and
16    actually raises up, and that's when I tried to
17    deliver a knee strike to create separation to
18    keep the distance from us.
19    MS. BOX: That's all the questions that I
20    have.
21    MR. BARNHART: Nothing on those.
22    MS. BOX: We'll reserve signature, please.
23
       BRIAN BURNETT
24

88

STATE OF INDIANA    )
COUNTY OF MARION    )

     I, Russell J. Scheiner, RPR, CSR, and a
Notary public in and for said county and state, do
hereby certify that the deponent herein was by
me first duly sworn to tell the truth, the whole
truth and nothing but the truth in the
aforementioned matter;

     That the foregoing deposition was taken on
behalf of the Plaintiff; that said deposition was
taken at the time and place heretofore mentioned
between the hours of 9:00 a.m. and 6:00 p.m.;

     That said deposition was taken down in
stenograph notes and afterwards reduced to
typewriting under my direction; and that the
typewritten transcript is a true record of the
testimony given by said deponent, and thereafter
presented to said witness for signature; that this
certificate does not purport to acknowledge or verify
the signature hereto of the deponent.

     I do further certify that I am a
disinterested person in this cause of action; that I
am not a relative of the attorneys for any of the

parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this_____day of_____, 2016.

_____
RUSSELL J. SCHEINER, RPR, CSR, Notary Public

My commission expires:
October 29, 2016

Job No. 0727BAR

Scott Barnhart, Esq.
Brooke Smith, Esq.
KEFFER BARNHART, LLP
230 East Ohio Street
Suite 400
Indianapolis, Indiana 46204

NOTICE OF DEPOSITION FILING

Billie Thompson, as Personal Representative of the Estate of Dusty Heishman, vs. City of Indianapolis, Indianapolis Metropolitan Police Department, et al.

U. S. District Court, Southern District of Indiana Indianapolis Division, Cause No. 1:15-cv-1712-TWP-DML

In compliance with Indiana Rules of Trial Procedure, Rules of the Industrial Board or Federal Rules of Civil Procedure, pursuant to Indiana Supreme Court order dated 10-1-86, you are notified of the filing with counsel for the Plaintiff, the deposition of BRIAN BURNETT.

Returned with ____ without ____ corrections.

_____
(Date of filing or mailing by
certified mail.)

cc:

Kathryn Box, Esq.
OFFICE OF CORPORATION COUNSEL
200 East Washington Street
Suite 1601
Indianapolis, Indiana 46204

Mary R. Feldhake, Esq.
Bose McKinney & Evans, LLP
111 Monument Circle
Suite 2700
Indianapolis, Indiana 46204

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302