Q: Alright. This is a witness statement given to Sergeant Mark Prater of the Indianapolis Metropolitan Police Department homicide branch on the date of Wednesday, 11/12/2014 at 0650 hours. This statement is being given in reference to an investigation that occurred at 10/5/2014 at approximately 1940, uh; -45 hours, correction 1940 to 50 hours. This statement is being in reference to a death investigation of Dusty Heishman, H-E-I-S-H-M-A-N. Uh; the case number reference is P-Paul D-David 14105557. This statement is being given at... what's this address?

A: 602 Pleasant Run Parkway North Drive.

Q: 602 Pleasant Run Parkway North Drive and which fire house is this?

A: Station 29.

Q: Station 29. Uh; is that IFD Station 29?

A: Correct.

Q: Okay. Could you state your name, please?

A: Yes, uh; Lance Cope.

Q: And how old are you, Lance?

A: I'm 36 years old.

Q: And your birthday?

A: ▓▓/78.

Q: And your, uh; business address?

A: 3930 Georgetown Road and that's in Indianapolis, EMS headquarters.

Q: Okay. And what is the phone number there?

A: 317-287-3101.

Q: Okay. And what is your job title?

A: Paramedic.

Q: Paramedic. Are you assigned a certain ambulance?

A: Yes.

Q: Who?

Statement of Lance Cope (Medic)    DP14105557    Page 1 of 17

A: I'm on medic 29. That's EMS number 1383.

Q: 1383. Going back to the date of 10/5/2014 on a Sunday evening approximately 1945 hours, I'm not specific on the time, but in that general area were you, uh; dispatched to a run?

A: Uh; yes, we were, uh; we had a run that came down at 1957 for an animal bite around Iowa and East Street.

Q: Okay. And that's all you know going into the run?

A: Right.

Q: Okay. Who was with you that day?

A: My, my EMT partner, Josue Ceballos.

Q: And how do you spell his name?

A: J-O-S-U-E, C-E-B-A-L-L-O-S.

Q: Okay. That's C-E-B-boy-A-L-L-O-S.

A: Yes.

Q: Okay. And now, on the ambulance that night was there a certain medic and med-tech or, or how does that go?

A: Uh; I'm, I'm the medic.

Q: You're the medic?

A: Yep.

Q: Okay.

A: So I, I was doing the patient care.

Q: And what was, uh; Ceballos's r-, role?

A: Uh; pretty much to, to assist me and then drive us into the hospital.

Q: Now is he a medic also?

A: He, no, he's an EMT, EMT basic.

Q: Okay. So there's a, there's a difference then?

A: Yes.

Q: Okay.

A: One's an ALS, like advanced provider.

Q: Uh-huh.

A: Which is a paramedic and then your basic provider is an EMT.

Q: Okay. So it's not a switch off on the runs, you do the medic?

A: Right, I do the ALS runs and he does the BLS runs.

Q: Okay. Well, was this an ALS or BLS run?

A: Uh; I would have to go back and look to see what the animal, animal bite was dispatched out as.

Q: Okay.

A: Uh; but typically, an animal bite is pretty much BLS in nature.

Q: Uh; now going there, were you guys updated on...

A: Uh; no. Uh; it was a pretty short distance from here at the firehouse to Iowa and East.

Q: So this is where you were when you were dispatched?

A: Right.

Q: Okay. So, uh; and what E, IEM, EMS medic number were you driving, was it 29?

A: Yeah.

Q: Okay.

A: Yeah, 29. EMS number 1383.

Q: Okay. Uh; when you arrived there do you remember what you saw?

A: Uh; yeah, it was a, it was a pretty crowded scene, lots of, lots of, uh; cop cars. We saw the wagon there. Uh...

Q: How many police cars estimate? I know you didn't start a count, but...

A: Uh; I would say at least, probably 5.

Q: Five?

Statement of Lance Cope (Medic)   DP14105557   Page 3 of 17

A: Yeah, probably about that.

Q: Now, were they in the middle of East Street?

A: Uh; yeah, everybody was in, in the middle of the road, uh...

Q: Okay.

A: ... traffic was blocked.

Q: Okay.

A: I mean there was no traffic going, uh; in either direction. Uh; when we got over to the scene, uh; we had one of, one of the officers approached us with a gentleman, uh, who was complaining of having a, a broken nose and being bit. Uh; during the course of talking with him, though, uh; there was a police officer who came over, 'cause I could, I could see tht there was some commotion going on over by, uh; where the, uh; where the sheriff's wagon is.

Q: Okay.

A: Uh; but I couldn't really see everything that was going on just because of the vehicles that were blocking the view. Uh; but somebody from over there, one of the officers; and I don't remember his name, he came over and asked if we could go over there and check this guy out.

Q: So the run you got was a person that was bit.

A: Right.

Q: It wasn't for the police would be anywhere?

A: Correct.

Q: Okay. Uh; where was this person bit at?

A: Uh; his, his, one of his hands, uh; honestly, the main complaint, he had was his broken nose. Uh; and he was, he was wanting, he was kind of being, uh; kind of contrary with us. He wanted us to pop his nose back in place right there and, you now, we were trying to explain, we don't really do that.

Q: Could you smell alcohol?

A: Uh; I didn't get that close enough yet.

Q: Okay:

Statement of Lance Cope (Medic)　　DP14105557　　Page 4 of 17

A: So...

Q: So he wanted you to pop his nose back?

A: Right. Uh; you know we, we advised him we couldn't. Uh; so I, I had my partner stay with the guy that, uh; we were originally dispatched on and...

Q: And that's was Ceballos?

A: Yes, Ceballos.

Q: Ceballos?

A: Yes, Ceballos.

Q: Excuse me.

A: Uh; so he stayed with, he stayed with him and I went with an officer to go check on the guy over by the wagon.

Q: Okay.

A: Uh; and at that time, you know, I got on the radio and I asked for another unit to come...

Q: Uh-huh.

A: ... so they could take care of the dog bite (Inaudible).

Q: Okay.

A: Yeah.

Q: And did they come in?

A: Uh; no, because that guy left the scene.

Q: Okay.

A: He, he, for whatever reason he was frustrated because we wouldn't pop his nose and he just took off and, uh; we, we, we never saw him again.

Q: Was he a white male?

A: Yes.

Q: Okay, but you don't know his name or anything?

A: No, no, we didn't even...

Q: Okay.

A: ... get that far into being able to assess them or get any information from him.

Q: Now when you went over to the other person on, where was the wagon parked?

A: Uh; if I remember right, it, it looked like it was facing south on the right side of, uh; East Street.

Q: So that would be what?

A: Kind of like the diagonal.

Q: Okay. So it would be like in the northbound lane?

A: Uh; okay, I, yeah, I guess, uh; no, I guess it would be the southbound lane.

Q: Southbound lanes?

A: Right.

Q: Okay. And where was the person at?

A: Uh; he was right outside of the back of the wagon. He was on the ground. Bas-... he was...

Q: Can you describe how he was?

A: He was prone, which he was face down.

Q: Okay.

A: Uh...

Q: Was he handcuffed?

A: He was handcuffed and...

Q: Behind his back?

A: Correct behind his back. Uh; I remember there being shackles.

Q: On his legs?

A: I guess that what you would refer to them...

Q: Okay.

A: ... as shackles on his legs. Uh; and he was still, he was still fighting, you know...

Q: There were shackles around his ankles?

A: Correct.

Q: Okay.

A: Correct.

Q: Around the ankles. Okay. How was he fighting still?

A: Uh; just, I mean, it, it, it looked like he just was trying to get up. Uh; even though, you know, the officers were... it looked like they were really struggling just to keep him down.

Q: Okay. Uh; now, how were, how were the officers positioned around him?

A: Uh; uh; there was, there were several, uh...

Q: Were they holding him down?

A: It looked like, I mean, it looked like they have a hold of like his shoulders. Uh; or like right up here, you know, like trying to...

Q: What with their hands or their legs?

A: With their hands.

Q: Okay.

A: Uh; I don't have a lot of detail on that, just because it was kind of such a quick, quick and chaotic scene. It was hard to remember the position of everyone's...

Q: Generally, how many officers were around here?

A: Oh, uh; probably at least 5.

Q: Did you see any officers with their feet on him?

A: I did not see officers with their feet on him.

Q: Okay. How about a knee in the middle of the back holding him down.

A: I don't remember any knees in the back.

Statement of Lance Cope (Medic)　　DP14105557　　Page 7 of 17

1134

Q: Okay. Uh; and he was handcuffed behind his back. Was he naked?

A: Yes.

Q: Okay. And was he saying anything?

A: Uh; at this point he wasn't really, he wasn't really saying anything, but it was more just like, more or less just, uh; like just grunts. And...

Q: Grunts. Okay.

A: Right.

Q: And he was at the rear of the wagon?

A: Yeah.

Q: With his head towards the wagon, the back end of the wagon?

A: Uh; if I, if I remember right it was, his head was kind of; his body would have been perpendicular.

Q: Perpendicular?

A: Parallel with the wagon.

Q: Okay. So parallel and feet was to which direction?

A: Uh; feet would have been kind of more, you know, facing west, I guess.

Q: Feet towards the west?

A: Yeah.

Q: And head towards the east?

A: Right.

Q: Okay. And what, I don't want to get to the medical part of it, uh; you just want to tell me you had treatment? What, what did you guys do then?

A: Uh; you know the, the, uh; main thing that, you know, the main thing I was concerned with, was, you know, dr-, drugs and...

Q: Him taking drugs?

A: Yeah, him, him...

Q: Okay.

A: I mean it just looked like, oh, you know, through a lot of our training you know, we're, uh; you know, he's, I kind of, uh; you know, what people look like when they're on some kind of like amphetamine or, you know, it seem like he was on something like that, just, given the way he was fighting and resisting.

Q: So it's more than alcohol?

A: Right.

Q: Okay.

A: Uh; you know, so that's when I made the decision to, and you know, to sedate him and I won't go into that...

Q: Right.

A: ... to that.

Q: Okay.

A: But, uh; uh; you know, just for his, his best interest for the safety of him and everyone.

Q: Okay. So you have to take that into consideration then if...

A: Right.

Q: ... evaluating and on the spot.

A: Uh-huh.

Q: Uh; when you did, uh; do that did he calm down a little?

A: Uh; it took me a couple of minutes.

Q: Okay.

A: I'd say less than two minutes.

Q: Okay. And then was he less combative at that point?

A: Yeah, he was, he was less combative, uh; but at that point I knew that, like he was like motionless.

Q: Motionless?

A: Yeah.

Q: Okay.

A: And so we had to get him up off the ground onto our stretcher.

Q: Okay.

A: Uh; so we did that. We put him supine on the stretcher and...

Q: What's that supine?

A: On his back.

Q: On his back, okay.

A: Yeah, we laid him on his back on the stretcher.

Q: Okay.

A: Uh; and so we cover him up 'cause he was naked. And we're taking him to the ambulance and then at, it was at that point where I, just by looking at it, you know, I could, and it was getting kind of dark, but it looked like he wasn't really breathing.

Q: Okay.

A: And so then once we were able to get him in the ambulance and evaluate him that's when we knew that he had went into (Inaudible).

Q: Okay. Uh; not did you transport him to the hospital?

A: Yes.

Q: Okay.

A: To Eskenazi.

Q: Okay. And was there any police riding with you?

A: Uh; no, not inside the ambulance.

Q: Were they following you?

A: Following us.

Q: And was he under arrest, were you told that then or...?

A: Uh; I don't know if anyone specifically told me he was under arrest. Uh; I think I just assumed that he was since the, since the wagon was there and, but...

Q: Okay.

A: ... he was in cuffs.

Q: Okay.

A: Uh; from my experience that usually means somebody's under arrest.

Q: Like, when you got to Wishard, where, where did you take him to the holding area or...?

A: Uh; no, not, in his circumstance...

Q: Uh-huh.

A: ... we took him straight to the shock room.

Q: Okay. And they treated him there?

A: Yes.

Q: Did... uh; did he say anything on the way (Inaudible)?

A: No.

Q: No. Did any officer, uh; did you see any wrong doings by any officer, kicking, hitting him?

A: No.

Q: Uh; unnecessary roughness or anything like that?

A: No.

Q: Okay.

A: I never saw anything, anything like that.

Q: Okay. Did you recognize any officers in here?

A: Uh; I did. I remember seeing, uh; and, uh; I'm not good with their, all of their, their first names and last names. Uh...

Q: Uh-huh.

A: Somebody named, uh; I remember seeing Amanda, uh...

Q: Is that her first name?

A: Her first name's Amanda...

Q: White female?

A: She's a white female short real thin blonde hair.

Q: Okay.

A: Uh; she was the one that walked up to me, when we initially got there. She was with, uh; the gentleman that had the broken nose.

Q: Okay.

A: Uh; I remember seeing, his last name was Burnett. Uh; I can't remember his first name. And then, uh; I think it was Bill, uh; Beckers, Buckers.

Q: Okay.

A: Uh; I know I'm chopping these names up.

Q: That's...no, that's fine. Yeah.

A: But, uh; he, actually Bill he kind of he works I think, part time for us. So he kind of picked up from a computer and just started time stamping stuff for us.

Q: Is he an EMT for you guys?

A: I believe so. I believe...

Q: Oh, wow.

A: I believe he does work part time as an EMT...

Q: As an EMT.

A: ... for us.

Q: Okay. Uh; Buckers?

A: Yeah, so...

Q: So you were familiar with some of the officers?

A: Right.

Q: Okay. Alright, uh; have you had any runs on this patient before?

A: No, this was the first time I'd ever, ever had him.

Q: Did he st-, uh; I have to ask, but did he say if he took any drugs or was he...

A: No.

Q: ... even talking?

A: No, he wasn't even in the condition to be able to talk.

Q: Was there a lot of, uh; civilians gathered around?

A: Yeah, there was a, 'cause there's a bar nearby.

Q: Right.

A: Uh; there's a lot of people out, uh; a lot of people with cell phones and, recording and...

Q: Now, you were south of the bar, right?

A: Uh; yes I was.

Q: As far as Ohio, Iowa and East?

A: Right. So it would have been just a little bit south of that.

Q: South of the bar?

A: Yeah.

Q: Okay. Uh; anything else you can think of that might help?

A: Uh; no, I, I think that's about it.

Q: Okay.

A: That's (Inaudible).

Q: Okay.

A: Anything that I remember, you know, without getting into specific...

Q: Right.

A: ... medical details, but...

Q: And, and you're, uh; your job title is a medic correct?

A: Correct. Okay.

Q: Okay. How long have you been employed with...

A: Uh...

Q: ...IEMS?

A: It will be, uh; 4 years.

Q: Okay. So you used to be with Wishard ambulance right or Eskenazi?

A: Right, uh...

Q: (Inaudible) always been at IEMS for a while, hasn't he?

A: Yeah, I got hired in, uh; like maybe a month before we actually became IEMS.

Q: Okay.

A: So...

Q: You're, you're part of Public Safety, correct?

A: (Nonverbal response)

Q: Okay. Oh, who's your supervisor?

A: Doug Lackey.

Q: Doug Lackey?

A: Yeah.

Q: L-A-...?

A: L-A-C-K-E-Y.

Q: Okay.

A: That's my direct supervisor. He was, he was there on the scene that day.

Q: He was on the scene?

A: Yeah.

Q: Okay. Well, did he get there after you got there?

A: He did.

Q: Okay.

A: He got there after we left.

Q: How long would you say?

A: Uh; maybe I'm guessing, maybe 5 minutes...

Q: Oh.

A: ... after we did.

Q: Okay.

A: 6 minutes, somewhere around there.

Q: How long have you totally, uh; on the scene, well, let's say from the time you approached the person on the ground?

A: Uh; I, you know, I'd have to look at our, I'd have to look at the run report to be able to tell...

Q: Okay.

A: ... uh; what the exact time was.

Q: Is this here, here?

A: Yeah.

Q: Okay.

A: Yeah, so, in the report you gave me its...

Q: Yes.

A: We got there at, uh; we arrived at the scene at 8:00 p.m. I made patient contact at 8:02 p.m.

Q: That was the person on the ground, right?

A: Yes.

Q: Okay.

A: And we departed the scene at 8:17 p.m.

Q: Okay. So...

A: ... for Eskenazi. And we arrived at Eskenazi at 8:26. Excuse me I have a cold.

Q: It was, uh; 8;26 when you departed the scene at...

A: We just parted the scene at 8:17.

Q: So you were on the patient contact about 15 minutes before you left then, right, 8:02?

A: Right.

Q: Okay.

A: So that was from the time I was with him on the ground until the time he left.

Q: (Inaudible) Uh; and you, you guys went like red lights and sirens...

A: We did.

Q: ... to the hospital?

A: Sure.

Q: And, your partner drove then?

A: Uh; I got to think about that now. Uh; because I know we had, I know we had a, somebody, we had one of the... somebody from the squad that lives in the back with me. I'm not sure if he, if he drove in or somebody else, uh; one of the IEMT guys drove up now.

Q: You know who it was that came back with you or...

A: I know, uh; her name is Natalie Cox.

Q: Natalie Cox?

A: She's on the, on the squad for IFD.

Q: And what, was the fire department dispatched also?

A: Uh; not initially. Not, not for the dog bite.

Q: Okay.

A: The animal bite. Uh; but once we, once we found out what it was...

Q: Uh-huh.

A: ... we, uh; we requested the...

Q: Requested?

A: Requested they send, uh; manpower from the fire department.

Q: Okay. What, what, uh; okay. Alright, uh; do you have anything else to add to this statement?

A: Nope.

Q: Okay. This is the end of the statement at this time. The date is 7, correction 11/12/2014. Time by my watch is 0710 hours. End of statement.

END OF STATEMENT

alr
IMPD
01/05/2015