IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
representative OF THE ESTATE OF )
DUSTY HEISHMAN, )
                                                  )
       Plaintiff,     )   CAUSE NO.
    -v-                           ) 1:15-cv-1712-TWP-DML
                                                  )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
                                                  )
      Defendants.     )

     The deposition upon oral examination of
**PHILIP GREENE**, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 3:00 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.


      RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                 3437 Beasley Drive
           Indianapolis, Indiana 46222
           Tel. & Fax (317) 299-6302

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
representative OF THE ESTATE OF )
DUSTY HEISHMAN, )
)
      Plaintiff, ) CAUSE NO.
-v- ) 1:15-cv-1712-TWP-DML
)
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
)
      Defendants. )

The deposition upon oral examination of
PHILIP GREENE, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Keffer Barnhart, LLP, 230 East Ohio Street, Suite
400, Indianapolis, Marion County, Indiana, on July
27, 2016, at 3:00 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302

---

APPEARANCES

FOR THE PLAINTIFF:
   Scott Barnhart, Esq.
   Brooke Smith, Esq.
   KEFFER BARNHART, LLP
   230 East Ohio Street
   Suite 400
   Indianapolis, Indiana 46204

FOR THE DEFENDANTS CITY OF INDIANAPOLIS, INDIANAPOLIS
METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER
DONALD SPIEGL, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, OFFICER WILLIAM BUECKERS, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, PARK RANGER PHILIP
GREENE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
MARION COUNTY SHERIFF'S DEPARTMENT, AND DEPUTY BILLY
JOHNSON:
   Kathryn Box, Esq.
   OFFICE OF CORPORATION COUNSEL
   200 East Washington Street
   Suite 1601
   Indianapolis, Indiana 46204

FOR THE DEFENDANTS HEALTH AND HOSPITAL CORPORATION OF
MARION COUNTY, MEDIC LANCE COPE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES:
   Mary R. Feldhake, Esq.
   Bose McKinney & Evans, LLP
   111 Monument Circle
   Suite 2700
   Indianapolis, Indiana 46204

FOR THE DEFENDANTS MARK BRITTON AND WILLIAM PATTERSON:
   Not present or represented by counsel.

---

INDEX OF EXAMINATION

                                      Page

DIRECT EXAMINATION,
   Questions By Mr. Barnhart         4

INDEX OF EXHIBITS

                                      Page

Plaintiff's Exhibit Q               23

---

4

1             PHILIP GREENE,
2   having been first duly sworn to tell the truth,
3   the whole truth and nothing but the truth in the
4   aforementioned matter, testified as follows:
5
6   DIRECT EXAMINATION,
7      QUESTIONS BY MR. SCOTT BARNHART:
8   Q. Good afternoon, Officer. My name is Scott
9      Barnhart, and I represent the plaintiff in this
10     matter. Please state your name and spell your
11     last name for the record.
12   A. It's Philip Greene. G-r-e-e-n-e.
13   Q. Have you ever been deposed before?
14   A. Yes.
15   Q. Approximately how many times?
16   A. Two I think.
17   Q. Was that for a criminal proceeding or a civil
18     proceeding?
19   A. Criminal.
20   Q. Are you currently under the influence any alcohol
21     or drugs?
22   A. No.
23   Q. Anything that would affect your ability to give
24     truthful testimony here today?
25   A. No.

**Page 5**

1 Q. What did you do to prepare for this deposition?
2 A. I met with my attorney.
3 Q. Did you meet with anybody else other than your
4     counsel?
5 A. No, sir.
6 Q. Did you look at any documents?
7 A. Yes.
8 Q. What documents were those?
9 A. The police report, the Internal Affairs report.
10 Q. Any other documents?
11     MS. BOX: Interrogatories.
12 A. Interrogatories. I'm sorry.
13 Q. Anything else other than those?
14 A. No.
15 Q. Did you look at any video?
16 A. No, sir.
17 Q. What is your age, sir?
18 A. Fifty.
19 Q. Where did you go to high school?
20 A. Roncalli.
21 Q. Any college?
22 A. No, sir.
23 Q. Did you go to ILEA?
24 A. Sheriff's Academy.
25 Q. Sheriff's Academy. When did you go there?

**Page 6**

1 A. '99. '98, '99.
2 Q. Do you have any other law enforcement training or
3     experience other than what?
4 A. Special Deputy school before that in '96.
5 Q. Was that on a volunteer basis, or who was that
6     with?
7 A. That was with the Sheriff's Department. I worked
8     for the Sheriff's Department prior to the
9     rangers.
10 Q. So what is your official title?
11 A. Police officer with the park rangers.
12 Q. You have full law enforcement powers?
13 A. Yes, sir.
14 Q. And as a law enforcement officer you have to do
15     continuing education?
16 A. Yes.
17 Q. How many hours a year, do you know?
18 A. I'm not quite sure.
19 Q. Have you stayed current on that training?
20 A. Yes.
21 Q. So prior to becoming a special deputy with the
22     Sheriff's Department and your work as a park
23     ranger, did you have any law enforcement
24     experience?
25 A. No.

**Page 7**

1 Q. Do you know what CIT training is?
2 A. (Inaudible.)
3 Q. Yes. Are you CIT certified?
4 A. No.
5 Q. As a park ranger who do you report to?
6 A. We're a unit of IMPD.
7 Q. Are you under the IMPD General Orders?
8 A. Yes.
9 Q. Do you have your own orders or special
10     procedures?
11 A. No. We're a unit you under them, under Homeland
12     Security. IMPD's Homeland Security Division.
13 Q. How many park rangers are there?
14 A. Fifteen.
15 Q. Do you have a particular park that you're
16     assigned to?
17 A. No, sir.
18 Q. And in October of 2014 what shift were you
19     generally assigned to?
20 A. I was working late tech and wide.
21 Q. What does that mean?
22 A. At the time I went in at 7:00 at night, got off
23     at 3:30 in the morning, and my area of
24     responsibility was the whole county.
25 Q. Are your runs specifically confined to parks, or

**Page 8**

1     can you take any run?
2 A. No, we take any runs.
3 Q. And so as a park ranger do you have specific
4     responsibilities that are different than another
5     officer? Or explain to me how that works.
6 A. Our primary function is the safety and security
7     of all the parks. Park properties, patrons. And
8     then we also take runs, and we back up metro on
9     runs. We can take runs for them if they're busy.
10 Q. What is called back into a run?
11 A. Yes.
12 Q. I know what that term is, but what does that term
13     mean to you?
14 A. You go assist another officer.
15 Q. So on a given shift would you kind of go from
16     park to park and just take runs as they need you
17     to?
18 A. Yes.
19 Q. Is there a certain rotation that you do, or how
20     does that work?
21 A. No. We start out, we just pick which district we
22     want to start off in, and we work that district
23     for a couple of hours, and then we move to
24     another district. If it's busy in a particular
25     area, then we'll go to that area and work there.

**Page 9**

1 Q. Do you recall the day of this incident involving
2     Mr. Heishman?
3 A. Yes.
4 Q. Do you recall prior to receiving the run? Did
5     you get the run?
6 A. No, I did not.
7 Q. Do you know who did?
8 A. I know Officer Burnett got it. I don't know who
9     the other officer was that was dispatched on it.
10 Q. How do you know he got it?
11 A. I was sitting in the parking lot talking to him
12     when he got the run.
13 Q. Where were you at?
14 A. We were at a parking lot at Garfield Park.
15 Q. I think there are a couple of them. There is
16     like a library there; right?
17 A. Yes.
18 Q. And then there is another area. Where were you
19     specifically?
20 A. One of the parking lots south of the pool. There
21     is two of them right there. I'm not sure which
22     one we were in.
23 Q. Do you remember what you were talking about?
24 A. No, I do not.
25 Q. Were you on lunch or dinner or whatever?

**Page 10**

1 A. No.
2 Q. And did you hear it on the radio, or did he tell
3     you that?
4 A. No, I heard it on the radio.
5 Q. And you guys are on the same channel?
6 A. Yes, sir.
7 Q. South district uses the same channel?
8 A. Yes.
9 Q. Do you know whether you ever switch to different
10     channels? Do you ever have the occasion to
11     switch to different channels?
12 A. Yes.
13 Q. On that particular day do you know whether you
14     ever switched channels?
15 A. Did I switch channels? After I left that
16     incident and I went to a different district I
17     did.
18 Q. And during the incident itself, or during the
19     run, do you recall whether anybody ever switched
20     channels?
21 A. No, sir.
22 Q. So after he gets the run you're talking with him,
23     and does he continue talking with you or does he
24     go immediately to the run?
25 A. No, he goes to the run.

**Page 11**

1 Q. And what did you do?
2 A. I drove out -- I drove around the south end of
3     the park. Went out to Southern and went towards
4     Shelby Street, and I heard him say they had a
5     resister. I turned north on Shelby. I just
6     started driving that way, you know, until they
7     could advise. Another control operator hit for
8     them and they didn't answer, and that's when I
9     backed on the run and I went.
10 Q. What did you do when you arrived on scene?
11 A. When I arrived on the scene I saw them on the
12     ground, and I walked over and --
13 Q. Let me stop you. Who did you see on the ground?
14 A. I saw two officers and a citizen and the suspect.
15 Q. Anybody else?
16 A. I don't recall, no.
17 Q. And where did you go park your vehicle in
18     proximity to where they were?
19 A. Maybe I was facing northbound, about 20 feet
20     south of them.
21 Q. What did you do in response?
22 A. I went up and tried to hold on to his legs,
23     because he was flailing all over the ground.
24 Q. Was he kicking, or was he just flailing?
25 A. Kicking and moving around, squirming around, and

**Page 12**

1     they were trying to get control of him.
2 Q. And what did you do after that?
3 A. The control operator hit and asked if everything
4     was secure, and we said no, he's still resisting.
5     And then more officers showed up. And then we
6     got it under control after that.
7 Q. How long did it take you to get him under
8     control?
9 A. A couple of minutes maybe.
10 Q. Did you participate in the handcuffing?
11 A. No.
12 Q. Do you know who did?
13 A. No, I don't.
14 Q. Were you watching what was happening?
15 A. I was concentrated on his legs. I was trying to
16     hold his legs down. He was pretty strong, so I
17     was holding his legs down. I don't remember who
18     handcuffed him. I know Officer Burnett was
19     trying to get one hand, and I think another
20     officer finally came up and helped him, but I
21     don't remember who it was.
22 Q. Do you have any recollection of what the civilian
23     was doing?
24 A. Yes. He was laying on the ground, kind of had
25     his arms around him trying to hold him, trying to

**Page 13**

```
 1     hold him down.
 2  Q. Where were his arms specifically? What part of
 3     his body?
 4  A. Upper body, up around his shoulders.
 5  Q. Did he have them around his neck?
 6  A. I don't remember. I know it was up high, but I
 7     can't remember if it was around his neck or
 8     around his shoulders.
 9  Q. After you were able to get him under control,
10     then what happened?
11  A. We tried to put him in the wagon, and he started
12     resisting again. We couldn't get him in the
13     wagon.
14  Q. When you say "resisting," what do you mean?
15  A. Kind of fighting with us, squirming around. He
16     wasn't cooperating. Kind of kicking his legs
17     back and forth.
18  Q. He was handcuffed at that point; right?
19  A. He was handcuffed. Yes.
20  Q. Did he have any leg shackles?
21  A. I don't recall.
22  Q. After he started flailing around in back of the
23     wagon -- let me back up.
24        How many officers were around him at that
25     point?
```

**Page 14**

```
 1  A. About three or four maybe.
 2  Q. Where were the civilians at that point?
 3  A. I don't know.
 4  Q. And at that point whose scene was it, who was in
 5     control?
 6  A. I would say the wagon driver. We were trying to
 7     put him in the wagon, and we couldn't.
 8  Q. And so was he taken to the ground?
 9  A. Yes.
10  Q. What position was he on the ground?
11  A. I don't recall.
12  Q. What happened after he was taken to the ground?
13  A. An ambulance showed up, and we put him on the
14     gurney of the ambulance. Or on the gurney.
15  Q. Do you know how long it took for the ambulance to
16     arrive?
17  A. No, I don't.
18  Q. And do you know which EMT responded?
19  A. No.
20  Q. When they responded did they come by themselves,
21     was there anybody else with them, or just one
22     person do you recall?
23  A. I don't recall. I think it was just the
24     ambulance.
25  Q. Did he bring a gurney with him?
```

**Page 15**

```
 1  A. Yes.
 2  Q. At any point did you see anybody administer
 3     medication?
 4  A. Yes.
 5  Q. Who was that?
 6  A. I don't know. It was one of the medics. I don't
 7     remember who it was.
 8  Q. The medication is what is referred to as a
 9     chemical restraint. Does that term mean anything
10     to you?
11  A. They gave him an injection.
12  Q. Where did they give him the injection?
13  A. I believe his left arm.
14  Q. Did you see him do it?
15  A. Yes.
16  Q. How did he do it? Was he looking -- can you
17     describe that to me?
18  A. "He" meaning.
19  Q. Meaning the EMT. It was the EMT that gave him
20     the --
21  A. Yes.
22  Q. Describe how he did it.
23  A. I don't remember. I know he walked up and then
24     he gave him the injection while he was on the
25     gurney. He was strapped in the gurney. He gave
```

**Page 16**

```
 1     him the injection and he calmed down shortly
 2     after that.
 3  Q. Prior to giving the injection did the EMT talk to
 4     anybody?
 5  A. I don't recall.
 6  Q. Do you recall whether any of the officers said
 7     anything to him?
 8  A. To the EMT?
 9  Q. Yes.
10  A. No, I don't.
11  Q. Did you say anything to the EMT?
12  A. No, I did not.
13  Q. So he was on the gurney when he got injected?
14  A. Um-hm.
15  Q. Do you remember whether it was his right arm or
16     left arm?
17  A. I believe it was his left.
18  Q. Do you recall where on the arm?
19  A. No, I don't.
20  Q. What happened after that?
21  A. He calmed down.
22  Q. How long did it take for him to calm down?
23  A. A couple of minutes maybe.
24  Q. Did you have physical contact with him at the
25     time?
```

17

1  A. No.
2  Q. Were you watching him?
3  A. I was standing maybe ten feet back.
4  Q. So at the time that he gave the injection he was
5     on the gurney and he was outside; is that
6     correct?
7  A. Yes.
8  Q. Was it outside of the wagon?
9  A. Yes. The wagon was facing southbound, the
10    ambulance was facing northbound. They were nose
11    to nose, and the gurney was back at the back of
12    the wagon.
13 Q. Were you watching him for signs of distress?
14 A. No.
15 Q. Did you ever see him have any difficulty
16    breathing?
17 A. No.
18 Q. Did you ever take his pulse?
19 A. No, I did not.
20 Q. Do you know if anybody did?
21 A. No.
22 Q. No, they didn't take his pulse?
23 A. I didn't see anybody, no.
24 Q. Prior to the EMT giving him an injection did you
25    see him take any vital signs or assess him at

18

1     all?
2  A. I don't recall, no.
3  Q. Do you recall whether he had a bag with him? Do
4     you know what I mean by that?
5  A. The EMT?
6  Q. Yes.
7  A. I don't recall. I mean, I don't remember seeing
8     one.
9  Q. When he gave him the injection did he have a
10    physical reaction?
11 A. He just calmed down.
12 Q. I guess I need to be more specific. When he
13    first stuck him did he flail or respond?
14 A. I don't remember.
15 Q. Do you know whether he told Mr. Heishman that he
16    was going to be injecting him?
17 A. No.
18 Q. No, he --
19 A. No, I don't remember him saying anything to him.
20 Q. Do you remember the EMT talking to him at all?
21 A. The EMTs were up closer to his head. I mean,
22    like I say, I was ten feet back from the foot of
23    the gurney, so I don't know if he said anything
24    to him, or I didn't hear him say anything.
25 Q. You say he calmed down. How do you know that?

19

1  A. I mean, he was just quiet after that. I mean, he
2     didn't -- he wasn't trying to resist or anything.
3     I mean, he didn't keep moving around like he was
4     when he was real agitated before that. But after
5     that he was not.
6  Q. Were his eyes open or closed?
7  A. Open.
8  Q. Was he conscious?
9  A. I believe so.
10 Q. Did he continue talking, or did he remain quiet?
11 A. He was quiet.
12 Q. At the time that the injection occurred how many
13    officers were around him?
14 A. There were a lot of officers on the scene. I
15    don't know how many were around him at the time.
16    It might have been a couple right there.
17 Q. And the gurney. When he was placed on the gurney
18    did it have straps?
19 A. Yes.
20 Q. Were the straps secure?
21 A. Yes.
22 Q. How many straps were secure?
23 A. Two or three.
24 Q. On a typical gurney, how many straps are on a
25    typical gurney?

20

1  A. I think two or three.
2  Q. And those straps are kind of like seatbelts; is
3     that right?
4  A. Yes.
5  Q. They have a buckle at one end --
6  A. Um-hm.
7  Q. -- and then latch?
8  A. Yes.
9  Q. And they were able to do that; is that correct?
10 A. Um-hm.
11 Q. Is that a yes?
12 A. Yes.
13 Q. Do you recall whether the gurney was -- the back,
14    whether it was elevated or whether it was flat?
15 A. No, I don't recall.
16 Q. Do you know what I mean by that?
17 A. Yes.
18 Q. Was he sitting, laying upright, or was he laying
19    prone?
20 A. I don't remember.
21 Q. So you're back approximately ten feet watching
22    this?
23 A. Yes.
24 Q. Then what did they do next?
25 A. They took him around to the back of the ambulance

21

1 and put him in the ambulance, and I stood there
2 for a few minutes.
3 Q. So they give him the substance; right? They
4 inject him?
5 A. Yes.
6 Q. And then just step back and wait?
7 A. Did I?
8 Q. No. What happened after they gave him the
9 injection?
10 A. Once they did that, then they went ahead and they
11 took him back and put him in the ambulance.
12 Q. Did they wait at all?
13 A. I don't recall whether they did or not.
14 Q. And they put him in the ambulance?
15 A. Yes.
16 Q. Did you see them put him in the ambulance?
17 A. No.
18 Q. Okay. So what were you doing at that point?
19 A. I was back at the back of the wagon, and they
20 went around and took him and put him in the back
21 of the ambulance after that.
22 Q. Then what did you do?
23 A. We stood there until we heard a commotion back in
24 the ambulance, and we went back. We thought
25 maybe, you know, he was resisting or something

22

1 again, and that's when I saw Officer Bueckers
2 doing chest compressions in the back of the
3 ambulance on him.
4 Q. And who else was in the ambulance?
5 A. I don't know.
6 Q. After you saw Officer Bueckers giving chest
7 compressions, what did you do?
8 A. Nothing. They took off. They went and left to
9 go to the hospital.
10 Q. After they went to the hospital then what did you
11 do?
12 A. Shortly after that I marked back into service,
13 went back to the district.
14 Q. Did you ever speak with Officer Burnett after
15 that?
16 A. No.
17 Q. Did you speak with him after the ambulance left,
18 but before you marked back in-service?
19 A. I don't recall.
20 Q. Do you recall speaking to any of the officers on
21 scene?
22 A. No.
23 Q. Do you recall any supervisors being on scene?
24 A. There were supervisors there, yes.
25 Q. Who were they?

23

1 A. I believe Lieutenant Feeney, and there was a
2 sergeant. I don't remember which one it was.
3 Q. If I represent to you it was Sergeant Miller,
4 would that --
5 A. It might have been Sergeant Miller.
6 Q. I'm going to back up a little bit.
7    When he was on the ground and as you were
8 arriving, you said you were trying to control his
9 leg?
10 A. Um-hm.
11 Q. His right leg or his left leg?
12 A. Both of them. I put my hands on his ankles to
13 try to hold him still.
14 Q. Did you deliver any strikes?
15 A. No, sir.
16 Q. Were you ever asked to do a supplement?
17 A. No, sir.
18 Q. Were you ever asked to give an Internal Affairs
19 statement?
20 A. Yes.
21 Q. Do you recall when you gave that statement?
22 A. When I gave it? No, I don't.
23       (Plaintiff's Deposition Exhibit
24 Letter Q was marked for identification
25 by the reporter.)

24

1 Q. I'll hand you what has been marked as Exhibit Q,
2 which I represent to be your statement. Please
3 review that and let me know if that is in fact
4 your statement.
5 A. Yes.
6 Q. I'll direct your attention to page 3, Bates
7 stamped 1248. That first block, the first
8 answer, about the middle of the way down where it
9 says, "I said control he's still resisting and
10 all I did is I grabbed his ankles just trying to
11 hold his ankles down and at one point he was on
12 his stomach and I had most of my weight on his
13 ankles." Is that correct?
14 A. Yes.
15 Q. So you were interacting with him in the prone
16 position at least at one point?
17 A. Yes.
18 Q. Do you have any idea about how long he was in the
19 prone position?
20 A. No, I don't.
21 Q. And you said you had most of your weight on his
22 ankles; is that correct?
23 A. Yes. I was kind of kneeling over the top of him
24 and holding him down.
25 Q. That was my next question. So you're on your

25

1  knees and you're leaning on him, would that be
2  fair?
3  A. I was -- yes, my knees were up and I had my hands
4     down, just holding him down. I wasn't sitting on
5     him, I just kind of kneeled over him and held him
6     down.
7  Q. You weren't standing, though?
8  A. No.
9  Q. You were kneeling, kneeling over and using your
10    weight to hold his legs down?
11 A. Yes.
12 Q. In the same answer, about the second or third
13    sentence from the bottom. "The medic got there
14    and the medic came up saw that he was pretty
15    agitated they gave him a shot of something." And
16    "That's what brought him down and calmed him way
17    down and got him on the gurney." Is that
18    correct?
19 A. I'm sorry.
20 Q. It's the same paragraph.
21 A. Okay. Yes.
22 Q. So was he on the gurney at the time that the shot
23    was administered, or was he off the gurney?
24 A. I believe he was on the gurney. I don't remember
25    now, but --

26

1  Q. Let me direct your attention to page 5, about the
2     middle of the way down. Question: "What was he
3     doing at the back of the wagon?" You said, "He
4     started squirming around putting his legs up and
5     I mean you couldn't-you couldn't get him in the
6     back of that wagon so that's when I say we just
7     laid him back down right at the back of the
8     wagon." Is that correct? About the middle of
9     the way down.
10 A. Yes.
11 Q. And do you recall the position that you laid him
12    in?
13 A. No, I don't.
14 Q. And so you indicate on the same page you were
15    there when the medics administered the -- put
16    something into him; is that correct?
17 A. Yes.
18 Q. You say, "I want to say in his upper arm but I
19    don't know which arm it was." Is that correct?
20 A. Correct.
21 Q. You indicated it worked relatively quickly?
22 A. Yes. Within a couple of minutes.
23 Q. Did you just start your shift that day do you
24    recall?
25 A. I don't recall. I don't remember what time it

27

1     was.
2  Q. Do you remember any runs before or after on that
3     day?
4  A. No, I don't.
5  Q. Did you have the occasion to make runs to the
6     Bryant's Friendly Inn, the bar that was --
7  A. No, I've never been there.
8  Q. How many onlookers were there when you arrived?
9  A. I don't recall. I mean, I didn't pay attention
10    to people that were on the sidewalk and stuff.
11 Q. When you were interacting with Mr. Heishman and
12    the other officers and the civilian did you smell
13    any alcohol?
14 A. No.
15 Q. Did you know who they were, the civilian that you
16    mentioned?
17 A. No, I don't.
18 Q. Have you had anybody approach you after this
19    incident to ask you what your involvement is, or
20    ask you about the incident itself?
21 A. Just Internal Affairs.
22 Q. Anybody else?
23 A. No.
24 Q. What kind of area is that in?
25 A. Residential.

28

1  Q. Is that near Garfield Park?
2  A. It's about three blocks north.
3  Q. How tall are you?
4  A. About 5' 11".
5  Q. How much do you weigh?
6  A. About 195.
7  Q. Did you weigh that in October of 2014, give or
8     take?
9  A. Probably, yes.
10 Q. So after the ambulance drove away do you recall
11    talking to any of these officers, Officer Burnett
12    or anybody else?
13 A. No.
14 Q. And either on the scene or at some point between
15    then and now have you talked to any of the
16    officers about this incident?
17 A. About the incident, no.
18 Q. Did you talk to any officers about the Complaint?
19 A. No.
20 Q. You talked to Internal Affairs?
21 A. Yes.
22 Q. Anybody else?
23 A. My attorney.
24 Q. Has anybody approached you and asked you about
25    this?

29

1 A. No, they have not.
2 Q. You didn't know Mr. Heishman?
3 A. No.
4 Q. You didn't recognize him?
5 A. No, I did not.
6 Q. When the EMTs were called and they responded on
7    the scene was there one or two that walked up?
8 A. I believe there was two.
9 Q. What was the other one doing?
10 A. I don't know.
11 Q. Were you injured?
12 A. No.
13 Q. Did you have a taser?
14 A. No, sir.
15 Q. Did you have an asp?
16 A. Yes.
17 Q. Did you use your asp?
18 A. No.
19 Q. And a gun I assume?
20 A. Yes.
21 Q. Did anybody pull their weapon that you're aware
22    of?
23 A. I don't recall seeing that, no.
24 Q. Do you recall seeing any blood on Mr. Heishman?
25 A. I don't remember.

30

1 Q. Do you recall seeing any injuries?
2 A. No.
3 Q. Do you recall checking to see whether he was in
4    distress? Did that come to your mind when you
5    approached the scene?
6 A. He was hollering and screaming. I mean, I don't
7    remember what he was saying or anything, but I
8    know he was doing a lot of screaming.
9 Q. Was he sweaty?
10 A. I believe so.
11 Q. Do you know whether he was hot or cold?
12 A. I don't remember. I had gloves on when I held
13    his ankles, so I don't remember.
14 Q. Do you know what positional asphyxia is?
15 A. Do I know what position it is?
16 Q. Do you know what positional asphyxia is, the term
17    itself?
18 A. Not specifically.
19 Q. Do you know whether any General Orders address
20    positional asphyxia or concerns about positional
21    asphyxia?
22 A. I don't recall.
23 Q. How often do you have the occasion to review
24    General Orders?
25 A. They are out there. I mean, you can look at them

31

1    any time you want to.
2 Q. Do you make it a habit of looking at them?
3 A. The ones that apply to me.
4    MR. BARNHART: We're about done. We'll take
5    a quick break.
6    (A brief recess was taken at this time.)
7
8 Q. As a park ranger how often do you have the
9    occasion to arrest people? Do you arrest them
10   very often?
11 A. On a daily basis. I mean, the occasion is on
12    every shift.
13 Q. So I guess my question is, generally speaking,
14    the fact that you're a park ranger doesn't
15    necessarily preclude you from general law
16    enforcement duties or arresting people or doing
17    normal police work, is that fair? It's kind of a
18    strange question. I'm trying to wrap my head
19    around the responsibilities of a park ranger as
20    separate and apart from an officer with IMPD. Is
21    there any distinction?
22 A. I always tell people the color of my uniform.
23    That's about it. We have the same power and
24    authority as what they have.
25    MR. BARNHART: That's all that I have.

32

1    MS. FELDHAKE: I have no questions.
2    MS. BOX: No questions.
3    MR. BARNHART: Thank you, sir.
4
   _____
   PHILIP GREENE

33

STATE OF INDIANA )
)
COUNTY OF MARION )

I, Russell J. Scheiner, RPR, CSR, and a Notary public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Plaintiff; that said deposition was taken at the time and place heretofore mentioned between the hours of 8:00 a.m. and 6:00 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent, and thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the

34

parties.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this_____day of_____, 2016.


_____
RUSSELL J. SCHEINER, RPR, CSR, Notary Public

My commission expires:
October 29, 2016


Job No. 0727BAR

35

Scott Barnhart, Esq.
Brooke Smith, Esq.
KEFFER BARNHART, LLP
230 East Ohio Street
Suite 400
Indianapolis, Indiana 46204

NOTICE OF DEPOSITION FILING

Billie Thompson, as Personal Representative of the Estate of Dusty Heishman, vs. City of Indianapolis, Indianapolis Metropolitan Police Department, et al.

U. S. District Court, Southern District of Indiana
Indianapolis Division, Cause No. 1:15-cv-1712-TWP-DML

In compliance with Indiana Rules of Trial Procedure, Rules of the Industrial Board or Federal Rules of Civil Procedure, pursuant to Indiana Supreme Court order dated 10-1-86, you are notified of the filing with counsel for the Plaintiff, the deposition of PHILIP GREENE.

Returned with ____ without ____ corrections.

_____
(Date of filing or mailing by certified mail.)

cc:

Kathryn Box, Esq.
OFFICE OF CORPORATION COUNSEL
200 East Washington Street
Suite 1601
Indianapolis, Indiana 46204

Mary R. Feldhake, Esq.
Bose McKinney & Evans, LLP
111 Monument Circle
Suite 2700
Indianapolis, Indiana 46204

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302