IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COPY

BILLIE THOMPSON, as Personal       )
Representative of the ESTATE OF     )
DUSTY HEISHMAN,                     )
                                    )
            Plaintiff,              )    CAUSE NO.
      -v-                           ) 1:15-cv-1712-TWP-DML
                                    )
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT,     )
OFFICER BRIAN BURNETT, in his       )
individual and official            )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official     )
capacities, OFFICER WILLIAM         )
BUECKERS, in his individual and     )
official capacities, PARK RANGER    )
PHILIP GREENE, in his individual    )
and official capacities, MARION     )
COUNTY SHERIFF'S DEPARTMENT,        )
DEPUTY BILLY JOHNSON, in his        )
individual and official            )
capacities, HEALTH AND HOSPITAL     )
CORPORATION OF MARION COUNTY,       )
MEDIC LANCE COPE, in his            )
individual and official            )
capacities, MARK BRITTON, and       )
WILLIAM PATTERSON,                  )
                                    )
            Defendants.             )

        The deposition upon oral examination of
**WILLIAM BUECKERS**, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Bose McKinney & Evans, LLP, 111 Monument Circle,
Suite 2700, Indianapolis, Marion County, Indiana, on
August 4, 2016, at 2:45 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.


        RUSSELL J. SCHEINER, RPR, CSR, Notary Public
                    3437 Beasley Drive
               Indianapolis, Indiana  46222
                 Tel. & Fax (317) 299-6302

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BILLIE THOMPSON, as Personal )
Representative of the ESTATE OF )
DUSTY HEISHMAN, )
)
Plaintiff, )  CAUSE NO.
-v.-  ) 1:15-cv-1712-TWP-DML
)
CITY OF INDIANAPOLIS, INDIANAPOLIS )
METROPOLITAN POLICE DEPARTMENT, )
OFFICER BRIAN BURNETT, in his )
individual and official )
capacities, OFFICER DONALD SPIEGL, )
in his individual and official )
capacities, OFFICER WILLIAM )
BUECKERS, in his individual and )
official capacities, PARK RANGER )
PHILIP GREENE, in his individual )
and official capacities, MARION )
COUNTY SHERIFF'S DEPARTMENT, )
DEPUTY BILLY JOHNSON, in his )
individual and official )
capacities, HEALTH AND HOSPITAL )
CORPORATION OF MARION COUNTY, )
MEDIC LANCE COPE, in his )
individual and official )
capacities, MARK BRITTON, and )
WILLIAM PATTERSON, )
)
Defendants. )

The deposition upon oral examination of
WILLIAM BUECKERS, a witness produced and sworn before
me, Russell J. Scheiner, RPR, CSR, and Notary Public
in and for the County of Marion, State of Indiana,
taken on behalf of the Plaintiff in the offices of
Bose McKinney & Evans, LLP, 111 Monument Circle,
Suite 2700, Indianapolis, Marion County, Indiana, on
August 4, 2016, at 2:45 p.m., pursuant to Notice and
Federal Rules of Civil Procedure.

RUSSELL J. SCHEINER, RPR, CSR, Notary Public
3437 Beasley Drive
Indianapolis, Indiana 46222
Tel. & Fax (317) 299-6302

---

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Scott Barnhart, Esq.
    Brooke Smith, Esq.
    KEFFER BARNHART, LLP
    230 East Ohio Street
    Suite 400
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS CITY OF INDIANAPOLIS, INDIANAPOLIS
METROPOLITAN POLICE DEPARTMENT, OFFICER BRIAN BURNETT,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES, OFFICER
DONALD SPIEGL, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, OFFICER WILLIAM BUECKERS, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, PARK RANGER PHILIP
GREENE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
MARION COUNTY SHERIFF'S DEPARTMENT, AND DEPUTY BILLY
JOHNSON:
    Kathryn Box, Esq.
    OFFICE OF CORPORATION COUNSEL
    200 East Washington Street
    Suite 1601
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS HEALTH AND HOSPITAL CORPORATION OF
MARION COUNTY, MEDIC LANCE COPE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES:
    Mary R. Feldhake, Esq.
    Bose McKinney & Evans, LLP
    111 Monument Circle
    Suite 2700
    Indianapolis, Indiana 46204

FOR THE DEFENDANTS MARK BRITTON AND WILLIAM PATTERSON:
    Not present or represented by counsel.

---

I N D E X   O F   E X A M I N A T I O N

                                              Page
                                              ----
DIRECT EXAMINATION,
    Questions By Mr. Barnhart               4

CROSS-EXAMINATION,
    Questions By Ms. Feldhake               44

CROSS-EXAMINATION,
    Questions By Ms. Box                    45


I N D E X   O F   E X H I B I T S

                                              Page
                                              ----
Plaintiff's Exhibit R                         33

---

4

1              W I L L I A M   B U E C K E R S ,
2       having been first duly sworn to tell the truth,
3       the whole truth and nothing but the truth in the
4       aforementioned matter, testified as follows:
5
6   DIRECT EXAMINATION,
7       QUESTIONS BY MR. SCOTT BARNHART:
8   Q.  Well, you've raised your hand, so I presume that
9       you've been deposed before?
10  A.  Yes, sir.  Twenty-one years of police service.
11  Q.  Approximately how many times have you been
12      deposed?
13  A.  Hundreds.
14  Q.  Are they mostly criminal depositions?
15  A.  Yes.
16  Q.  Any civil depositions that you can recall?
17  A.  Yes.
18  Q.  Are you currently under the influence of any
19      alcohol or drugs?
20  A.  No.
21  Q.  Any prescribed medication?
22  A.  No.
23  Q.  Anything that would prevent you from giving
24      truthful testimony here today?
25  A.  No.

**5**

1 Q. What did you do to prepare for this deposition?
2 A. I just met with the prosecutor. Or the state.
3    I'm sorry. I'm used to saying the prosecutor.
4 Q. And I don't want to go over what you talked
5    about, but did you review any documents?
6 A. Yes.
7 Q. What did you review?
8 A. I believe it was my IA statement, and then the
9    case report.
10 Q. Did you view any individual?
11 A. No.
12 Q. So if you've done 100 depositions I'll spare you
13    the ground rules.
14       You understand that you have to answer out
15    loud?
16 A. Yes.
17 Q. If I ask you a question I'll presume that you
18    heard it and you understood it. If you did not,
19    I would ask that you ask me to either repeat it
20    or rephrase it. Is that fair?
21 A. Yes, sir.
22 Q. What is your current age, sir?
23 A. I am 45. Did you want to get my name on record?
24 Q. Oh, yes. Thank you.
25       (A brief discussion was held off the record

**6**

1    at this time.)
2
3 Q. Will you state and spell your last name?
4 A. William Bueckers. B-u-e-c-k-e-r-s.
5 Q. And you're 45 years old?
6 A. Correct.
7 Q. And 23 years in law enforcement?
8 A. Twenty-one.
9 Q. Twenty-one. Has it always been with either IPD
10    or IMPD?
11 A. No, it was not.
12 Q. Okay. Can we break that down?
13 A. Yes. I started in '95 with Monroe County
14    Sheriff's Department and Ellettsville Police
15    Department. I was hired by IPD in August of
16    2001, and have been with them through the merger,
17    and now currently IMPD.
18 Q. Where did you go to high school?
19 A. Rocori High School.
20 Q. And where is that?
21 A. It's in Cold Springs, Minnesota.
22 Q. Do you have any college?
23 A. I have had just a little bit of college through
24    Ivy Tech.
25 Q. And do you recall what district you were assigned

**7**

1    to in IMPD in October of 2014?
2 A. Southeast.
3 Q. Have you always in been in southeast?
4 A. Yes.
5 Q. Do you recall responding to a run involving an
6    individual by the name of Dusty Heishman?
7 A. Yes.
8 Q. What do you recall about that?
9 A. It was to an officer's aid. He was having a
10    resister.
11 Q. And which officer was that, do you recall?
12 A. Officer Burnett.
13 Q. And what district is he in?
14 A. Southeast at the time.
15 Q. Prior to receiving that call had you worked with
16    Officer Burnett before?
17 A. Yes.
18 Q. How often?
19 A. We were actually partners for several years.
20 Q. When you say "partners," what do you mean by
21    that?
22 A. We were on a proactive unit together, and also we
23    worked the same shift.
24 Q. Like split?
25 A. It was NRO's, Neighborhood Resource Officers.

**8**

1 Q. Can you explain that, how that worked?
2 A. Certainly. It was basically dealing with quality
3    of life issues. We dealt with complaints in the
4    neighborhoods. We validated the complaints, and
5    then addressed them the best way we could.
6 Q. What neighborhoods did you work in?
7 A. All of southeast.
8 Q. When you responded to the scene, what
9    neighborhood would you consider that?
10 A. Fountain Square.
11 Q. Is Fountain Square one of the neighborhoods that
12    you worked?
13 A. Yes. We didn't have a specific area of patrol.
14    We had the entire district responsibility.
15 Q. And how long were you partners with Officer
16    Burnett?
17 A. About five years.
18 Q. You weren't an FTO, were you?
19 A. No.
20 Q. Are you an FTO?
21 A. Yes.
22 Q. What does that term mean to you?
23 A. Field Training Officer.
24 Q. And what are the responsibilities of the Field
25    Training Officer?

9

1 A. Basically trained new officers from the academic
2 requirements of the police academy, to the
3 application of officer safety, and also policy
4 and procedures to the field study.
5 Q. So you received a call involving a resister; is
6 that right?
7 A. Officer Burnett requested additional cars because
8 he had a resister.
9 Q. Did you hear that call over the radio?
10 A. It was over the radio at roll call.
11 Q. So you were at roll call?
12 A. Yes.
13 Q. Had roll call occurred, or --
14 A. It had just completed I believe.
15 Q. So you were going on shift?
16 A. Correct.
17 Q. Just for purposes of the record, explain what
18 roll call means.
19 A. Roll call is basically an attendance of officers
20 for their shift, and also to brief officers with
21 anything that occurred while they were off duty.
22 Q. And it generally involves officers that are on
23 that district that are on that shift?
24 A. Correct.
25 Q. And approximately how many officers were in that

10

1 roll call?
2 A. I couldn't recall.
3 Q. How long does roll call usually take?
4 A. It varies on how many things that we have to be
5 informed about. It usually lasts no more than
6 ten or 15 minutes.
7 Q. So it's generally between five to 20 minutes,
8 give or take?
9 A. Correct.
10 Q. And roll call is generally done every day; is
11 that right?
12 A. Correct.
13 Q. So you were at roll call and you received a
14 dispatch? Or received the call on the radio?
15 A. It was a broadcast with Officer Burnett
16 requesting additional cars.
17 Q. Do you know if any other officers heard the calls
18 as well?
19 A. I'm sure there was. It was over our channel.
20 Q. And so was there any discussion about who would
21 respond, or did you just automatically respond?
22 A. Usually the protocol is the officer has the radio
23 because of giving updates.
24 Q. So when you say the officer has the radio, you're
25 not -- did you indicate on the radio that you're

11

1 responding?
2 A. No, we responded -- we usually use our computers
3 to back up.
4 Q. And it's general protocol to not get on the radio
5 to block traffic, so that the person that is at
6 the scene can respond accordingly?
7 A. Correct. If he needs -- like if something was to
8 happen or something.
9 Q. You're kind of talking in code. I know what
10 you're saying, but I'm going to break it down a
11 little bit.
12 A. That's fine.
13 Q. So it's Officer Burnett making the call on the
14 radio; is that correct?
15 A. Yes. He was asking for additional help because
16 he had a resister.
17 Q. Were you in the district, or were you in your
18 car?
19 A. I was at roll call. I was at the roll call site
20 inside the building.
21 Q. Was anybody else around?
22 A. There was other officers, yes.
23 Q. Did you tell them what you were doing?
24 A. It was pretty obvious. The officers took off out
25 the door. This is an area that I was responsible

12

1 for.
2 Q. What kind of area is it?
3 A. It's southeast 20. Zone 20.
4 Q. Can you explain to me kind of what the
5 neighborhood is like?
6 A. It's more residential. There is some businesses,
7 smaller businesses.
8 Q. And is it a good neighborhood, bad neighborhood,
9 indifferent?
10 A. Each neighborhood has issues, but there is issues
11 with narcotics.
12 Q. You responded, right, to the call?
13 A. Yes.
14 Q. And so you leave the district and go to your car.
15 Do you know if other officers responded that were
16 in roll call?
17 A. I didn't pay any attention to that. I was too
18 busy focusing on what was going on with Officer
19 Burnett.
20 Q. Were you walking, running, do you recall?
21 A. I was driving.
22 Q. When you left the district did you run out, did
23 you walk out, or do you recall?
24 A. I don't recall. It was probably in a hurry.
25 Q. How long did it take you to get from roll call to

13

1     the scene?
2 A. I couldn't give you an exact time, but a couple
3     of minutes.
4 Q. Did you use lights and sirens?
5 A. I don't recall.
6 Q. What happened once you got there?
7 A. When I arrived I parked on the west side of the
8     street and observed a couple of police cars ahead
9     of me, and ran up to Officer Burnett's aid.
10 Q. Where was he?
11 A. He was on the west side of the street, on the
12     street itself with an individual that he was
13     fighting with other officers.
14 Q. How many other officers were around?
15 A. I couldn't tell you exactly who was there at that
16     moment.
17 Q. You said he was fighting. What do you mean?
18 A. They were on the ground. They were wrestling
19     around. I mean, it wasn't like Officer Burnett
20     had control by himself, or the other officers.
21 Q. Were there any civilians that were involved?
22 A. Not that I saw.
23 Q. Did you see any strikes being applied by anyone?
24 A. No. This was more of a -- more of a grappling
25     type situation, because we had him down on the

14

1     ground.
2 Q. Was he handcuffed?
3 A. No, he was not.
4 Q. Was he shackled?
5 A. No. He was actively fighting even with
6     responding officers.
7 Q. What was he wearing?
8 A. Nothing.
9 Q. So what did you do once you observed that?
10 A. I basically got control of an arm, so that way
11     we -- because it was taking all the officers to
12     get him under control.
13 Q. What did you do once you took control of his arm?
14 A. I held on until I got additional help. This guy
15     had super human strength.
16 Q. Did he appear to be under the influence?
17 A. Yes.
18 Q. To your understanding do you know what he may
19     have been under the influence of?
20 A. I have no idea what he was under the influence
21     of.
22 Q. Was he prone, was he face up, or what position
23     was he in?
24 A. He was face down.
25 Q. Face down. So you touched his arm; right?

15

1 A. Yes.
2 Q. Do you recall anything about his body? Was he
3     sweaty?
4 A. He was very sweaty. Extremely sweaty.
5 Q. Was he saying anything?
6 A. He was grunting and groaning. He wasn't making
7     connections with words.
8 Q. When you say you grabbed a hold of his arm, did
9     you extend it out, or how did you grab on to him?
10 A. I tried to extend it. I tried to extend it, but
11     it was bent. And then he did mention that they
12     are going to kill me.
13 Q. Do you recall him saying anything else?
14 A. No.
15 Q. Did you say anything to him?
16 A. No. He was fighting. He was fighting. We were
17     trying to communicate amongst each other in
18     regards to trying to get a plan, because, I mean,
19     he was -- he was moving multiple officers.
20 Q. Do you recall you saying anything to the other
21     officers?
22 A. I just -- control, control, control, control, and
23     trying to get his arms switched to his back.
24 Q. And do you recall what they said to you?
25 A. I couldn't tell you. It was chaos.

16

1 Q. How long did it take you to get him under
2     control?
3 A. It seemed like an eternity. I couldn't give you
4     a time frame, because it seemed like whenever we
5     had him under control we lost control. I mean,
6     this is -- the officers were fighting for our
7     lives with this guy. I mean, until you're
8     involved in a fight like this it's hard to
9     understand. But this guy was getting the best of
10     all of the officers there.
11 Q. Did you apply any strikes to him?
12 A. No.
13 Q. Did you observe any strikes?
14 A. No. We were too busy trying to get the arms into
15     position for handcuffing.
16 Q. Were you able to do that?
17 A. Eventually.
18 Q. And what happened after he was handcuffed?
19 A. The wagon had arrived on scene. And we got him
20     into shackles as well, because he was kicking.
21     It wasn't just his arms that he was fighting
22     with, it was his legs and -- it was everything.
23 Q. When you put the shackles on him did he ever
24     change locations? When you were wrestling with
25     him initially, when you initially approached, did

**17**

1  you ever change locations, or did it remain at
2  that particular location?
3  A. Another officer put the shackles on.
4  Q. Do you know who that was?
5  A. I believe it was the wagon. I believe so. I
6  mean, I'm not for certain.
7  Q. When you say "the wagon," you mean the wagon
8  driver?
9  A. Yes. Billy Johnson.
10  Q. And do you know when the shackles were applied?
11  A. It was once we had him handcuffed. It was at
12  some point after the handcuffing, because he was
13  still kicking at us and everything else.
14  Q. Was it behind the wagon, or --
15  A. Yes, it was behind the wagon.
16  Q. So you moved him from where he was to the wagon?
17  A. The wagon was south of where he was located.
18  Q. How far?
19  A. Approximately ten feet, 15 feet, something like
20  that.
21  Q. So I guess what I'm trying to understand is when
22  exactly were the shackles placed on him.
23  A. After we got him handcuffed.
24  Q. When he --
25  A. At the scene. While he was still -- I mean, he

**18**

1  was being subdued by the officers.
2  Q. He hadn't been moved yet?
3  A. I don't believe so.
4  Q. And then once you got the shackles, then what
5  happened?
6  A. Then we tried to put him into the wagon.
7  Q. And did you have a hold of him when you were
8  doing that?
9  A. Yes.
10  Q. What side were you on?
11  A. I believe I was still on the right arm. I
12  believe.
13  Q. And at this point do you know how many other
14  officers were around?
15  A. I can't recall. I mean, I think the shackles
16  came on after we attempted to load him onto the
17  wagon, because he was pushing against the wagon.
18  So I'm trying to recall. I can't be exact in
19  regards -- but I want to say that he was kicking
20  at the wagon when we were trying to load him into
21  the wagon, and when he had used his legs to prop
22  himself.
23  Q. Is it possible to kick at the wagon and still be
24  shackled?
25  A. What is that?

**19**

1  Q. Is it possible to kick at the wagon and still be
2  shackled, leg shackled?
3  A. It is possible, yes. Especially when we were
4  trying to load him. I mean, we were going feet
5  first.
6  Q. So sitting here today do you recall when exactly
7  he was shackled?
8  A. I'm not for certain. I really don't -- I want to
9  say that it was before. I just remember that he
10  was kicking at the -- he was kicking at the
11  wagon, and that's why we couldn't load him into
12  the wagon, because he was kicking and he had
13  actually got his legs apart enough to where we
14  couldn't get him into the wagon.
15  Q. And what happened after that?
16  A. Medics were called. The medics were called to
17  the scene.
18  Q. How long did it take for the medics to get there?
19  A. Once again, the sense of time is kind of off.
20  Q. Okay. And I'm not -- I'm just seeing what you
21  know and what you don't know.
22  A. Right.
23  Q. So when the medics arrived what happened?
24  A. He was still fighting us, and the medics came
25  over and administered a shot.

**20**

1  Q. Before the medics arrived, where was he located
2  and what position was he in?
3  A. He was still in the street, because we couldn't
4  get him into the wagon. So he was brought back
5  down to the street where we could control him.
6  Q. Was he sitting, was he prone?
7  A. He was prone.
8  Q. When I say "prone," flat on the ground and face
9  down?
10  A. Flat on the ground, yes.
11  Q. And he's face down?
12  A. Yes, because he was -- I mean, yes.
13  Q. And then the medics arrived. Do you know which
14  medic it was?
15  A. I couldn't tell you exactly. I don't know. It
16  would be reasonable to believe that it was 29,
17  but I'm not for certain.
18  Q. If I represented to you that it was Medic Cope,
19  would you have any reason to dispute that?
20  A. No.
21  Q. Did you speak with the medic once they arrived?
22  A. No.
23  Q. Did anybody?
24  A. Not that I'm aware of. I mean, we were dealing
25  with him.

**21**

1  Q.  And while you were waiting was anybody leaning on
2      him, or where were the officers?
3  A.  Just in a position to control him.  I mean, it
4      was -- this guy was actively thrashing and
5      everything else.
6  Q.  And you say he administered a shot?
7  A.  Yes.
8  Q.  Do you know what that was?
9  A.  No.
10 Q.  Do you know where he administered it?
11 A.  I can't be for certain.  I just remember he
12     administered it.
13 Q.  Do you know what part of his body?
14 A.  The upper body.
15 Q.  Upper body.  Any idea more specifically as to
16     where, if you know?
17 A.  I can't remember.  All I remember is, you know, I
18     was on the arm and I seen the medic come in.  I
19     think it was on the right side.  It was by me.
20 Q.  So when the medic comes up what does he do first?
21 A.  What does the medic do?  I couldn't tell you for
22     certain.  I mean, I couldn't tell you for
23     certain.
24 Q.  Where was Mr. Heishman when the medic first
25     showed up?

**22**

1  A.  He was on the ground.
2  Q.  And when the shot was administered where was he?
3  A.  Still on the ground.
4  Q.  What time was this, do you recall?
5  A.  No.  Once again, it was after roll call.
6  Q.  Do you recall him tending to him at all,
7      assessing him, anything like that?
8  A.  I mean, there was no life threatening injuries.
9      I mean, there was no blood or anything on
10     Mr. Heishman.
11 Q.  And so you didn't see any blood?
12 A.  Didn't see any blood.
13 Q.  Did you see any injuries?
14 A.  None that was affecting his ability to fight us.
15 Q.  Do you recall seeing any injuries?
16 A.  No.  But once again, I didn't perform a physical
17     to make certain, you know, because, I mean, he
18     was fighting.
19 Q.  And so when the medic shows up and he administers
20     the shot somewhere in his upper body, what
21     happens next?
22 A.  It takes a little bit of time for it to take
23     effect, and we were able to put him onto the cot
24     and bring him to the back of the ambulance.
25 Q.  Do you recall how long it took?

**23**

1  A.  No, I couldn't tell you.
2  Q.  Do you recall what the medic was doing while you
3      were waiting for the medicine to take effect?
4  A.  He was monitoring him.  He was right there.
5  Q.  Was there any device on Mr. Heishman?
6  A.  No.  No, he was just monitoring him.
7  Q.  Was there any oxygen that was applied?
8  A.  Not -- I don't believe so.  Because he hasn't
9      calmed -- I mean, he wasn't calmed down yet.  It
10     wasn't until we got him onto the gurney that he
11     actually started calming down.
12 Q.  So the shot was applied when he was on the
13     ground?
14 A.  I believe so.
15 Q.  And you don't know what was given to him?
16 A.  No.
17 Q.  Have you ever had this circumstance where you've
18     been on scene and a medic has given a shot to
19     somebody?
20 A.  Yes.
21 Q.  How many times?
22 A.  I couldn't tell you exactly how many, but we --
23     right before this happened we were having an
24     epidemic of these kinds of episodes, the super
25     human strength.

**24**

1  Q.  Can you give me an approximate number?
2  A.  I know that we had one just like a week or so
3      before this.
4  Q.  Do you recall what that person's name was?
5  A.  No.
6  Q.  Was a shot administered at that point?
7  A.  Yes.  It was the only way that we could control
8      the guy.
9  Q.  And was it administered by a medic?
10 A.  Yes.
11 Q.  What happened in that case?
12 A.  I don't -- I wasn't the arresting officer.
13 Q.  Were they taken to the hospital do you know?
14 A.  Yes.
15 Q.  Any others that you can recall prior to this
16     incident?
17 A.  Not off the top of my head.
18 Q.  Have you been involved in any where there have
19     been medical complications?
20 A.  No.
21 Q.  Does that include this one?
22 A.  This one -- after we got him loaded into the
23     ambulance there was issues.
24 Q.  And you don't recall exactly how long it took for
25     the medicine to kick in, as you put it?

**25**

1  A.  Right.  I mean, it wasn't like immediate.  It
2     took a little bit, a couple of minutes for it to
3     really take into effect.
4  Q.  And so who was involved in moving him to this
5     stretcher, to the gurney?
6  A.  I couldn't tell you all the people that were a
7     part of it.  I mean, there was a couple -- four
8     of us that moved him onto the gurney.  Four or
9     five of us.  I don't recall.
10 Q.  Would it have been Officer Burnett?
11 A.  It's possible.  I mean, we were pretty exhausted.
12 Q.  And after you moved him to the gurney, then what
13    happened?
14 A.  We went to the back of the ambulance and put him
15    in the ambulance.
16 Q.  Then what did you do after that?
17 A.  I'm an EMT, so I went inside to help, make
18    certain if I could be of assistance, whatever
19    they needed.
20 Q.  And so when did you decide to go into the back of
21    the ambulance?
22 A.  I was right there.  I mean, as soon as they got
23    him inside I went inside to see if I could help
24    the medics with anything.  Because, I mean, he
25    was under arrest and the other officers had to do

**26**

1     paperwork and everything else because he's going
2     to detention.
3  Q.  When did you notice that he was having troubles?
4  A.  When they said he's going into arrest, and I
5     administered the CPR.
6  Q.  When did you hear them say he's going into
7     arrest?
8  A.  It was shortly after we got him inside the
9     ambulance.
10 Q.  Do you know at what point he started going into
11    arrest?
12 A.  I couldn't tell you exactly.  I mean, he had a
13    pulse and everything else.  They were doing
14    vitals on him.
15 Q.  When did he have a pulse?
16 A.  All the way up into the inside of the ambulance.
17    And then when we got him inside there they
18    started doing vitals, and that's when I believe
19    he coded.
20 Q.  How do you know whether he had a pulse?
21 A.  Just because they have a pulse oximeter.
22 Q.  Did you check his pulse?
23 A.  No, I did not.
24 Q.  Do you know whether they did or not?
25 A.  I couldn't tell you for certain, but they're

**27**

1     pretty -- I mean, they're putting 12 leads and
2     everything else on him.
3  Q.  So you don't know whether they were checking for
4     his pulse or not?
5  A.  He had respiratory.  He was breathing.
6  Q.  When you say he had respiratory --
7  A.  I mean there was rise and fall in his chest.
8  Q.  Did you see that?
9  A.  Yes.
10 Q.  And what point were you looking for that?
11 A.  Oh, it was -- I mean, he was panting.  He was --
12    I mean, he was calming down.  I mean, he
13    wasn't -- he was breathing a lot easier.
14 Q.  Where were you when you were looking for the rise
15    and fall of his chest?
16 A.  It was when we loaded him onto the gurney and
17    brought him around.  It was visible.  He was
18    naked.
19 Q.  So when you were loading him onto the gurney, or
20    were loading him into the ambulance?
21 A.  Both.  He was breathing both on the gurney and
22    then when we put him into the ambulance.  But, I
23    mean, when I walked around and got inside,
24    shortly after that is when they said he's going
25    into code and started doing CPR.

**28**

1  Q.  So I guess what I'm trying to figure out is you
2     first learned that he was going into cardiac
3     arrest inside the ambulance?
4  A.  Yes.  He was going into cardiac in the ambulance.
5  Q.  Was he going into cardiac arrest before you got
6     in the ambulance?
7  A.  No.
8  Q.  How do you know that?
9  A.  Because the medics -- it wasn't until we were
10    inside the ambulance that the paramedic announced
11    that he was having a cardiac issue.  And that's
12    when we started CPR.
13 Q.  Okay.  Who started the CPR?
14 A.  The other EMT, and then I was doing the oxygen.
15    I was providing breath oxygen to his lungs.
16 Q.  And how were you doing that?
17 A.  One squeeze every six seconds.
18 Q.  And did they have oxygen available in the
19    ambulance?
20 A.  Yes.
21 Q.  What were you using specifically, do you recall?
22 A.  The bag mask valve.
23 Q.  And who was in the back of the ambulance?  It's
24    Mr. Heishman, you, and who else?
25 A.  It was the medic, the other EMT, myself, and

## 29

```
1      Mr. Heishman.
2  Q.  So you were doing the bag valve?
3  A.  Yes.
4  Q.  What was the medic doing?
5  A.  I don't recall everything.  He was doing what
6      medics do with cardiac arrest.  Probably
7      getting -- I mean, I couldn't tell you everything
8      that he was doing, I was more focused on making
9      sure that I'm doing what I'm responsible for.
10 Q.  And you are trained as an EMT you said?
11 A.  Yes.
12 Q.  What was the other EMT doing, do you recall?
13 A.  He was doing the chest compressions.
14 Q.  And how long did this go on?
15 A.  Until we got the pulse back.
16 Q.  How long did that take?
17 A.  I couldn't give you an exact.  But once we got
18      his pulse back -- I had actually got on the radio
19      and told -- asked for a supervisor to come back
20      there, and Officer Burnett came back there with a
21      supervisor.  It wasn't very long, because right
22      after that they went to the hospital.
23 Q.  Why did you ask for a supervisor to come back?
24 A.  Because he was in code.
25 Q.  When you say "in code," what does that mean?
```

## 30

```
1  A.  It means that he's in cardiac arrest.
2  Q.  So what was your reasoning behind asking for a
3      supervisor?
4  A.  Just to make him aware that this guy is in
5      cardiac arrest.  I mean, it's best to have a
6      supervisor involved, especially in this
7      situation.
8  Q.  Is there a specific General Order or SOP that you
9      were trying to follow, or you just thought it
10     was --
11 A.  A supervisor needed to be aware of this.  I was
12     involved in a situation where a person overdosed,
13     and we had supervisors involved with that.
14 Q.  And when was that?
15 A.  '05.
16 Q.  So your experience with that incident in 2005
17     kind of led you to think to call a supervisor, is
18     that fair?
19 A.  Whenever there is an issue.  I mean, this is
20     obviously -- this is someone that is in our
21     custody that goes into cardiac arrest.  I mean,
22     it was a good thing to have a supervisor be
23     aware.
24 Q.  What supervisor responded?
25 A.  I think it was Ed Miller or Tom Feeney.  There
```

## 31

```
1      was a lot of people there.  And as soon as the
2      pulse was back they were gone.
3  Q.  Ed Miller is a sergeant; correct?
4  A.  Correct.
5  Q.  And Feeney is a lieutenant?
6  A.  Yes.
7  Q.  And what happened after he got pulse back?
8  A.  They took him straight to the hospital, with
9      patrol cars following him.
10 Q.  Were you still in the ambulance?
11 A.  No.
12 Q.  At what point did you get out of the ambulance?
13 A.  Right after they got the pulse back and they said
14     they were leaving.
15 Q.  And what did you do after you got out of the
16     ambulance?
17 A.  I don't recall exactly.  I mean, it was chaos.
18 Q.  Are you CIT?
19 A.  No.
20 Q.  Do you recall seeing officers standing behind the
21     ambulance when you called for a supervisor?
22 A.  No, I don't recall anybody around there.
23 Q.  Do you know who drove?
24 A.  No, I don't.
25 Q.  So after you left what were your
```

## 32

```
1      responsibilities, if anything?
2  A.  Get back in-service and start responding to
3      calls.
4  Q.  Mark back in?
5  A.  Yes, as soon as we got everything wrapped up.
6  Q.  So I'm trying to see if there was anything that
7      you did after you got out of the ambulance.
8          So you get out of the ambulance after they
9      get the pulse back; is that right?
10 A.  Yes.
11 Q.  And then did you do anything between that time
12     and when you marked back in?
13 A.  I don't recall.  I don't recall.
14 Q.  Do you recall talking to anybody?
15 A.  No one in particular.
16 Q.  Did you ever do a report or a supplement?
17 A.  No.
18 Q.  Did anybody ever ask you to do a report or a
19     supplement?
20 A.  No.
21 Q.  You met with Internal Affairs; is that right?
22 A.  Correct.
23 Q.  Did you ever meet with Detective Prater?
24 A.  I don't know who Detective Prater is.
25 Q.  Did you ever meet with an investigator?
```

33

1  A.  Yes.
2  Q.  Do you know what the name of that investigator
3      is?
4  A.  I don't recall.  This is some time ago.
5  Q.  Yes.  And like I said, I'm trying to figure out
6      what you know and what you don't know.
7          MR. BARNHART:  I don't have copies of this.
8      Is it possible to make copies?
9          (A brief recess was taken at this time.)
10         (Plaintiff's Deposition Exhibit
11     Letter R was marked for identification
12     by the reporter.)
13
14 Q.  Let me know when you've had a chance to review
15     that.
16 A.  Okay.
17 Q.  Is that a true and accurate copy of your Internal
18     Affairs statement?
19 A.  Yes.
20 Q.  And you appeared to have made this statement --
21         MS. BOX:  It's on the very first page.
22         MR. BARNHART:  Thank you.
23 Q.  October 22nd, 2014?
24 A.  Correct.
25 Q.  So this would have been shortly after the

34

1      incident?
2  A.  Correct.
3  Q.  Would your memory have been better or worse when
4      you gave this statement than it is today?
5  A.  It's a lot better.
6  Q.  So it would be fair to say that this would be a
7      more accurate representation or recollection?
8  A.  Correct.
9  Q.  You indicated in your statement that there is a
10     new narcotic on the street by the nickname of
11     Crush?
12 A.  Crush.
13 Q.  What is that?
14 A.  It's bath salts and PCP.  I believe that's --
15     they keep modifying them.
16 Q.  You indicated here also in your statement that
17     medics arrived on scene, they gave him a shot of
18     Haldol?
19 A.  Um-hm.  It could have been Haldol.  I mean,
20     didn't sit there and -- the medics are the ones
21     that verify everything else.
22 Q.  Why did you use the term Haldol?
23 A.  Just because, I mean, it's something that I've
24     seen them do before.  It has similar effects.
25 Q.  Do you know what drug they used?

35

1  A.  I do not know.
2  Q.  So when you said that they gave him a shot of
3      Haldol, you were assuming it was Haldol, you
4      weren't sure what it was?
5  A.  That is correct.
6  Q.  And you indicated here that he calmed down after
7      he was given some substance; is that right?
8  A.  That is correct.
9  Q.  What is your understanding of him calming down,
10     how did he calm down, or how did you --
11 A.  Less resistant.  Not as aggressive.
12 Q.  And at the time that the drug was administered
13     did you have physical contact with him?
14 A.  It says here we tried to lift him up to the
15     wagon.  I mean, I would assume that I still had
16     control of him.
17 Q.  And it says here, "We were standing around there
18     and I was summoned to the ambulance by one of the
19     medics because they had to get one of the hands
20     free because they were having issues with the
21     blood pressure?"
22 A.  That is correct.
23 Q.  What did you mean by that?
24 A.  Basically with the arm against the body it's hard
25     to get the cuff in there.  So I don't know

36

1      exactly, they just told me that they needed an
2      arm free.
3  Q.  So when you said they were having issues with
4      blood pressure, they were having issues with
5      measuring his blood pressure, or were they having
6      issues with the blood pressure of Mr. Heishman?
7  A.  I don't know.  They said that they needed a hand
8      free because they were having issues with blood
9      pressure.  I'm assuming that is because of where
10     the arm was handcuffed to the gurney it's harder
11     for the medics to get in there for a blood
12     pressure reading.
13 Q.  Was he ever released from his handcuffs after he
14     was handcuffed the first time?  Do you understand
15     what I mean by that?
16 A.  Once he was handcuffed by the officers was he
17     handcuffed again?
18 Q.  Yes.  Was he ever released and then handcuffed to
19     the gurney or any other --
20 A.  According to my Internal Affairs statement I
21     freed up a hand and re-secured it -- then I
22     re-secured it.  So I re-secured the hand to the
23     gurney.
24 Q.  Do you specifically recall doing that, or are you
25     relying on your statements in the report?

37

```
1  A.  No, I do recall that, because it's -- when
2      they're lying on the back we handcuff them to the
3      gurney.
4  Q.  And was this outside the ambulance?
5  A.  This sounds like it was inside the ambulance.
6  Q.  Was this when he went into cardiac arrest?
7  A.  I'm assuming that right after that they didn't
8      feel a pulse, so it was probably as the cardiac
9      arrest was occurring.
10 Q.  Can you give me kind of a better understanding of
11     the layout of the back the ambulance in terms of
12     where people are located?
13 A.  Certainly.  It's the back of the ambulance, and
14     then there is the cap.  The back of the
15     ambulance, on the passenger side is a long bench
16     seat.  On the driver's side there is a seat, a
17     single seat.  And then where the gurney would be,
18     in the front of that is a single person seat as
19     well.
20 Q.  And how much space is in the back of there?
21 A.  For the conditions there is quite a bit of space.
22 Q.  With the gurney, how many people can comfortably
23     sit in the back, I guess is my question?
24 A.  Four.  Maybe -- well, maybe five.  I mean, it
25     depends on the bench.  I mean how many people can
```

38

```
1      fit on the bench.  But it can do four to five
2      comfortably.
3  Q.  And this indicates that you checked his pulse and
4      you didn't get any dismal pulse?
5  A.  Distal.
6  Q.  And how did you check that?
7  A.  Just basically, you know, for the pulse off the
8      arteries.
9  Q.  Do you know specifically where you were feeling?
10 A.  Seeing that I'm up by the head, it would be the
11     carotid.
12 Q.  So the carotid artery in his neck?
13 A.  Yes.  By his Adams apple.
14 Q.  And you felt that there was no pulse; is that
15     correct?
16 A.  That is correct.
17 Q.  And you were inside the ambulance at that point?
18 A.  Correct.
19 Q.  Do you recall seeing whether his eyes were open
20     or closed?
21 A.  I don't recall.
22 Q.  Prior to getting in the ambulance and when you
23     were on the ground with him, you indicate on page
24     4 that, "he in his mind gave me the impression
25     that he was truly fearful for his life."  About
```

39

```
1      halfway down the second large paragraph.
2  A.  Yes, that he was actually fearful that the
3      demons -- that he was actually seeing demons.
4  Q.  Was it your impression or understanding that he
5      was scared?
6  A.  Yes.  I believe that in his mind that he was
7      seeing demons.
8  Q.  Did he ever throw any punches at you?
9  A.  Not at this time.  He was just -- he was
10     fighting.  I mean, he was -- we were trying to
11     get him under control.
12 Q.  He was trying to release himself from your grasp,
13     but was he throwing any punches?
14 A.  He didn't have the ability to because of the
15     number of officers that it was taking to do it.
16 Q.  So the officers are on top of him, and how was he
17     fighting?
18 A.  I guess I don't know what you mean by "fighting."
19 Q.  Yes, and that's what I'm trying to understand.
20         In terms of when the officers are on top of
21     him you indicated that he was struggling with
22     you.  How exactly, how would you articulate how
23     he was struggling?
24         MS. BOX:  And I'm going object briefly, just
25     because I don't think there has been any
```

40

```
1      testimony that officers were on top of him.
2  Q.  Okay.  Let me clarify.  So when you responded to
3      him and you were assisting with him on the
4      ground; right?
5  A.  Um-hm.
6  Q.  And he was in the prone position; is that
7      correct?
8  A.  Correct.
9  Q.  And you grabbed his arm; is that right?
10 A.  Yes.
11 Q.  So you indicated he was trying to get away or he
12     is struggling; right?
13 A.  He was not complying with the officers'
14     direction.
15 Q.  How was he not complying?
16 A.  I mean, the officers were trying to get him under
17     control, get him into cuffs.  I mean, according
18     to my statement he was in cuffs -- according to
19     this he was thrashing around and the officers
20     were having a difficult time maintaining control
21     of the individual.  And then he was demonstrating
22     the super human strength, and that he was seeing
23     demons, and the demons are trying to kill him.
24 Q.  And there is an indication here that you had
25     received two straps.  What is a strap?  I'm
```

41

```
1    referencing that second full paragraph on page 4.
2    Or a large paragraph I should say.
3  A. Two straps to the gurney I'm assuming.
4  Q. At any point did you ever see Mr. Heishman throw
5    any punches or any strikes?
6  A. No.  I seen him kicking, I seen him -- he was
7    doing -- he was pushing off the ground with
8    multiple officers there with him.
9  Q. So he was grappling, but he never threw any
10   strikes?
11 A. No.
12 Q. And when you were giving this statement is it
13   fair to say you were doing your best to give a
14   true and accurate statement?
15 A. Yes, I was.
16 Q. Is there anything in here that as far as your
17   recollection now that you believe is inaccurate
18   or untrue?
19 A. No.
20 Q. At the point when you were engaging him and you
21   were on the ground, were you using your body
22   weight to assist you in keeping him on the
23   ground?
24 A. No.
25 Q. What is your height and weight, sir?
```

42

```
1  A. 5' 11", and about 250.
2  Q. Is that what you weighed around that time as
3    well?
4  A. Yes.
5  Q. And when I say "around that time," let me be
6    clear and say at the time that this incident
7    occurred in October of 2014.
8  A. That is correct.  I may have been a little bit
9    lighter.  I've aged.
10 Q. Fair enough.  So when you say a little bit
11   lighter, can you give me an idea of that?
12 A. I couldn't tell you exactly what I weighed.
13 Q. So is that close?
14 A. It's relatively close, yes.
15 Q. Whenever there is a taser involved there is
16   usually a Use Of Force report; is that correct?
17 A. Yes.
18 Q. Do you recall seeing a Use Of Force report in
19   this case?
20 A. No.  That's something that would have been
21   drafted.
22 Q. Would you ever have seen it?
23 A. No, I wouldn't have seen it.  It wouldn't have
24   been pertaining to me.
25 Q. What businesses actually were around when this
```

43

```
1    incident occurred, do you know?
2  A. Yes.  There is a bar on the northeast corner.
3  Q. What is the name of that bar?
4  A. Friendly's.  Friendly's Inn.  I'm trying to make
5    certain, because there is two bars that is down
6    the street from one another.  I think it was
7    Friendly's Inn.
8  Q. What is the other bar you're thinking of?
9  A. Eastwinds.
10 Q. How far are they apart?
11 A. Four blocks, three blocks.
12 Q. Have you ever had any runs to Friendly's bar?
13 A. Yes.
14 Q. How many?
15 A. Not as many as I would expect.  I mean, it's --
16   maybe four or five a year, if that.  Now I don't
17   have any because I'm on day shift.
18 Q. Did you have any injuries as a result of this
19   incident?
20 A. According to this here, I had some scratches.
21 Q. Where?
22 A. Scratches to my hands.
23 Q. To your hands?
24 A. Yes, sir.
25 Q. Any other injuries that you can recall?
```

44

```
1  A. Not that I can recall.  I mean, I did have to go
2    through blood borne pathogens and all that other
3    stuff.
4  Q. When would you have to do that?
5  A. When there is open wound blood exposure.
6  Q. So you had said scrapes.  You didn't have any
7    open wounds?
8  A. Well, I mean, I had -- there wasn't anything that
9    like needed -- I'm trying to think, because I've
10   had -- I was gloved up, but there was mention
11   about some scratches.  In my statement I made
12   mention to it.  I can't find it at this time.
13 Q. Were you exposed to any of Mr. Heishman's blood
14   to your recollection?
15 A. I don't believe so.
16      MR. BARNHART:  I believe that's all that I
17   have.
18
19 CROSS-EXAMINATION,
20    QUESTIONS BY MS. MARY FELDHAKE:
21 Q. I have just a few questions.  My name is Mary
22   Feldhake, and I represent the IEMS.
23      I think previously you said that you went
24   into the back of the ambulance to help out
25   because you're also an EMT, and that the other
```

**45**

1 officers had paperwork, and that Mr. Heishman was
2 going to detention. Was it your understanding
3 that he was going to detention from the scene?
4 A. Yes. Wishard/Eskenazi has got a detention area
5 where prisoners go for medical services.
6 Q. So he was going to the hospital, and a detention
7 unit was in the hospital, is that what you're
8 saying?
9 A. That is correct. Where inmates go from the jail
10 prison system, and also people that have been
11 arrested by the department.
12 MS. FELDHAKE: Okay. That's all that I have.
13
14 CROSS-EXAMINATION,
15 QUESTIONS BY MS. KATHRYN BOX:
16 Q. Officer, I just have a few clarification
17 questions. I think the first one, if you go back
18 to page 4, there was a reference to you having
19 two straps.
20 Is it possible that that was a typo, and it
21 could be that you were trying to say you had two
22 scratches? Because that sentence continues, "I
23 sustained scratches to my hands."
24 A. That could be.
25 Q. Okay.

**46**

1 A. And it does mention that I did have blood
2 exposure from Dusty.
3 Q. And then turning to the next page, page 5, you
4 were asked, "Was anybody laying on top of him or
5 kneeling on top of him," and you said not that
6 you saw or can recall. Is your recollection any
7 different today?
8 A. No, it's -- I mean, this is a better statement.
9 I mean, this is fresh, and I mean I would agree
10 with my statement to this day.
11 Q. Okay. And there was also some discussion, and I
12 don't remember the paragraph right now. I think
13 that same paragraph with the two straps. It
14 talks about in his mind he was scared.
15 Did you ever feel like he was scared of the
16 officers?
17 A. No.
18 Q. Did you ever feel like he felt like the officers
19 were going to kill him?
20 A. No, he never made any kind of mention about us
21 being demons.
22 Q. And after the medication was administered
23 Mr. Heishman was put on the gurney.
24 Were you monitoring his breathing at that
25 time?

**47**

1 A. No.
2 Q. Do you remember seeing if he was breathing at
3 that time?
4 A. I'm sorry.
5 Q. That's okay. Take your time.
6 A. I don't recall actually just sitting there and
7 monitoring his breathing.
8 Q. Did you have any reason at that time to think
9 that he wasn't breathing?
10 A. No.
11 Q. Did you at any time feel like he was in distress?
12 A. No.
13 Q. Officer Bueckers, do you have any special
14 training in narcotics or drugs?
15 A. I went through the DRE program. Drug Recognition
16 Expert.
17 Q. Can you explain a little bit about what the DRE
18 program is?
19 A. It's basically -- for impaired drivers we do
20 evaluations on individuals, cooperative
21 individuals, and basically we can categorize --
22 after a full evaluation we can kind of put into a
23 category what an individual is on, whether it be
24 a depressant, a stimulant, hallucinogen. So
25 that's basically what we do. But in regards to

**48**

1 the DRE program, it's to log that it's a medical
2 condition versus a narcotic related offense for
3 impaired drivers.
4 Q. Okay. And based upon your training with DRE did
5 you form an opinion as to Mr. Heishman?
6 A. Yes.
7 Q. And what was that?
8 A. That he showed signs of being on a hallucinogen
9 and a stimulant.
10 MS. BOX: No other questions.
11 MR. BARNHART: Nothing else.
12 MS. FELDHAKE: Nothing for me. Thank you.
13

WILLIAM BUECKERS

14
15
16
17
18
19
20
21
22
23
24

49

STATE OF INDIANA    )
                    )
COUNTY OF MARION    )

      I, Russell J. Scheiner, RPR, CSR, and a
Notary public in and for said county and state, do
hereby certify that the deponent herein was by
me first duly sworn to tell the truth, the whole
truth and nothing but the truth in the
aforementioned matter;

      That the foregoing deposition was taken on
behalf of the Plaintiff; that said deposition was
taken at the time and place heretofore mentioned
between the hours of 8:00 a.m. and 6:00 p.m.;

      That said deposition was taken down in
stenograph notes and afterwards reduced to
typewriting under my direction; and that the
typewritten transcript is a true record of the
testimony given by said deponent, and thereafter
presented to said witness for signature; that this
certificate does not purport to acknowledge or verify
the signature hereto of the deponent.

      I do further certify that I am a
disinterested person in this cause of action; that I
am not a relative of the attorneys for any of the

50

parties.

      IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my notarial seal this_____day
of_____, 2016.


              _____
              RUSSELL J. SCHEINER, RPR, CSR, Notary Public

My commission expires:
October 29, 2016


Job No. 0904BAR

51

Scott Barnhart, Esq.
Brooke Smith, Esq.
KEFFER BARNHART, LLP
230 East Ohio Street
Suite 400
Indianapolis, Indiana  46204

      NOTICE OF DEPOSITION FILING

Billie Thompson, as Personal Representative of the
Estate of Dusty Heishman, vs. City of Indianapolis,
Indianapolis Metropolitan Police Department, et al.

U. S. District Court, Southern District of Indiana
Indianapolis Division, Cause No. 1:15-cv-1712-TWP-DML

      In compliance with Indiana Rules of Trial
Procedure, Rules of the Industrial Board or
Federal Rules of Civil Procedure, pursuant to
Indiana Supreme Court order dated 10-1-06, you
are notified of the filing with counsel for the
Plaintiff, the deposition of WILLIAM BUECKERS.

      Returned with ____ without ____ corrections.

      _____
      (Date of filing or mailing by
      certified mail.)

cc:

Kathryn Box, Esq.
OFFICE OF CORPORATION COUNSEL
200 East Washington Street
Suite 1601
Indianapolis, Indiana  46204

Mary R. Feldhake, Esq.
Bose McKinney & Evans, LLP
111 Monument Circle
Suite 2700
Indianapolis, Indiana  46204

      RUSSELL J. SCHEINER, RPR, CSR, Notary Public
             3437 Beasley Drive
          Indianapolis, Indiana  46222
          Tel. & Fax (317) 299-6302