**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| BILLIE THOMPSON, as personal representative of the ESTATE OF DUSTY HEISHMAN, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:15-cv-01712-TWP-DML ) |
| CITY OF INDIANAPOLIS, INDIANAPOLIS DEPARTMENT OF PUBLIC SAFETY, INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, BRIAN BURNETT, DONALD SPIEGL, WILLIAM BUECKERS, PHILLIP GREENE, MARION COUNTY SHERIFF'S DEPARTMENT, BILLY JOHNSON, HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, LANCE COPE, MARK BRITTON, and WILLIAM  PATTERSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**ENTRY ON CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants City of Indianapolis, Indianapolis Department of Public Safety, Indianapolis Metropolitan Police Department ("IMPD"), Marion County Sheriff's Department, Officer Brian Burnett ("Officer Burnett"), Officer Donald Spiegl ("Officer Spiegl"), Officer William Bueckers ("Officer Bueckers"), Park Ranger Phillip Greene ("Ranger Greene"), and Sergeant Billy Johnson ("Sergeant Johnson") (collectively, "City Defendants") ([Filing No. 90](Filing No. 90)).  Plaintiff Billie Thompson ("Thompson"), as personal representative of the Estate of Dusty Heishman ("Heishman"), filed this action alleging numerous state law claims and Fourth and Fourteenth Amendment violations pursuant to 42 U.S.C. § 1983 ("Section 1983") after Heishman died following his arrest.  Thompson's Section 1983 claims are for excessive force,

deliberate indifference, and failure to protect or intervene. The City Defendants ask for summary judgment on Thompson's claims, arguing that they are entitled to qualified immunity and the state law claims are barred by the Indiana Tort Claims Act. For the following reasons, the Court **grants in part and denies in part** the City Defendants' Motion for Summary Judgment.

## I.    <u>BACKGROUND</u>[1]

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Thompson as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On the evening of October 5, 2014, at approximately 7:45 p.m., a grandmother of young children called 911 to alert police to the belligerent and erratic behavior of a man (later identified as Heishman) who was naked and out on the streets down the road from Bryants Friendly Inn, close to Iowa and East Streets in Indianapolis, Indiana. Prior to taking off his clothes, Heishman was yelling at a woman across the street who was trying to get him into her car. He removed his clothes and was shouting, "kill me, shoot me," while running around in the street (Filing No. 119-15 at 2–3).

As he was running around naked, Heishman jumped into the bed of a pickup truck. While the truck was moving, Heishman began hitting the back window with a pipe. He broke the window and attempted to hit the driver. The driver accelerated to try to throw Heishman from the truck. This was unsuccessful, so the driver continued to drive around the neighborhood to look for help.

---

[1] Portions of this background section should look familiar to the parties because, in drafting this section, the Court borrowed from the background section of its Entry on Medical Defendants' Motion for Partial Summary Judgment (Filing No. 151) for the sake of judicial efficiency.

He stopped near Bryants Friendly Inn, where Heishman jumped off the truck ([Filing No. 92-2 at 3](#)–5).

Officer Brian Burnett was in the area and received a dispatch call regarding a man exposing himself on Terrace Avenue.  He headed in that direction and encountered Heishman near Bryants Friendly Inn, so he radioed in the new location to dispatch. He immediately noticed that Heishman was naked, sweating profusely, and had blood on his hands. Heishman was surrounded by several people and bouncing around.  It appeared to Officer Burnett that Heishman was "really pumped up" and under the influence of narcotics ([Filing No. 92-3 at 2](#)–4).

Officer Burnett exited his police vehicle and directed Heishman to calm down and to sit down on the ground; however, Heishman began to approach Officer Burnett and his vehicle and ignored his commands. Because Heishman was approaching Officer Burnett and was not responding to commands, Officer Burnett used his Taser to try to get compliance.  The Taser hit Heishman's stomach and chest and knocked him to the ground.  Officer Burnett ran two continuous Taser cycles through Heishman for a total of nine seconds.  Heishman pulled the wires out of the Taser probes and then jumped back onto his feet.  *Id.* at 3–4; [Filing No. 92-12 at 2](#).

Heishman tried to climb into Officer Burnett's police vehicle, but Officer Burnett was able to lock the car using his key fob.  When Heishman could not get into the car, he turned back toward Officer Burnett and approached him.  The two circled the police vehicle, with Officer Burnett trying to keep some distance away from Heishman.  Officer Burnett continued to give verbal commands to calm down or sit down, but Heishman stared through him and did not respond. Heishman repeatedly said that "they're trying to kill me."  ([Filing No. 92-3 at 4](#)–5).

In a moment that appeared to be compliance with Officer Burnett's commands, Heishman decided to lay down in the middle of the street on his stomach with his hands behind his back.

Officer Burnett approached Heishman and knelt down, placing his knee on Heishman's shoulder, and attempted to handcuff him. This lasted approximately five seconds until Heishman started squirming and jumped to his feet and jogged away. As Heishman was squirming and getting back up, Officer Burnett tried to hold him down and delivered a knee strike, but this was ineffective (Filing No. 92-4, video of incident at 0:24–0:42).

Officer Burnett asked for help from two civilian bystanders, Mark Britton ("Britton") and William Patterson ("Patterson"), who were on the sidewalk near his police vehicle. They immediately responded and tried to get Heishman on the ground. Heishman and the two civilians engaged in a physical struggle, and they were able to get him to the ground briefly. Officer Burnett went to his police vehicle to get his baton and then approached the three men. Heishman was actively fighting Britton and Patterson by throwing elbows, kicking, swinging, and biting. Heishman elbowed Britton in the face, possibly breaking his nose, and bit Britton's hand. Britton and Patterson punched and hit Heishman during the physical altercation, and one of them choked Heishman, trying to get his compliance. When they had Heishman back on the ground, Officer Burnett tried to get handcuffs on him, but the men still struggled to subdue him. Officer Burnett gave directions to Britton and Patterson throughout the altercation to guide them in containing Heishman. Officer Burnett had his leg on Heishman's shoulder to try to "deaden" his arm to gain control. Other law enforcement officers began arriving on the scene to assist with the arrest. Officer Burnett asked Officer Spiegl and Ranger Greene to help control Heishman's legs (Filing No. 92-3 at 5–7, 10; Filing No. 119-2 at 1). Officer Spiegl used a metal, expandable baton— striking Heishman about three times on the legs—to try to get Heishman down and control his legs, but this was unsuccessful (Filing No. 92-6 at 3).

During the ongoing struggle, Officer Burnett attempted to drive-stun Heishman with his Taser for approximately four seconds to gain compliance (Filing No. 92-4, video of incident at 2:40–2:44; Filing No. 92-12 at 2).  As additional law enforcement officers arrived on scene, they tried to move civilians away from the ongoing struggle, and they assisted with trying to arrest Heishman.  Officer Bueckers arrived on the scene and tried to help with securing one of Heishman's arms.  He tried to extend Heishman's arm away from his body, but Heishman was able to keep his arm bent and tucked in.  Officer Bueckers observed that Heishman was extremely sweaty and exhibiting incredible strength.  Heishman was grunting and groaning and at one point uttered, "they are going to kill me." Heishman was difficult to handle and control, so the officers made a plan to link two sets of handcuffs together.  Eventually after several minutes, the officers were successful at getting handcuffs on Heishman behind his back.  Once the handcuffs were secured on Heishman, he started to calm down for moments, but then he would begin to resist the officers again (Filing No. 92-3 at 6–7; Filing No. 119-2 at 1; Filing No. 92-6 at 3; Filing No. 92-7 at 3).

Sergeant Johnson (from the Marion County Sheriff's Department) arrived on the scene with the police transport wagon after Heishman was already handcuffed.  One of the officers asked for leg shackles, so Sergeant Johnson gave him leg shackles to apply to Heishman.  At this point, Britton and Patterson were no longer assisting the officers (Filing No. 119-4 at 5).  Sergeant Johnson observed that Heishman was naked on the ground and had a number of officers around him who were holding him to maintain control over him.  Sergeant Johnson observed that Heishman was face down on his stomach, and the scene was secure despite Heishman's attempts to struggle.  Sergeant Johnson talked with Sergeant Ed Miller about a plan to get Heishman into the police transport wagon. Leg shackles were applied to Heishman, and then, with the assistance

of approximately four other police officers, Sergeant Johnson walked Heishman to the back of the wagon. Heishman was very tense and stiffened his body, making it difficult to move him to the wagon and to get him up into the wagon. Heishman stepped up onto the step of the wagon and then pushed back with his legs on the wagon, knocking the police officers off balance. The officers were able to get Heishman back to the ground and hold him there. *Id.* at 5–7.

Sergeant Johnson then said to Sergeant Miller, "I'm not going to be able to take him for safety reasons." (Filing No. 119-4 at 7.) Sergeant Johnson explained, "I'm not going to be able to transport him, and they requested a medic." *Id.* at 9. Sergeant Johnson later indicated, "It just was to[o] unsafe in his condition to put him in a cage in the back of a wagon and transport him and then try to get him out at the APC so for my safety and his safety a medic was summoned." (Filing No. 119-5 at 3.) Officer Burnett also explained that, after the officers could not get Heishman into the wagon, the officers "just knew that he wasn't getting in the wagon, so we said the only other choice is to get him on a cot." (Filing No. 119-1 at 11.)

When asked what the objective was concerning Heishman, Sergeant Johnson explained that, first it was to put him into the police transport wagon, and when that was unsuccessful, "just to hold him down and restrain him until the medics arrived." (Filing No. 119-4 at 22.) When asked where Heishman would be transported to, Sergeant Johnson explained, "Probably to Eskenazi [Hospital]. He was too intoxicated or too out of control probably for the APC [Arrestee Processing Center]." *Id.* The Marion County Sheriff's Department "maintain[s] custody over prisoners at the Eskenazi Hospital. . . . [T]hat's where people under arrest go. . . . [W]e have a specially built holding room out there just for people in custody." *Id.* at 14.

While waiting for a medic, Heishman was held on the ground face down on his stomach with approximately four officers staying in physical contact with him. He occasionally pushed

back on the officers who were holding him. Sergeant Johnson delivered a knee strike to Heishman's leg and knelt on the back of Heishman's legs to hold him down.[2] Another officer used a pain compliance or pressure point wrist manipulation, attempting to gain control over Heishman. It took the medics approximately three to five minutes to arrive on the scene. *Id.* at 9–10.

Medic Lance Cope ("Medic Cope") and his EMT partner, Josue Ceballos, were dispatched to the area in response to a complaint of an animal bite incident. They arrived at the scene at approximately 8:02 p.m. and learned that the animal bite incident did not involve an animal, but rather, Heishman had bitten someone (Britton) ([Filing No. 119-7 at 1](#)–2; [Filing No. 119-6 at 15](#)).

Soon after Medic Cope arrived at the scene, an IMPD officer approached him and asked that he first help with another person (Heishman) who was being combative. Medic Cope followed the officer and observed that Heishman was lying prone in the middle of the street, was handcuffed behind his back with leg shackles on, and had been tased. Medic Cope also observed that Heishman was struggling with approximately five police officers who were holding him down ([Filing No. 119-7 at 1](#)). An officer indicated that he believed Heishman was intoxicated on PCP or other drugs. Medic Cope received a brief rundown of the history of what happened before he arrived on the scene. Medic Cope did a quick assessment of Heishman, checking his airway, breathing, circulation, and pulse. It appeared to Medic Cope that Heishman was under the influence of some type of amphetamine ([Filing No. 119-6 at 6](#)).

Medic Cope gave Heishman ten milligrams of Versed intramuscularly in his left deltoid muscle as a "chemical restraint for patient and crew safety." ([Filing No. 119-7 at 1](#).) Within a couple of minutes after the injection, Heishman calmed down. Medic Cope was surprised by how

---

[2] Sergeant Johnson weighed approximately 330 pounds with his gear on, and he applied most of his weight on the back of Heishman's legs to hold him. Heishman was still able to lift up Sergeant Johnson ([Filing No. 119-5 at 3](#)).

quickly the Versed had an effect because normally it takes approximately ten minutes to be effective when injected intramuscularly. Medic Cope visually monitored Heishman during the couple of minutes while the Versed was taking effect, watching his breathing and watching for any struggling (Filing No. 119-6 at 16). No one monitored Heishman's vital signs or used medical devices to monitor him; instead, he was left on the ground until it appeared the Versed had its effect (Filing No. 119-4 at 23).

The IMPD and EMS crews picked up Heishman and placed him on a cot, laying him on his back. He was covered with a blanket and moved toward the ambulance. While moving to the ambulance, it became apparent that Heishman was no longer breathing, but it was difficult to assess his condition because of the darkness outside. Once he was inside the ambulance, Medic Cope noted that Heishman was not breathing, and he had no pulse. Heishman's handcuffs and Taser probes were removed after he was placed inside the ambulance, and CPR was started because Heishman had gone into respiratory and cardiac arrest (Filing No. 119-7 at 1). After approximately seven minutes of CPR, Heishman was revived but not conscious. *Id.* at 3–4.

Heishman was transported to Eskenazi Hospital and then transferred to Methodist Hospital the following day. Heishman had lost brain function and was treated with hypothermic therapy in an attempt to recover brain function. The attempts were futile, and Heishman died on October 13, 2014 (Filing No. 119-10 at 3). His cause of death was noted as "complications of excited delirium" with contributing factors of "acute methamphetamine intoxication, positional body restraint by law enforcement, acute psychotic state (mania), dilated cardiomyopathy, discharge by electric stun device, and history of grand mal seizure disorder." *Id.* at 1.

After the incident on October 5, 2014, but before his death, Heishman was charged with resisting law enforcement, battery resulting in bodily injury, criminal mischief, and public nudity

([Filing No. 119-2 at 1](#)).   After his death, the charges against Heishman were dropped.   On September 28, 2015, Thompson, representing the Estate of Heishman, filed this action alleging Fourth and Fourteenth Amendment violations pursuant to Section 1983, as well as numerous state law claims, against the City Defendants and other co-defendants. Thompson's Section 1983 claims against the City Defendants allege excessive force, deliberate indifference, and failure to protect or intervene.   The City Defendants seek summary judgment on the three constitutional claims, asserting qualified immunity, and on the state law claims under the Indiana Tort Claims Act.

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).   "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

The City Defendants request summary judgment on each of Thompson's constitutional claims—excessive force, deliberate indifference, and failure to protect or intervene—on the basis of qualified immunity. They also assert that summary judgment is appropriate on Thompson's state law claims under the Indiana Tort Claims Act.

### A.    Qualified Immunity and the Constitutional Claims

The City Defendants argue that they are entitled to qualified immunity against Thompson's constitutional claims. They explain, "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether qualified immunity applies, courts consider, "in the light most favorable to the party asserting the injury, [whether] the facts alleged show the officer's conduct violated a constitutional right," and "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The City Defendants assert that Thompson's claims fail under both prongs of the qualified immunity test.

1.      **Excessive Force**

Regarding the excessive force claim, the City Defendants raise the well-established standard that these claims are analyzed under the Fourth Amendment's "objective reasonableness" standard, which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 388, 396 (1989).

Quoting *Graham*, the City Defendants explain,

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97 (citations and quotation marks omitted).  They also direct the Court to the Seventh Circuit cases of *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005), and *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), asserting that this case is more akin to *Estate of Phillips*, where the Seventh Circuit determined that summary judgment was appropriate.

In *Abdullahi*, an officer knelt on the arrestee's back and shoulder area after the arrestee already was laying prone on the ground.  The arrestee died approximately two minutes later.  All the doctors agreed that the cause of death was the chest and neck trauma and a collapsed lung. Evidence also suggested that the injuries and death could have resulted from the officer's actions, and a doctor suggested that the officer used enough force to crush the arrestee's chest cavity.  The Seventh Circuit determined that, because a reasonable jury could find that kneeling on an arrestee with enough force to cause his death was excessive, there was a disputed fact that should go to

trial regarding the reasonableness of the force used and whether it was excessive. *Abdullahi*, 423 F.3d at 766, 771, 773.

In *Estate of Phillips*, the arrestee was evicted from a hotel room for erratic and destructive behavior. He snuck back into the hotel room the following morning, and when housekeeping checked on the room, he was found naked in the room. He barricaded himself in the hotel room. Hotel security broke down the door and called for police. Officers believed the arrestee had ballpoint pens clenched in his fists, so they grabbed his wrists, and a physical struggle ensued. The arrestee violently tried to break free from the officers. One officer placed her knee on his right shoulder to keep him down, and he remained handcuffed in the prone position for several minutes while paramedics were summoned. They watched him while he lay in the prone position. The arrestee stopped breathing and lost his pulse. Paramedics arrived and performed CPR, and the arrestee regained his pulse; however, he died at the hospital the next day, and the doctor determined that many factors contributed to his death. The Seventh Circuit determined that the officers' actions were objectively reasonable based on the circumstances that they confronted and as the situation escalated, and thus, summary judgment was granted to the officers on the excessive force claim. *Estate of Phillips*, 123 F.3d at 588–93. The Seventh Circuit also noted, "Authorities must be allowed to graduate their response to the demands of any particular situation. . . . Restraining a person in a prone position, is not, in and of itself, excessive force when the person restrained is resisting arrest." *Id.* at 593.

The City Defendants argue that this case is like *Estate of Phillips*, where there is no evidence that officers used any amount of force that could have severely injured Heishman or could have been the primary cause of his death. Instead, the City Defendants assert, the evidence clearly shows that the uses of force were measured responses to Heishman's ongoing resistance

and were necessary to effectuate his arrest and for the protection of Heishman, the officers, and the others nearby. While some uses of force may have contributed to Heishman's death, like in *Estate of Phillips*, the focus should be on whether those uses of force were objectively reasonable under the circumstances. The Court will examine each circumstance alleged.

### a) Excessive force use of the Taser

Focusing on the facts of this case, the City Defendants assert that Officer Burnett's use of a Taser was objectively reasonable. They explain that Heishman was approaching Officer Burnett and not complying with verbal commands to calm down or sit down. In response to Heishman's failure to comply, Officer Burnett used the Taser to try to gain compliance and to arrest him. The Taser report indicated three cycles were fired: two were consecutively cycled when Heishman was first approaching Officer Burnett, and the third cycle was minutes later as a reaction to Heishman grabbing Officer Burnett when the men were struggling on the ground. The City Defendants argue that the use of the Taser was objectively reasonable in light of Heishman's active resistance and the need to arrest him. They assert that, if Officer Burnett's use of the Taser was unreasonable, it would be hard to imagine any situation where using a Taser is reasonable.

Thompson argues that the use of the Taser was unreasonable because it was one of the contributing factors to Heishman's death according to Dr. Sozio, who performed the autopsy. Pointing to allegedly conflicting evidence concerning whether the Taser was used for only one cycle or three cycles, Thompson asserts that the conflicting evidence also supports a finding of unreasonableness.

Thompson compares this case to *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), where officers tased an unarmed, mentally ill person who was located on private property and wearing nothing but a bathrobe. When the arrestee did not comply with the officer's initial command to come down to the street from the driveway, the officer fired his Taser on the

individual. The arrestee fell to the ground and eventually got back on his feet but then fell to the ground again. The officer tased the individual again, which caused him to roll down the driveway. He stopped rolling near the bottom of the driveway, landing on his stomach with his hands underneath him. When he did not comply with orders to put his hands behind his back, the officers tried to dislodge his hands out from underneath him, and the officer "deployed the Taser in drive-stun mode to [his] back several times over the next minute or so." *Id.* at 860. The evidence was conflicted concerning how many times the Taser was fired; the officer testified to firing it six times, yet the Taser report indicated twelve trigger pulls. The court determined that this evidence created "enough of a factual discrepancy" regarding the amount of force used to preclude summary judgment. *Id.* at 862.

Thompson argues that, in light of the totality of the circumstances, the use of the Taser was unreasonable. Officer Burnett knew that Heishman was naked, unarmed, and intoxicated. Thompson asserts that Heishman did not try to hit or touch Officer Burnett. Despite this, Officer Burnett tased Heishman for nine seconds through the first two cycles. This, Thompson claims, was obviously unreasonable.

The Court views the evidence in the light most favorable to Thompson as the non-moving party. There appears to be no real, meaningful dispute regarding how many times the Taser was used. The Taser report clearly indicates that the Taser was used three times: two continuous cycles for a total of nine seconds and a later third cycle for four seconds (Filing No. 92-12 at 2). Thompson points to deposition testimony from Officer Burnett where he states he ran one five-second cycle through Heishman. However, later in his deposition, Officer Burnett acknowledges the three times the Taser was used (Filing No. 119-1 at 16–17). The City Defendants acknowledge

in their summary judgment motion that the Taser report indicates Officer Burnett pulled the trigger three times, and the third time was in response to Heishman grabbing Officer Burnett.

Thompson ignores the undisputed facts leading up to Officer Burnett's initial use of the Taser. She relies on her assertion that Heishman did not try to hit or touch Officer Burnett. However, the undisputed evidence indicates that Officer Burnett responded to a dispatch call for public exposure; he was the only officer on scene when he encountered Heishman; there was a crowd gathered around Heishman; Heishman was naked, sweaty, and had blood on his hands; Heishman appeared to be "pumped up" on drugs; and when Officer Burnett commanded Heishman to calm down and sit down, Heishman refused to comply and came after Officer Burnett. That Heishman did not initially hit or touch Officer Burnett is likely because Officer Burnett was backing away from Heishman when he came at the officer while giving him commands to calm down. Under the circumstances of this case, it was objectively reasonable for Officer Burnett to use his Taser to try to gain compliance from Heishman who was under the influence of drugs, not complying with officer's commands, and coming at the officer who was the sole officer on the scene at the time.

The third use of the Taser, for four seconds, occurred about two-and-a-half minutes later when Heishman was actively fighting with the men who were trying to contain him. At this point, Heishman had been up and down from the ground multiple times and had been fighting and struggling with at least two or three other men. Heishman was on the ground, without handcuffs on, and still resisting arrest. Heishman grabbed Officer Burnett, who in response, used the Taser to try to gain compliance. Under these circumstances, this use of the Taser also was objectively reasonable.

The Court notes that this case is not like *Cyrus*, where the arrestee had not engaged in active fighting with the officers or others and had not come at the officer. This case is not like *Cyrus*, where the officer tased the arrestee two times and then again "deployed the Taser in drive-stun mode to [his] back several times over the next minute or so," with conflicting evidence of six to twelve trigger pulls. *Cyrus*, 624 F.3d at 860. In this case, Officer Burnett's use of his Taser was a reasonably measured response to the circumstances facing him.

### b) <u>Excessive force regarding failure to handcuff</u>

Based on interrogatory responses from Thompson, the City Defendants next focus on the claim that they used excessive force when Officer Burnett failed to handcuff Heishman when Heishman freely laid on the ground. They assert that Officer Burnett's failure to initially handcuff Heishman was the result of Heishman's own actions of squirming and jumping back on his feet. Additionally, his failure to handcuff Heishman is a failure to use force, not an excessive use of force. Thompson does not respond to this argument. The Court concludes that it was not an excessive use of force when Officer Burnett failed to initially handcuff Heishman when he voluntarily laid on the ground and then squirmed and jumped back to his feet.

### c) <u>Excessive force from assisting civilians</u>

Next, the City Defendants assert that it was objectively reasonable for Officer Burnett to utilize the assistance of civilians to effectuate Heishman's arrest. They explain that they have not had success in finding analogous case law in the context of using civilians for seizures, but case law allows the use of civilians for searches, and the same principles of objective reasonableness apply to searches and seizures under the Fourth Amendment.

In light of the circumstances, Court agrees that Officer Burnett acted reasonably when he asked Britton and Patterson for assistance. At the time he asked for assistance, Officer Burnett was by himself, confronted by a naked adult male who was forcibly resisting arrest. Heishman's

actions made it impossible for Officer Burnett to effectuate the arrest without the assistance of others.  Officer Burnett clearly needed the assistance of Britton and Patterson because, at the time of the request for help, Heishman was running away from Officer Burnett.

The City Defendants also argue that Officer Burnett acted reasonably by not allowing Britton and Patterson to use excessive force.  They point to Officer Burnett's deposition testimony:

> I observed Mr. Britton had his arm around his neck, choking him. And I know since I had to ask him to help, obviously I still have to make sure they're doing the right thing, so I told them not to choke him, but to stay on top of him, hold him down.
> . . .
> At the same time I'm trying to watch Mr. Britton. I observed Mr. Patterson striking Mr. Heishman in the torso area. I told him to stop hitting him, it's not going to be effective, and to get his right arm. That's when Mr. Patterson started trying to control his right arm. And I did observe Mr. Britton strike Mr. Heishman a few times in the head area. . . . I told him to stop, but he said he's biting me, so I take that as he was trying to get his hand free.

(Filing No. 92-3 at 6.)  Officer Burnett also testified that Britton and Patterson did not continue to strike Heishman after he told them to stop.  *Id.*  The City Defendants assert that it is obvious Officer Burnett did not have time to instruct Britton and Patterson on how to arrest a strong, adult male who is actively resisting arrest. Officer Burnett did what he reasonably could do in the circumstances by directing Britton and Patterson as the events unfolded.

Thompson responds that she does not contend that law enforcement cannot use civilians to assist in effectuating an arrest.  Rather, she explains, when civilians are utilized, they become agents of law enforcement and must be held to the Fourth Amendment's reasonableness standard. Thompson takes issue with the fact that Officer Burnett did not first ask Britton and Patterson about their level of intoxication, their training, or their previous interactions with Heishman before asking for their help.  Both of them had been drinking and were intoxicated.  Thompson also argues

it was unreasonable to continue to use the civilians once Officer Spiegl and other officers arrived on the scene.

Thompson directs the Court to various statements from witnesses to support her argument that the use of Britton and Patterson was unreasonable. She notes, Officer Burnett told Patterson, "hit him, hit him, hit him calm him down hit him and something like that and then he said hit him in his side take his air out of him so we can get this other hand so I did." ([Filing No. 119-17 at 5.](#)) According to another witness, Michelle Altee, "the officer was telling [Britton and Patterson] where to hit him take his breath, take his breath body shock take his breath . . . [t]he officer told them to take his breath." ([Filing No. 119-16 at 4.](#)) When asked whether she saw anyone punch or kick Heishman, Ms. Altee said, "[o]nly when the officer told them to." *Id.* Because Britton had his arm around Heishman's neck, Officer Burnett explained, "[y]ou know at times I'd look up and say hey don't kill him" ([Filing No. 119-3 at 3](#)). Britton also admitted that he poked Heishman's eye and "got an eye gouge on him[.]" ([Filing No. 119-20 at 8.](#)) At one point during the struggle, Britton almost let go of Heishman, and Officer Burnett "actually grabbed Mr. Britton and put him back on the subject[.]" ([Filing No. 119-3 at 4.](#))

Thompson concludes that, from these various statements, there is a material dispute regarding the amount of force used by Britton and Patterson and how much of that force was used at the direction or approval of Officer Burnett or other officers. Thus, the reasonableness inquiry should be presented to a jury.

Again, the Court looks at the evidence in the light most favorable to Thompson. The parties do not dispute that Officer Burnett asked for assistance from Britton and Patterson, and they do not dispute that Officer Burnett gave directions to Britton and Patterson as they assisted to effectuate the arrest. The evidence does not show a dispute regarding the amount of force used by

Britton and Patterson. Thompson provides witness statements, which do not create a material dispute; rather, the statements provide additional, consistent information about Officer Burnett's directions to Britton and Patterson, and provide additional, consistent confirmation that they used force.

Thompson's portrayal of the witness statements leaves out important facts and context. According to Ms. Altee's testimony in full context, Officer Burnett told Britton and Patterson where to hit Heishman and to take his breath away because "the guy was reaching for the officer's gun." (Filing No. 119-16 at 4.) The full statement from Britton provides important context that Thompson left out: "I got an eye gouge on him *because he was biting me*." (Filing No. 119-20 at 8 (emphasis added).)

Officer Burnett initially asked for assistance from Britton and Patterson because he could not effectuate an arrest on his own, and no other officers were on the scene. It was not unreasonable, as Thompson suggests, for Officer Burnett to fail to first ask Britton and Patterson about their level of intoxication, their training, or their previous interactions with Heishman before asking for their help because this was a quickly evolving situation where Heishman was fleeing from the scene. Officer Burnett had no time to interview potential helpers.

Officer Burnett's instructions to Britton and Patterson to hit Heishman in particular locations to take his breath away were directed at gaining compliance to complete the arrest. When Officer Burnett realized that pain compliance techniques were not effective, he directed them to stop hitting Heishman and to try to hold Heishman's body and arms. Britton's eye gouging and punching Heishman in the head/face were in direct response to Heishman biting him and were not under the direction of officers. When Officer Burnett saw Britton choking Heishman, he told him to stop choking Heishman. These facts are not disputed.

The designated evidence further shows, without dispute, that Heishman continued to actively fight and resist arrest after additional officers arrived to help. Officer Spiegl was asked to try to hold down Heishman's legs. Ranger Greene also was asked to try to hold down Heishman's legs. Britton and Patterson continued to try to gain control over Heishman's upper body while Officer Burnett continued to try to handcuff Heishman. Even with additional officers arriving to assist, Heishman continued to struggle with the men and evaded being handcuffed for some time. There was nothing unreasonable about having Britton and Patterson continue to assist while the struggle with Heishman continued uninterrupted. The officers did not have an opportunity to pause the ongoing struggle and ask Britton and Patterson to step aside. Rather, the officers needed their further assistance as Heishman was showing great strength in resisting the arrest.

Based on the designated evidence, the initial and continued use of and directions to Britton and Patterson were objectively reasonable in light of the circumstances as Heishman continued to fight and resist arrest. Britton's and Patterson's actions against Heishman also were objectively reasonable based on his active biting, kicking, elbowing, and fighting against them. The actions were a reasonable and measured response to Heishman's actions.

### d) **Excessive force regarding the prone position**

Next, the City Defendants assert that it was not unreasonable to keep Heishman in a prone position throughout the encounter. The City Defendants assert that there is no evidence that could suggest excessive force was used to keep him in the prone position, and it was not excessive force in itself to keep him in the prone position. They explain that the Seventh Circuit made clear that "[r]estraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Estate of Phillips*, 123 F.3d at 593.

The City Defendants explain that there was a reason to keep Heishman in the prone position as he was kicking and fighting violently throughout the encounter. With keeping him in the prone

position, Heishman was able to kick with less force than if he had been facing upwards. Heishman also had been biting individuals, and keeping his face down would help to prevent him from biting further. They assert that Heishman's behavior was a danger to himself and others, and keeping him in the prone position was a reasonable way for the officers to keep him as restrained as possible. The officers used no more pressure than was necessary, tailoring the amount of pressure they placed on Heishman to the amount of resistance he offered.

In response, Thompson argues that excessive force was used to keep Heishman in the prone position both before he was handcuffed as well as after he was handcuffed. Thompson points to the evidence, which shows that prior to the handcuffing, the men were "wrestling around." She points to Britton's choke-hold and eye-gouge. She notes that Officer Spiegl hit Heishman's legs three times with a baton and put his weight on Heishman's legs. Ranger Greene also laid on Heishman's legs. Officer Bueckers tried to extend Heishman's arm, but Heishman kept his arm bent and under him. Thompson also points to the directions that Officer Burnett gave to Patterson and Britton to hit Heishman to take the breath out of him. Thompson also notes that Officer Spiegl explained when he first arrived on the scene that it looked like things were somewhat under control. Thompson points out that is unclear exactly how long it took the officers to handcuff Heishman. It appears that Heishman was held in the prone position for five to seven minutes until he could be handcuffed. Once the handcuffs were on, an officer "had his foot on [Heishman's] back helping to hold him down while . . . the other officers were holding his legs." (Filing No. 119-18 at 9.) Thus, Thompson asserts, there are material disputes of fact regarding the level of force that was necessary.

The Court notes that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396, and

"[a]uthorities must be allowed to graduate their response to the demands of any particular situation." *Estate of Phillips*, 123 F.3d at 593. The designated evidence in this case shows that the actions taken by the officers, Britton, and Patterson were measured and reasonable responses to the amount of resistance that Heishman raised against them.

Thompson's reliance on certain witness statements does not raise a factual dispute regarding what amount of force was used or how the events unfolded. The facts are not in dispute. Instead, Thompson's asserted dispute focuses on her disagreement with whether the level of force was reasonable. Many of the facts Thompson relies on—the wrestling, the choke-hold, the eye-gouge—did not keep Heishman in the prone position. These actions occurred throughout the active fighting undertaken by Heishman. The evidence shows that eventually Heishman was held in the prone position. He continued to struggle with the officers. Handcuffs eventually were secured, and he continued to push back against the officers. Again, Thompson's portrayal of a witness statement leaves out important facts and context. The witness who testified that an officer "had his foot on [Heishman's] back helping to hold him down while . . . the other officers were holding his legs," also testified that Heishman was still fighting and not giving up at that time, and the officer "wasn't standing on him he was just holding him with his foot." (Filing No. 119-18 at 9.)

The Court addressed above the reasonableness of Britton's and Patterson's actions. Officer Spiegl's three leg strikes with a baton were an attempt to control Heishman's legs while he was kicking and fighting. Officer Spiegl and Ranger Greene laid on Heishman's legs to try to control the kicking and moving. Officer Bueckers pulled on Heishman's arm trying to extend it to handcuff him. These actions were reasonable, graduated responses to the demands of Heishman's ongoing resistance and fighting. Additionally, it was objectively reasonable to keep Heishman in

the prone position in light of his violent, ongoing kicking, fighting, and biting so that he could not have as much force with kicking and elbowing and so that he could not bite individuals.

**e)  <u>Excessive force following handcuffing</u>**

Thompson further asserts that excessive force was used after Heishman was handcuffed when the officers continued to hold him in the prone position until the ambulance arrived as well as after the sedative was administered.  She asserts that it was unreasonable to have three or four officers hold him in a prone position for five to seven minutes.  She points out that one of the officers (Sergeant Johnson) weighed more than 300 pounds and knelt on Heishman's legs with most of his weight.  Sergeant Johnson applied a knee strike to Heishman's leg and another officer used a pain compliance or pressure point wrist manipulation.  At this point, Heishman was no longer biting or throwing punches.  Once Medic Cope arrived on scene and administered the sedative, the officers just left Heishman in the prone position until he was no longer moving, and they did not monitor his vital signs.  Thompson asserts that all these actions were unreasonable as there was no need to use any force at that point in time.

Thompson does not designate any evidence to dispute the fact that Heishman continued to push back against the officers even after he was handcuffed.  The officers' contend their actions were in response to his continued resistance.  The officers had moved him from the prone position to try to put him into Sergeant Johnson's police transport wagon, but Heishman pushed back on the vehicle and into the officers, so the officers placed him back on the ground.  When Medic Cope arrived, he observed that Heishman was still struggling against approximately five police officers who were holding him down.  After Medic Cope administered the sedative, he monitored Heishman's breathing and any struggling.  Once it became clear that Heishman was calm and was not going to continue resisting, the officers helped Medic Cope turn Heishman over and place him on the stretcher. Officers are permitted to use graduated responses to address the demands of the

23

particular situation. The evidence shows that, under the circumstances of this case, the officers' actions after Heishman was handcuffed were objectively reasonable to address Heishman's ongoing resistance.

Because the designated evidence leads to the conclusion that the officers' actions were objectively reasonable based on Heishman's actions of fighting and resisting arrest, the officers are entitled to qualified immunity against Thompson's constitutional claims for excessive force. Therefore, the Court **grants** the City Defendants' Motion for Summary Judgment on the two excessive force claims.

### 2.        Deliberate Indifference

The City Defendants argue that Thompson's constitutional claim against the officers for deliberate indifference rises and falls on the merits of the excessive force claim because the claim is simply restyled from the excessive force claim. They assert that Thompson's claim alleges the officers were deliberately indifferent to his health and safety based on the use of civilians in the arrest and keeping Heishman in the prone position. They argue that these issues are fully addressed and resolved under the excessive force claims.

In considering this claim independent of the excessive force claim, the City Defendants point out that the Court must consider: (1) whether the officers had notice of Heishman's medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011).

Thompsons claim is based on her allegation that the officers were deliberately indifferent to Heishman's serious medical needs when they used excessive force against him, failed to get him appropriate medical treatment, and communicated with Medic Cope concerning a chemical

restraint. The City Defendants assert that the evidence shows the officers summoned a paramedic for assistance when it became clear that Heishman was not going to get into the police transport wagon. Medic Cope then arrived approximately five minutes later. They did not ignore his medical needs, but rather, they summoned a paramedic. They also assert that there is nothing objectively unreasonable or deliberately indifferent about communicating with a paramedic concerning a chemical restraint. The City Defendants argue that the evidence suggests Medic Cope made the decision on his own to administer the sedative. Therefore, they argue, there is nothing in the evidence to support a deliberate indifference claim.

In response, Thompson notes Officer Burnett tased a naked, unarmed man who was intoxicated, and rather than attempt to calm the situation or call for an ambulance, he decided to shoot Heishman with a Taser and failed to handcuff him after he got on the ground and presented his hands to the officer to be handcuffed. After Officer Burnett was unable to handcuff Heishman, Officer Burnett solicited and exposed Heishman to the danger of untrained and intoxicated civilians physically assaulting him and choking and punching him in an effort to take his breath away. Additionally, Officer Burnett permitted the civilians to participate in the arrest even after other officers arrived on scene to assist in the arrest.

Regarding the other officers' deliberate indifference, Thompson asserts those officers suspected that Heishman was intoxicated but nonetheless assisted in his arrest and physically assaulted Heishman rather than calling for an ambulance or facilitating appropriate medical care. Even after Heishman was handcuffed and had calmed down, officers continued to use force and maintain Heishman in the prone position. The officers simply waited for a police wagon, and then an ambulance, to arrive so Heishman could be taken away.

Thompson's deliberate indifference claim against the officers is based solely on the conduct alleged under the excessive force claim, with Thompson adding the conclusory allegation that the conduct was deliberately indifferent to Heishman's medical needs. There is no evidence that suggests the officers had notice of any specific medical needs beyond Heishman's intoxication. In fact, Thompson fails to point to any particular injury or medical need that required the officers' attention. Based on the circumstances confronting them, the officers reasonably responded to Heishman's actions and intoxication, as described more fully under the excessive force analysis, and when the officers realized that Heishman could not be transported in the police wagon, they summoned a paramedic. The evidence simply does not support a deliberate indifference claim against the officers. Therefore, the officers are entitled to qualified immunity against Thompson's constitutional claim for deliberate indifference, and the Court **grants** the City Defendants' Motion for Summary Judgment on this claim.

### 3. Failure to Protect or Intervene

Regarding the failure to protect or intervene claim, the City Defendants again argue that the claim rises and falls on the merits of the excessive force claim because this claim is also restyled from the excessive force claim. Thompson's claim alleges the officers failed to protect or intervene by allowing other officers and intoxicated civilians to use force that they knew or should have known was unreasonable, by allowing them to physically attack Heishman, and by allowing them to keep Heishman in the prone position. The City Defendants argue that these issues are fully addressed and resolved under the excessive force claims.

The City Defendants further argue that Thompson's failure to protect claim is too ill-defined to address separately from the excessive force claim. They note,

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983

if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official, *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 287 (7th Cir. 1994).  Because the excessive force claim cannot survive and there is no other underlying constitutional violation, the City Defendants argue, the failure to protect or intervene claim must necessarily fail also.

Thompson responds that Officer Burnett, Officer Spiegl, Officer Bueckers, and Ranger Greene assisted in using physical force before and after he was handcuffed and Sergeant Johnson used physical force after Heishman was handcuffed.  Each of them knew or should have known that the force the other officers used and the civilians used was excessive.  Further, after Heishman was handcuffed and shackled, those officers continued to use excessive force against Heishman and were in a position to intervene and protect Heishman from harm.  Thompson asserts, based on Heishman's presentation, it was obvious that he needed medical care rather than transportation to a controlled facility.  Despite this, the officers used force against Heishman while he remained in a prone position in order to facilitate his arrest and transportation to the Sheriff's holding room at the hospital.

Based on the clear case law in *Yang v. Hardin* that there must be an underlying constitutional violation to support a claim for failure to protect or intervene, and based on the Court's conclusions above that the excessive force and deliberate indifference claims are not supported by the evidence, Thompson's failure to protect or intervene claim must also necessarily fail to the extent that it is based on the other officers' and recruited civilians' actions.

However, Thompson also bases her failure to protect or intervene claim on the officers' failure to intervene when Medic Cope administered a chemical restraint to Heishman.  She asserts

that, despite the fact Heishman was handcuffed and shackled, the officers nonetheless permitted the use of a chemical restraint at a time when Heishman was not fighting the officers.

The Court has already addressed the question of excessive force used by Medic Cope in administering Versed to Heishman in its Entry on Medical Defendants' Motion for Partial Summary Judgment (*see* Filing No. 151 at 9–14). The evidence shows Heishman was lying prone on the ground, handcuffed and leg-shackled, with approximately five law enforcement officers holding him at the time that Medic Cope administered Versed as a chemical restraint. The evidence suggests that, when he initially arrived on the scene, Medic Cope observed Heishman resisting the officers, but at the time he administered the Versed, Heishman was not fighting the officers; he was tense and pushing back, but the officers had control of him (Filing No. 119-4 at 10). While the City Defendants assert that Medic Cope made the decision to administer Versed independent of the officers, there is evidence that shows Medic Cope had conversations with officers before administering the sedative, and the officers were surrounding Heishman at the time the sedative was administered. Based on the evidence, there appears to be a material dispute regarding whether the officers had a realistic opportunity to intervene to prevent the harm from Medic Cope's use of force against Heishman.

Therefore, the Court **grants in part and denies in part** the City Defendants' Motion for Summary Judgment as to the claim for failure to protect or intervene. The Motion is **granted** to the extent the claim is based on the other officers' and recruited civilians' actions; however, it is **denied** to the extent the claim is based on Medic Cope's administration of the chemical restraint to Heishman.

**B.     State Law Claims and the Indiana Tort Claims Act**

Thompson's Complaint asserts Indiana state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against each of the individual officers and each of the governmental entities.  The City Defendants assert that Indiana Code § 34-13-3-3(8) provides governmental entities and employees acting within the course and scope of their employment with immunity from state law tort claims provided the claim arises from the enforcement of the law.  The City Defendants acknowledge that while this immunity does not apply to torts such as assault and battery, it does apply to "add on" claims "such as negligence and intentional infliction of emotional distress."  *Chapman v. Indiana*, 2014 U.S. Dist. LEXIS 63593, at *12 (N.D. Ind. May 8, 2014).

> Other than tort claims expressly carved out by statutory limits or affirmative obligations imposed on law enforcement (such as claims of false arrest), police officers have immunity from Indiana tort claims, including claims for negligence and intentional infliction of emotional distress arising from their actions in effecting arrests while engaged in law enforcement duties.

*Id.*; *see also Struck v. Town of Fishers*, 2013 U.S. Dist. LEXIS 37588, at *7–9 (S.D. Ind. Mar. 19, 2013).

**1.   Intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence**

The City Defendants explain that there is no question that the officers were engaged in their law enforcement duties, and thus, Thompson's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence are barred by the Indiana Tort Claims Act.

Thompson provides no meaningful response to the City Defendants' argument concerning the claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.  Instead, she states, "emotional distress forming the basis of a negligent infliction

of emotion distress claim can be caused by 'negligent or otherwise tortuous [sic] conduct,' *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000), and battery of course qualifies as other tortious conduct." ([Filing No. 118 at 38](#).) She also asserts, "the officers' personal liability is not protected by the Indiana Tort Claims Act because [their] actions were criminal, malicious, willful and wanton, or calculated to benefit the employee personally. *See* Ind. Code § 34-13-3-5(c)." *Id.* at 39.

While the case law is clear that a tort claim of battery does not fall under the law enforcement immunity, the case law is equally clear that Thompson's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence do fall under the statutory immunity. Furthermore, Thompson's bald assertion of a legal conclusion cannot save her statutorily barred tort claims. She has presented no evidence that suggests the officers' actions were criminal, malicious, willful and wanton, or calculated to benefit them personally. Therefore, the Court **grants** the City Defendants' Motion for Summary Judgment on these three state law tort claims.

### 2. <u>Battery against the individual officers</u>

Next, the City Defendants assert that the state law battery claim against the individual officers in their personal capacity are barred by a different section of the Indiana Tort Claims Act. They acknowledge that battery claims are an exception to the law enforcement immunity, but they assert the Act provides that a "lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b). Thus, Thompson's battery claim against the individual officers in their personal capacity are barred. They further argue that if the Court determines that the officers acted reasonably under the Fourth Amendment, the battery claim against them should also be decided in their favor, relying on *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010) (an officer may use force

reasonably necessary to effect a lawful arrest, but "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery.")

Thompson responds that the record supports a battery claim against each of the officers, and then she "acknowledges that those battery claims are connected with the § 1983 excessive force claims. *Estate of Williams*, 26 F. Supp. 3d at 864 (noting that the issue is whether the officers used unreasonable force: if they did, they are liable; if not, they are not liable)." (Filing No. 118 at 38–39.) Like the City Defendants, Thompson also points to *Wilson v. Isaacs*.

In light of the clear case law on point and the Court's conclusion that the officers did not act unreasonably or use excessive force under the Fourth Amendment, and considering Thompson's acknowledgement regarding the connection between the battery claim and the excessive force claim, the Court determines that summary judgment in favor of the officer Defendants is appropriate on Thompson's state law battery claim.

### 3. **Wrongful Death Statute and Survival Statute**

Finally, the City Defendants address Thompson's two counts under Indiana's Wrongful Death Statute and Survival Statute against the governmental entities. The City Defendants explain these statutes do not define separate torts but merely allow the personal representative of a decedent's estate to recover damages that the decedent could have recovered had he survived. They further explain that these statutes derogate from the common law, under which "actions for personal injuries did not survive and actions for wrongful death did not exist." *Bebout v. F.L. Mendez & Co.*, 37 N.E.2d 690, 692 (Ind. Ct. App. 1941). The Wrongful Death Statute allows an estate to recover "[w]hen the death of one is caused by the wrongful act or omission of another," and the Survival Act allows an estate to recover when the decedent "receives personal injuries caused by the wrongful act or omission of another and subsequently dies from causes other than those personal injuries." Ind. Code §§ 34-23-1-1, 34-9-3-4. The City Defendants argue, therefore,

these "counts," though denominated as such in Thompson's Complaint, require no analysis independent from the other state law tort claims.

Thompson asserts this Court has recognized that, "Indiana's wrongful death statute permits the recovery of damages for an individual's death '[w]hen the death . . . is caused by the wrongful act or omission of another,'" quoting *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 863 (S.D. Ind. 2014). Heishman was tased, assaulted, and battered by the officers, and the law enforcement immunity does not apply to her battery claim. Thompson asserts, "Because the City Defendants did not address Plaintiff's wrongful death claim, they waive that argument and tacitly concede that Plaintiff's claim survives summary judgment." (Filing No. 118 at 38.)

After consideration of the parties' short arguments regarding the counts alleged under the Indiana Wrongful Death Statute and the Survival Statute, the Court determines that these two counts must be dismissed on summary judgment because they do not create separate torts independent of the other state law claims that are being dismissed on summary judgment in favor of the City Defendants. The excessive force, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence claims are dismissed as to the City Defendants, and thus, there is no underlying claim to support the Wrongful Death or Survival Statutes counts. While Thompson points to the decision in *Estate of Williams* in an attempt to keep her wrongful death claim alive, she fails to recognize that in that case, the court analyzed and disposed of the wrongful death claim on the basis that the battery claims failed. 26 F. Supp. 3d at 862–65. Such is the case here. Thus, the Court **grants** the City Defendants' Motion for Summary Judgment on the counts alleged pursuant to the Wrongful Death and Survival Statutes.

# IV.    CONCLUSION

It may be a close call as to whether officers had a realistic opportunity to intervene to prevent the harm from Medic Cope's use of force against Heishman; however, material evidentiary disputes regarding these allegations are sufficient to defeat summary judgment.  For the reasons explained above, the Court **GRANTS in part and DENIES in part** the City Defendants' Motion for Summary Judgment (Filing No. 90).  Summary judgment is **DENIED** on Thompson's constitutional claim for a failure to protect or intervene against Officer Burnett, Officer Spiegl, Officer Bueckers, Ranger Greene, and Sergeant Johnson to the extent the claim is based on Medic Cope's administration of the chemical restraint to Heishman.  Summary judgment is **GRANTED** in favor of each of the City Defendants on all other claims asserted in Thompson's Complaint.  With no remaining claims pending against them, Defendants City of Indianapolis, Indianapolis Department of Public Safety, Indianapolis Metropolitan Police Department, and Marion County Sheriff's Department are **terminated** as defendants in this matter.

**SO ORDERED.**

Date:  9/29/2017

_TANYA WALTON PRATT, JUDGE_
United States District Court
Southern District of Indiana

DISTRIBUTION:

Scott Leroy Barnhart
ATTORNEY AT LAW
barnhart@kbindy.com

Brooke Smith
KEFFER BARNHART LLP
Smith@KBindy.com

Mary M. Ruth Feldhake
BOSE MCKINNEY & EVANS, LLP
mfeldhake@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov

Thomas J.O. Moore
OFFICE OF CORPORATION COUNSEL
thomas.moore@indy.gov

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
ard@rucklaw.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
ejm@rucklaw.com

John F. Kautzman
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com